**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Sasha Pippenger et al., | Civil Action No. 25-cv-1090 |
| *Plaintiffs*, | |
| -against- | |
| United States DOGE Service, et al., | |
| *Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER
AND A PRELIMINARY INJUNCTION**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

Ali & Lockwood LLP
501 H Street NE, Suite 200
Washington, D.C. 20002
(202) 651-2475

# TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ...................................................................... v-ix

PRELIMINARY STATEMENT ...................................................................1

USIP: RELEVANT BACKGROUND AND STATUTORY FRAMEWORK ..............................3

DEFENDANTS' RELEVANT BACKGROUND AND LEGAL FRAMEWORK ......................5

DEFENDANTS' UNLAWFUL ATTEMPT TO SHUTTER USIP .................................7

ARGUMENT ......................................................................................13

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...................................14

     A.     Plaintiffs are Likely to Show that Defendants President Trump's and Trent Morse's Summary Removal of Ten Bipartisan Board Members Was *Ultra Vires* in Violation of the USIP Act Removal Protections (Count I) ............15

          1.     Defendants' Summary Termination of Board Members Was *Ultra Vires* ...............................................................15

          2.     The USIP Act's Removal Protections Are Constitutional ........................16

               a.     USIP Is an Independent, Non-Profit Corporation....................17

               b.     USIP Does Not Wield Executive Power.............................17

               c.     Even if USIP Were a Government Agency within the Executive Branch, the USIP Act's Removal Protections Are Still Consistent with Article II Because USIP is a Multimember Expert Board that (at most) Exercises *De Minimis* Executive Power.............................................................19

                    i.     Removal Protections Are Constitutional Because USIP is a Multimember Expert Board...................19

                    ii.     Removal Protections Are Constitutional Because USIP Exercises (at most) *De Minimis* Executive Power.............................................................21

     B.     Plaintiffs Are Likely to Demonstrate that Defendant DOGE Violated the APA By Breaking into USIP in March 2025 to Shutter It (Count II).............22

| | 1. | Defendant DOGE Is a Federal Agency Within The Meaning of The APA .................................................................23 |
|---|---|---|
| | 2. | The DOGE Seizure of USIP Is a Final Agency Action ...........................25 |
| | 3. | DOGE's Actions Violate Section 706(2) of the APA ..............................26 |
| C. | | Plaintiffs Are Likely to Demonstrate that Defendants DOGE and the Coopted Version of Defendant USIP Violated the APA § 706(2) in Attempting to Cease USIP's Activities and Shutter the Agency (Count III) ........................................26 |
| | 1. | Defendant DOGE Is a Federal Agency Subject to the APA. In the Alternative, Defendant Coopted USIP is Too.............................................27 |
| | 2. | Defendants DOGE and/or Coopted USIP Have Taken a Final Agency Action       ...............................................................................28 |
| | 3. | Defendants' Actions Violate Section 706(2) of the APA .........................30 |
| | | a. Defendants' Actions Were Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law............30 |
| | | b. Defendants' Actions Lacked Reasoned Analysis……….................31 |
| | | c. Defendants Acted with Utter Disregard for Plaintiffs' Reliance Interests……………………………………………………….32 |
| | | d. Defendants Acted Contrary to Constitutional Rights and Power and in Excess of Statutory Jurisdiction, Authority or Limitations…………………………………………34 |
| D. | | Plaintiffs' *Ultra Vires* Claims Against Defendants Gleeson, Jackson, Cavanaugh, Rubio, Hegseth, and Garvin Are Likely to Succeed on the Merits (Count IV).....35 |
| E. | | Plaintiffs' *Ultra Vires* Claims Against Defendants for Violation of the Separation of Powers Are Likely to Succeed on the Merits (Count V). **Error! Bookmark not defined.** |
| II. | | IN THE ABSENCE OF PRELIMINARY RELIEF, PLAINTIFFS WILL SUFFER IRREPERABLE HARM...................................................................................36 |
| A. | | Economic Loss in a Specific Employment Context .............................................37 |
| B. | | Loss of Healthcare and Urgent Medical Treatment..............................................39 |
| C. | | Loss of Immigration Status...................................................................................40 |

     D.      Injury to Reputation and Goodwill ........................................................................41

     E.      Physical Danger ....................................................................................................42

     F.      Disclosure of Sensitive Information .....................................................................43

     G.      Unrecoverable Business Loss ...............................................................................44

III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR PRELIMINARY RELIEF...........................................................................................44

CONCLUSION...........................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health and Hum. Servs.*,
    594 U.S. 758 (2021)..................................................................................... 37

*Am. Fed'n of Lab. & Congr. of Indus. Orgs. v. U.S. Dep't of Labor*,
    25-CV-0339 (D.D.C. Feb. 14, 2025) ..................................................... 24

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
    25-CV-0596, 2025 WL 868953 (D. Md. Mar. 20, 2025) ......................... 24, 43

*Am. Foreign Serv. Ass'n v. Trump*,
    No. 1:25-CV-352, 2025 WL 435415 (D.D.C. Feb. 7, 2025)......................... 42

*Am. Foreign Serv. Ass'n v. Trump*,
    No. 1:25-CV-352, 2025 WL 485043 (D.D.C. Feb. 13, 2025)....................... 43

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015)..................................................................................... 35

*Aviel v Gor*,
    No. 25-CV-778, 2025 WL 1009035 (D.D.C. Apr. 4, 2025)......................... 38

*Bennett v. Spear*,
    520 U.S. 154 (1997)......................................................................... 25, 26, 29

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
    972 F.3d 83 (D.C. Cir. 2020)....................................................................... 25

*Biden v. Texas*,
    597 U.S. 785 (2022)..................................................................................... 28

*Buckley v. Valeo*,
    424 U.S. 424 U.S. 1 (1976).................................................................... 17, 18

*Changji Esquel Textile Co. Ltd. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022)..................................................................... 13

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ...................................................... 13, 37, 39

*Citizens for Resp. & Ethics in Wash. v. United States Doge Serv.*,
No. 25-CV-511, 2025 WL 752367 (D.D.C. Mar. 10, 2025) ....................... 23, 24

*City of Arlington, Tex. v. F.C.C.*,
    569 U.S. 290 (2013)..................................................................................... 17

*Collins v. Yellen*,
   594 U.S. 220 (2021) ................................................................................ 19

*Davis v. Billington*,
   76 F. Supp. 3d 59 (D.D.C. 2014) ............................................................ 37

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) .................................................................................... 30

*Does 1-26 v. Musk*,
   No. 25-CV-0462, 2025 WL 840574 (D. Md. Mar. 18, 2025) ................... 38, 42

*Dong v. Smithsonian Inst.*,
   125 F.3d 877 (D.C. Cir. 1997) ...................................................... 17, 18, 23

*Drs. for Am. v. Off. of Pers. Mgmt.*,
   No. 25-CV-322, 2025 WL 452707 (D.D.C. Feb. 11, 2025) ....................... 28

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ................................................................................ 30

*Friedman v. Fed. Aviation Admin.*,
   841 F.3d 537 (D.C. Cir. 2016) ................................................................ 25

*Gomez v. Trump*,
   485 F. Supp. 3d 145 (D.D.C. 2020) ........................................................ 40

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006) ................................................................................ 35

*Harris v. Bessent*,
   No. 25-CV-412, 2025 WL 679303 (D.D.C. Mar. 4, 2025) ....................... 45

*Humphrey's Ex'r v. U.S.*,
   295 U.S. 602 (1935) ................................................................ 19, 20, 21, 22

*In re United Mine Workers of Am. Int'l Union*,
   190 F.3d 545 (D.C. Cir. 1999) ................................................................ 36

*Ipsen Biopharmaceuticals, Inc. v. Azar*,
   943 F.3d 953 (D.C. Cir. 2019) ................................................................ 29

*Jones v. District of Columbia*,
   177 F.Supp.3d 542 (D.D.C. 2016) .......................................................... 41

*Larson v. Domestic & Foreign Com. Corp.*,
   337 U.S. 682 (1949) ................................................................................ 35

*League of Women Voters of U. S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................. 37

*Lee Constr. Co., Inc. v. Federal Reserve Bank*,
    558 F.Supp. 165 (D.Md.1982) ............................................................. 23

*Lee v. Christian Coal. of Am., Inc.*,
    160 F. Supp. 2d 14 (D.D.C. 2001) ....................................................... 37

*Lombardo v. Handler*,
    397 F. Supp. 792 (D.D.C. 1975) .......................................................... 23

*McKinney v. Caldera*,
    141 F.Supp.2d 25 (D.D.C. 2001) ......................................................... 23

*Me. Cmty. Health Options v. United States*,
    140 S. Ct. 1308 (2020) ......................................................................... 34

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) ............................................................. 36

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................... 30

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*,
    437 F.3d 1256 (D.C. Cir. 2006) ........................................................... 35

*Nat'l Automatic Laundry and Cleaning Council v. Shultz*,
    443 F.2d 689 (D.C. Cir. 1971) ............................................................. 30

*Nat'l Treasury Emps. Union v. United States*,
    927 F.2d 1253 (D.C. Cir. 1991) ........................................................... 37

*Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*,
    26 F.4th, 960 (D.C. Cir. 2022) ...................................................... 34, 35

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) ............................................................. 13

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ....................................................... 45

*Risteen v. Youth for Understanding, Inc.*,
    245 F.Supp.2d 1 (D.D.C. 2002) ........................................................... 39

*Sampson v. Murray*,
    415 U.S. 61 (1974) ......................................................................... 37, 38

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
      591 U.S. 197 (2020) ........................................................................ 17, 19, 20, 21

*State of New Mexico v. Musk,*
      No. 1:25-cv-00429, (D.D.C. Mar. 21, 2025) ............................................... 27

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.,*
      578 U.S. 590 (2016) ................................................................................. 28

*Washington v. Reno,*
      35 F.3d 1093 (6th Cir. 1994) ................................................................... 45

*Widakuswara v. Lake,*
      No. 25-CV-2390, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) ............... 39, 40

*Wiener v. U.S.,*
      357 U.S. 349 (1958) ................................................................................. 19

*Wilcox v. Trump,*
      25-CV-334, 2025 WL 720914 (D.D.C. Mar. 6, 2025) .............................. 19, 20

*Winter v. Nat. Res. Def. Council, Inc.,*
      555 U.S. 7 (2008) ..................................................................................... 36

*Youngstown Sheet & Tube Co. v. Sawyer,*
      343 U.S. 579 (1952) ................................................................................. 35

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
      576 U.S. 1 (2015) ..................................................................................... 17

**Statutes**

22 U.S.C. § 4601 ............................................................................................. 3, 31

22 U.S.C. § 4603 ........................................................................................... passim

22 U.S.C. § 4604 ........................................................................................... passim

22 U.S.C. § 4605 ........................................................................................... passim

22 U.S.C. § 4606 ....................................................................................... 4, 16, 27

22 U.S.C. § 4607 ....................................................................................... 4, 17, 44

22 U.S.C. § 4609 ........................................................................................... 4, 12

29 U.S.C. § 153 ................................................................................................... 21

5 U.S.C. § 704 ............................................................................................... 22, 25

5 U.S.C. § 706 ............................................................................................ 22, 25, 26, 34

5 U.S.C. §551 ................................................................................................................ 22

D.C. Code § 29-406.30 ................................................................................................. 17

District of Columbia Nonprofit Corporation Act, Pub. L. 87-569 (Aug. 6, 1962) § 5(o) ............. 5

Pub. L. No. 108-57, 117 Stat. 859 (2003) .................................................................... 18

Pub. L. No. 87-569, 17 Stat. 265, 268 (Aug. 6, 1962) ................................................. 33

United States Institute of Peace Act, Pub. L. No. 98-525,
    98 Stat. 2492, Tit. XVII, § 1701, (1984), 22 U.S.C. § 4601-4611, *as amended* ............ 3, 4

**Other Authorities**

Exec. Order No. 14210 .................................................................................................. 6

Exec. Order No. 14217 ............................................................................................. 7, 31

Exec. Order No. 14158 .................................................................................................. 6

**Constitutional Provisions**

U.S. Const. art. I, § 1 .................................................................................................... 34

U.S. Const. art. II, § 2 .................................................................................................. 17

## PRELIMINARY STATEMENT

The United States Institute of Peace ("USIP") is an independent organization based in Washington, D.C. that exists to "promote international peace and the resolution of conflicts among the nations and peoples of the world without recourse to violence." It was created via an Act of Congress and organized under the non-profit corporation laws of the District of Columbia. Until March 2025, USIP owned its own $500 million headquarters building in Washington, D.C., employed over 400 people, enjoyed the support of an Endowment it had created from private donations and Congressionally-appropriated funds, and maintained an annual budget of roughly $55 million. Beginning on March 14, 2025, that all changed.

In a bizarre series of events that one might expect in a war-torn, unstable country abroad—and which are plainly anathema to how the United States government relates to American civil society—the federal government, by the U.S. DOGE Service and/or the U.S. DOGE Service Temporary Organization (collectively, "DOGE"), and the other Defendants in this case, broke into USIP's headquarters using agents from the Federal Bureau of Investigation ("FBI"), the Municipal Police Department ("MPD"), and a leftover skeleton key held by USIP's former security contractor; fired ten members of USIP's independent Board of Directors in violation of their statutory removal protections; usurped USIP's Board; and arrested USIP's functioning. Defendants transferred USIP's $500 million building to the Government Services Administration for no consideration, drained its Endowment, and began to fire its employees and contractors, including those working in active warzones abroad.

Federal agencies led a hostile takeover of an independent organization that exists to promote international peace because it disagreed with the Congress's decision to fund it. Defendants do not really dispute that their misconduct violated the law. Instead, it appears they believe to be above it. Defendants claim that because USIP's Board is appointed by the President

of the United States, and USIP receives funding from Congress (as well as private funding, to be clear), it is a plaything of the President of the United States, DOGE, and the other Defendants. These are unserious positions that flout the separation of powers and rule of law.

And while the case of USIP is particularly egregious because of USIP's distinct statutory and functional existence as an independent, not-for-profit corporation that is expressly not a subdivision of the Executive Branch, it is not anomalous. Defendants have effectively shuttered or attempted to shutter dozens of other entities that receive federal appropriations. In each case, Defendants claim that they are merely reducing their targets to their "statutory minimum." But in no case have Defendants actually determined what that was, or developed a reasonable plan— consistent with their lawful authority—to achieve their ends. Instead, Defendants have delegated their homework—which is of Constitutional proportions—to the Article III courts, who are left to sort through the mess of Defendants' chaotic and irrational misconduct.

Plaintiffs in this case are employees and contractors of USIP both within the United States and abroad—in Libya and the Ukraine—and a donor to the Endowment for USIP. They are suffering from ongoing irreparable harm by the unlawful actions of Defendants. They are at risk of severe health consequences from the abrupt cessation of health insurance, loss of immigration status, inability to recover economic redress, reputational harm, physical danger, and more. They ask this Court to stop the dissolution of USIP by issuing a temporary restraining order, enjoining further illegal activities by Defendants, including the now coopted USIP itself, and vitiating the irreparable, collateral consequences of Defendants' unlawful actions that have no other remedy at law.

## USIP: RELEVANT BACKGROUND AND STATUTORY FRAMEWORK

In 1984, Congress established USIP via The United States Institute of Peace Act (the "USIP Act")[1] as an independent nonprofit corporation that would work with the United States Government and global civil society to help resolve and prevent violent conflicts. 22 U.S.C. § 4601, et seq. The statutory purpose of USIP is to:

> to serve the people and the Government through the widest possible range of education and training, basic and applied research opportunities, and peace information services on the means to promote international peace and the resolution of conflicts among the nations and peoples of the world without recourse to violence.

22 U.S.C. § 4601(b).

USIP acts through a fifteen member, bipartisan Board of Directors ("Board"), twelve of whom cannot be government officials, to advance USIP's purpose through a variety of discretionary activities, such as supporting scholarly inquiry on international peace and conflict resolution, developing publications, establishing a clearinghouse for information from the field of peace learning, and creating one or more non-profit entities organized under the laws of the District of Columbia to support its purposes. 22 U.S.C. § 4604(b-d). One such legal entity created by USIP is the Endowment for USIP, which was mandated by Congress pursuant to 22 U.S.C. § 4603(c) to support USIP in its mission.

Consistent with its status as an independent, non-governmental entity, USIP:

- May sue and be sued, 22 U.S.C. § 4604(k);

- Maintains (or at least maintained) a ".org" domain and not ".gov";[2]

---

[1] United States Institute of Peace Act, Pub. L. No. 98-525, 98 Stat. 2492, Tit. XVII, § 1701, (1984), 22 U.S.C. § 4601-4611, *as amended*.

[2] The official website of USIP is www.usip.org. In March 2025, Defendants shut it down, and there is only a landing page that remains.

- Has independent discretion to enter into personal services and other contracts, 22 U.S.C. § 4604(f);

- Is authorized by law to direct unobligated appropriated funds to its Endowment and spend them "without regard to fiscal year limitations, 22 U.S.C. § 4609(b);

- Maintains its own private auditor, 22 U.S.C. § 4607;

- Has power over its land;[3]

- Built its Washington, D.C. headquarters building, a $500 million asset, with privately raised funds, *see* Decl. of Daniel M. Eisenberg in Sup. of Mot. ("Eisenberg Decl."), Ex. A;

- Pays its employees via a private payroll provider, *id.*, Ex. A;

- Maintains its own procurement, grant, and contracting policies that are distinct from the uniform federal policies applicable to the Executive Branch, *id.*, Ex. A;

- Does not use Office of Personnel Management forms to mark personnel actions because its employees are of USIP, under terms specifically negotiated with USIP, and not employed by the federal government, *see id.*, Ex. A;

- Does not offer its employees any of the suite of federal benefits, such as the Federal Employee Health Benefits, Federal Employee Retirement System, Thrift Savings Program, federal travel benefits (such as the General Services Administration City Pair Program negotiated airfares), *id.*, Ex. A; and

- Has independent discretion as to whether it responds to "the request of a department or agency of the United States Government to examine, study, and report on any issue []," 22 U.S.C. § 4604(e).

Because USIP is inherently non-governmental, the USIP Act specifically enumerated how USIP could engage with the legislative and executive branches of government. USIP's Board would be appointed by the President of the United States and confirmed by the United States Senate, 22 U.S.C. § 4605(d)(2). USIP is subject to FOIA, 22 U.S.C. § 4607(i); has grant-making authority with public funds, *id.* §§ 4603(c), 4604(b)(1), (d), 4606(b); is tasked with making

---

[3] Pub. L. 104-201 § 2831 (giving the Institute administrative jurisdiction—effectively a permanent rent-free tenancy—over three acres); Pub. L. 109-364 § 2842 (giving the Institute administrative jurisdiction over an additional acre, including two buildings that were subsequently renovated and renamed the Bush and Clinton Buildings).

reports to Congress, *id.* § 4604(c)(3); may obtain administrative support services from the General Services Administration, *id.* § 4604(o); and may access classified materials, *id.* § 4603(e).

While the Board directs USIP's activities within USIP's Congressional mandate, USIP remains subject to at least three non-discretionary, fundamental statutory edicts. *First*, USIP's Board can only be appointed and removed by the procedures set forth in the USIP Act. *See id.* 4605(b)(4), (f). *Second*, USIP possesses all the powers of a non-profit corporation organized under the laws of the District of Columbia *except* the power to "cease its corporate activities and surrender its corporate franchise." *See* USIP Act 22 U.S.C. § 4604(a) (citing District of Columbia Nonprofit Corporation Act, Pub. L. 87-569 (Aug. 6, 1962) § 5(o). Section 5(o) of the District of Columbia Nonprofit Corporation Act is available at Eisenberg Decl., Ex. B at 268.

*Third*, pursuant to the Gandhi-King Scholarly Exchange Initiative Act (the "Gandhi-King Act"), Congress mandated that USIP "*shall create* a professional development training initiative on conflict resolution tools based on the principles of nonviolence . . . [that, among other things,] target representatives from governments, nongovernmental organizations, civic organizations, and educational, cultural, women's, civil, and human rights groups, . . . with ongoing political, social, ethnic, or violent conflict []." Consolidated Appropriations Act of 2021, Pub. L. 116-260 (Dec. 27, 2020) (signed into law by President Donald J. Trump); *see also* Eisenberg Decl., Ex. P.

Prior to the unlawful conduct at issue here, USIP employed roughly 400 employees and a budget of roughly $55 million in Congressional appropriations, and as well as Personal Services Contractors ("PSC") and vendors around the world in furtherance of its global mission.

## DEFENDANTS' RELEVANT BACKGROUND AND LEGAL FRAMEWORK

After assuming office on January 20, 2025, Defendant President Donald J. Trump issued EO 14158 entitled "Establishing and Implementing the President's 'Department of Government

Efficiency,'" ("DOGE EO"). The DOGE EO states that its purpose is to "establish[] the Department of Government Efficiency to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." The DOGE EO further establishes an Administrator reporting to the White House Chief of Staff, and establishes the U.S. DOGE Service Temporary Organization, headed by the USDS Administrator, DOGE EO, Section 3(b).[4]

On February 11, 2025, President Trump issued EO 14210 that lays out DOGE's role in "eliminating waste, bloat, and insularity" and its mandate to work with agency heads to create and implement hiring plans, including anointing DOGE with the power to decide which vacancies should be filled. DOGE is obligated to "submit a report to the President regarding implementation of this order, including a recommendation as to whether any of its provisions should be extended, modified, or terminated." Exec. Order No. 14210, 90 Fed. Reg. 9669, Section 3 at 3(f) (Feb. 11, 2025).

As of February 19, 2025, DOGE had at least 34 employees, of which 20 are listed as being at the Executive Office of the President and the remaining 14 staffers are listed as working at various federal agencies, including Defendants the Government Services Administration, the Office of Personnel Management, and the Department of State.[5] Defendant Nate Cavanaugh, a 28 year-old tech entrepreneur with no prior government service and no experience in the field of peacebuilding—the purported current acting president of USIP—has been widely reported to be

---

[4] "USDS" is a predecessor entity to DOGE.

[5] Avi Asher-Shapiro et al., *Elon Musk's Demolition Crew*, PROPUBLICA, https://projects.propublica.org/elon-musk-doge-tracker/ (last updated Mar. 14, 2025).

employed by and working at the behest of DOGE.[6] So has Defendant Kenneth Jackson. *See* Compl. ¶ 83.

According to Office of Management and Budget apportionment records—available until they were taken down, in violation of statute—DOGE has an operating budget of $14.4 million.[7] DOGE has established a website with a ".gov" URL (https://doge.gov/) that includes the header "An official website of the United States government" and a X account (@DOGE)), both of which are used to promote its work, findings, and actions, such as cancelling other governmental and non-governmental entities' contracts and grants.

### DEFENDANTS' UNLAWFUL ATTEMPT TO SHUTTER USIP

On February 19, 2025, Defendant President Trump signed Executive Order ("EO") 14217, ("EO 14217").[8] EO 14217's stated purpose was to "reduce the size of the Federal Government," with "a reduction in the elements . . . that the President has determined are unnecessary." The EO lists certain "governmental entities" that "shall be eliminated to the maximum extent consistent with applicable law" and instructs that "such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." USIP was one of these targeted entities. Other listed entities included the Inter-American Foundation ("IAF") and the U.S. African Development Foundation. Exec. Order No. 14217. On March 4,

---

[6] Rachel Lerman et al., *The DOGE employees and allies working on Elon Musk's government goals*, WASH. POST, https://www.washingtonpost.com/business/interactive/2025/doge-employees-list-staff-elon-musk/ (last updated Apr. 8, 2025).

[7] Formerly accessible at https://apportionment-public.max.gov/Fiscal%20Year%202025/Executive%20Office%20of%20the%20President/Excel/FY2025_Agency%3DEOP_Bureau%3DUNAN_TAFS%3D011-X-0041_Iteration%3D3_2025-02-08-11.33.xlsx.

[8] EO 14217, 90 Fed. Reg. 10577 (Feb. 25, 2025).

2025, DOGE announced that it had reduced IAF, an entity with a $60 million operating budget, to its allegedly statutory minimum: one employee.[9]

Defendants GSA/OPM/DOGE (hereinafter collectively referred to as "DOGE") then began targeting USIP. On March 14, 2025, Defendant President Trump—through communication sent by Defendant Trent Morse, Deputy Director of President Personnel at the White House—purported to terminate 11 members of the USIP Board from their positions, leaving only the three *ex officio* Board members: Defendants Secretary of State Marco Rubio, Secretary of Defense Pete Hegseth, and Defendant President of the National Defense University Peter Garvin—all of whom possess their Board seats by virtue of their service in other federal government posts serving at the pleasure of the President of the United States. 22 U.S.C. § 4605(b). It is undisputed that Defendants Trump and Morse did not abide by the Board member removal procedures required in the USIP Act , 22 U.S.C. § 4605(f). *See, e.g.*, Compl. ¶¶ 71-72.

Also on March 14, 2025, representatives from DOGE, including Defendant Kenneth Jackson, appeared at USIP headquarters building requesting access. USIP representatives denied them entry. *Id.* ¶ 74. The new, coopted, Rubio-Hegseth-Garvin USIP Board purported to fire USIP's then-acting president George Moose by resolution, and replace him with Defendant Jackson. *See id.* at ¶ 75.

Then, on March 17, 2025, representatives of DOGE, assisted by Special Agents from the FBI, USIP's former security contractor, Inter-Con Security Systems Inc. ("Inter-Con"), and officers from MPD, broke into USIP's headquarters on Constitution Avenue—a $500 million

---

[9] Department of Government Efficiency (@DOGE), X (Mar. 4, 2025, 3:37 PM)
https://x.com/DOGE/status/1897023739960680843.

building that USIP, and USIP alone—built and which the Endowment owned.[10] *See* 22 U.S.C. §
4604(h)(3)(A). Inter-Con had been told by one or more DOGE employees that every federal
contract Inter-Con held would be cancelled if they did not assist the Defendants get into the
building. *See* Compl. ¶ 77.

That same day, Anna Kelly, Deputy White House Press Secretary, posted on X in response
to a different message on X with a quote from George Moose, acting president and Chairman of
USIP, that "DOGE has broken into our building":

> [George Moose, the then-President of USIP] is actually a career
> bureaucrat who wants to be unaccountable to the American people.
> The Trump Administration won't let him.[11]

Accompanying the message was an image of an undated "resolution" of the Rubio-Hegseth-Garvin
Board of Directors purporting to terminate, as of March 14, 2025, Mr. Moose from his position
and appointing Defendant Kenneth Jackson as the acting president.  *See* Compl. ¶¶ 82-83.

On March 18, 2025, in an article entitled "Trump administration guts board of US Institute
of Peace. Group says DOGE arrives," the Associated Press quoted Ms. Kelly as follows:

> Rogue bureaucrats will not be allowed to hold agencies hostage. The
> Trump administration will enforce the President's executive
> authority and ensure his agencies remain accountable to the
> American people.[12]

The DOGE Defendants' dismantling of USIP continued, as DOGE started physical destruction of
the USIP building, including tearing the USIP seal off the wall and shredding hard copy

---

[10] Jackie Bensen et al., *US Institute of Peace says DOGE broke into its building*, NBC4 WASHINGTON
(Mar. 17, 2025) https://www.nbcwashington.com/news/president-trump-politics/us-institute-of-peace-
doge-trump-administration/3869923/.

[11] Anna Kelly (@AnnaKelly47), X (Mar. 17, 2025, 6:42 PM)
https://x.com/AnnaKelly47/status/1901766110275359051.

[12] Matthew Lee & Chris Megerian, *Trump administration guts board of US Institute of Peace. Group says
DOGE arrives*, ASSOCIATED PRESS, https://apnews.com/article/doge-trump-us-institute-of-peace-
03362c3440884c6b29e28ad0d88f5014 (last updated Mar. 18, 2025).

documents. *See* Compl. ¶ 84. Around the same time, USIP employees learned that DOGE employees could access all systems, computers, and phones. *Id.* ¶ 86. Later that day, some USIP employees learned that DOGE representatives were sending email messages from USIP email addresses to contractors and program partners on behalf of USIP program staff. *Id.* ¶ 87. When USIP staff lost access to their accounts, they simultaneously lost access to a virtual private network that allowed staff to connect to USIP's financial management system, and thereby their ability to conduct business on behalf of USIP, including paying invoices submitted by USIP contractors. *Id.* ¶ 88.

On March 19, 2025, Karoline Leavitt, White House Press Secretary, responded to a question asked during a White House press conference about DOGE's forced entry into USIP's headquarters. She responded as follows:

> ***We were made aware of this story by individuals at DOGE, Elon Musk's team,*** and also at the State Department, who were unable to access this building. [And it] became very clear that there was a concerted effort among the rogue bureaucrats at the United States Institute of Peace to actually physically barricade themselves, essentially, inside of the building ***to prevent political appointees of this administration***, who work at the direction of the President of the United States, to get into the building.[13]

Beginning on or about March 21, 2025, senior USIP executives began receiving termination notices without warning or explanation.

At some point during this period, an undated document entitled "Resolution of the Board of Directors"—this time signed only by two *ex officio* Board Members, Defendants Rubio and Hegseth—ended Defendant Jackson's tenure as acting president and appointed Defendant Nate Cavanaugh in his stead. *Id.*, Ex. D. Once appointed, Defendant Cavanaugh sent a letter to the

---

[13] Forbes Breaking News, *Karoline Leavityt Asked Point Blank If DOGE 'Illegally' Entered US Institute of Peace Building*, YOUTUBE (Mar. 19, 2025) https://youtu.be/VzN1ViRNaX4 (emphasis added).

Government Services Administration requesting transfer of USIP's privately-owned headquarters building (valued at $500 million) to the federal government. *Id.*, Ex. C. Cavanaugh's undated letter specifically states that no reimbursement was required. *Id.*, Ex. D.

Throughout March 2025, Defendants' coopted version of USIP continued to terminate its employees, "[a]t the direction of the President of the United States Institute of Peace," and wind down its operations. *See* Compl. ¶¶ 89, 94, 117. Termination included four of the Plaintiffs, among hundreds of others, with the small balance of USIP employees and PSC—including one of the Plaintiffs—expected to follow in short order.[14] *See id.* ¶¶ 100-110. Of course, these surprise, summary, and baseless terminations have caused extreme collateral harm, such as abrupt cessation of health insurance coverage and loss of immigration status in the United States. They also jeopardize the safety and security of USIP PSCs and contractors working abroad, who are now forced to navigate life in active conflict zones without the security infrastructure and support of USIP's myriad teams. *See* Compl. ¶ 126; Eisenberg Decl., Ex. K.

Contractors with long-term business relationships with USIP, such as two of the Plaintiffs, have received surprise cancellation notices that have jeopardized their solvency. *See* Eisenberg Decl., Ex. N, O. To this day, they are owed money from USIP for work that has been lawfully completed prior to cancellation but so far have been unable to collect—their contracting officers have been fired and the Endowment drained. Donors, like Plaintiff Crocker, have pledged money specifically to support the expansion of USIP's peace-building mandate, and now suffer reputational harm from their donation as speech and affiliation with USIP due to Defendants' *ultra*

---

[14] Kathryn Watson, *U.S. Institute of Peace staff receive termination notices, sources say*, CBS NEWS, https://www.cbsnews.com/news/us-institute-of-peace-staff-termination-notices/ (last updated Mar. 29, 2025).

*vires* actions. *See* Eisenberg Decl., Ex. F-O.  The seizure of these donations is not consistent with the lawful purposes of these charitable pledges.

On March 29, 2025, hours after the coopted USIP terminated the employment of hundreds of USIP employees, Anna Kelly, Deputy White House Press Secretary, told CBS News via written statement as follows:

> Taxpayers don't want to spend $50 million per year on a publicly-funded "research institute" that has failed to deliver peace. President Trump ended the era of forever wars and established peace in his first term, and he is carrying out his mandate to eliminate bloat and save taxpayer dollars.[15]

On March 31, 2025, the official DOGE X account posted the following message:

> Each year, the United States Institute of Peace (USIP) receives $55M in congressional (taxpayer) funds. - Prior management would sweep excess funds into its private Endowment (zero congressional oversight). -In the past 10 years, USIP has transferred ~$13M to its private Endowment, mainly used for private events and travel.[16]

In that message, the account also posted a list of four USIP contracts that had purportedly been cancelled, including one that identified a former member of the Taliban who was working to advance USIP's peacebuilding efforts in Afghanistan. *See id.*. Public disclosure of this information has exposed this contractor to the world as working for USIP and led to death threats against him and his family has been harassed within Afghanistan. Compl. ¶ 112.

On April 1, 2025, the official DOGE X account posted: "Update: the $13M in taxpayer dollars (referenced [in the March 31, 2025 USIP X message]) has been returned to the

---

[15] Kathryn Watson, *U.S. Institute of Peace staff receive termination notices, sources say*, CBS NEWS, https://www.cbsnews.com/news/us-institute-of-peace-staff-termination-notices/ (last updated Mar. 29, 2025).

[16] Department of Government Efficiency (@DOGE), X (Mar. 31, 2025, 7:22 PM) https://x.com/Tracking_DOGE/status/1906849704106713106] Eisenberg Decl., Ex. E.

Treasury."[17] Of course, USIP is authorized to move Congressionally-appropriated funds to the Endowment at the end of every fiscal year pursuant to 22 U.S.C. § 4609(b).

Since then, Defendant DOGE, and DOGE-coopted Defendant USIP and Endowment for USIP, have made clear the intent to shutter USIP permanently in violation of the USIP Act, leaving USIP unable to implement any of its programs or statutorily mandated functions. *See* Compl. ¶¶ 114-117.

## ARGUMENT

A temporary restraining order, and likewise, a preliminary injunction, should be granted if the moving party shows "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). When a government entity is a party to the case, the third and fourth factors merge, as the government's interests are seen to overlap with that of the public. *See Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). While the movant must demonstrate that all four factors weigh in favor of granting preliminary injunctive relief, courts in this Circuit historically have used a "sliding scale" approach that recognizes courts may award relief when "a strong showing on one factor could make up for a weaker showing on another." *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (cleaned up).

Here, Defendants have improperly removed ten members of USIP's bipartisan Board members in violation of statute and then moved immediately to cease, wind down, and ultimately

---

[17] Department of Government Efficiency (@DOGE), X (Apr. 1, 2025, 8:30 PM) https://x.com/DOGE/status/1907229152073199840; *see also* Compl. ¶ 113.

13

shutter USIP's activities, eliminate its personnel and contracts, and seize its assets. Plaintiffs seek emergency relief from this Court to stop the bleeding, and specifically, to: (1) enjoin USIP, the Endowment of USIP, USIP's Board, and USIP's officers from transferring any assets outside of USIP or the Endowment for USIP; (2) enjoin USIP, USIP's Board, and USIP's officers from any new termination of USIP employment or contracts; (3) restore all USIP employees terminated since March 14, 2025 to their prior roles in a paid leave status so that they can obtain the health insurance, immigration, and other collateral benefits of employment while this litigation unfolds; and (4) enjoin Defendants from publishing and/or disclosing any information pertaining to the identity of current and former employees, grantees, program partners, contractors, or PSCs.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs assert five claims. *First*, that Defendants President Trump and Trent Morse violated the USIP Act's Board member removal protections and thus acted *ultra vires* of statutory authority, improperly ceding USIP to the control of the other Defendants seeking its unlawful demise. *Second*, that Defendants Government Services Administration, Office of Personnel Management, Department of State, and DOGE (when acting collectively, "DOGE") violated the Administrative Procedure Act ("APA") with an arbitrary and capricious agency action to seize control over USIP by forcing entry into USIP's privately-owned headquarters, claiming USIP's assets without consideration, and destroying USIP's records.

*Third*, Defendants DOGE and coopted Defendant USIP violated the APA in attempting to cease USIP's activities and shutter the agency because those actions were (1) arbitrary and capricious; (2) contrary to constitutional rights, power, privilege, immunity; and (3) in excess of statutory jurisdiction. *Fourth*, Defendants Gleason, Rubio, Hegseth, Garvin, Jackson, Cavanaugh, and coopted Defendant USIP violated the statutory mandates in the USIP Act and Gandhi-King Act by acting *ultra vires* in excess of their authority by ceasing USIP's activities and shutting it

down. *Fifth*, all Defendants violated the separation of powers by invading an independent entity in violation of law.

A.    **Plaintiffs are Likely to Show that Defendants President Trump's and Trent Morse's Summary Removal of Ten Bipartisan Board Members Was *Ultra Vires* in Violation of the USIP Act Removal Protections (Count I)**

Defendants President Trump's and Trent Morse's summary termination of ten members of the USIP Board violated the USIP Act's removal protections so that they could cede control of USIP to DOGE and facilitate the *ultra vires* cessation of the agency. They also violate the separation of powers and the Take Care Clause. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order.").

Defendants will argue that the USIP Act's removal protections for the Board are unconstitutional. They are not. USIP is a non-profit corporation that does not wield *any* executive power on behalf of the President of the United States. To the extent this Court finds that USIP does exercise some executive authority, the USIP Act's removal protections are still consistent with Article II because USIP does not wield "substantial executive power" and is a multimember, partisan-balanced expert Board.

1.    **Defendants' Summary Termination of Board Members Was *Ultra Vires***

The USIP Act states that the Board is comprised of 15 voting members who have been nominated by the President of the United States and confirmed by the United States Senate. 22 U.S.C. § 4605(b), (e)(3), (e)(5). Three of those Board Members are *ex officio*, meaning they are Board members of USIP by virtue of other positions that they hold in the Government (Secretary of State, Secretary of Defense, and the President of the National Defense University) where they serve at the pleasure of the President. *Id.* Twelve bipartisan members cannot be officers or

employees of the United States Government but must bring appropriate practical or academic experience in peace and conflict resolution efforts. *Id.* § 4605(b), (d). There can be no more than eight Board Members from a single political party. *Id.* § 4605(c).

The 12 non-*ex officio* Board Members—a category that represents all of the Board members that Defendants terminated—can only be removed from their positions by the President of the United States in one of three ways.

> (1) in consultation with the Board, for conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties;
>
> (2) upon the recommendation of eight voting members of the Board; or
>
> (3) upon the recommendation of a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate.

*Id.* § 4605(f)(1-3).

Here, Defendant President Trump unlawfully removed ten members of USIP's Board via one-line termination emails sent by Defendant Trent Morse, without abiding by the statutory removal protections. *See* Compl. ¶ 70; 22 U.S.C. § 4605(f). Improper removal of the Board members, and all harm to Plaintiffs that flowed from those illegal actions, were *ultra vires* in violation of the USIP Act.

### 2. The USIP Act's Removal Protections Are Constitutional

The USIP Act's removal protections do not run afoul of Article II of the Constitution for two alternative reasons. *First*, USIP is a non-profit corporation that does not wield executive power on behalf of the President of the United States, and therefore, its statutory removal protections do not restrict the President's Article II powers. *Second*, to the extent that this Court were to find that

USIP does exercise some executive authority, the USIP Act's removal protections are consistent with Article II because USIP does not wield "substantial executive power" and is a multimember, partisan-balanced expert Board.

### a.    USIP Is an Independent, Non-Profit Corporation

In order to determine whether an entity wields executive power as part of the executive branch, courts must analyze the entity's legal structure and functioning. Here, Congress structured USIP as an "independent nonprofit corporation"; provided that USIP shall be a charitable organization under the tax code; provided that it shall have all powers of a nonprofit corporation (save cessation of activity and dissolution); provided that it is a distinct legal entity that may sue and be sued; and provided that officers and employees are not federal officers or employees except for limited purposes. 22 U.S.C. §§ 4603(b), 4604(a), 4604(k), 4606(f)(1).

USIP's Board members, twelve of whom cannot be officers of the federal government, have broad discretion to direct the activities of USIP consistent with USIP's peacebuilding mandate. The Board members' fiduciary duties are to USIP, not the United States. *See* D.C. Code § 29-406.30. USIP's structure and operations make clear that it is independent from the federal government, *see supra*. Because USIP is manifestly not part of the Executive Branch—and not inherently subject to laws that govern government agency function—the USIP Act specifically extended a few features of government function to USIP, such as making USIP subject to FOIA, § 4607(i),17 and allowing USIP to purchase services from GSA, § 4604(o). Of course, these features would be automatic and need not be legislated if USIP were a government agency.

### b.    USIP Does Not Wield Executive Power

Consistent with its structure and mandate as a peacebuilding research organization, USIP does not exercise any of the President's executive authority. It does not carry out any functions "on behalf" of the President. It does not make or enforce "policy" for the President. *See Seila Law*

*LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 225 (2020). Nor does USIP carry out the President's foreign affairs duties. USIP does not direct the military or represent the United States in dealings with foreign governments. Eisenberg Decl., Ex. A. Engagement in international activity does not constitute governmental foreign affairs; private organizations and civil-society groups play a prominent role. Even when USIP works with Executive Branch agencies, it does so as a partner—just as it works as a consultant and advisor to foreign governments and nongovernmental agencies—not as a department or agency that is executing the President's policies with respect to foreign affairs. *Id.*, Ex. A; U.S. Const. art. II, § 2; *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S.1, 13, 20-21, 28 (2015).

USIP does not enforce any laws or issue any rules, regulations, or advisory opinions "fleshing out" any statute regulating the public. *See Buckley v. Valeo*, 424 U.S. 1, 137 (1976); *Dong v. Smithsonian Inst.*, 125 F.3d 877, 879 (D.C. Cir. 1997) (Smithsonian Institution not establishment of executive branch). Nor may USIP apply the law to private parties through adjudication. *See City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 304 n.4 (2013). While USIP issues grants using federal funds, this function is not inherently executive in nature, and it is not executive at all in the case of USIP. Private nonprofit (and even for-profit) as well as state-government entities routinely receive federal funds and then dole them out to other private or non-federal organizations. *See, e.g.*, Pub. L. No. 108-57, 117 Stat. 859 (2003) (appropriated funds be made available to a private nonprofit, the Congressional Hunger Center, which would then distribute them as fellowships).

When USIP does make grants, it is not administering any federal statute directing how and where funds should be distributed or adjudicating statutory eligibility criteria for grantees. *Compare Buckley*, 424 U.S. at 139–41 (FEC Commissioners' "determinations of eligibility for"

public campaign funds via interpretation and application of a detailed statutory regime constituted "administration and enforcement of the public law" such that it was an executive function) *and Dong*, 125 F.3d at 882 ("To the extent that the Smithsonian devotes part of its own budget to funding grants and fellowships, it appears to be no different from any private research university which receives federal funds and enjoys some control over their use."). The USIP Act provides only general guidance on the purposes for which USIP may make grants, namely in support of its peace studies mission. 22 U.S.C. § 4604(d). USIP decides the rest.

In sum, the President of the United States retains no Article II removal interest on which the USIP Act's removal protections might intrude. Accordingly, the USIP Act's removal protections bind the President, and purported removal of USIP Board members without complying with the statute was *ultra vires*.

> **c.    Even if USIP Were a Government Agency within the Executive Branch, the USIP Act's Removal Protections Are Still Consistent with Article II Because USIP is a Multimember Expert Board that (at most) Exercises *De Minimis* Executive Power**

The USIP Act's removal protections would be constitutional even if the Court were to conclude that USIP is part of the Executive Branch because (1) USIP is directed by a bipartisan, multimember Board that (2) exercises (at most) *de minimis* executive power.

> **i.    Removal Protections Are Constitutional Because USIP is a Multimember Expert Board**

The Supreme Court has repeatedly, and often unanimously, held that vesting of leadership of an entity in "a multimember group of experts," removable by the President only for cause, are consistent with Article II. *Humphrey's Ex'r v. U.S.*, 295 U.S. 602, 620, 632 (1935) (upholding this structure in the context of the Federal Trade Commission); *Wilcox v. Trump*, Civ. Action No. 25-334, 2025 WL 720914, at *18 (D.D.C. Mar. 6, 2025) (applying *Humphrey's* to uphold a similar

structure for the National Labor Relations Board); *Wiener v. U.S.*, 357 U.S. 349 (1958). These are the line of cases that address the harms that Plaintiffs have suffered here by termination of USIP's lawful Board.[18]

Just like the Federal Trade Commission ("FTC") Act—where the Supreme Court affirmed the statutory removal protections for FTC Commissioners—the USIP Act does not concentrate any executive authority in the hands of a single, removal-protected director. *See Seila Law*, 591 U.S. at 223–26; *Collins v. Yellen*, 594 U.S. 220, 251-56 (2021). To the contrary, USIP is directed by the multiple expert members of a bipartisan Board, some of whom the President may lawfully remove at will—such as the three *ex officio* members—others who the President is entitled to appoint during his term of office due to the Board members' staggered terms[19]—others who are guaranteed to be members of the President's political party—and others whom he may remove under certain circumstances. 22 U.S.C. § 4605(c); *Humphrey's*, 295 U.S. at 602.

The Supreme Court has upheld removal protections for multi-member adjudicatory boards, like the FTC and NLRB—a function that is a much clearer exercise of executive branch function than what USIP does—research, training, and education to support international peace. This is not a close call for USIP.

---

[18] There is a separate line of cases that concern removal protections for single heads of agencies exercising executive policymaking and enforcement powers, which are inapposite to the case at bar. *See Seila Law*, 591 U.S. at 228 ("not revisit[ing] *Humphrey's Executor*"); *Collins*, 594 U.S. at 251 (recognizing that *Seila Law* did "not revisit [] prior decisions") (quoting *Seila Law*, 591 U.S. at 204).

[19] *See Seila Law*, 591 U.S. at 225 (finding it constitutionally significant that because of the CFPB director's five-year term, some Presidents may never have the opportunity to appoint a CFPB director, diminishing presidential influence over the CFPB).

ii. **Removal Protections Are Constitutional Because USIP Exercises (at most) *De Minimis* Executive Power**

For the reasons stated *supra*, USIP does not exercise "substantial executive power," and it certainly exercises far less executive authority than the FTC or NLRB, where Courts have affirmed the constitutionality of statutory removal protections. The USIP Act removal protections are constitutional.

USIP carries far less extensive executive authority than either the FTC or the NLRB, both of which have removal protections for the multi-member agency heads that are consistent with Article II. *See Humphrey's*, 295 U.S. at 629; *Wilcox*, 2025 WL 720914, at *8 (collecting authorities reaching similar conclusions with respect to the Consumer Product Safety Commission); *Humphrey's* "dictates the same outcome" for USIP. And regardless, the USIP Act's removal protections do not meaningfully impede the President's ability to direct USIP's leadership: the President has at least the same level of authority to remove that the Supreme Court held constitutional in *Humphrey's* and this Court held constitutional in *Wilcox. Compare* 22 U.S.C. § 4605(f)(1) (the President may remove a non-ex-officio USIP Board member for "malfeasance in office, persistent neglect of duties, or inability to discharge duties," as well as for conviction of a felony), *with Humphrey's*, 295 U.S. at 620 (FTC Act provided for presidential removal "for inefficiency[,] neglect of duty[,] or malfeasance in office") *and* 29 U.S.C. § 153(a) (the President may remove NLRB board members "upon notice and hearing, for neglect of duty or malfeasance in office").

Unlike the FTC and NLRB, where the entire Board enjoyed removal protection, the President retains the unfettered right under the USIP Act to remove the three *ex officio* members of the USIP Board for whatever reason he wishes (or for no reason at all). Should the President wish to remove additional members under 22 U.S.C. § 4605(f)(2), the President's control over

these *ex officio* seats provides three of the eight votes necessary to do so. If the Board's partisan balance happens to be as heavily weighted against the President as it possibly can be at any given time (the USIP Act prohibits a partisan voting imbalance more extreme than 8 to 5), adding the three *ex officio* members to the appointed Board members who will be members of the President's party puts the President in a strong position to garner a majority vote to remove. The USIP Act's staggering of Board terms combined with its specification that Board member terms shall last four years means that that every President will have the opportunity to fill Board vacancies, providing still another means of presidential control over the direction of USIP. *See Seila Law*, 591 U.S. at 225 (finding it constitutionally significant that because of the CFPB director's five-year term, some Presidents may never have the opportunity to appoint a CFPB director, diminishing presidential influence over the CFPB).

If the comparatively limited presidential removal power in *Humphrey's* did not unduly impede the President's Article II functions, the removal provisions in the USIP Act are also consistent with Article II.

**B.    Plaintiffs Are Likely to Demonstrate that Defendant DOGE Violated the APA By Breaking into USIP in March 2025 to Shutter It (Count II)**

The APA authorizes courts to review "final agency action," and set aside any action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706.

Here, Defendant DOGE is a federal agency subject to the APA that engaged in a final agency action when it forced entry and seized USIP's privately-owned headquarters, seized USIP's assets without consideration, and destroyed USIP's records as part of a final agency action to injure or destroy USIP, which led to the irreparable harms that Plaintiffs now suffer. *See* Compl. ¶¶ 81-

82, 85, 115. There is no legitimate basis for DOGE, an agency of the federal government, to employ two different law enforcement agencies and USIP's former security contractor to breach USIP's privately-owned and controlled offices and computer systems in furtherance of a scheme to abruptly shut USIP down and terminate its staff and contracts. DOGE's purported basis for these actions—its belief that USIP is not entitled to funds that Congress has made available to it[20]—self-evidently does not pass muster under the separation of powers or APA.

### 1.    Defendant DOGE Is A Federal Agency Within the Meaning of the APA

The APA provides that an "agency" is "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. §551(1). Courts have given this language a "broad, inclusive reading" to apply the APA to both executive branch agencies and independent agencies. The "law on the simple question of what is an agency is quite complex" and requires courts to "examine the structure, function, and mandate" of an entity. *McKinney v. Caldera*, 141 F.Supp.2d 25, 31-33 (D.D.C. 2001) (quoting *Lee Constr. Co., Inc. v. Federal Reserve Bank*, 558 F.Supp. 165, 172 (D.Md.1982)).

Courts will consider whether the entity acts with the sanction of the government behind it, and the "centers of gravity" in the exercise of administrative power "where substantial 'powers to act' . . . are vested," *McKinney*, 141 F. Supp. 2d at 3.2 (cleaned up). Another consideration is whether an administrative unit, either within the Executive Branch or independently situated, "exercise[s some] substantial independent [governmental] authority," *Dong.*, 125 F.3d at 881; *see, e.g.*, *id.* (Smithsonian Institution was not an agency because it did not perform any regulatory functions or control the allocation of federal dollars); *Lombardo v. Handler*, 397 F. Supp. 792,

---

[20] Kathryn Watson, *U.S. Institute of Peace staff receive termination notices, sources say*, CBS NEWS, https://www.cbsnews.com/news/us-institute-of-peace-staff-termination-notices/ (last updated Mar. 29, 2025).

795-96 (D.D.C. 1975) (National Academy of Sciences not an agency because it had no "significant delegation of governmental authority, jurisdiction, administrative function or power").

Here, each of these considerations militate in favor of a finding that Defendants DOGE is an "agency" within the meaning of the APA: it acts with the sanction of the government behind it, is a substantial center of gravity in the exercise of administrative power, and it exercises substantial independent function. *See McKinney*, 141 F. Supp. 2d at 25; *Dong*, 125 F.3d at 881. In analyzing whether DOGE is subject to FOIA and the Federal Records Act because it is an "agency," this Court found that it likely was. *Citizens for Resp. & Ethics in Wash. v. United States Doge Serv.*, No. 25-CV-511, 2025 WL 752367, at *11, (D.D.C. Mar. 10, 2025) (appeal pending) (finding DOGE is an agency wielding substantial independent authority for purposes of the Federal Records Act and FOIA requests because it wields "substantial authority over vast swathes of the federal government."); *id. at *2*, 11 (DOGE EO "appears to give [DOGE] the authority to implement the DOGE Agenda, not just to advise the President in doing so," and DOGE EO defines DOGE's purpose as "establish[ing] the Department of Government Efficiency to implement the President's DOGE Agenda.") (emphasis added).

The Court also found that "USDS [the predecessor entity to DOGE that was later renamed ("DOGE")] has a defined staff: the [] Administrator, a temporary organization operating within [DOGE], and DOGE teams that are embedded outside [DOGE] within each executive branch agency." *id at *40. Other courts have held similarly. *See* Mem. Opinion and Order, *Am. Fed'n of Lab. & Congr. of Indus. Orgs. v. U.S. Dep't of Labor*, 25-CV-0339 Dkt No. 34 (D.D.C. Feb. 14, 2025), (concluding that DOGE is an agency for purposes of the Economy Act); *Am. Fed'n of State, Cty. & Mun. Emps. v. Social Sec. Admin.*, No. 25-CV-596-ELH, slip op. at 109-11 (D.Md. Mar. 20, 2025).

DOGE is exercising significant authority by directing agencies to implement various policies, superintending personnel decisions, purporting to close federal agencies, acquiring access to sensitive databases, and threatening agency officials who fail to comply.[21] In just one month, DOGE has wielded expansive power over all manner of federal operations—far exceeding its limited authority as a non-statutory entity. For example, DOGE has taken over the Office of Personnel Management ("OPM"), eliminated 50,000 jobs at the U.S. Agency for International Development, functionally shuttered the Inter-American Foundation and African Development Foundation, and touted its success in cancelling $1 billion in contracts across 25 agencies and cutting $900 million in education funding.[22]

### 2. The DOGE Seizure of USIP Is a Final Agency Action

Defendants' actions to seize and injure USIP, its staff, and its contractors is final agency action subject to review under the APA. It both "marks the consummation of the agency's decision making process," is not "merely tentative[,]" and is a determination of "rights or obligations . . . or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up). A final agency action need not be expressly memorialized in writing, *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) or formally acknowledged by the agency as a "final resolution," *Friedman v. Fed. Aviation Admin.*, 841 F.3d 537, 541-42 (D.C. Cir. 2016), so long as the action has the same legal effects and implications.

---

[21] Abigail Williams, *USAID security leaders removed after refusing Elon Musk's DOGS employees access to secure systems*, NBC NEWS (Feb. 2, 2025) https://www.nbcnews.com/politics/national-security/usaid-security-leaders-removed-refusing-elon-musks-doge-employees-acce-rcna190357.

[22] Charles Creitz, *DOGE announces more than $1B in savings after canceling 104 federal DEI contracts*, FOX NEWS (Jan. 31, 2025), https://www.foxnews.com/politics/doge-announces-morethan-1b-savings-after-canceling-104-federal-dei-contracts; *Savings*, DEP'T OF GOV'T EFFICIENCY, https://www.doge.gov/savings (last visited Apr. 11, 2025); Zach Montague & Dana Goldstein, *Musk Team Announces Millions in Cuts to Education Dept. Amid Legal Pushback*, N.Y. TIMES (Feb. 11, 2025) https://www.nytimes.com/2025/02/11/us/politics/musk-doge-education-data.html.

### 3.    DOGE's Actions Violate Section 706(2) of the APA

Starting on or about March 14, 2025, DOGE, with the help of two separate law enforcement agencies and USIP's former security contractor, invaded USIP's parcel of land and privately-owned building, and started physical destruction of USIP's property and building, including tearing the USIP seal off the wall and shredding hard copy documents. *See supra*. DOGE seized access to USIP systems, computers and phones, and began sending emails from USIP email addresses to contractors and program partners on behalf of USIP program staff. Then, DOGE began firing USIP's employees and cancelling its contracts. There is no legitimate, rational, legal, or reasoned basis for these actions, which violate each section of APA § 706(2).

### C.    Plaintiffs Are Likely to Demonstrate that Defendants DOGE and the Coopted Version of Defendant USIP Violated the APA § 706(2) in Attempting to Cease USIP's Activities and Shutter the Agency (Count III)

After Defendant DOGE coopted Defendant USIP, DOGE engaged in a second set of violations of the APA by attempting to cease USIP's activities. The Defendants' decision to do so was (1) arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law due to the agency's utter disregard for reliance interests and lack of legitimate rationale or reasoned analysis; (2) contrary to constitutional rights, power, privilege, or immunity because the decision to shutter an entity of Congress's creation must be an act of Congress, not some other executive agency's action, and (3) exceeded agency statutory jurisdiction, authority, or limitations with regard to statutory mandates under the USIP Act and the Gandhi-King Act.

Plaintiffs will be able to show that DOGE is a federal agency for the reasons stated *supra*. While Plaintiffs do not believe that USIP—coopted or otherwise—is a government agency or that it wields any executive power—should the Court disagree, Plaintiffs argue in the alternative that coopted USIP is subject to the APA, and that Defendants DOGE and coopted USIP took "final agency action" from which "legal consequences flow[ed]," *see Bennett*, 520 U.S. at 178 (cleaned

up), and specifically, shuttering USIP in violation of the USIP Act, the Gandhi-King Act, and APA sections 706(2)(A-C).

### 1.    Defendant DOGE Is a Federal Agency Subject to the APA. In the Alternative, Defendant Coopted USIP is Too.

Defendant DOGE is an agency within the meaning of the APA for the reasons stated *supra*. While the entirety of USIP's statutory architecture and functioning militates in favor of a finding by this Court that USIP is an independent, non-profit entity, USIP is a creature of federal statute and shares some features with government agencies. For example, USIP's leadership is appointed by the President of the United States and confirmed by the U.S. Senate, 22 U.S.C. § 4605(b)(4); it has two Cabinet members sitting *ex officio*, *id.* § 4605(b)(1)-(2); and, per the USIP Act, USIP is subject to FOIA, which applies to executive branch entities. Further, USIP has grant-making authority with funds appropriated by Congress, *id.* §§ 4603(c), 4604(b), 4606(b); is tasked with making reports to Congress, *id.* § 4604(c)(3); may respond to the request of a department or agency of the U.S. Government to investigate, examine, study, and report on any issue within the [USIP's] competence," may access classified materials, 4603(e); and may obtain services from the General Services Administration, *id.* § 4604(o).

Because of the real-world events that gave rise to Plaintiffs' emergency application, the only current USIP Board members acting to dismantle USIP serve at the pleasure of Defendant President Trump, *see* 22 U.S.C. § § 4605(d)(2), and are enabling DOGE's efforts to destroy USIP, including by appointing a DOGE employee as president of USIP and vesting him with broad powers to extricate USIP's assets. Due to the myriad *ultra vires* actions of Defendants, USIP is functioning more like an "agency" or instrument of Defendants than is allowed by statute.

The filings in another case before this Court shed some light on how DOGE has cloaked itself in the purported authority of other entities it has coopted. In *State of New Mexico v. Musk*,

No. 1:25-cv-00429-TSC, ECF No. 70-1 (D.D.C. Mar. 21, 2025) at 3-4, filings revealed that a grant cancellation letter was, according to its metadata, written by a DOGE affiliate, rather than the high-ranking Department of Education official who signed it. The same is essentially true here: DOGE has cloaked itself in the color of USIP's authority, but it is still just DOGE.

### 2. Defendants DOGE and/or Coopted USIP Have Taken a Final Agency Action

Whether the rapid dismantling of USIP was directed and implemented by Defendants DOGE—acting though purported USIP president Defendant Cavanaugh—or Defendant coopted USIP—to execute a final agency action, there is but one conclusion: final agency action has been taken, and it is subject to review under the APA.

There is nothing "tentative" about ousting the vast majority of USIP's staff from its operations, revoking grants, cancelling contracts, seizing the USIP's property—including a building—shutting down a website and all electronic access to USIP's online resources, and stealing over $13 million dollars of Congressionally appropriated funds and an even greater amount of private monies from the Endowment. *See, e.g., U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016); *see Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (holding that Department of Homeland Security's decision to end the Migrant Protection Protocols program was a final agency action because it forbade staff "to continue the program in any way from that moment on" (cleaned up)). Nor would the Defendants' decision at a later date to restore elements of USIP—for example, restoring the USIP website that they have taken down—negate the finality of the agency's current actions. *See, e.g.*, *Drs. for Am. v. Off. of Pers. Mgmt.*, No. CV 25-322 (JDB), 2025 WL 452707, at *6 (D.D.C. Feb. 11, 2025) ("[T]that an agency may restore the removed webpages in the future does not mean that the agency's prior removal decision was not the consummation of an agency's decisionmaking process.").

The finality of the Defendants' actions is clear. For example, they have terminated over 265 dedicated employees, including the named Plaintiffs, under the pretense of a fabricated "cost cutting" and "government efficiency," and "[at] the direction of the [p]resident of the United States Institute of Peace," Eisenberg Decl., Ex. G at 10-13; DOGE has publicly announced it has transferred over $13 million in Congressional appropriations to the Endowment back to the Treasury—appropriations that the Institute was lawfully entitled to transfer into its Endowment and which are now unavailable to the Institute to carry out any of its statutory functions, *see* Comp. ¶ 112, and the USIP website has been shut down and all of its electronic resources and trainings rendered inaccessible.[23]

Defendants have made clear—through these and other actions—that their goal is to reduce USIP to what is, in Defendants' view, the "statutory minima," limited to maintenance of its Board, the appointment of a president, the payment of incidental expenses for the Board, and the submission of certain reports to Congress and the Executive branch. Eisenberg Decl., Ex. C. Such reduction would entail permanently shuttering USIP, retaining no employees or contractors, and implementing no programs or grants.

Legal rights and obligations flow from the decision to dismantle and dissolve USIP. *See Bennett* 520 U.S. at 178. Defendants' actions have had significant, "concrete consequences" on Plaintiffs' legal rights. *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019). The Employee Plaintiffs have lost their jobs—or face the imminent loss of their employment—and have lost their health insurance and lawful immigration status to remain in the country with

---

[23] *Board of Directors*, United States Institute of Peace, https://www.usip.org/about/leadership/board-directors (last accessed Apr. 11, 2025); *see also* Arne Strand, *Silencing peace research: Trump's shutdown of USIP*, CHR. MICHELSEN INST. (Mar. 31, 2025) https://www.cmi.no/news/3446-silencing-peace-research-trumps-shutdown-of-usip.

their families. The Contractor Plaintiffs have been deprived of the benefits of their longstanding contracts with USIP—not only from invoices cancelled and left unpaid and personal property seized by DOGE at USIP headquarters—but also future contract work. The Donor Plaintiff, relying on USIP's Congressional mandate and critical role as a neutral, peace-building institution, pledged gifts to USIP to expand its programming and to support the maintenance of its headquarters—the Defendants have eviscerated this programming and unlawfully given away the building and the Endowment

Finally, as discussed *infra*, the decision to dissolve USIP derives from "top agency officials"—whether it is the DOGE Defendants, acting at the behest of the Defendant Amy Gleason or Nate Cavanaugh, or USIP Defendants acting through Defendants Cavanaugh, Rubio, Hegseth, and Garvin. *See Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 702 (D.C. Cir. 1971) (holding agency head approval of an agency action as a "signpost[] of authoritative determination, finality[,] and ripeness").

### 3. Defendants' Actions Violate Section 706(2) of the APA

Following the unlawful removal of Board Members and the unauthorized appointment of Defendant Cavanaugh, all subsequent actions taken by Defendant DOGE and DOGE-coopted Defendant USIP to all-but dissolve USIP have violated section 706(2) of the APA.

#### a. Defendants' Actions Were Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law

Dissolving an independent entity created by Congress without regard for reliance interests, legitimate rationale, or reasoned analysis, violates the APA.

The APA requires agencies to engage in "reasoned decision making," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), meaning an agency must "examine the relevant data and articulate a satisfactory explanation for its action" including a rational connection

between the facts found and the choice made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted). The absence of "reasoned analysis" accompanying Defendants' actions render them arbitrary and capricious. *Id.*; *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("[W]here [an] agency has failed to provide even [a] minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.").

The *de facto* suspension of all operations at USIP under the guise of "cost cutting" is precisely the type of unreasoned decision making that renders it arbitrary and capricious. Defendants also failed to consider the disastrous consequences of unlawfully terminating Board members, unlawfully appointing Defendant Cavanaugh who lacks any relevant experience, and then, led by *ex officio* Board members who demonstrably contradict USIP's bipartisan mission, improperly mandating a mass-layoff, immediate termination of critical benefits like health insurance, cancellation of dozens of programmatic grants and contractors, and systematic gutting of USIP's assets in violation of USIP's own bylaws and federal statute.

### b. Defendants' Actions Lacked Reasoned Analysis

Perhaps most egregiously, the Defendants failed to comply with the terms of the EO that they purported to implement by shutting down statutorily mandated functions. EO 14217 provides that USIP "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law[.]" But the primary statutory function of USIP is to exist as an independent entity. And in any case, the USIP Act and Gandhi-King Act both prohibit USIP from dissolving itself and require it to perform at least some specific functions.

Defendant Cavanaugh, in his purported role as president of USIP, sent a letter to the Government Services Administration explaining what, in his view, constituted the "statutory

minima" of the USIP's functions. Eisenberg Decl., Ex. C at 2. Confusingly, he wrote that USIP's statutory mandate moving forward is focused on "serv[ing] the people and the Government through the widest possible range of education and training, basic and applied research opportunities, and peace information services on the means to promote international peace and the resolution of conflicts among the nations and peoples of the world without recourse to violence[,]" 22 U.S.C. § 4601(b), all while removing USIP's physical infrastructure and human resources necessary to effectuate it.[24] *See* Compl. ¶¶ 161, 166. Of course, USIP could not do that absent its physical infrastructure—that Defendants traded away to the Government Services Administration without consideration—its field offices, staff, website, Endowment, and contractors who were working in twenty-six countries around the world. Eisenberg Decl., Ex. H

Further, Defendant Cavanaugh also, with no reasoned analysis or expertise in USIP's critical peacebuilding work, claims that USIP's current programming "duplicate the efforts of other federal agencies, including the State Department." Of course, this is false. *See supra*; Eisenberg Decl., Ex. C. Defendants' arbitrary and capricious gutting of USIP will leave it entirely unable to implement its statutory mandates.

### c. Defendants Acted with Utter Disregard for Plaintiffs' Reliance Interests

Defendants' actions are also arbitrary and capricious given their failure consider the substantial reliance interests of employees, contractors, and international grantees and partners.

---

[24] He also claimed that the transfer of USIP's headquarters will in no way affect USIP's obligations pursuant to 4604(b)(1)-(10) to "establish a Jennings Randolph Program," "enter into formal and informal relationships with other institutions," "establish a Jeannette Rankin Research Program," "develop programs to make international peace and conflict resolution research, education, and training more available and useful," "provide, promote, and support peace education and research programs," "conduct training, symposia, and continuing education programs," "develop, for publication or other public communication, and disseminate, the carefully selected products of the Institute," and "establish the Spark M. Matsunaga Scholars Program." Eisenberg Decl., Ex. C.

"When an agency changes course, as [FHWA] did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents*, 591 U.S. at 30 (cleaned up).

Current and former employees, including named Plaintiffs, relied on USIP's stated severance policies. For example, Plaintiff Bosley relied on existing USIP policies and practices related to termination and severance when deciding to start the process of having a baby with his husband via surrogacy. Ex. I ¶ 7. The cost of the process is $90,000, of which large tranches have already being paid, and more tranches are due in the coming months. *Id.* Now terminated with no notice and no severance, Mr. Bosley's ability to continue that process is uncertain. *Id.* Plaintiff Jane Doe, a Colombian citizen with an H1B1 visa, relied on her visa status to lawfully work at USIP and remain in the United States with her baby and husband. Ex. J ¶ 4. This visa will expire within 60 days of the end of Ms. Doe's employment at USIP; not only will she be forced to leave the country, her husband will also lose his visa status. Ex. J ¶¶ 5-8.

Plaintiff Quinlan and other employees similarly situated relied on USIP's previously communicated severance policies, as well as the possibility of COBRA coverage, and was given *less than one day* to find costly alternatives. Ex. G ¶¶ 14-16, 19, 23. With the abrupt termination of over 75% of USIP's workforce, there will be no COBRA coverage available *at all* when USIP is no longer able to offer group health coverage. Ex. F ¶ 14. Further, Plaintiffs relied on decades-long business relationships with USIP, and local partners relied on USIP's privacy policies and data management procedures to ensure that confidential, highly sensitive information about grant recipients and program participants would not be disclosed. Plaintiffs, and their local partners, are now facing imminent safety and security risks—including death threats and retaliation—for their affiliation with USIP.

d.      **Defendants Acted Contrary to Constitutional Rights and Power and in Excess of Statutory Jurisdiction, Authority or Limitations**

USIP's statutory mandates are clear. *First*, Congress established USIP via the USIP Act as an autonomous, independent entity that is expressly forbidden from "ceas[ing] its corporate activities" or dissolving itself. 22 U.S. C. §§ 4603(b), 4604(a) (all powers except section 5(o) of the District of Columbia Nonprofit Corporation Act); Pub. L. No. 87-569, 17 Stat. 265, 268 (Aug. 6, 1962); Eisenberg Decl., Ex. B. Defendant USIP does not have the power to dismantle and dissolve itself. Nor can Defendant DOGE, an agency acting within the executive branch implementing the President's agenda. The decision to shutter an entity of Congress's creation must be an act of Congress, not some other executive agency's action.

*Second*, as discussed above, the Gandhi-King Act mandates: "The president and chief executive officer of the United States Institute of Peace *shall create* a professional development training initiative on conflict resolution tools based on the principles of nonviolence." HR 5517 (section (a) (1-4)). Congress enumerated four statutorily mandated activities of the Academy, *see id.* (a) (1-4), and expressly prohibited USIP from contracting out this work to other entities, *id.* section (b). Yet all 33 employees of the Academy, including Plaintiff Pippenger, were terminated on March 28. Ex. F ¶ 9. Defendants cannot dispute that these are unequivocal mandates. *See Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("shall" connotes a non-discretionary "requirement"); *Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*, 26 F.4th, 960, 971 (D.C. Cir. 2022) (shall is "undoubtedly mandatory").

The final agency action of DOGE and/or USIP to effectively dissolve USIP is also "contrary to constitutional right, power, privilege, or immunity[.]" 5 U.S.C. § 706(2)(B). Defendants' conduct violates the separation of powers, including the legislature's exclusive

authority to make law, U.S. Const. art. I, § 1, by unilaterally ceasing statutorily mandated functions and effectively shuttering an agency that Congress has created by statute.[25]

### D. Plaintiffs' *Ultra Vires* Claims Against Defendants Gleeson, Jackson, Cavanaugh, Rubio, Hegseth, and Garvin Are Likely to Succeed on the Merits (Count IV)

Federal courts possess the power in equity to grant equitable and injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) (equitable relief available against federal officials who act "beyond th[e] limitations" imposed by federal statute). And Courts have a well-established authority to issue injunctions against subordinate executive officials to prevent illegal action by the Executive Branch. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 584 (1952); *Hamdan v. Rumsfeld,* 548 U.S. 557, 567 (2006).

"Review for *ultra vires* acts rests on the longstanding principle that if an agency action is 'unauthorized by the statute under which [the agency] assumes to act,' the agency has 'violate[d] the law' and 'the courts generally have jurisdiction to grant relief.'" *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 970 (citations omitted). "A challenged action must 'contravene[ ] a clear and specific statutory mandate' to be susceptible to *ultra vires* review." *Id.* at 971 (quoting *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1264 (D.C. Cir. 2006)) (emphasis in original).

For the same reasons explained *supra* as to Defendant DOGE's and Defendant USIP's violations of the APA, DOGE Defendants Gleason, Rubio, Hegseth, Garvin, and Cavanaugh—

---

[25] For similar reasons, Plaintiffs are likely to prevail on the separation of powers claim, *see* Count Five, against all Defendants.

who undertook those series of unlawful actions—have acted in contravene of statutory authority.

Accordingly, Plaintiffs are likely to prevail on the merits of each of their claims.

E.    **Plaintiffs' *Ultra Vires* Claims Against Defendants for Violation of the Separation of Powers Are Likely to Succeed on the Merits (Count V)**

For the same reasons as explained *supra*, Defendants' actions to take over a non-profit corporation created by Congress to reclaim Congressional appropriation violates the separation of powers. Indeed, the Executive Branch violates the Take Care Clause where it fails to execute or otherwise acts contrary to statutes enacted by Congress and signed into law. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order.").

## II.    IN THE ABSENCE OF PRELIMINARY RELIEF, PLAINTIFFS WILL SUFFER IRREPARABLE HARM

Defendants' rapid dismantling of USIP and its Endowment are certain to cause current employees, former employees, contractors, and donors imminent and irreparable harm, absent the Court's intervention, in at least the following ways: (1) inability to recover economic damages; (2) loss of critical health insurance coverage necessary for treatment of serious, chronic illness; (3) loss of immigration status; (4) reputational harm; (5) physical danger; (6) disclosure of sensitive information; and (7) unrecoverable business loss.

To constitute "irreparable harm," Plaintiffs must show injuries that are "both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief[.]" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotations and citation omitted). "Plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (internal citations omitted).

### A.    Economic Loss in a Specific Employment Context

The D.C. Circuit has long recognized that "economic loss" may constitute irreparable harm when it is unrecoverable, such as when inflicted by a federal agency or a federally regulated employer, *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991), or when a plaintiff has "no guarantee of eventual recovery" of economic damages, *Alabama Ass'n of Realtors v. Dep't of Health and Hum. Servs.*, 594 U.S. 758, 765 (2021), or when an imminent action "could threaten the very existence of" a business and foreclose the possibility of future recovery of backpay or monetary damages. *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 31 (D.D.C. 2001).

Here, the economic loss by Plaintiffs falls into both categories. Should the Court find that Plaintiffs' economic losses from termination of their employment stemmed from misconduct by DOGE—a federal agency or regulate employer—Plaintiffs losses may not be recoverable. *Nat'l Treasury Emps. Union*, 927 F.2d at 1254-55. Similarly, should the Court find that USIP or its officers' (who are indemnified by USIP) caused Plaintiffs' economic losses, and that Defendants are draining USIP of its assets and shuttering it, there will likely be no assets left to recover, especially given the number of people and entities who have been harmed. Plaintiffs' injuries are plainly "beyond remediation" under the circumstances. *League of Women Voters of U. S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).

Injunctive relief and reinstatement is also appropriate in the employment realm "where 'the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found.'" *Davis v. Billington*, 76 F. Supp. 3d 59, 65 (D.D.C. 2014) (quoting *Sampson v. Murray,* 415 U.S. 61, 92 n. 68, 94 (1974)).

Injunctive relief has been granted in the "genuinely extraordinary situation[s]" rapidly unfolding across the country arising from the Defendants' unprecedent dismantling of dozens of federal agencies and entities. *See, e.g.*, *Aviel v Gor*, No. CV 25-778 (LLA), 2025 WL 1009035, at *10 (D.D.C. Apr. 4, 2025) (noting that because the "very survival of [the] organization"—the Inter-American Foundation—was at stake, the circumstances fell "squarely in the 'genuinely extraordinary situation' contemplated by *Sampson*" (quoting *Sampson*, 415 U.S. at 92 n.68)); *Does 1-26 v. Musk*, No. CV 25-0462-TDC, 2025 WL 840574, at *28 (D. Md. Mar. 18, 2025) ("[I]f the stated reasons for the shutdown of USAID and the related personnel actions were limited to . . . the need to assess USAID's operations and align its functions to the President's and the Secretary [of State's] priorities, . . . the termination of Plaintiffs . . . would result in the typical reputational harm that stems from a termination, which would not support a finding of irreparable harm. *However, Defendants' public statements regarding the reasons for the actions relating to USAID go far beyond the ordinary*.") (cleaned up) (emphasis added) (stayed pending appeal).

Moreover, the harms caused by Defendants' abrupt and sweeping dissolution of USIP, its personnel, its physical property, its programs, and its financing, are unlikely to be remediable by mere money damages following months of litigation. Judge Paul Oetken in the United States District Court of the Southern District of New York recently concluded, regarding similarly abrupt and disastrous shuttering of an agency, that:

> [S]hutting down necessary systems, laying off personnel, and terminating contracts, even ones that might be able to be eventually reinstated, halt agency function in the short term and threaten the efficacy of the agency in the long-term. It would take [the agency] months, if not years, to piece back together the infrastructure, staff, and contractual relationships to fully function again after this damage is done. In short, these harms cannot be remedied with mere money damages.

*Widakuswara v. Lake,* No. 25-CV-2390 (JPO), 2025 WL 945869, at *9 (S.D.N.Y. Mar. 28, 2025). The same is true here. *See* Ex. H ¶¶ 14, 15, 18-22, 23 (explaining that "the decision to terminate the majority of USIP employees and contractors is extremely harmful to USIP and its personnel, and has resulted in irreparable consequences for USIP's operations, legal protections, and the safety and financial security of USIP's employees, contractors, and research subjects").

### B.    Loss of Healthcare and Urgent Medical Treatment

Abrupt termination of health insurance, particularly for Plaintiffs with serious medical issues, constitutes irreparable harm. *Chaplaincy of Full Gospel Churches,* 454 F.3d at 297. *See, e.g.*, *Risteen v. Youth for Understanding, Inc.*, 245 F.Supp.2d 1, 16 (D.D.C. 2002) (finding irreparable injury when the plaintiff demonstrated that he would not have access to "critical medical attention because he has lost his health insurance").

Plaintiffs Pippenger and Quinlan are both former employees with serious, chronic health issues. Ex. F ¶ 11; Ex. G ¶¶ 9-11. Plaintiff Pippenger has been diagnosed with a serious, incurable autoimmune disease for which she requires costly drug infusions every six weeks without lapses. If she experiences any lapse in treatment, she will face a significant medical risk of developing antibodies to the medication; should this occur, she would become permanently resistant to this specific drug, rendering it ineffective and eliminating a critical treatment option for the rest of her life. Ex. F ¶ 12. Because Defendants terminated Plaintiff Pippenger's health insurance coverage with less than a day's notice to opt into COBRA, she has been unable to switch to another provider and seek authorization for her regular treatments. *Id.* at ¶ 13. If USIP ceases to exist, Plaintiff Pippenger and others similarly situated are likely to lose COBRA coverage entirely, leaving her without access to a critical drug. *Id.* at ¶ 14.

Plaintiff Quinlan was recently diagnosed with a Chiari I malformation in her brain, causing severe headaches three to four times a week that do not respond to most pain management

medication. If left untreated, Chiari I malformation symptoms can evolve to include numbness, tingling, imbalance, vertigo, and permanent neurological damage. Ex. G ¶ 9. Defendants have caused Ms. Quinlan to forego critical and urgent medical testing and treatment, which she will continue to have to forego absent reinstatement and return of her health insurance coverage. Quinlan Affidavit ¶¶ 20-22.

Plaintiffs Pippenger and Quinlan, along with other former employees and their families who have relied on USIP health insurance, are at imminent risk of dire, long-term health consequences as a result of the Defendants' abrupt termination of health insurance for terminated employees and complete lack of communication regarding alternatives. Monetary damages to pay for health insurance, including severance, will not remedy these harms.

### C.    Loss of Immigration Status

Employment termination resulting in the abrupt loss of a visa status allowing an employee to lawfully work and remain in the United States constitutes irreparable harm. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 200 (D.D.C. 2020); *Widakuswara*, 2025 WL 945869, at * 10 (loss of a J-1 nonimmigrant visa constitutes irreparable harm).

Plaintiff Jane Doe is a Colombian citizen who holds an H1B1 visa tied to her employment with USIP. Ex. J ¶ 4. The H-1B category enables U.S. employers to hire qualified foreign professionals in "specialty occupation[s]" requiring "theoretical and practical application of a body of highly specialized knowledge" and a "bachelor's or higher degree." 8 USCA §§ 1184(i)(1), 1101(a)(15)(H)(i)(b). An H1B1 visa cannot be transferred to another employer or organization; upon Plaintiff Doe's termination from USIP, she has only 60 days before she will be required to leave the country. Ex. J ¶ 6. Plaintiff Doe's husband, also a Colombian citizen, holds an H4 visa which is tied to her H1B1 visa. *Id.* at ¶ 4. Their infant son, however, was born in the United States and does not hold Colombian citizenship. *Id.* at ¶¶ 4, 7. As a result of Defendants' unlawful, abrupt

termination of Plaintiff Doe's employment with no notice, she was unable to seek alternate employment or seek legal counsel for immigration options for her family. *Id.*

If the Court does not intervene to reinstate Plaintiff Doe's employment—and by extension, her visa—Plaintiff Doe and her husband will be separated from their son, causing severe emotional and psychological distress, displacement, and loss of their home and community in Virginia. *Id.* at ¶¶ 8, 9. These harms—tearing a family apart and leaving an infant behind in the United States— clearly cannot be remedied with economic damages. Any current employees who have not yet been terminated will also imminently no longer have access to immigration-related legal services if Defendants terminate the USIP's contracts with legal services contractors. Ex. H ¶ 17.

### D.    Injury to Reputation and Goodwill

This Court has held that "[i]njury to reputation and goodwill is not easily measured in monetary terms," and is therefore "often viewed as irreparable." *Jones v. District of Columbia*, 177 F.Supp.3d 542, 547 (D.D.C. 2016) (citing 11A Charles Alan Wright *et al.*, Federal Practice and Procedure § 2948.1 (3d ed. 2013 & 2015 Supp.). Employee Plaintiffs here will suffer severe harm to their goodwill, reputation, and relationships with contractors, subcontractors, foreign governments, grant recipients, and other stakeholders. *See* Eisenberg Decl., Exs. F-G; *id.*, Ex. H ¶¶ 21-23; *id.*, Exs. I-L; *id.*, Ex. M ¶ 9("Brave Generation trusted USIP with [confidential] personal information based on USIP's longstanding reputation for independence, neutrality, and its established record of discretion in handling high-risk, sensitive matters, and on our direct personal relationships with close, trusted colleagues at USIP. That trust does not extend to the people we do not know, who have taken over USIP and fired our close colleagues and friends."); *id.*, Ex. N-O.

Contract officers who have not been terminated yet will be forced to violate contractual duties by deferring payments to suppliers, vendors, or landlords. *Id.*, Ex. H ¶¶ 14-15. The abrupt

cut-off to financial management systems and email access has disrupted Plaintiffs' relationships with longstanding partners and contractors whose trust has been cultivated over decades, and current employees Plaintiffs have had to and will continue to go back on previous assurances made to contractors and local partners who have relied on agreements with USIP. *Id.*, Ex. H ¶¶ 14-15.

The professional reputation of current employees is also likely to be imminently harmed should Defendants continue on their course of leaking and disclosing highly confidential material. For example, the electronic data and computer systems that the Defendants have seized and now maintain control over also contain highly confidential data related to USIP's research studies, which often include human studies subject to Institutional Review Board approval. *Id.*, Ex. H ¶ 20. As a donor to the Endowment, Plaintiff Crocker's donation has now been or will imminently be directed towards unlawful ends, which is contrary to his intent and the conditions of his donations. *Id.*, Ex. L ¶ 8.

### E.    Physical Danger

Imminent and irreparable harm is likely to occur to Plaintiffs working and residing overseas who have relied on USIP contract payments and security support teams. This is true of Plaintiff John Doe, a current PSC employed by USIP since 2022 who resides in Libya. *Id.*, Ex. K ¶ 1. Should Plaintiff Doe's contract be terminated, he and his family will be left without the support of USIP's international security team, which has previously provided emergency planning and protection due to the extreme instability and violence in Tripoli. *Id.*, Ex. K ¶¶ 5-7. These are precisely the sort of serious threats to physical safety that have prompted other courts to find irreparable harm in similar circumstances. *See, e.g.*, *Does 1-26*, 2025 WL 840574, at *27 (finding that plaintiff's "specific account of circumstances creating a physical security risk in a high-risk location arising from Defendants' control of USAID systems demonstrates a likelihood of irreparable harm"); *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-CV-352 (CJN), 2025 WL 435415

(D.D.C. Feb. 7, 2025), modified, No. 1:25-CV-352 (CJN), 2025 WL 485043, at *3 (D.D.C. Feb. 13, 2025), ("No future lawsuit could undo the physical harm that might result if USAID employees are not informed of imminent security threats occurring in the countries to which they have relocated in the course of their service to the United States." Defendants' actions are likely to leave Plaintiff Doe and his family in "an unlivable and life-threatening situation" and left vulnerable to targeting and retaliation for his affiliation with USIP.). Eisenberg Decl., Ex. K ¶¶ 8-9.

F.    **Disclosure of Sensitive Information**

Given the extreme measures already taken by Defendants to infiltrate USIP headquarters, take possession of all physical and electronic files, and publicly disclose personal and identifying information about local partners and grantees working in high-risk countries, Local Partner Plaintiffs face a likelihood of imminent and irreparable harm should the Defendants not be enjoined from disclosure of any further USIP data that compromises contractors, donors, or local partners. *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. CV ELH-25-0596, 2025 WL 868953 (D. Md. Mar. 20, 2025) (collecting cases). These partners, including Plaintiff Brave Generation, have relied on the discretion of USIP and its employees to maintain secure and confidential data management protocols; Plaintiffs now face imminent risk of bodily harm and death due to the Defendants' reckless disregard for privacy concerns. Eisenberg Decl., Ex. M ¶ 9.

This risk is not only likely; it has already happened once: DOGE published the name of a USIP contract-recipient from Afghanistan who had been working with the Institute on peacebuilding initiatives—this contractor and his relatives are now facing death threats from the

Taliban.[26] Financial compensation under these circumstances cannot remedy the imminent and real threat to life and safety if Defendants' brazen disclosures of confidential information continue.

### G.    Unrecoverable Business Loss

InterMotion Media and Peace in Praxis have contracted with USIP for years to provide education and training-related content to counter violent extremism and other peacebuilding initiatives.  At the time that their contracts were terminated by Defendants without following the required USIP contract termination procedures, *see* Eisenberg Decl., Ex. N ¶¶ 2-4, they were owed payment for services and work already done. Defendants acknowledged and agreed to pay. But when InterMotion Media and Peace in Praxis sought to collect, Defendants have repeatedly ignored them.  *Id.*, Ex. N ¶¶ 2, 10; id. Ex. O..  They have lost thousands of dollars. *Id.*, Ex. N ¶ 12. Additionally, InterMotion Media is missing professional-grade green screen equipment that was seized by the DOGE Defendants during their unlawful trespass and seizure of USIP's headquarters. *Id.*, Ex. N ¶ 12. InterMotion Media's and Peace Praxis's reputations are at risk for inability to pay subcontractors. *Id.*, Exs. N, O.[27]

### III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR PRELIMINARY RELIEF

Here, a temporary restraining order would require Defendants to comply with the duly enacted, constitutional, USIP Act. Both balancing the equities and the public interest weigh heavily

---

[26] Department of Government Efficiency (@DOGE), X (Mar. 31, 2025, 7:22 PM) https://x.com/Tracking_DOGE/status/1906849704106713106] Eisenberg Decl., Ex.

[27] To be clear, InterMotion Media and other similarly situated contractors are not seeking solely economic compensation for their losses due to the failure to pay them, which, as in any contract case, could be far greater than the amount lost due to USIP's bad faith breach of contract. Under the APA, InterMotion Media seeks invalidation of the Defendants' actions regarding the decisions to cancel outstanding contracts and Defendant's failure to abuse by statutorily mandated suspension and termination procedures, *see* §4607(b) ("The Institute shall prescribe procedures to ensure that grants, contracts, and financial support under this chapter are not suspended unless the grantee, contractor, or person or entity receiving financial support has been given reasonable notice and opportunity to show cause why the action should not be taken.").

in favor of "having governmental agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Defendants do not have the lawful authority to act for the purpose of dissolving a non-governmental entity created by an Act of Congress. The balance of equities strongly favors Plaintiffs. Defendants will suffer no comparable hardship if restrained from continuing their unlawful course for a brief period pending this Court's further review. The hardship to Plaintiffs is concrete and irreversible. And when weighing these equities, "[t]he [g]overnment cannot suffer harm from an injunction that merely ends an unlawful practice[.]" *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).

Likewise, the public has a strong interest in ensuring that government officials comply with duly enacted statutes—and an attendant interest in meaningfully remedying injuries to organizations and individuals who suffer lasting, irreparable harm when government officials violate such laws. *Harris v. Bessent*, No. CV 25-412 (RC), 2025 WL 679303, at *14 (D.D.C. Mar. 4, 2025)*. And the public has an interest in seeing USIP, an organization created by Congress to promote, study, and engage in training as to the peaceful, nonviolent resolution of conflict, restored to its ability to fulfill a mission that Congress found to be in the nation's interest. Without the immediate enjoinment of all further terminations, asset transfers, and operational rollbacks initiated by Defendants, pending a full hearing on the merits of this case the damage to Plaintiffs— and to the rule of law governing independent federal institutions—will be incalculable and irreversible.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order and motion for a preliminary junction should be granted.

Dated: April 11, 2025
       New York, New York

EMERY CELLI BRINCKERHOFF          ALI & LOCKWOOD LLP
ABADY WARD & MAAZEL LLP

  /s/ Daniel M. Eisenberg            /s/ Kathryn Ali
Andrew G. Celli, Jr.*              Kathryn Ali
Daniel M. Eisenberg               Elizabeth Lockwood
Rachael Wyant*                    Meghan Palmer

One Rockefeller Plaza, 8th Floor   501 H Street NE, Suite 200
New York, New York 10020          Washington, D.C. 20002
(212) 763-5000                    (202) 651-2475

acelli@ecbawm.com                 katie.ali@alilockwood.com
deisenberg@ecbawm.com             liz.lockwood@alilockwood.com
rwyant@ecbawm.com                 meghan.palmer@alilockwood.com

*Attorneys for Plaintiffs*          *Attorneys for Plaintiffs*


*Application for admission pro hac vice forthcoming.*