# Exhibit G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SASHA PIPPENGER, et al., <br><br> Plaintiffs, <br><br> -against- <br><br> United States DOGE Service, et al., <br><br> Defendants. | DECLARATION |

### DECLARATION OF ELIZABETH QUINLAN

I, Elizabeth Quinlan, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to give this declaration.

2. This declaration is based on my personal knowledge, information, and belief.

3. Until March 28, 2025, I was a full-time, permanent employee of the United States Institute of Peace (USIP). I reside in the District of Columbia.

4. I began working with USIP in 2016 as a Program Assistant for External Relations. Over the years I also served as the Program Coordinator for External Relations and the Program Specialist for External Relations at USIP.

5. From January 2020 to March 2025, I served as the Program Officer for Public Engagement and D.C. Partnerships at USIP. I provided the American public with information about USIP's founding and how its current work helps to make America safer and more secure by supporting national security priorities through peacebuilding approaches. These programs served students from elementary through university levels, veterans, tourists, policymakers, peacebuilding practitioners, and members of the general public.

1

6. I led the planning, design, implementation, and follow up for these public outreach and education programs. These programs included informational sessions, educational workshops, exhibits, and open houses. The content of these programs included an introduction to the origins of an American peace institute, which trace from U.S. President George Washington's proposal to create a National Academy of War and Peace, to bipartisan Congressional efforts and a grassroots campaign in the 1960s and 70s that ultimately led to passage of the USIP Act in 1984. Congressmen in the 1960s who were combat veterans of World War II, the Korean War, and the Vietnam War were compelled by their frontline experiences to explore creating a national institute for the explicit purpose of strengthening and growing the United States' capabilities for preventing future wars. A grassroots National Peace Academy Campaign in the 1970s bolstered their efforts, with broad public support from veterans groups, faith based organizations, academics, and everyday people across the nation. The Matsunaga Commission (1979 - 1981) traveled across the U.S. to engage the American public in a thorough process to evaluate the need and timeliness for such an institution, and its report to Congress in 1981 affirmed that the American people valued an independent, nonpartisan organization that would be dedicated to preventing violent conflicts and broker peace deals abroad.

7. In a range of public visitor programs, I taught visitors about the practicalities of peacebuilding and about USIP's efforts to advance peace around the world in service of the American people. I emphasized how USIP provides the U.S. government and those working to end conflict around the world with proven solutions to manage political tensions before they escalate and to support peace processes. I connected visitors with experts who talked about how they deployed technical expertise to strategically important countries and regions, to work directly with U.S. allies and like-minded leaders on innovative ways to reduce drivers of conflict.

Workshops demonstrated how USIP trained peace negotiators and mediators, diplomats, and security actors on peacebuilding approaches to ending destabilizing conflicts. Through exhibits and open houses, I informed the public about how peacebuilding is used to address issues like violent extremism and mass migration.

8. USIP has catalogued over 500 testimonials from visitors affirming the value of its public engagement programs, and welcomed at least 44,000 visitors to USIP's headquarters in Washington, D.C. since 2011.

**Serious Medical Condition**

9. In late December 2024, I was diagnosed with a Chiari I malformation in my brain, which is characterized by overgrowth of the cerebellum brain tonsils. The symptoms I experience include severe headaches three to four times a week that do not respond to most pain management medication. If left untreated, Chiari I malformation symptoms can evolve to include numbness, tingling, imbalance, vertigo, and permanent neurological damage.

10. My neurologist and neurosurgeon assess that surgery is likely the only long-term treatment option available. In late December 2024, they ordered additional diagnostic imaging and new prescriptive pain management medication.

11. I was approved for FMLA Intermittent Leave on December 30, 2024 related to this diagnosis. I began trying the pain management prescription on March 11, 2025, and I completed the final diagnostic MRIs on March 29, 2025.

**Disruption in Health Insurance**

12. On Friday, March 28, 2025 at 11:46 p.m.—without cause or warning—I received an employment termination notice from USIP to my personal email address.

13. Attached here as Exhibit A is a true and correct copy of the Termination Letter I received on March 28, 2025.

14. The Severance Agreement and Release of Claims document that was included in the email terminating my employment and is attached here as Exhibit B, states as follows at Paragraph 2:

> Your health benefits will continue through March 31, 2025. Pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), you will have an opportunity to continue health care benefits at your expense for a period of time. Your COBRA period will begin on the first day of the month following your Departure Date through September 30, 2026. You will receive separate information regarding details of choosing this option.

15. USIP did not provide the referenced "information regarding details" of insurance coverage through COBRA and as such I was unable to make an informed decision about the insurance options legally available to me by the enrollment deadline of Monday, March 31, 2025 for coverage beginning April 1, 2025. I had one business day (Monday, March 31, 2025) after my sudden termination to research, select, and enroll in new health coverage before my health insurance coverage expired.

16. As of the date of this Declaration, I still have not received information from USIP regarding continuing health care benefits through COBRA.

17. The sudden and unexpected termination of my job with USIP and resulting loss in my previous employer-supported health care and lack of information or communication regarding post-employment options has direct bearing on my well-being and health.

18. The DC Health Link plan I selected costs $1,206.37 per month and provides the closest amount of coverage to the care I received under my employer-sponsored insurance; though, I will pay more out of pocket for premiums, co-pays, tests, and any hospital visits.

19. I made this choice because of the continuing uncertainty of my brain diagnosis and my need to regularly access specialists and prescription medication through a consistent and enduring health insurance plan. In the end, COBRA was essentially a non-option because USIP never provided the information on cost and coverage that I needed to make an informed decision.

20. Due to the loss of employer-supported health care insurance coverage after March 31, 2025, and due to concern over the potential cost to me, I have delayed and will potentially forgo a second opinion on my neurologist's and neurosurgeon's recommendations to seek additional imaging and long-term prescriptive pain management medication, which I had scheduled to begin on April 14, 2025.

21. Further, due to the costs without my employer-sponsored insurance, I have delayed or will forgo return visits to my neurologist to monitor my experience of the new pain management prescription, a follow-up appointment with my neurosurgeon to discuss the findings of the March 29 MRIs and the diagnostic impact on the potential surgery recommendation.

22. I am still not confident that I made the best possible health care insurance decision for my situation, and I do not know if I will be able to access the level of care that I need—and was previously receiving by virtue of my employment with USIP—without incurring significant costs, for which I was not planning nor given any notice to prepare for.

23. Further, this is not in keeping with USIP's previously stated severance policies. Thus, I had not conceived or, or prepared for, the potential for a sudden loss of health coverage or need to select a new plan with little/no information from USIP.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Washington, District of Columbia on 10 April, 2025.

_____
ELIZABETH QUINLAN

Severance Policy

Share thisLike

SubscribeFavorite

PrintPDFShow Page Details

- Published:05/02/2019

- Last Updated:09/10/2024

**Terms and conditions under which USIP employees may receive severance pay and benefits if employment is terminated.**

Applicability

This policy applies to all full-time and part-time employees of the Institute who satisfy the eligibility criteria, in the event of an involuntary separation. This policy is effective and supersedes any previous severance policy. The Institute reserves the sole right to interpret, amend, or terminate this policy.

Policy

This policy outlines the terms and conditions under which USIP employees may receive severance pay and benefits if their employment with the Institute is terminated.

Eligibility

The Institute may grant severance pay to an eligible employee in the event of an involuntary separation or if such an employee submits a voluntary resignation in lieu of an involuntary separation.

To qualify as an eligible employee, the employee must:

- Have served under a qualifying appointment

- Have been continuously employed by the Institute under one or several qualifying appointments for more than 12 months prior to the request of severance; and

- Have executed and returned the Separation Agreement and Release Claims. The Separation Agreement and Release Claims may be modified to comply with the requirements of the Age Discrimination in Employment, the Older Workers Benefit Protection Act, and other applicable federal and D.C. law.

Waivers to the above criteria are subject to approval by the Executive Office through consultation with the Office of Human Resources.

An eligible employee may not qualify for severance if the employee is removed from employment owing to a termination, if they submit a voluntary resignation in lieu of termination, if the employee's not-to-

exceed date is not extended, or if the employee submits a voluntary resignation outside the context of an otherwise involuntary separation.

Amount of Severance Pay

Basic Severance Pay Amount

An eligible employee may receive 2 weeks' basic pay for the first 12 months of employment as basic severance pay.

Additional Severance Pay

An eligible employee may receive 1 additional week of basic pay for each additional full year of continued employment beyond 12 months, up to 10 weeks of additional severance pay.

Calculating Severance Pay

Severance pay is the product of the basic pay times the number of weeks of eligibility for severance pay.

Health Benefits

Eligible employees may continue their current kind and level of elected USIP health benefits coverage under COBRA at USIP expense effective as of the first day of the calendar month following their departure date, should they elect to continue insurance coverage under COBRA. The length of coverage is as follows:

| Weeks of Severance Pay | Length of Paid Health Coverage under COBRA |
| --- | --- |
| 2–4 weeks | 1 month |
| 5–8 weeks | 2 months |
| 9–12 weeks | 3 months |

Re-employment by the Institute

Re-employment with the Institute terminates an employee's right to any continued or unpaid severance pay or benefits.

Exceptions

In special circumstances, the President (or designated representative) may, at their sole discretion, authorize severance pay and benefits that differ from these prescribed amounts and eligibility.



# Separation Agreement and Release of Claims

March 28, 2025

Elizabeth Quinlan

1308 Clifton St NW 214
Washington, DC 20009

Dear Elizabeth,

At the direction of the President of the United States Institute of Peace, you are terminated from your position as Program Officer, PE and DC Partnerships with the United States Institute of Peace effective March 28, 2025 ("Departure Date"). This letter will confirm that your employment with the United States Institute of Peace, inclusive of any related entities or subsidiaries (collectively "USIP") will end on March 28, 2025. If you elect to sign this Separation Agreement and Release of Claims ("Agreement"), upon your signature this will constitute the complete agreement between you and USIP regarding the terms of your separation from employment. If you choose not to sign, you will receive the benefits described in paragraphs 1 and 2 below. In either event you must comply with the requirements in paragraph 3.

1. On or around ***Aprill 11, 2025***, you will receive a check for all unpaid wages and accrued, unused vacation due through your Departure Date, less applicable payroll deductions.

2. Your health benefits will continue through March 31, 2025. Pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), you will have an opportunity to continue health care benefits at your expense for a period of time. Your COBRA period will begin on the first day of the month following your Departure Date through September 30, 2026. You will receive separate information regarding details of choosing this option. All other benefits will terminate on your Departure Date, except that you retain benefit rights under USIP's section 403(b) Plan solely as provided under the terms of such plan.

3. Return all USIP property currently in your possession or under your control, whether at the work site or elsewhere, to either Mr. Marshall Rich or Mr. Carter Farmer. You can do this by scheduling a visit to USIP Headquarters using the Calendly link provided below. Please note that all property must be returned by April 7, 2025. This includes, but is not limited to:

    - Computers and computer peripherals (printers, monitors, etc.)
    - Tablets and phones

- Keys, building access badges, and any other US government–issued ID cards issued on USIP's behalf
- Parking hang tags
- All original and copies of any written, recorded, or computer-readable information related to USIP, including its procedures, contact lists, and other business information

Use the Calendly link below to schedule your visit to USIP Headquarters to complete all required turn-ins and action items. Upon arrival, please enter through the main entrance, where you will be directed to the appropriate location. You may drive your vehicle, which will be screened upon entry. You will also be screened before entering the building. No personal phones or recording devices are allowed. Rest assured, this process is designed to ensure a smooth, safe, and efficient return of the USIP property and finalize any open administrative actions.

If you hold a security clearance through USIP, you will receive a Classified Non-Disclosure Agreement from USIP's Personnel Security Manager. You must sign and return this form. All USIP property and materials, kept at the office or elsewhere, must be returned by April 7, 2025. This close-out process is critical for our security measures to finalize your transition.

**CLICK HERE TO SCHEDULE YOUR APPOINTMENT**

4. In addition to the above, under the terms and conditions as detailed below, USIP will agree to provide you additional payments and other benefits, which you acknowledge are payments and benefits to which you are otherwise not entitled if you do not sign this Agreement. If you do not sign this Agreement, you will not receive the additional payments and benefits. The payments and other benefits set forth below in Paragraph 5 are being offered solely in consideration for your release of claims, as set forth below. The payments are not an admission of any wrongdoing by USIP.

5. Solely in consideration for execution of this Agreement and release of all claims against USIP, USIP will provide you the following:

   a) Additional amount of $4,946.89. This amount, to which you would otherwise not be entitled, will be paid in pay periods following your last day.

   b) At USIP's expense, continuation of health benefits coverage under COBRA for one month beginning the first day of the calendar month following your Departure Date. After such time, you may, at your own expense, continue health benefits for whatever balance of time to which you are entitled under COBRA.

6. (a) If you are age 40 or older on your Departure Date, pursuant to the Older Workers Benefit Protection Act (OWBPA):

   (i) You acknowledge that you received a copy of this Agreement on March 28, 2025.

    (ii)    You acknowledge that by signing this Agreement, you are giving up claims and rights under the Age Discrimination in Employment Act of 1967, as amended.

    (iii)    You may consult an attorney before executing this Agreement (2); that you have up to twenty-one (21) days to consider this Agreement, although you may, at your discretion, waive your right to consider it for the full 21-day period and may sign and return the Agreement at any earlier time.

    (iv)    You agree that in waiving rights or claims under the terms of this Agreement, you do so in exchange for consideration that is in addition to anything that USIP would otherwise be obligated to provide to you and that this Agreement has been written in a manner that you understand.

    (v)    You further acknowledge that you may, after signing, revoke your waiver of Age Discrimination in Employment Act claims under this Agreement at any time up to seven (7) calendar days by written notice received by USIP's HR specialists before the seven (7) day period expires. The day after the revocation period expires is the Effective Date of this Agreement. If you do not execute the Agreement within the time permitted, then USIP's offer as set forth in Paragraph 4 will expire by its own terms at such time.

7. In consideration for the promises in this Agreement, you agree, on behalf of yourself and anyone claiming through you, to unconditionally release and forever discharge USIP from any and all claims, liabilities, promises, actions, damages, and the like, known and unknown, which you may have or which could be asserted on your behalf, based on any action, omission, or event that existed or occurred prior to your execution of this Agreement. This is a general release, and includes, without limitation, claims under the Age Discrimination in Employment Act, Title VII of the 1964 Civil Rights Act, the Worker Adjustment and Retraining (WARN) Act, the Americans with Disabilities Act (ADA), the Family and Medical Leave Act (FMLA), the Employment and Retirement Income Security Act (ERISA), the National Labor Relations Act, and all other federal, state, or other laws, orders, or regulations. Included in this general release, without limitation, are claims of wrongful discharge, that USIP or other Releasees have treated you unfairly or in bad faith, tortious claims, claims of express or implied contract of employment, or any other cause of action or claim of violation of the common law. Also included in this general release are all claims for attorney fees, costs, and for future damages based on the alleged continuation of the effects of any past action, omission, or event.

8. You understand and agree that the terms of this Agreement are confidential, and you agree not to disclose the terms of this Agreement, except as required by law, requested by governmental agencies, or with the advance written consent of USIP. Notwithstanding this Paragraph 8, you are not precluded from making a disclosure of the terms of this Agreement to your immediate family or for purposes of securing professional, financial, tax or legal services, provided that, prior to making any such disclosure, you inform any such persons that this confidentiality clause is in effect and that they are also bound by it.

9. You agree that your obligations under Paragraphs 3, 6 and 7 are material and that, in the event you breach any of those obligations under this Agreement, USIP will be entitled to recover the full amounts paid under Paragraph 4 above, and to obtain all other remedies provided by law or equity.

10. If any portion of this Agreement should ever be determined to be unenforceable, it is agreed that this will not affect the enforceability of any other clause of the remainder of this Agreement.

11. This Agreement shall take effect immediately upon signing by all parties, except as to paragraphs 1 and 2, which are in effect upon delivery of this letter to you, and the waiver of Age Discrimination in Employment Act claims, which shall take effect on the 8th day after signing by all parties, provided that you have not revoked your waiver of Age Discrimination in Employment Act claims (if applicable), as set forth in paragraph 5(a)(v).

12. This Agreement and any dispute arising thereunder shall be governed by and construed in accordance with the laws of the District of Columbia without regard to its principles of conflict or choice of laws.

Mirna Rivas

Acting Vice President

Human Resource

**By signing this Agreement, I acknowledge all of the following:  I have had the opportunity to review this Agreement carefully with legal or other personal advisors of my own choice; I understand that by signing this Agreement I am releasing USIP of all claims against it;  I have read this Agreement and understand its terms; I have been given a reasonable period of time to consider its terms and effect and to ask any questions I may have; I voluntarily agree to the terms of this Agreement.**

**ACCEPTED**:

_____          _____
Employee Name                                                                    Date