UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SASHA PIPPENGER, et al.,

Plaintiffs,

v.                                                          Civil Action No. 25-1090 (BAH)

U.S. DOGE SERVICE, et al.,

Defendants.

**OPPOSITION TO THE MOTION FOR A TEMPORARY RESTRAINING ORDER**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION.................................................................................................................. 1

BACKGROUND .................................................................................................................. 1

I.    The Institute is an Establishment of the United States and Exercises Executive
Functions................................................................................................................ 1

II.   The President Lawfully Removed the Former Board Members, and the Remaining
Board Members in Turn Properly Removed George Moose ................................. 4

LEGAL STANDARD......................................................................................................... 5

ARGUMENT ...................................................................................................................... 6

I.    Plaintiffs Are Not Likely to Succeed on the Merits ................................................ 6

    A.    The Court Lacks Jurisdiction Over Many of Plaintiffs' Claims ............................ 6

        1.    Plaintiffs Do Not Have a Legally Protected Interest or Standing to
Pursue Many of Their Claims ................................................................. 6

        2.    The Tucker Act Bars Jurisdiction Over Claims Sounding in
Contract.................................................................................................... 7

    B.    Plaintiffs Are Unlikely to Show that the President Unlawfully Removed
Members of the Institute's Board................................................................ 9

        1.    The Institute Is Part of the Executive Branch ............................................ 9

            a.    The Institute Is Part of the United States Government ................. 10

            b.    The Characteristics of the Institute Plainly Reflect Those of
an Executive Branch Agency ........................................................ 14

            c.    The Institute's Status as an Executive Branch Agency Is
Confirmed by Federal Statutes and the Historic Way It Has
Been Treated Under the Law ........................................................ 17

        2.    The Institute Exercises No Quasi-Judicial or Quasi-Legislative
Functions, and Thus, Its Board Members Are Removable by the
President in His Discretion ...................................................................... 18

            a.    *Myers*, *Seila Law*, and *Collins* Dictate the Result Here................ 18

            b.    *Humphrey's Executor* and *Wiener* Are Inapposite ........................ 19

           c.      Plaintiffs' Other Grounds for Permitting For-Cause
Removal of Institute Board Members Fail.................................... 21

       3.      Plaintiffs' Other Claims Rise and Fall with Their Removal Claims......... 22

C.      Plaintiffs' APA Claims at Counts II and II Are Unlikely to Succeed................... 22

       1.      USDS Is Not an "Agency" Subject to the APA ....................................... 22

       2.      Plaintiffs Fail to Identify a Final Agency Action ...................................... 25

       3.      Plaintiffs Fail to Identify an APA Violation ............................................... 27

D.      Plaintiffs' Ultra Vires Claims Will Likely Fail ....................................... 28

II.      Plaintiffs Have Not Shown that They Will Face Imminent Irreparable Harm
Absent a Temporary Restraining Order ........................................................................ 29

A.      Economic Loss ................................................................................................... 29

B.      Health Insurance .............................................................................................. 31

C.      Reputation ......................................................................................................... 33

D.      Physical Danger ................................................................................................ 34

E.      Disclosure of Information ................................................................................. 36

F.      Business Loss ..................................................................................................... 36

III.     The Equities and Public Interest Favor the Government .................................................. 37

IV.    Any Restraining Order Should Be Limited ..................................................................... 38

V.     Any Restraining Order Should Be Accompanied by Security and Stayed ....................... 39

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) ............................................... 5

*Am. Fed. of Labor & Congress of Indus. Orgs. v. Dep't of Labor, .*
Civ A. No. 25-0339, 2025 WL 542825 (D.D.C. Feb. 14, 2025) ........................... 24

*Am. Federation of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin., Civ. A.*
No. 25-0596, 2025 WL 868953 (D. Md. Mar. 20, 2025) ........................ 34

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ............................................... 15

*American Foreign Service Association v. Trump, Civ. A.*
No. 25-0352, 2025 WL 573762 (D.D.C. Feb. 21, 2025) .................................. 31, 32

*APA. Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ............................................... 8

*Aviel v. Gor*,
Civ. A. No. 25-0778, 2025 WL 1009035 (D.D.C. Apr. 4, 2025) ..................................... 28, 29

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................... 25

*Buckley v. Valeo*,
424 U.S. 1 (1976) ............................................... 16

*Cecile Indus., Inc. v. Cheney*,
995 F.2d 1052 (Fed. Cir. 1993) ............................................... 8

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ............................................... 21

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ............................... 27, 28, 30, 32, 33, 34

*Collins v. Yellen*,
594 U.S. 220 (2021) ............................................... 18, 20, 21

*Congress," Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ............................................... 25, 26

*CREW v. U.S. Doge Serv.*,
Civ. A. No. 25-0511, 2025 WL 752367 (D.D.C. Mar. 10, 2025) ........................... 24

*Crowley Gov't Servs., Inc. v. GSA*,
  38 F.4th 1099 (D.C. Cir. 2022) ................................................................ 7

*Ctr. for L. & Educ. v. Dep't of Educ.*,
  396 F.3d 1152 (D.C. Cir. 2005) ............................................................... 6

*Dalton v. Sherwood Van Lines, Inc.*,
  50 F.3d 1014 (Fed. Cir. 1995) .................................................................. 8

*Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*,
  166 F.3d 356 (D.C. Cir. 1999) ................................................................ 28

*Davis v. Pension Benefit Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ............................................................. 36

*Dellinger v. Bessent*,
  Civ. A. No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025) ......... 36

*Dep't of Educ. v. California*,
  No. 24A910, 2025 WL 1008354 (U.S. Apr. 4, 2025) .................................. 7-8, 35

*Dep't of Homeland Sec. v. New York*
  140 S. Ct. 599 (2020) ............................................................................ 37

*Does 1-26 v. Musk*,
  Civ. A. No. 25-0462, 2025 WL 840574 (D. Md. Mar. 18, 22025) ............... 29, 34

*Dong v. Smithsonian Inst.*,
  125 F.3d 877 (D.C. Cir. 1997) ............................................................... 22

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999) ................................................................. 38

*Elec. Data Sys. Fed. Corp. v. Gen. Servs. Admin.*,
  629 F. Supp. 350 (D.D.C. 1986) .............................................................. 6

*Esparraguera v. Dep't of the Army*,
  101 F.4th 28 (D.C. Cir. 2024) ................................................................. 6

*Farris v. Rice*,
  453 F. Supp. 2d 76 (D.D.C. 2006) .......................................................... 28

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70*,
  415 U.S. 423 (1974) ............................................................................... 5-6

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ............................................................................... 15

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ................................................................................. 15, 36

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    219 F. Supp. 2d 57 (D.D.C. 2002) ...................................................... 36

*Hulli v. Mayorkas*,
    549 F. Supp. 3d 95 (D.D.C. 2021) ...................................................... 5

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) ............................................................... 9, 17, 19

*Wiener v. United States*,
    357 U.S. 349 (1958) ................................................................ 19, 20

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949) ..................................................................... 27

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995) ..................................................................... 12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...................................................................... 6

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ..................................................................... 37

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ...................................................................... 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ...................................................................... 26

*Muthana v. Pompeo*,
    985 F.3d 893 (D.C. Cir. 2021) ......................................................... 15

*Myers v. United States*,
    272 U.S. 52 (1926) ................................................................. 17, 18

*Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*,
    435 F.3d 326 (D.C. Cir. 2006) ......................................................... 37

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ................................................................. 25, 26

*Postal Police Off. Ass'n v. U.S. Postal Serv.*,
    502 F. Supp. 3d 411 (D.D.C. 2020) ..................................................... 5

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
    489 F.3d 1279 (D.C. Cir. 2007) ......................................................... 6

*Risteen v. Youth for Understanding, Inc.*,
    245 F. Supp. 2d (D.D.C. 2002) ........................................................ 31

*Sampson v. Murray*,
  415 U.S. 61 (1974) ................................................................ 28, 29, 31

*Seila Law LLC v. Consumer Financial Protection Bureau*,
  591 U.S. 197 (2020) ................................................................ 18, 20

*Shelley v. Am. Postal Workers Union*,
  775 F. Supp. 2d 197 (D.D.C. 2011) ......................................... 6

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ................................................. 5

*Student Loan Mktg. Ass'n v. Riley*,
  104 F.3d 397 (D.C. Cir. 1997) ................................................. 17

*U.S. Conf. of Catholic Bishops v. Dep't of State*,
  Civ. A. No. 25-465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ........... 8, 34

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936) ................................................................ 15

*Widakuswara v. Lake*,
  2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) ............................. 29

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579–611 (1952) ......................................................... 16

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1–14 (2015) ............................................................... 15

## Statutes

5 U.S.C. § 103(1) .......................................................................... 16

5 U.S.C. § 104(a) .......................................................................... 17

5 U.S.C. § 105 ............................................................................... 16

5 U.S.C. § 415(a)(2) ...................................................................... 11

5 U.S.C. § 415(h) .......................................................................... 11

5 U.S.C. § 551(1) .......................................................................... 22

5 U.S.C. § 704 ........................................................................... 24, 25

5 U.S.C. § 8336(c)(1) ..................................................................... 16

22 U.S.C. § 4601 ........................................................................... 14

22 U.S.C. § 4601(a) ..................................................................... 2, 14

22 U.S.C. § 4601(b) ....................................................................... 14

22 U.S.C. § 4603 ............................................................... 2, 3, 4, 10, 17

22 U.S.C. § 4604(h)(3) ............................................................. 10, 17

22 U.S.C. § 4604(o) ........................................................................................ 3, 10

22 U.S.C. § 4605 ................................................................................................... 16

22 U.S.C. § 4605(a) ............................................................................................. 2-3

22 U.S.C. § 4605(b) ................................................................................. 3, 10, 16

22 U.S.C. § 4605(c) ................................................................................................. 3

22 U.S.C. § 4605(h) ........................................................................................ 3, 10

22 U.S.C. § 4605(j) ......................................................................................... 3, 10

22 U.S.C. § 4606 ...................................................................................... 3, 5, 21

22 U.S.C. § 4606(f)(1) .................................................................................. 4, 10

22 U.S.C. § 4607(i) ......................................................................................... 3, 10

22 U.S.C. § 4610 ..................................................................................... 4, 10, 17

28 U.S.C. § 1491(a) ................................................................................................. 8

29 U.S.C. § 154(a) ................................................................................................. 16

41 U.S.C. § 7102(a)(2) ........................................................................................... 8

41 U.S.C. § 7103(a)(1) ........................................................................................... 8

41 U.S.C. § 7104(b)(1) ........................................................................................... 8

42 U.S.C. § 12209(4) ........................................................................................... 13

45 U.S.C. § 541 (1995) ....................................................................................... 12

## Other

59 Fed. Reg. 43598, 43599 (Aug. 24, 1994) ................................................ 11

60 Fed. Reg. 55742, 55743 (Nov. 2, 1995) .................................................. 11

61 Fed. Reg. 50514, 50516 (Sept. 26, 1996) ................................................ 11

62 Fed. Reg. 23505, 23507 (Apr. 30, 1997) ................................................. 11

63 Fed. Reg. 37421, 37422 (July 10, 1998) ................................................. 11

64 Fed. Reg. 45291, 45293 (Aug. 19, 1999) ........................................... 11-12

65 Fed. Reg. 38611, 38612 (June 21, 2000) ................................................ 12

66 Fed. Reg. 20492, 20493 (Apr. 23, 2001) ................................................ 12

67 Fed. Reg. 46218, 46220 (July 12, 2002) ................................................ 12

68 Fed. Reg. 35015, 35016 (June 11, 2003) ................................................ 12

70 Fed. Reg. 4157, 4158 (Jan. 28, 2005) ..................................................... 12

71 Fed. Reg. 24872, 24875 (Apr. 27, 2006) ................................................ 12

71 Fed. Reg. 39690, 39691 (July 13, 2006) ................................................ 12

72 Fed. Reg. 67985, 67987 (Dec. 3, 2007) .................................................. 12

74 Fed. Reg. 3656, 3657 (Jan. 21, 2009) ..................................................... 12

79 Fed. Reg. 1896, 1897 (Jan. 10, 2014) ....................................................................... 12

90 Fed. Reg. 10577 (Feb. 19, 2025) ........................................... 4, 5, 26, 28, 29, 30, 36

Defendants, through undersigned counsel, respectfully oppose Plaintiffs' motion for a temporary restraining order.

## INTRODUCTION

The United States Institute of Peace (the "Institute") receives millions of dollars of taxpayer appropriations each year with the goal of enhancing the United States' soft power and diplomatic efforts internationally and obviating the need for military action. The Institute is led by a board selected by the President with the advice and consent of the Senate, and whose constituency is guaranteed to always track the political party of the President. On these basic facts, any reasonable observer would easily recognize the Institute to be an Executive Branch component of the Nation's federal government, exercising executive power and performing executive functions.

Plaintiffs, however, argue to the contrary. Attempting to insulate themselves from the President's Article II removal powers, Plaintiffs—mostly former employees and contractors—contend the Institute is not a government agency at all, or at least sits outside of the Executive Branch and exercises no executive power whatsoever. This bizarre assertion flies in the face of the Institute's organic statute, the fundamental structure of the Constitution, case law, and well-established law recognizing the President's authority to supervise the entire Executive Branch. Accordingly, because the Institute does not fall into the exception created by *Humphrey's Executor*, its leadership (the Institute's board) must be removable by the President at will. For these and the other reasons set forth below, the motion for a temporary restraining order should be denied.

## BACKGROUND

### I.    The Institute is an Establishment of the United States and Exercises Executive Functions

In 1984, Congress established the Institute through the Department of Defense Authorization Act of 1985, Act. Pub. L. No. 98-525, tit. XVII, § 1701, 98 Stat. 2492, 2649 (1984).

*See* 22 U.S.C. §§ 4601–4611. In the Institute's organic statute, Congress made several findings

that prompted the Institute's creation, including the following:

(1)     a living institution embodying the heritage, ideals, and concerns of the American people for peace would be a significant response to the deep public need for the Nation to develop fully a range of effective options, in addition to armed capacity, that can leash international violence and manage international conflict; . . .

(4)     there is a national need to examine the disciplines in the social, behavioral, and physical sciences and the arts and humanities with regard to the history, nature, elements, and future of peace processes, and to bring together and develop new and tested techniques to promote peaceful economic, political, social, and cultural relations in the world; . . .

(6)     there is a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information;

(7)     the Commission on Proposals for the National Academy of Peace and Conflict Resolution, created by the Education Amendments of 1978, recommended establishing an academy as a highly desirable investment to further the Nation's interest in promoting international peace;

(8)     an institute strengthening and symbolizing the fruitful relation between the world of learning and the world of public affairs, would be the most efficient and immediate means for the Nation to enlarge its capacity to promote the peaceful resolution of international conflicts; and

(9)     the establishment of such an institute is an appropriate investment by the people of this Nation to advance the history, science, art, and practice of international peace and the resolution of conflicts among nations without the use of violence.

22 U.S.C. § 4601(a).

To fulfill these needs, Congress created the Institute as an establishment of the United

States. 22 U.S.C. § 4603(a). As to its form, the Institute is organized as a nonprofit corporation and

prohibited from having any owner other than its incorporator, the United States. *Id.* § 4603(b)

("The Institute is an independent nonprofit corporation . . . The Institute does not have the power

to issue any shares of stock[.]"). Authority to run the Institute is vested in its board of directors. *Id.*

§ 4605(a). The board consists of three voting ex officio members—the Secretary of State, the Secretary of Defense, and the president of the National Defense University—and twelve appointed members. *Id.* § 4605(b). The appointed members are "appointed by the President, by and with the advice and consent of the Senate." *Id.* § 4605(b)(4). No more than eight total members can be from one political party, but by virtue of the ex officio members, the Institute's board is designed to be dominated by the political party of the President. *Id.* § 4605(c).

The Institute's board has the power to select a president of the Institute. *Id.* § 4606(a). The president and other officers of the Institute "serve at the pleasure of the Board[,]" meaning they can be removed by the board at any time for any reason. *Id.* The Institute receives congressional appropriations and is prohibited from receiving non-governmental funds except for two highly specific activities—the construction and maintenance of a suitable headquarters and program-related hospitality. *Id.* § 4605(h)(3). The Institute, including through its president, is authorized to "receive and disburse public moneys, obtain and make grants, enter into contracts, [and] establish and collect fees," among other authorities. *Id.* § 4606(b).

The Institute's organic statute includes various other provisions, including:

(a)    it is authorized to use the name and seal of the United States, *id.* § 4603;

(b)    it is subject to the Freedom of Information Act, *id.* § 4607(i);

(c)    it is required to publish notices of board meetings in the Federal Register, *id.* § 4605(h)(3);

(d)    it can obtain services and support from the General Services Administration ("GSA"), *id.* § 4604(o);

(e)    the compensation of its board members, president, and employees are set by federal statute, *id.* §§ 4605(i), 4606(a), 4606(c);

(f)    reimbursement of its board's travel expenses is controlled by federal statute, *id.* § 4605(j);

(g)    the Federal Tort Claims Act applies to it and its officers and employees, *id.* § 4606(f)(1);

(h)    its employees receive federal government benefits (e.g., workers compensation, civil service retirement, federal life insurance, and federal health insurance), *id.* § 4606(f)(1); and

(i)    upon liquidation, its asserts revert to the United States Treasury, *id.* § 4610.

## II.    The President Lawfully Removed the Former Board Members, and the Remaining Board Members in Turn Properly Removed George Moose

On February 19, 2025, President Trump signed Executive Order 14,217. Exec. Order 14,217, 90 Fed. Reg. 10577 (Feb. 19, 2025). That Order described the policy of President Trump's administration "to dramatically reduce the size of the Federal Government, while increasing its accountability to the American people." *Id.* § 1. To fulfill that objective, the President directed that "[t]he non-statutory components and functions of [certain identified] governmental entities shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law[.]" *Id.* § 2(a). The Institute was among the identified entities. *Id.* § 2(a)(iv).

To carry out that Executive Order, on or about March 14, 2025, the White House Presidential Personnel Office notified the Institute's board members that they had been terminated from their positions with the Institute. Am. Compl. ¶ 69, ECF No. 9. Thereafter, the remaining Institute board members (i.e., the ex officio members) issued a resolution of the board removing the then-acting Institute president, George E. Moose, and designating a new president, Kenneth Jackson. *See* Bd. Resolution, ECF No. 18-1.

In response, Moose barricaded the Institute's then-headquarters and only permitted Jackson to enter with the assistance of law enforcement. *See* Am. Compl. ¶¶ 73-80. After successfully

gaining access to the Institute's headquarters, Jackson began efforts to implement the Executive Order.

By resolution effective March 25, 2025, the Institute's board removed Jackson as the Institute's president and appointed Nate Cavanaugh as the Institute's acting president. Bd. Resolution, ECF No. 18-3. Thereafter, consistent with government property statutes and regulations, the Institute transferred title of its former headquarters to GSA. *See id.*; GSA Form 1334, ECF No. 18-5; Institute Request Letter, ECF No. 18-6; OMB Approval Letter, ECF No. 18-7.

Thereafter, beginning around March 28, 2025, Plaintiffs and other former Institute employees began receiving termination letters. *See* Am. Compl. ¶¶ 99-107. As at-will employees, they could be terminated for any reason and without warning. *See* 22 U.S.C. § 4606(a) ("All officers shall serve at the pleasure of the Board."); *id.* § 4606(b) ("The president . . . may . . . remove such employees of the Institute as the president determines necessary to carry out the purposes of the Institute.").

## LEGAL STANDARD

A temporary restraining order ("TRO") is "an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion." *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021) (quoting *Postal Police Off. Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 418 (D.D.C. 2020)). As with a preliminary injunction, a party seeking a temporary restraining order must establish "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). A court also considers the "underlying purpose" of a TRO—"preserving the status quo and

preventing irreparable harm" until it has an opportunity to rule on the merits. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974); *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 202 (D.D.C. 2011) ("The court may issue a temporary restraining order ('TRO') when a movant is faced with the possibility that irreparable injury will occur even before the hearing for a preliminary injunction required by Federal Rule of Civil Procedure 65(a) can be held."); *Elec. Data Sys. Fed. Corp. v. Gen. Servs. Admin.*, 629 F. Supp. 350, 352 (D.D.C. 1986) ("In the context of the limited purpose of a temporary restraining order, the Court's analysis of these factors seeks principally to ensure preservation of the status quo.").

## ARGUMENT

### I.    <u>Plaintiffs Are Not Likely to Succeed on the Merits</u>

#### A.    **The Court Lacks Jurisdiction Over Many of Plaintiffs' Claims**

##### 1.    *Plaintiffs Do Not Have a Legally Protected Interest or Standing to Pursue Many of Their Claims*

The "irreducible constitutional minimum of standing contains three elements": (1) the plaintiff must have suffered injury in fact, an actual or imminent invasion of a legally protected, concrete and particularized interest; (2) there must be a causal connection between the alleged injury and the defendant's conduct at issue; and (3) it must be "likely," not " speculative," that the court can redress the injury. *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The "party invoking federal jurisdiction bears the burden of establishing these elements." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007). Notably, if an "employee serves at will—that is, if the government may remove her for 'any constitutionally permissible

reason or for no reason at all'—the employee has no property interest" in her position. *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024).

Plaintiffs are not likely to succeed on the merits of their claims because they lack standing to seek the relief they request. For example, Plaintiffs ask the Court to "[d]eclare that USPS's Board and officers as of March 14, 2025 are the lawful Board members and officers of USIP," Am. Compl. at 36, but Plaintiffs—who are not themselves Board members—do not have a concrete and particularized interest in the employment of the board members. Plaintiffs also ask the Court to "restore all USIP employees terminated since March 14, 2025 to their prior roles on paid leave status," Am. Compl. at 36; but, similarly, Plaintiffs do not have a concrete and particularized interest in the employment of "all USIP employees" other than themselves. None of Plaintiffs have an interest in the headquarters for USIP or its endowment either, even though they ask the Court to "enjoin USIP, the Endowment of USIP, USIP's Board, and USIP's officers from transferring any assets outside of USIP or the Endowment for USIP." Am. Compl. at 36. Nor would a return of the headquarters to the Institute's possession redress any injury claimed by them.

        2.       *The Tucker Act Bars Jurisdiction Over Claims Sounding in Contract*

Generally, the federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Although the Administrative Procedure Act ("APA") provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *id.*, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

When a party seeks to challenge the terms of a contract it has entered into with the United States, the proper remedy is typically suit under the Tucker Act, not the APA. *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (noting that the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over suits based on any express or implied contract with the United States). The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). As the D.C. Circuit has explained, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (cleaned up); *see also U.S. Conf. of Catholic Bishops v. Dep't of State*, Civ. A. No. 25-465 (TNM), 2025 WL 763738, at *8 (D.D.C. Mar. 11, 2025), *appeal docketed* No. 25-5066 (D.C. Cir.).

Further, the Contract Disputes Act "applies to any express or implied contract . . . made by an executive agency for . . . the procurement of services." 41 U.S.C. § 7102(a)(2). Under the Act, "[e]ach claim by a contractor against the [f]ederal [g]overnment relating to a contract shall be submitted to the contracting officer for a decision." 41 U.S.C. § 7103(a)(1). After such a claim has been made, "a contractor may bring an action directly on the claim in the United States Court of Federal Claims." 41 U.S.C. § 7104(b)(1). Moreover, there is no genuine dispute that the Court of Federal Claims enjoys exclusive jurisdiction over claims arising out of the Contracts Disputes Act. *See Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1055 (Fed. Cir. 1993) ("The [Contract Disputes Act] exclusively governs Government contracts and Government contract disputes."). Put differently, "[w]hen the Contract Disputes Act applies, it provides the exclusive mechanism for dispute resolution; the Contract Disputes Act was not designed to serve as an alternative

8

administrative remedy, available at the contractor's option." *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995).

Here, among other things, Plaintiffs ask the Court to restore personal services contractors and enjoin the termination of personal service contractors. *See* Proposed Order, ECF No. 11-18. Plaintiff Chester Crocker declared he donated about $35,000 to the Institute over the years, which he believes "violates [his] contractual understanding with the USIP Endowment." Crocker Decl. ¶¶ 4-5, 8, ECF No. 11-13. Plaintiff InterMotion Media, LLC declared that it has now lost almost $15,000 for contract services. InterMotion Media Decl. ¶ 12, ECF No. 11-15. Plaintiff Mohamed Khalil Abuznad declares that he was a personal service contractor in Libya but he provides no other details. Abuznad Decl. ¶ 1, ECF No. 11-12. The Court is not likely to have jurisdiction over these claims.

## B. Plaintiffs Are Unlikely to Show that the President Unlawfully Removed Members of the Institute's Board

### 1. The Institute Is Part of the Executive Branch

The Institute is plainly an Executive Branch agency. First, the Institute is clearly part of the Government, not a private corporation sitting outside of it. Second, its place in the Government's tripartite is clear—the Institute exercises no judicial or legislative function, it exercises only executive duties. Because the Institute is part of the Executive Branch and exercises no quasi-judicial or quasi-legislative functions, the President's Article II powers allow him to remove its board members in his discretion. The Institute is far removed from the early-20th century Federal Trade Commission discussed in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and even the current Merit Systems Protection Board and National Labor Relations Board pending at

issue in *Harris v. Bessent*, No. 25-5055 (D.C. Cir.), and *Wilcox v. Trump*, No. 25-5057 (D.C. Cir.).[1]

All of the functions exercised by the Institute are executive in nature. Thus, the Institute's board

members are removable by the President in his discretion. This dooms Plaintiffs' claims.

a.   The Institute Is Part of the United States Government

The Institute falls within the federal government, despite Plaintiffs' arguments to the

contrary. As noted above, the Institute was created by a federal statute. *See* Department of Defense

Authorization Act of 1985, Pub. L. 98-525, 98 Stat. 2492 (Oct. 19, 1984). That statute makes clear

that the Institute is an establishment of the United States. 22 U.S.C. § 4603(a) ("There is hereby

established the United States Institute of Peace."). The Institute's enabling statute is housed in the

U.S. Code's Title 22, "Foreign Relations and Intercourse." The Institute was established in 1984,

with the purpose of being a "soft power weapon" against the Cold War. *See* 26 U.S.C.

§ 170(c)(2)(B) (. . ."organized and operated exclusively for religious, charitable, scientific, literary,

or educational purposes . . .") In signing the Institute into law, President Reagan clearly signaled

his understanding the understanding of the Department of Justice that nothing in the statute's

removal restrictions "restrict[s] the President's constitutional power to remove those officers." This

implies an understanding from the beginning that this was an executive entity and those Board

members are principal officers.

The Institute's organic statute includes various other hallmarks of being part of the federal

government:

a.   its board consists of cabinet officials and individuals appointed by the
President with the advice and consent of the Senate, 22 U.S.C. § 4605(b);

b.   it is authorized to use the name and seal of the United States, *id.* § 4603;

---

[1]    The Supreme Court has now stayed the preliminary injunctions entered by the district court
in those matters. *See Trump v. Wilcox*, No. 24A966 (U.S. Apr. 9, 2025).

c.   it is subject to the Freedom of Information Act, *id.* § 4607(i);

d.   it is required to publish notices of board meetings in the Federal Register, *id.* § 4605(h)(3);

e.   it is funded almost exclusively by appropriations, *id.* § 4604(h)(3);

f.   it is prohibited from issuing stock, and thus, having private owners or members, *id.* § 4603(b);

g.   it can obtain services and support from the General Services Administration, *id.* § 4604(o);

h.   the compensation of its board members, president, and employees are set by federal statute, *id.* §§ 4605(i), 4606(a), 4606(c);

i.   reimbursement of its board's travel expenses is controlled by federal statute, *id.* § 4605(j);

j.   the Federal Tort Claims Act applies to it and its officers and employees, *id.* § 4606(f)(1);

k.   its employees receive federal government benefits (e.g., workers compensation, civil service retirement, federal life insurance, and federal health insurance), *id.* § 4606(f)(1); and

l.   upon liquidation, its assets revert to the United States Treasury, *id.* § 4610.

Given these characteristics, it should come as no surprise that the Institute has long been considered part of the federal government. For example, under the Inspector General Act of 1978, the Office of Management and Budget is required to publish a list of specifically identified "designated federal entities" and separately a list of other "federal entities." 5 U.S.C. § 415(h). A "federal entity" as used under that statute means:

any Government corporation (within the meaning of section 103(1) of this title), any Government controlled corporation (within the meaning of section 103(2) of this title), or any other entity in the executive branch of the Government, or any independent regulatory agency, but does not include—

(A)  an establishment (as defined under section 401 of this title) or part of an establishment;

(B)  a designated Federal entity (as defined under paragraph (1) of this subsection) or part of a designated Federal entity;

(C)     the Executive Office of the President;

(D)     the Central Intelligence Agency;

(E)     the Government Accountability Office; or

(F)     any entity in the judicial or legislative branches of the Government,
        including the Administrative Office of the United States Courts and the
        Architect of the Capitol and any activities under the direction of the
        Architect of the Capitol.

5 U.S.C. § 415(a)(2). Like clockwork, for decades, each listing published in the Federal Register

under the Inspector General Act lists the Institute as a "federal entity." *See* List of Designated

Federal Entities & Federal Entities, 59 Fed. Reg. 43598, 43599 (Aug. 24, 1994); 1995 List of

Designated Federal Entities & Federal Entities, 60 Fed. Reg. 55742, 55743 (Nov. 2, 1995); 1996

List of Designated Federal Entities & Federal Entities, 61 Fed. Reg. 50514, 50516 (Sept. 26, 1996);

1997 List of Designated Federal Entities & Federal Entities, 62 Fed. Reg. 23505, 23507 (Apr. 30,

1997); 1998 List of Designated Federal Entities & Federal Entities, 63 Fed. Reg. 37421, 37422

(July 10, 1998); 1999 List of Designated Federal Entities & Federal Entities, 64 Fed. Reg. 45291,

45293 (Aug. 19, 1999); 2000 List of Designated Federal Entities & Federal Entities, 65 Fed. Reg.

38611, 38612 (June 21, 2000); 2001 List of Designated Federal Entities & Federal Entities, 66

Fed. Reg. 20492, 20493 (Apr. 23, 2001); 2002 List of Designated Federal Entities & Federal

Entities, 67 Fed. Reg. 46218, 46220 (July 12, 2002); 2003 List of Designated Federal Entities &

Federal Entities, 68 Fed. Reg. 35015, 35016 (June 11, 2003); 2004 List of Designated Federal

Entities & Federal Entities, 70 Fed. Reg. 4157, 4158 (Jan. 28, 2005); 2005 and 2006 List of

Designated Federal Entities & Federal Entities, 71 Fed. Reg. 24872, 24875 (Apr. 27, 2006);

Revised 2006 List of Designated Federal Entities & Federal Entities, 71 Fed. Reg. 39690, 39691

(July 13, 2006); 2007 List of Designated Federal Entities & Federal Entities, 72 Fed. Reg. 67985,

67987 (Dec. 3, 2007); 2008 and 2009 List of Designated Federal Entities & Federal Entities, 74

Fed. Reg. 3656, 3657 (Jan. 21, 2009); Fiscal Year (FY) 2013 and (FY) 2014 List of Designated Federal Entities & Federal Entities, 79 Fed. Reg. 1896, 1897 (Jan. 10, 2014).

The Institute's status as a federal entity is also consistent with controlling law. For example, in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 399 (1995), the Supreme Court considered whether Amtrak was part of the federal government for purposes of the First Amendment. After a lengthy analysis, the Court concluded it was, summarizing its holding as:

> We hold that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment.

*Id.* The Court reached this conclusion, despite Amtrak's then-organic statute expressly disavowing its government status, declaring it "will not be an agency or establishment of the United States Government." 45 U.S.C. § 541 (1995). It also rejected the contention that because Amtrak was created as a "corporation," it could not be part of the federal government. *Lebron*, 513 U.S. at 398 ("Amtrak is not merely in the temporary control of the Government (as a private corporation whose stock comes into federal ownership might be); it is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees."). As the Court explained further, "[t]here is no valid basis for distinguishing between many government-sponsored enterprises and other types of government activities, except for the fact that they are designed by law as 'not an agency and instrumentality of the United States Government.' Comparable powers and immunities could be granted to such agencies without characterizing them as non-government." *Id.* at 391 (citation omitted). The Institute's structure and composition resembles that of Amtrak in *Lebron*—it is a corporation where the United States retains the authority to appoint a controlling share of its leadership. As such, under Supreme Court precedent it is part of the federal government.

13

> b.    The Characteristics of the Institute Plainly Reflect Those of an
>         Executive Branch Agency

A component of the federal government must fall into one of three branches: the Legislative, the Executive, or the Judicial Branch. U.S. Const. art. I, II, III. The Institute falls within the Executive Branch. First, it is not the Judicial Branch. The Institute has no authority to conduct contested hearings or render or support administrative, quasi-judicial, or judicial decisions of any sort. 22 U.S.C. §§ 4601–4611. Equally clear, it is not the Legislative Branch. The Institute has no rulemaking authority or other authority to promulgate regulations, rules, or quasi-legislative provisions; nor does it have the exclusive purpose of supporting Congress in its legislative functions. *Id.*; *see also, e.g.*, 42 U.S.C. § 12209(4) (identifying the "instrumentalities of Congress" to be "the Government Accountability Office, the Government Publishing Office, and the Library of Congress").

Further, the process to select the leadership of the Institute is the same as that of typical Executive Branch agencies—nomination by the President and confirmation with the advice and consent of the Senate. That is the process commanded by the Constitution for "ambassadors, other public ministers and consuls, judges of the Supreme Court, and all other officers of the United States[.]" U.S. Const. art. II, § 2, cl. 2 (cleaned up). While the use of this process, which is also used for officials firmly in other branches of the federal government, does not itself make them Executive Branch officers,[2] where there is any doubt, the use of the Constitutional appointment procedure is yet another indication that the government component those officers control falls under Article II.

---

[2]    For example, the Comptroller General, Librarian of Congress, and the Director of the Government Publishing Office are nominated by the President and appointed with advice and consent of the Senate.

The Institute's core mission falls squarely within the ambit of the Executive's foreign policy powers. That mission is best summarized as extending the United States' soft power to enhance its diplomacy and foreign relations and attempt to obviate the need for military action. *See* 22 U.S.C. § 4601. The Institute's organic statute identifies, among other rationales for its creation, "the deep public need for the Nation to develop fully a range of effective options, in addition to armed capacity, that can leash international violence and manage international conflict[,]" *id.* § 4601(a)(1), and "a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information[,]" *id.* § 4601(a)(6). It concludes by highlighting "the establishment of such an institute is an appropriate investment by the people of this Nation to advance the history, science, art, and practice of international peace and the resolution of conflicts among nations without the use of violence." *Id.* § 4601(a)(9). Consistent with these underlying rationales, Congress identified the purpose of the organic statute "to establish an independent, nonprofit, *national institute* to serve the people and the Government through the widest possible range of education and training, basic and applied research opportunities, and peace information services on the means to promote international peace and the resolution of conflicts among the nations and peoples of the world without recourse to violence." *Id.* § 4601(b) (emphasis added).

Negotiating for peace, international engagement, and diplomacy are quintessential executive functions. "[T]he Constitution vests the President with certain foreign-affairs powers including '[t]he executive Power,' which includes a residual authority over war, peace, and foreign interactions." *Haaland v. Brackeen*, 599 U.S. 255, 341 (2023) (Thomas, J., dissenting) (quoting U.S. Const. art. II). Indeed, "[t]he President is the sole organ of the nation in its external relations,

and its sole representative with foreign nations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) (noting that external relations include the powers to "wage war, to conclude peace, to make treaties, to maintain diplomatic relations with other sovereignties"); *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 13–14 (2015) (recognizing that diplomacy is an executive function); *id.* at 36 (Thomas, J., concurring in part) ("The external executive power 'comprehends war, peace, the sending and receiving ambassadors, and whatever concerns the transactions of the state with any other independent state[.]'" (cleaned up)). While formal declarations of war and peace treaties require cooperation of the political branches, *see* U.S. Const. art. I, § 8, cl. 11; *id.* § 10, cl. 3, the Constitution unquestionably vests the Executive with diplomatic and foreign affairs powers. *Muthana v. Pompeo*, 985 F.3d 893, 907 (D.C. Cir. 2021) (discussing President's diplomatic powers); *Holder v. Humanitarian L. Project*, 561 U.S. 1, 61 (2010) (Breyer, J., dissenting) ("the Constitution entrusts to the Executive and Legislative Branches the power to provide for the national defense, and that it grants particular authority to the President in matters of foreign affairs"); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–611 (1952) (Frankfurter, J., concurring)). The Institute's work in those areas is, thus, substantially executive in nature.

The Institute's organic statute shows that the President, through members of his or her political party, expressly controls the Institute's board due to party affiliation requirements and the presence of cabinet secretaries as ex officio members. *See* 22 U.S.C. § 4605(b), (c). That Congress opted to give the Institute some flexibility in its operations—e.g., a choice of legal counsel,

auditors, and employment provisions—is unremarkable and commonplace in Executive Branch agencies. *See, e.g.*, 29 U.S.C. § 154(a) (affording National Labor Relations Board independent litigating authority from the Justice Department); 5 U.S.C. § 8336(c)(1) (affording law enforcement and other classes of employees different retirement terms). Moreover, had Congress decided to place the Institute outside of the Executive Branch (which it did not), significant constitutional issues would be at play. This is because placing executive functions outside of the Executive Branch is flatly prohibited by the Constitution. As the Supreme Court ruled in *Buckley v. Valeo*, 424 U.S. 1, 138–42 (1976), Congress has no authority to create government entities answerable to it that exercise executive authorities. Certainly, having a Legislative Branch component conduct diplomacy would violate that rule.

> c.    The Institute's Status as an Executive Branch Agency Is Confirmed by Federal Statutes and the Historic Way It Has Been Treated Under the Law

Statutory definitions further confirm the Institute's executive status. The Institute is best described for purposes of Title 5 as a "wholly owned corporation" of the United States, 5 U.S.C. § 103(1), which in turn makes it an "executive agency," 5 U.S.C. § 105. This is because the Institute's organic statute identifies it to be a corporation established by the United States. 22 U.S.C. §§ 4603(a), (b). Its organic statute also makes clear it is owned by the United States— the United States created it, *id.*, the United States controls its board, *id.* § 4605, the Institute is prohibited from issuing any other shares, *id.* § 4603(b), the Institute is prohibited from receiving non-governmental sums to fund its operations, *id.* § 4604(h)(3), and the United States retains title to the Institute's assets upon its dissolution, *id.* § 4610. These characteristics tick-off the classic indicia of ownership. *Cf. Student Loan Mktg. Ass'n v. Riley*, 104 F.3d 397, 410 (D.C. Cir. 1997) (Wald, J., concurring) (identifying indicia of ownership of loans to include control, financial benefits, and dissolution rights).

Were the Institute not a government corporation for purposes of Title 5, it plainly is an "independent establishment" under that Title, 5 U.S.C. § 104(a), which again means it is an "executive agency." As noted above, the Institute is an "establishment" under its organic statute, 22 U.S.C. § 4603(a), exercises executive authorities, *supra*, and its organic statute provides it is "independent" of other agencies, 22 U.S.C. § 4603(b). Once again, a simple joining of terms and review of its activities confirms that if the Institute is not a wholly owned government corporation, it qualifies as "independent establishment" under Title 5.

    2.    *The Institute Exercises No Quasi-Judicial or Quasi-Legislative Functions, and Thus, Its Board Members Are Removable by the President in His Discretion*

Because the Institute is part of the Executive Branch and performs executive functions, the President may remove its board members at his will and outside the alternative procedures identified in the Institute's organic statute.

    a.    *Myers*, *Seila Law*, and *Collins* Dictate the Result Here

In *Myers v. United States*, 272 U.S. 52 (1926), as clarified by *Humphrey's Executor*, 295 U.S. at 627–28, the Supreme Court held that "all purely executive officers" are "subject to the exclusive and illimitable power of removal by the Chief Executive[.]" *Humphrey's Executor*, 295 U.S. at 627–28. This is because, as *Myers* explained, Article II of the Constitution "grants to the President the executive power of the government—i.e., the general administrative control of those executing the laws, including the power of appointment and removal of executive officers—a conclusion confirmed by his obligation to take care that the laws be faithfully executed . . . to hold otherwise would make it impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed." *Myers*, 272 U.S. at 163–64 (cleaned up).

Since *Myers* and *Humphrey's Executor*, the Supreme Court has maintained that purely executive officers are removable by the President at will and that constraints on this authority are unconstitutional. In *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 213 (2020), the Court applied *Myers* and voided the for-cause removal protections of the Director of the Consumer Financial Protection Bureau, which it found exercised "quintessentially executive power[.]" Similarly, in *Collins v. Yellen*, 594 U.S. 220, 253 (2021), the Court struck down for-cause removal protections for the Director of the Federal Housing Finance Agency, finding that the position exercised executive functions. In so doing, the Court stressed that the test for whether for-cause removal provisions are constitutional does not turn on the degree of executive power exercised: "Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry." *Id.*

Against this backdrop, the result here is compelled by the Court's recent precedents. The Institute exercises executive power, performing executive functions. Its board members are thus subject to removal under the President's exercise of his Article II prerogatives. *Seila Law*, 591 U.S. at 228 ("the President's removal power is the rule, not the exception").

b.    *Humphrey's Executor* and *Wiener* Are Inapposite

*Humphrey's Executor* created an exception to the developed rule that members of the Executive Branch are removable at will by the President; and the government acknowledges that whatever remains of the *Humphrey's Executor* exception after *Seila Law* remains controlling on this Court. But the exception in *Humphrey's Executor* is not operative here.

In the wake of *Myers*, the *Humphrey's Executor* Court compared the structure and functions of the then-existing Federal Trade Commission ("FTC") (the agency in *Humphrey's Executor*) against those of the Postal Service (the agency in *Myers*). *Humphrey's Executor*, 295 U.S. at 627–

32. It distinguished the holding of *Myers* by finding that the FTC, "[t]o the extent that it exercises any executive function, as distinguished from executive power in the constitutional sense, [ ] does so in the discharge and effectuation of its quasi legislative or quasi judicial powers, or as an agency of the legislative or judicial departments of the government." *Id.* at 628. Accordingly, the Court held: "[t]he power of removal here claimed for the President falls within this principle, since its coercive influence threatens the independence of a commission, which is not only wholly disconnected from the executive department, but which, as already fully appears, was created by Congress as a means of carrying into operation legislative and judicial powers, and as an agency of the legislative and judicial departments." *Id.* at 630.

Removal restrictions were next considered by the Court in *Wiener v. United States*, 357 U.S. 349, 356 (1958). There, the restrictions were evaluated again in the context of non-executive functions. That is, in *Wiener*, the Court confronted the President's removal of a member of the War Claims Commission, a purely adjudicatory body. Adopting the holding of *Humphrey's Executor*— that Article II does not require the President to have at-will removal over officers exercising quasi-legislative or quasi-judicial powers—the Court found the removal to be improper:

> Judging the matter in all the nakedness in which it is presented, namely, the claim that the President could remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission, we are compelled to conclude that no such power is given to the President directly by the Constitution, and none is impliedly conferred upon him by statute simply because Congress said nothing about it. The philosophy of Humphrey's Executor, in its explicit language as well as its implications, precludes such a claim.

*Wiener*, 357 U.S. at 356.

Fast forward a few decades and in *Seila Law*, the Court confirmed the narrowness of the exception to at-will removal recognized in *Humphrey's Executor* and *Wiener*. The Court in *Seila Law* specifically noted: "the contours of the *Humphrey's Executor* exception depend upon the

20

characteristics of the agency before the Court. Rightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" 591 U.S. at 216.

Here, the Institute does not act in a quasi-legislative or quasi-judicial capacity. The Institute carries out an executive purpose through executive functions. Its board members are, thus, removable in the President's discretion under Article II.

> c.    Plaintiffs' Other Grounds for Permitting For-Cause Removal of Institute Board Members Fail

Plaintiffs attempt to highlight other aspects of the Institute in a quest to enforce the for-cause removal provisions of its organic statute as the sole means of removing Institute board members.

*First*, Plaintiffs argue that the executive power exercised by the Institute is "de minimis." Mot. at 28-30. But the Court in *Collins*, 594 U.S. at 252, rejected this as being a factor relevant to the analysis. "[T]he nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head." *Id.* at 252. Plaintiffs fail to grapple with this holding at all.

*Second*, Plaintiffs argue that the removal restrictions on Institute board members under its organic statute are more modest than those in *Humphrey's Executor*. Mot. at 30. In *Collins*, the Court confronted this very argument and rejected it. There, the terminated official argued that the tenure provisions at issue only offered "modest" protections. 594 U.S. at 255. The Court found that did not matter. *Id.* at 255–56. Instead, the Court emphasized that under Article II, "[t]he President must be able to remove not just officers who disobey his commands but also those he finds negligent and inefficient, those who exercise their discretion in a way that is not intelligent or wise, those who have different views of policy, those who come from a competing political

party who is dead set against the President's agenda, and those in whom he has simply lost confidence[.]" *Id.* at 256 (cleaned up).

In sum, none of Plaintiffs' justifications for an exception to the rule of presidential at-will removal carry the day.

### 3.    *Plaintiffs' Other Claims Rise and Fall with Their Removal Claims.*

Because Plaintiffs are not likely to succeed on their claim that the removal of the former board members was ultra vires, their other claims also are likely to fail. For example, if the board members were properly removed, then the removal of George Moose as president of the Institute, and the ex officio appointments of Jackson and later Cavanaugh were proper. That is because the president of the Institute serves "at the pleasure of the Board." 22 U.S.C. § 4606(a); *see also Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 725 (D.C. Cir. 2022) ("For an agency to act ultra vires, it must transgress 'clear and mandatory' limits that Congress has imposed on its authority."). Thereafter, the transfer of property and termination of employees were also proper.

### C.    **Plaintiffs' APA Claims at Counts II and II Are Unlikely to Succeed**

Apart from their claim about the removal of the Institute's board members, Plaintiffs attempt to bring some poorly defined claims under the APA. These claims fail for several reasons.

### 1.    *USDS Is Not an "Agency" Subject to the APA*

Plaintiffs' APA claims largely target the United States DOGE Service ("USDS") and primarily disclaim that the Institute itself is subject to the APA. Mot. at 23-25, 27-28. But USDS itself is not an "agency" within the meaning of the APA's definition, 5 U.S.C. §§ 551(1), 701(b)(1), because it does not "exercise substantial independent authority," *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C. Cir. 1997). As the Executive Orders pertaining to USDS make clear, it sits within the Executive Office of the President, its head reports to the White House Chief of Staff, and it has a limited set of advisory responsibilities, none of which involves the authority to direct

agencies or other components of the Executive Branch. USDS includes the following tasks and responsibilities:

- Agency DOGE Teams—who are employees of the respective agency, *not* USDS—are tasked generally with "coordinat[ing] their work with USDS" while "advis[ing] their respective Agency Heads on implementing the President's DOGE Agenda." Exec. Order 14,158, § 3(c).

- The USDS Administrator should to the maximum extent consistent with law, "have full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* § 4(b).

- The USDS Administrator must commence a software modernization initiative and "work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." *Id.* § 4(a).

- The Assistant to the President for Domestic Policy is directed to consult with USDS (among other entities) in developing a federal hiring plan. Exec. Order 14,170, § 2(a).

- In implementing that plan, USDS may provide "advice and recommendations as appropriate" concerning implementation. *Id.* § 2(d).

- USDS receives monthly hiring reports from each DOGE Team Lead. Exec. Order 14,210, § 3(b)(iii)

- The Administrator of USDS, with the Director of the Office of Management and Budget ("OMB") and in coordination with the Assistant to the President for Domestic Policy, is directed to identify sources of federal funding for illegal aliens and make various recommendations. Exec. Order 14,218, 2(b)(i)-(ii).

23

- USDS receives from each agency DOGE Team Lead "a monthly informational report on contracting activities," Exec. Order 14,222, § 3(d)(ii), as well as "to the extent consistent with law—. . . a monthly informational report listing each agency's justifications for non-essential travel," *id.* § 3(e).

- The OMB Director is directed to consult with the USDS Administrator (as well as the Director of the Office of Personnel Management), to submit a plan to reduce the size of the federal workforce. Presidential Memorandum, Hiring Freeze, available at https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/.

- The Secretary of the Treasury is directed to consult with the OMB Director and USDS Administrator in determining whether it is in the national interest to lift the current hiring freeze by the Internal Revenue Service. *Id.*

None of these limited responsibilities—which are purely advisory and consultative in nature—can plausibly be characterized as "authority" wielded by USDS, let alone authority that is substantially independent. *See Smithsonian*, 125 F.3d at 881.

Plaintiffs rely heavily on a decision from another court in this district concluding, in the context of a preliminary injunction, that plaintiffs were likely to prevail because USDS is an "agency" for purposes of the Freedom of Information Act. Mot. at 24 (citing *Citizens for Ethics & Resp. in Wash.* ("*CREW*") *v. U.S. Doge Serv.*, No. 25-0511, 2025 WL 752367 (D.D.C. Mar. 10, 2025)). Respectfully, that court's reasoning does not persuade. Most notably, it relied heavily on language in Executive Order 14,158 stating that USDS was established to "implement the President's DOGE agenda." *CREW*, 2025 WL 752367, at *11; *see also Am. Fed. of Labor & Congress of Indus. Orgs. v. Dep't of Labor*, Civ. A. No. 25-0339, 2025 WL 542825, at *3 (D.D.C. Feb. 14, 2025) (relying on the same language). First, those words appear in purely prefatory

language that explains why the President signed the Executive Order. The language itself established no particular responsibilities, and when read with the responsibilities USDS is actually assigned (*see supra* 23-24), it is clear that USDS's authority is purely advisory and consultative. Indeed, the Executive Order establishes a structure in which USDS and the USDS Temporary Organization will consult and coordinate with agency DOGE teams and agency DOGE team leads, all of whom are agency personnel reporting up agency chains of command. It is those agency DOGE teams and agency DOGE team leads that execute the "DOGE agenda" throughout federal agencies, and USDS that advises and consults on those actions. Accordingly, the *CREW* court erred in giving weight to the role played by a DOGE Team lead in decisions about filling federal vacancies. 2025 WL 752367, at *11, because the "DOGE Team Lead" is herself an agency employee, who reports to the agency head or an agency head's designee—not to USDS. Exec. Order 14,158, § 2(c). And the agency head may overrule the assessment of the DOGE Team Lead. *Id.* § 3(b)(ii).

In short, because USDS plainly does not wield substantial independent authority, it is not an agency subject to the APA.

## 2. *Plaintiffs Fail to Identify a Final Agency Action*

Plaintiffs' APA claims also fail because they do not target discrete agency action. A plaintiff must plead "an identifiable action or event." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 71, 899 (1990); *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (APA limits judicial review to "circumscribed, discrete agency actions"). The agency actions that can properly be challenged under the APA are those that are "circumscribed [and] discrete." *Norton*, 542 U.S. at 62. By contrast, the APA does not provide for "general judicial review of" agency conduct, *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (cited

approvingly in *Louisiana v. United States*, 948 F.3d 317, 321 n.13 (5th Cir. 2020)), or making a budget request, *see Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (quoting *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000)); *Am. Forest Res. Council v. United States*, 77 F.4th 787, 805 (D.C. Cir. 2023) (rejecting a "blunderbuss challenge" in which the plaintiffs "complain not that the Secretary failed to take a specific action but rather that she failed to carry out the . . . Act's general directives").

Plaintiffs do not identify actions fitting these criteria. The only "agency action" that they mention with respect to USDS is its alleged "actions to seize and injure [the Institute], its staff, and its contractors." Mot. at 25. There is no further elaboration. But reference to an amorphous collection of injurious "actions" is insufficiently "discrete"; instead, it constitutes the sort of "broad programmatic attack" that does not give rise to an APA claim. *SUWA*, 542 U.S. at 64. The same is true of Plaintiffs' attempt to identify a final agency action by USDS or the Institute. They contend that the "coopted" Institute is endeavoring to "dismantle and dissolve" itself. Mot. at 29.  Again, these are "programmatic" concerns that are not a proper subject for APA relief. Plaintiffs mention other agency actions—like transferring real property, disabling a website, and moving funds out of an endowment—but those are the sort of "day-to-day operations" that also fall outside the scope of the APA. *Lujan*, 497 U.S. at 899. And, as explained, *supra* at 7-9, actions like revoking grants and canceling contracts are not subject to review under the APA and must instead be pursued under the Tucker Act.

3.    *Plaintiffs Fail to Identify an APA Violation*

Finally, Plaintiffs fail to show that any of the purported agency actions they identify runs afoul of the APA's standards. The requirement to "examine relevant data and articulate a satisfactory explanation," Mot. at 30-31 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)), depends on a discrete decision—a final agency action— that is absent here. *See SUWA*, 542 U.S. at 62–65. The same is true of the general APA obligation to consider reliance interests. Mot. at 32-33. And requiring the Institute to provide a "reasoned analysis," Mot. at 31-32, makes no sense for the kinds of "day-to-day operations" at which Plaintiffs take aim. *Lujan*, 497 U.S. at 899. Otherwise, agencies would be expected to perform an analysis and articulate a contemporaneous explanation for a broad swath of everyday agency functions like transferring property, moving funds from an endowment, and managing a website. *See* Mot. at 32. The awkward fit of these doctrines reveals that the APA was simply not intended for plaintiffs to monitor everyday agency operations through litigation. And, in any event, the actions were taken to comply with the President's Executive Orders, which is sufficient reason.

Nor have Plaintiffs demonstrated that any agency action is contrary to law. First, they argue that the Institute may not cease all activities or dissolve itself. Mot. at 34. But the Institute is not doing so. Pursuant to the President's order, it is continuing in operation with the minimum functions required by law. Exec. Order 14,217, § 2(a), 90 Fed. Reg. 10577 (Feb. 19, 2025). Second, Plaintiffs assert that the Institute is not following a Congressional directive regarding the Gandhi-King Global Academy. Mot. at 34.[3] But, at bottom, the Institute is directed to develop a conflict-resolution curriculum and make it publicly available. Pub. L. 116-260, § 334(a), 134 Stat. 3114,

---

[3]    Plaintiffs incorrectly state that the Gandhi-King Scholarly Initiative Act prohibits the Institute from contracting out any work. Mot. at 34. But the prohibition is specific to contracting outside entities to "conduct advocacy" on behalf of the Institute. § 4(b).

3115 (2020). Plaintiffs fail to demonstrate that the Institute has not done so. Finally, for the reasons previously discussed, *supra* at 9-22, Plaintiffs are wrong that the agency's actions violate the constitutional separation of powers.

Nor have plaintiffs demonstrated that they fall within the zone of interests of USIP's organic act such that they have a cause of action to challenge these alleged "agency actions." "When a claim arises under the APA, the zone of interests test requires considering the 'substantive provisions' of the underlying statute, the 'alleged violations of which serve as the gravamen of the complaint.'" *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 589 (D.C. Cir. 2022) (quoting *Bennett v. Spear*, 520 U.S. 154, 175 (1997)). Here, plaintiffs are largely comprised of employees, contractors, and vendors, whose interests lie in their own continued employment and compensation. Those are precisely the kinds of "interests [that] are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized [these] plaintiff[s] to sue." *Id.* (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

### D.    Plaintiffs' Ultra Vires Claims Will Likely Fail

Plaintiffs also repackage their APA claims as ultra vires claims; but those claims will also likely fail. "[S]uits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689, 693 (1949). The exception to sovereign immunity is based on the principle that such ultra vires action by a federal officer "is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* at 690. Plaintiffs set forth no ultra vires claim that is distinct from their APA claims, and the ultra vires claims therefore fail for the same reasons.

II. **Plaintiffs Have Not Shown that They Will Face Imminent Irreparable Harm Absent a Temporary Restraining Order**

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). First, the moving party must demonstrate an injury that is "both certain and great" and "of such imminence that there is a 'clear and present' need for equitable relief in order to prevent irreparable harm." *Id.* (quoting *Wis. Gas Co. v. Fed. Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Second, the injury must "be beyond remediation," meaning the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297–98 (quoting *Wis. Gas*, 758 F.2d at 674). Plaintiffs' various attempts to identify such an injury fail.

A. **Economic Loss**

Plaintiffs first argue that some vaguely identified "economic losses" establish irreparable harm. Mot. at 37-39. To the contrary, "it is well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674. That is because such losses may be remedied through "adequate compensatory or other corrective relief . . . at a later date." *Id.* (citation omitted); *see also Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 367 (D.C. Cir. 1999) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)); *Farris v. Rice*, 453 F. Supp. 2d 76, 79-80 (D.D.C. 2006) ("[G]iven the court's equitable powers to remedy for loss in employment through, for example, back pay and time in service credit, cases are legion holding that loss of employment does not constitute irreparable injury.").

Plaintiffs make two attempts around this settled principle, but both are unavailing. First, they contend that any "losses from termination of their employment . . . may not be recoverable." Mot. at 37. They simply assert this with respect to their claims against USDS, but do not explain

the basis for their conclusion. To be sure, any relief ordered against USDS would not redress purported injuries from the termination of Plaintiffs' employment, which was effectuated by the Institute. But Plaintiffs cannot use their lack of standing to pursue a remedy as the basis for irreparable harm. As for the Institute, Plaintiffs speculate that there will "likely be no assets left to recover." *Id*. But while the President has directed that the Institute's "statutory functions and associated personnel" be reduced as allowed by law, Exec. Order 14,217, § 2(a), 90 Fed. Reg. 10577 (Feb. 19, 2025), Plaintiffs identify no "imminent" threat to the existence of appropriations that would satisfy a back pay award. Their bare assertion that asserts may disappear is too speculative to establish irreparable harm. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

Second, Plaintiffs offer inapt analogies to other recent federal litigation. The contrast with those cases only makes Plaintiffs' failure to show irreparable harm all the more stark. In *Aviel v. Gor*, Civ. A. No. 25-0778, 2025 WL 1009035 (D.D.C. Apr. 4, 2025), the finding of irreparable harm hinged on the fact that the plaintiff was the president and chief executive officer of the agency from which she was removed and claimed that no damages could replace her inability to function in that "once-in-a-lifetime job." *Id.* at *10. While the government disagrees with the court's analysis in *Aviel*,[4] that court still recognized that, in employment cases generally, such as the one the Court has before it here, "mere loss of employment is normally not enough to show irreparable harm because the plaintiff can be made whole through the issuance of backpay and reinstatement." 2025 WL 1009035, at *10 (citing *Sampson v. Murray*, 415 U.S. 61, 91-92 (1974)). The court in *Does 1-26 v. Musk*, Civ. A. No. 25-0462, 2025 WL 840574 (D. Md. Mar. 18, 2025), addressed a claim of reputational, not economic, harm, and the result there turned on statements that the court

---

[4]    *See* Emergency Mot. for Stay Pending Appeal 22-23, *Aviel v. Gor*, No. 25-5105 (D.C. Cir. Apr. 7, 2025).

found to characterize the agency as a "criminal enterprise from top to bottom." *Id.* at *28. Neither the nature of the harm nor the circumstances in *Does 1-26* support Plaintiffs' claimed harm from economic loss. Economic loss was also not at issue in *Widakuswara v. Lake*, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025), and the court there found that the plaintiffs had shown that "all [the agency's] operations have been shut down." *Id.* at *9 (quotations omitted). The Institute, by contrast, while reduced, continues to perform functions required by statute. Exec. Order 14,217, § 2(a), 90 Fed. Reg. 10577 (Feb. 19, 2025).

Even apart from Plaintiffs' abstract and flawed legal arguments, Plaintiffs fail to specifically describe any particularized irreparable harm that any of them will suffer as a result of "economic loss." They offer only an unadorned citation to a handful of paragraphs in the declaration of former employee Shira Lowinger. Mot. at 39 (citing Lowinger Decl. ¶¶ 14, 15, 18-22, 23). But the cited testimony speaks only to dealings with the Institute's contractors (who must pursue any remedy through the Tucker Act), Lowinger Decl. ¶¶ 14-15, 18, ECF No. 11-10, and speculation about the integrity of the Institute's data and documents, *id.* ¶¶ 20-23. That has nothing to do with any claimed economic losses by the Plaintiffs, and Plaintiffs point to no other record evidence on that score.

### B.    Health Insurance

Two plaintiffs—Sasha Pippenger and Elizabeth Quinland—claim irreparable harm from the termination of their employer-provided health insurance. Mot. at 39-40. But both acknowledge that they have other sources of insurance that will allow them to continue receiving the healthcare they need. Pippenger notes that she will "pay for COBRA health insurance," which will "prevent a lapse in [her] treatment." Pippenger Decl. ¶ 14, ECF No. 11-8. Indeed, she says she will lose insurance coverage only if the Institute somehow "dissolves" or for some unforeseen reason "no longer offers group health coverage." *Id.* But the Institute has informed its employees that they are

eligible for COBRA "through September 30, 2026." Separation Agreement ¶ 2, ECF No. 11-9. Plaintiffs provide no nonspeculative reason to believe that is untrue. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297

Quinland also acknowledges that she was offered the opportunity to pay for continued insurance through COBRA, but she opted to purchase a plan through D.C. Health Link, the health insurance exchange for the District of Columbia. Quinland Decl. ¶ 18, ECF No. 11-9. Quinland recounts that she has "delayed" some doctors' visits and consultations due to concern about the "potential" for higher out-of-pocket costs under her new plan, *id.* ¶¶ 20-21, but she does not establish that those costs will indeed be higher, much less prohibitively so. More importantly, she does not establish that she will lack access to any necessary medical treatment for her condition. While a change in insurance providers in the midst of important medical decisions is doubtless unwelcome, Quinland could have avoided it by remaining on her employer-provided insurance through COBRA, and in any event fails to show any imminent irreparable harm related to her healthcare needs.

The situation in *Risteen v. Youth for Understanding, Inc.*, 245 F. Supp. 2d at 1 (D.D.C. 2002), is dissimilar. Risteen, unlike Pippenger and Quinlan, was left with "no health insurance" and was faced with multiple uncovered medical expenses. *Id.* at 3. Pippenger and Quinlan, by contrast, have insurance options available to them. Pippenger ¶ 14, ECF No. 11-8; Quinlan ¶ 18, ECF No. 11-9. Notably, Risteen sought an injunction requiring his employer to extend him the option for health insurance under COBRA, *id.* at 1, something that the Institute has already provided to Pippenger and Quinlan. Pippenger Decl. ¶ 14, ECF No. 11-8; Quinland Decl. ¶ 14, ECF No. 11-9.

### C.    Reputation

Plaintiffs next attempt in two ways to show injury to their reputations. Each comes up short. First, Plaintiffs claim that former employees will lose goodwill with the Institute's contractors and "other stakeholders." Mot. at 40. But the loss of reputation associated with discharge from employment generally "falls far short of the type of irreparable injury which is a necessary predicate for the issuance of a temporary injunction." *Sampson v. Murray*, 415 U.S. 61, 91 (1974). For example, in *American Foreign Service Association v. Trump*, Civ. A. No. 25-0352, 2025 WL 573762 (D.D.C. Feb. 21, 2025), a court in this district found that any tarnish to reputation from being placed on administrative leave and being unable to perform standard duties were "standard employment harms" that "fall far short" of irreparable harm. *Id.* at *5. Moreover, the record here only contradicts a claim to reputational harm. Other than broadly citing to eight different declarations with no pin cites, Plaintiffs point only to testimony from former employee Shira Lowinger, speculating about the potential deletion of agency records without mentioning reputational harm, *see* Lowinger Decl. ¶¶ 21-23, ECF No. 11-10, and to the testimony of Brave Generation President Tetiana Kotelnykova, who tellingly professes her continued faith in her "close, trusted . . . colleagues and friends" who were formerly employed by the Institute. Brave Generation Decl. ¶ 9, ECF No. 11-14. This testimony contradicts Plaintiffs' assertion that former employees themselves have suffered any reputational hit. Lowinger also claims that there are no "qualified . . . contracting staff" at the Institute to assess closeout costs and pay advances on contract. Lowinger Decl. ¶¶ 14-15, ECF No. 11-10. But she identifies no serious contractual failing by the agency since she left her employment on March 28, 2025. *Id.* ¶ 2. Nor do Plaintiffs explain how employees who no longer work at the Institute would bear the reputational damage from a breakdown between the Institute and its contractors occurring after their employment has ended.

Second, Plaintiffs assert that "current employees" will be reputationally harmed if sensitive information is leaked or disclosed. Mot. at 41. But no plaintiff can claim such an injury because none of them is a current employee, much less a current employee who would suffer blame for any such disclosure. Nor have plaintiffs shown that there is certain and imminent threat that the Institute's sensitive information will be wrongfully disclosed. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

Third, Plaintiff Chester Crocker expresses his "grave concern" about the status of a conference room named for former Institute President Nancy Lindborg that was a condition of an ongoing pledged donation that he committed to in August 2020. Crocker Decl. ¶¶ 5, 8, ECF No. 11-13.[5] But he fails to explain how he would suffer any reputational damage connected with the transfer of the building housing that conference room to the General Services Administration.

Finally, Plaintiffs say that "continued efforts" to "malign" them as "rogue bureaucrats" harm their reputations. Mot. at 41. But Plaintiffs do not specify what these "continued efforts" are, much less provide any evidence of them. These unspecified and unproven accusations do not meet the high burden to show irreparable harm. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

D.    **Physical Danger**

Next, one plaintiff, Mohamed Khalil Abuznad, a personal services contractor who received a notice of termination on April 11, 2025, claims that he faces possible physical harm from the dissolution of his relationship with the Institute. Mot. at 41-42; Abuznad Decl. ¶ 41-42, ECF No. 11-12. But unlike the "relocated" employees of the United States Agency for International Development that some courts have said face irreparable harm if abandoned in another country,

---

[5]    Crocker also mentions a separate donation that he pledged in April 2019, but he acknowledges that that pledge was completed in June 2023, well before the recent change in the Institute's leadership. Crocker Decl. ¶ 4, ECF No. 11-13.

*see Am. Foreign Serv. Ass'n*, 2025 WL 435415, at *2, Abuznad appears to have lived and worked promoting human rights in Libya for well over a decade before his contractual affiliation with the Institute beginning in 2022. *See* Abuznad Decl. ¶ 1, ECF No. 11-12. Abuznad described no security concerns during that time, and there is no reason to believe that they would emerge based upon the termination of his contractual relationship with the Institute.

Abuznad's description of the harm he purports to face is also vague. He says that the Institute's security team is no longer available to provide "emergency planning or protection," Abuznad Decl. ¶ 6, ECF No. 11-12, but does not say he has ever had cause to utilize those services or that he imminently would require them. And he vaguely refers to a loss of "housing, healthcare, and other basic necessities" with "no alternatives for shelter or medical care," but offers no details about his precise situation or how these purported harms stem from the loss of his personal services contract. *Id.* ¶ 9. Courts that have credited threats of physical harm as an irreparable injury were presented with more specific information. In *Does 1-26*, for example, the court relied on evidence that disruptions to a payment system would cause an employee of the U.S. Agency for International Development stationed in a high-risk area of Central America to soon lose access to internet and electricity, which would disable security cameras and radios and leave the employee without means to contact the regional security office. 2025 WL 840574, at *27. No such allegations are presented here.

Moreover, Abuznad cannot demonstrate an entitlement to emergency relief because his claims fails on the merits. The temporary relief sought by Abuznad would seem to require the Institute to restore his personal services. Such relief sounds in contract and must be pursued under the Tucker Act. *Supra* at 7-9; *U.S. Conf. of Cath. Bishops v. Dep't of State*, Civ. A. No. 25-0465, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025).

35

### E.    Disclosure of Information

Plaintiffs next attempt to manufacture a threat that "data that compromises contractors, donors, or local partners" will be disclosed. Mot. at 42-43. This is speculative. Plaintiffs offer testimony from the President of Brave Generation stating without any basis that she does not trust the current leadership of the Institute. Brave Generation Decl. ¶ 9, ECF No. 11-14. But that unadorned distrust does not establish an actual and imminent threat that confidential data will be disclosed. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Plaintiffs also point to a social media post identifying the recipient of an Institute contract that had been rescinded. Mot. at 42-43. But Plaintiffs do not explain why the identity of this government contractor and recipient of taxpayer funds was confidential. That distinguishes it from the Privacy Act protected information that courts have addressed in other cases. *See Am. Federation of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, Civ. A. No. 25-0596, 2025 WL 868953, at *69 (D. Md. Mar. 20, 2025). Nor are Plaintiffs able to draw a conclusion from this single social media post that confidential and sensitive information will be imminently disclosed.

### F.    Business Loss

Finally, Plaintiffs claim that two contractors—InterMotion Media and Peace in Praxis— will suffer irreparable harm in the form of business losses. Mot. at 43-44. This contention runs headlong into the principle that "money" losses, even if "substantial," generally do not constitute irreparable harm. *Wisc. Gas*, 758 F.2d at 674.

Moreover, the harms claimed by InterMotion and Peace in Praxis are minimal. Wesley Dean, the founder of InterMotion, describes how his company reached a contract termination settlement with the Institute on March 17, 2025, and invoiced the Institute for a separate task order that same day. InterMotion Decl. ¶¶ 6, 8, ECF No. 11-15. At the time of Dean's declaration, those alleged payment obligations had been outstanding for less than 30 days, which is hardly irregular,

much less a cause for irreparable harm. And while Dean vaguely alludes to "likely" damage to InterMotion's reputation as a result of an "inability to pay subcontractors," he does not identify any payment obligation to any subcontractor that is past due, nor does he describe any subcontractor indicating frustration with InterMotion's payment practices.

Alison Mojto, founder of Peace in Praxis, also fails to describe imminent harm. She describes an invoice from February 24, 2025, for $3,815 that she is waiting to be paid. Peace in Praxis Decl. ¶ 5, ECF No. 11-16. But she identifies no harm other than the "financial loss," *id.* ¶ 9, which is plainly not irreparable, *Wisc. Gas*, 758 F.2d at 674.

Moreover, like Abuznad, the personal services contractor, InterMedia and Peace in Praxis are poor candidates for irreparable harm because their purported harms only highlight how unlikely they are to succeed on their claims. The immediate relief they seek is payment for amounts that they believe they are due under their contracts with the Institute. But money is not a form of relief Plaintiffs may obtain under the Administrative Procedure Act. *See California*, 145 S. Ct. at 968 (2025).

## III.     The Equities and Public Interest Favor the Government

The third and fourth requirements for a temporary restraining order—the balance of harms and the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Where, as here, a plaintiff cannot establish the first two factors necessary to obtain a restraining order, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009).

In any event, these factors independently favor the government. Granting the relief that Plaintiffs seek would disrupt the Institute's compliance with the President's directive that the agency's "performance of [its] statutory functions and associated personnel" be reduced to "the

minimum presence and function required by law." Exec. Order 14,217, 90 Fed. Reg. 10577 (Feb. 19, 2025). The public has an interest in permitting their elected President to remove officers exercising executive power and set policy priorities for executive agencies like the Institute. *See Dellinger v. Bessent*, No. 25-5052, 2025 WL 887518, at *4 (D.C. Cir. Mar. 10, 2025). The requested restraining order would also frustrate the President's decision about how to best address these questions in the arena of foreign affairs, and the Court must give deference to the Executive Branch's "evaluation of the facts" and the "sensitive and weighty interests of . . . foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those . . . decisions." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), aff'd, 333 F.3d 156 (D.C. Cir. 2003).

Plaintiffs assert that the public has an interest in ensuring that the Institute is not "dissolved" and that government officials "comply with duly enacted statutes." Mot. at 44-45. But the Institute will continue to perform its minimum statutory functions, Exec. Order 14,217, 90 Fed. Reg. 10577 (Feb. 19, 2025), and the President's changes to the Institute's board were fully in line with his constitutional authority to remove officers exercising executive power, *supra* at 9-22. Plaintiffs therefore fail to that show the public interest is served by a restraining order.

## IV.    Any Restraining Order Should Be Limited

For the reasons explained above, Plaintiffs are not entitled to a restraining order. But if the Court concludes otherwise, the relief granted "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). The expansive relief that Plaintiffs seek flouts these well-established principles and should be significantly narrowed, if awarded at all.

Plaintiffs have at most attempted to show that they would personally suffer harm in the absence of relief. As such, any restraining order should do no more than necessary to alleviate the irreparable harm to any specific Plaintiff that the Court finds to have established such harm. Extending relief that is either broader in substance (i.e., declaring the Board and officers of the Institute as of March 14, 2025, to be the lawful Board and officers and invalidating any action taken by the Board and officers after March 14) or scope (i.e., awarding relief to former employees and personal services contractors who are not parties to this litigation) would violate the foundational Article III principle that judicial remedies "must be tailored to redress the plaintiff's particular injury." Gill, 585 U.S. at 73. A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." Id. at 66 (citation omitted). Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable practice." Dep't of Homeland Sec. v. New York, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).

## V.       Any Restraining Order Should Be Accompanied by Security and Stayed

Any restraining order should also require Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a temporary restraining order "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. See DSE, Inc. v. United States, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond"). Particularly given that the relief requested by Plaintiffs could hinder Defendants' ability to install new leadership that will operate the Institute in a manner consistent with the President's

policies, the Court should consider the implications of any order prohibiting the President from having his preferred leadership at the Institute in determining the amount of bond to require from Plaintiffs.

Finally, to the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending any appeal that is authorized by the Solicitor General, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.


Date:  April 15, 2025
       Washington, DC

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

By:      /s/ Sam Escher
         SAM ESCHER, D.C. Bar #1655538
         JOHNNY WALKER, D.C. Bar #991325
         Assistant United States Attorneys
         601 D Street, NW
         Washington, DC 20530
         Escher: (202) 252-2531
         Walker: (202) 252-2511
         Sam.Escher@usdoj.gov
         Johnny.Walker@usdoj.gov

         *Attorneys for the United States of America*