**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Sasha Pippenger et al.,

          *Plaintiffs,*

United States DOGE Service, et al.,

          *Defendants.*

Case No. 1:25-cv-01090 (BAH)

Oral Argument Requested

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR EXPEDITED DISCOVERY**

<u>TABLE OF CONTENTS</u>

<u>PAGE NO.</u>

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

 A. Executive Order and the U.S. Institute of Peace...........................................3

 B. USIP's DOGE-Agenda Leadership Ends USIP's Functioning ..................3

 C. The DOGE Agenda at USIP and Elsewhere................................................6

ARGUMENT .....................................................................................................................9

 I. THE DISCOVERY THAT PLAINTIFFS SEEK—TWO FACT DEPOSITIONS AND THREE, NARROW RULE 30(B)(6) DEPOSITIONS—IS CRITICAL TO PLAINTIFFS' CLAIMS. ...........9

 II. THE DISCOVERY THAT PLAINTIFFS SEEK IS EXACTLY THE SORT OF TARGETED DISCOVERY THAT COURTS HAVE PERMITTED IN OTHER CASES. .......11

  A. The Facts Underlying Plaintiffs' *Ultra Vires* Claim Will Be Absent from Any Administrative Record. ......................................................14

  B. Whether the U.S. DOGE Service, the U.S. DOGE Service Temporary Organization is an APA "Agency" Will Be Absent from Any Administrative Record. ..........................................16

  C. Defendants Dispute that There Has Been Final Agency Action, Which Suggests There is No Administrative Record at All, or that It is Paltry....17

  D. There are Substantial Indicia of Bad Faith Underlying Defendants' Decisions and Exercise of Authority. ......................................................19

  E. Depositions Would Impose Minimal Burden on Defendants. ..................21

 III. EXPEDITED DISCOVERY IS WARRANTED................................................21

CONCLUSION.................................................................................................................23

i

TABLE OF AUTHORITIES

**Cases**

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
  663 F.3d 476 (D.C. Cir. 2011) ....................................................................... 18

*Alexander v. F.B.I*,
  186 F.R.D. 1 (D.D.C. 1998) ........................................................................... 21

*All. for Retired Americans v. Bessent*,
  No. 1:25-CV-00313 (D.D.C. Mar. 20, 2025) .................................................. 13

*Am. Bioscience, Inc. v. Thompson*,
  243 F.3d 579 (D.C. Cir. 2001) ................................................................. 14, 16

*Am. Broad. Cos. v. U.S. Info. Agency*,
  599 F. Supp. 765 (D.D.C. 1984) ..................................................................... 21

*Am. Fed'n of Lab. & Congress of Industrial Orgs. v. Dep't of Lab.*,
  No. 25-339, 2025 WL 1129227 (D.D.C. Apr. 16, 2025) ............................ 20, 22

*Am. Fed'n of Lab. & Congress of Industrial Orgs. v. Dep't of Labor*,
  No. 25-0339, 2025 WL 556325 (D.D.C. Feb. 19, 2025) ("AFL-CIO"); ................... 13, 14

*Am. First Legal Found. v. Cardona*,
  630 F. Supp. 3d 170 (D.D.C. 2022) .......................................................... 13, 18

*American Council of Learned Societies v. McDonald*,
  No. 1:25-CV-03657 (S.D.N.Y May 1, 2025) ................................................... 6

*Aracely, R v. Nielsen*,
  319 F. Supp. 3d 110 (D.D.C. 2018) ........................................................... 17, 18

*Attkisson v. Holder*,
  113 F. Supp. 3d 156 (D.D.C. 2015) ................................................................. 22

*Bellion Spirits, LLC v. United States*,
  335 F. Supp. 3d 32 (D.D.C. 2018) .................................................................. 11

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..................................................................................... 9, 17

*Brotherhood of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
  972 F.3d 83 (D.C. Cir. 2020) .......................................................................... 17

*Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*,
  No. 22-CV-0035, 2024 WL 2110141 (D.D.C. May 10, 2024) ................... 12, 14

*Citizens for Resp. & Ethics in Washington v. U.S. DOGE Service*,
  No. 1:25-CV-00511 (D.D.C. Apr. 15, 2025) (ECF No. 38) ("CREW") ........................ 13

*Dart v. United States*,
  848 F.2d 217 (D.C. Cir. 1988) ...................................................................................... 2

*Does v. Musk*,
  No. 25-0462, 2025 WL 840574 (D. Md. Mar. 18, 2025) ............................................... 20

*Dong v. Smithsonian Inst.*,
  125 F.3d 877 (D.C. Cir. 1997) ...................................................................................... 16

*Esch v. Yeutter*,
  876 F.2d 976 (D.C. Cir. 1989) ...................................................................................... 13

*Fed. Express Corp. v. U.S. Dep't of Commerce*,
  39 F.4th 756 (D.C. Cir. 2022) ....................................................................................... 15

*Friedman v. Fed. Aviation Admin.*,
  841 F.3d 537 (D.C. Cir. 2016) ...................................................................................... 17

*Guttenberg v. Emery*,
  26 F. Supp. 3d 88 (D.D.C. 2014) .............................................................................. 21, 22

*Landwehr v. Fed. Deposit. Insurance. Corp.*,
  282 F.R.D. 1 (D.D.C. 2010) .......................................................................................... 22

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  No. 25-CV-0946, 2025 WL 1187730 (D.D.C. Apr. 24, 2025) ....................................... 16

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ...................................................................................................... 18

*Maritel, Inc. v. Collins*,
  422 F. Supp. 2d 188 (D.D.C. 2006) ............................................................................... 12

*McAnnulty v. McFarland*,
  187 U.S. 108 (1902) ...................................................................................................... 15

*McKinney v. Caldera*,
  141 F. Supp. 2d 25 (D.D.C. 2001) ................................................................................. 16

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
  No. 1:19-CV-2236, 2023 WL 5221367 (D.D.C. Aug. 15, 2023) ............................... 11, 12

*Nat'l Ass'n of Postal Supervisors v. U.S.Postal Serv.*,
  26 F.4th 960 (D.C. Cir. 2022) ................................................................................. 2, 9, 15

*Nat'l Automatic Laundry & Cleaning Council v. Shultz,*
    443 F.2d 689 (D.C. Cir. 1971) ........................................................ 17

*Nat'l Mining Ass'n v. Jackson,*
    856 F. Supp. 2d 150 (D.D.C. 2012) ............................................ 13, 18

*Neighborhood Assistance Corp. of Am. v. U.S. Dep't of Hous. & Urb. Dev.,*
    No. 11-CV-1312, 2011 WL 3611461 (D.D.C. Aug. 17, 2011) ................. 18, 19

*New York v. Biden,*
    636 F. Supp. 3d 1 (D.D.C. 2022), *opinion clarified*, No. 20-CV-2340 (EGS), 2023 WL
    3311788 (D.D.C. Mar. 6, 2023)........................................................ 14

*New York v. Trump,*
    No. 25-CV-01144, 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025)..................... 20

*Oceana, Inc. v. Ross,*
    454 F. Supp. 3d 62 (D.D.C. 2020) .................................................... 12

*Oceana, Inc. v. Ross,*
    920 F.3d 855 (D.C. Cir. 2019) ......................................................... 18

*Soundboard Assoc. v. Fed. Trade Comm'n,*
    888 F.3d 1261 (D.C. Cir. 2018) ....................................................... 17

*Strike 3 Holdings, LLC v. Doe,*
    964 F.3d 1203 (D.C. Cir. 2020) ....................................................... 12

*Tummino v. Von Eschenbach,*
    427 F. Supp. 2d 212 (E.D.N.Y. 2006) ................................................ 20

*United States v. Newman,*
    531 F. Supp. 3d 181 (D.D.C. 2021) ................................................... 21

*Venetian Casino Resort, L.L.C. v. E.E.O.C.,*
    409 F.3d 359 (D.C. Cir. 2005) ......................................................... 12

*Venetian Casino Resort, L.L.C. v. E.E.O.C.,*
    530 F.3d 925 (D.C. Cir. 2008) ......................................................... 17

*Zimmerman v. Al Jazeera Am., LLC,*
    329 F.R.D. 1 (D.D.C. 2018)............................................................. 21

**Statutes**

22 U.S.C. § 4601 .......................................................................... 3, 4

22 U.S.C. § 4603(b) ......................................................................... 3

22 U.S.C. § 4604(b)(1)-(10) ............................................................................................ 4

22 U.S.C. § 4605 ............................................................................................................ 3

22 U.S.C. § 4609(b) ........................................................................................................ 8

5 U.S.C. § 551(1) .............................................................................................. 9, 11, 15

5 U.S.C. § 701(b)(1) ...................................................................................................... 11

5 U.S.C. § 706 ............................................................................................................... 12

Administrative Procedure Act.................................................................................. passim

Economy Act of 1933 ............................................................................................. 13, 14

Freedom of Information Act ......................................................................................... 13

**Other Authorities**

Executive Order 14158 .................................................................................................. 16

Executive Order 14217 .................................................................................................... 3

**Rules**

Fed. R. App. P. 16(a) ..................................................................................................... 12

Fed. R. Civ. P. 26(b)(1)................................................................................................. 12

Fed. R. Civ. P. 30(b)(6)........................................................................................... passim

LCvR (7)(h) cmt ........................................................................................................... 22

**Regulations**

90 Fed. Reg. 10577 (Feb. 25, 2025) ........................................................................ 3, 19

Plaintiffs seek leave to take expedited depositions of Kenneth Jackson and Nate Cavanaugh, the two DOGE-associated Defendants who, at all relevant times, served as the post-takeover presidents of the U.S. Institute of Peace ("USIP"), as well as limited Rule 30(b)(6) depositions of Defendants the U.S. DOGE Service, the U.S. DOGE Service Temporary Organization, and the General Services Administration ("GSA") to probe whether they exercised federal government authority in the takeover and shuttering of USIP.

## PRELIMINARY STATEMENT

In March 2025, Defendants Kenneth Jackson and Nate Cavanaugh, two people who are widely reported to be advancing the so-called "DOGE agenda," broke into USIP's privately administered and owned campus with the assistance of federal and local law enforcement. Then, they carried out their (or someone else's) decision to reduce USIP to what they apparently have determined to be its statutory minimum. Plaintiffs are various constituencies of USIP who claim, in pertinent part, that Defendants acted *ultra vires* and in violation of the Administrative Procedure Act ("APA") by seizing and shuttering USIP.

As a threshold matter, the Executive Branch's efforts to reduce USIP to a "statutory minimum" is a fool's errand because USIP's statutory minimum is to advance peacebuilding under the independent direction of a bipartisan Board of Directors. But in any case, there can be no reasonable dispute that firing all of USIP's employees, cancelling all of its contracts, blocking its access to funds duly appropriated by Congress for Fiscal Year 2025, transferring its $500 million privately owned building to GSA for free, and keeping USIP in its hobbled state where it does not actually do anything other than wind down violated Defendant Cavanaugh's own understanding of USIP's "Congressional mandate," as he described it in a letter to GSA shortly after assuming control of USIP.

1

That the federal government violated the law is clear; the identities of the progenitors of those violations are not. Plaintiffs require limited, expedited discovery to understand which person(s) or entit(ies) are responsible, what decisions they reached, on what basis, and via what authority—none of which is currently in the public domain, and most or all of which is unlikely to show up in any cobbled together, *post-hoc*, generated-in-the-midst-of-litigation "administrative record" that Defendants may propound in defense of Plaintiffs' APA claims, to the extent a record underlying Defendants' bizarre actions even exists. (Indeed, Defendants contend there has been no "final agency action.")

Furthermore, meaningful judicial review of Plaintiffs' *ultra vires* claims will require this Court to analyze both "the extent of [Defendants'] delegated authority" and "whether [Defendants have] acted within that authority."[1] This very cause of action is premised on the inherent power of the federal courts "to reestablish the limits on [executive] authority" through judicial review.[2] Fact depositions of Kenneth Jackson and Nate Cavanaugh, who were involved with all material events in this lawsuit, and narrow Rule 30(b)(6) depositions of the two DOGE entities and GSA should surface essential, non-public facts as to what authority—if any—Defendants drew upon in seizing and shuttering USIP.

What Plaintiffs seek is no broad fishing expedition. These depositions would impose minimal burdens on Defendants while maintaining the expedited briefing schedules expected by the Court in light of, among other considerations, Plaintiffs' continuing and serious harms caused by Defendants' ongoing illegal actions.

---

[1] *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (citation omitted).
[2] *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988).

## STATEMENT OF FACTS

### A.    Executive Order and the U.S. Institute of Peace

On February 19, 2025, Defendant President Trump signed Executive Order ("EO") 14217, which provided that the federal government should, for USIP and "governmental entities" specified therein, "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law."[3]  EO 14217 stated that this should be done "to the maximum extent consistent with applicable law."[4]

But the Executive Branch has no authority to reduce USIP's functions.  USIP is fundamentally unlike agencies of the federal government where the Executive Branch decides how to operate within bands of authority provided by Congress.  USIP is, by statute, an "independent nonprofit corporation" directed by an independent, bipartisan Board of Directors.  22 U.S.C. §§ 4603(b), 4605.  While the President of the United States has occasion to appoint certain of the Board Members serving staggered terms, and can exert some control over the Board via its three *ex officio* Board members who serve by virtue of their posts elsewhere in his administration, USIP is still required by statutory mandate, as an independent nonprofit corporation, to exercise its independent judgment in furtherance of its Congressional mandate.  *Id.* § 4601.

### B.    USIP's DOGE-Agenda Leadership Ends USIP's Functioning

The purported leadership at USIP changed in March 2025.  On March 14, 2025, President Trump, via email from White House Deputy Director of Presidential Personnel Trent Morse, fired ten of USIP's Board Members.  *See* Am. Compl. ¶¶ 69-71.  As of March 14, 2025, the remaining, *ex officio* Board Members purportedly appointed Kenneth Jackson as USIP's new President.  *See id.* ¶ 81.  On March 17, 2025, representatives or affiliates of Defendant DOGE, assisted by the

---

[3] Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 25, 2025).
[4] *Id.*

Federal Bureau of Investigations, USIP's former security contractor, and the Metropolitan Police Department, broke into USIP's headquarters on Constitution Avenue and began physical destruction of the USIP building, including tearing the USIP seal off the wall and shredding hard copy documents.  *Id.* ¶¶ 75, 83.  Later that day, most USIP employees were locked out of their online work accounts.  *Id.* ¶¶ 84, 86.  Then, DOGE representatives began cancelling USIP's contracts via USIP email addresses.  *Id.* ¶ 85.  On or about March 29, 2025, the *ex officio* Board ended Defendant Jackson's tenure as acting president and appointed Defendant Nate Cavanaugh in his stead.  *Id.* ¶ 94.  On March 28, 2025, USIP terminated approximately 275 employees.  *Id.* ¶ 108.

On March 31, 2025, Defendant Cavanaugh sent a letter to Defendant GSA requesting transfer of USIP's privately-owned headquarters building—constructed with private donations to USIP and Congressional appropriation, and now valued at $500 million—to GSA for no consideration.  *See* Declaration of Daniel M. Eisenberg in Support of Mot. for Discovery ("Eisenberg Decl."), Ex. A.  In explaining his rationale for the transfer, Defendant Cavanaugh wrote:

> Finally, satisfying Congress's mandate does not require USIP to own its own building. USIP is capable of "advanc[ing] the history, science, art, and practice of international peace and the resolution of conflicts among nations without the use of violence" without the ownership of a large and expensive building. [T]he transfer of USIP's headquarters to GSA will in no way affect USIP's obligation to "establish a Jennings Randolph Program," "enter into formal and informal relationships with other institutions," "establish a Jeannette Rankin Research Program," "develop programs to make international peace and conflict resolution research, education, and training more available and useful," "provide, promote, and support peace education and research programs," "conduct training, symposia, and continuing education programs," "develop, for publication or other public communication, and disseminate, the carefully selected products of the Institute," and "establish the Spark M. Matsunaga Scholars Program."

*Id.* (quoting 22 U.S.C. §§ 4601(a)(9), 4604(b)(1)-(10)).

Prior to the DOGE agenda takeover of USIP, USIP had approximately 270 full-time employees stationed to its Washington, D.C. headquarters, 140 full-time Personal Services Contractors (non-citizens who functioned as employees), contractors in 26 countries, seven field offices (Nigeria, Thailand, Colombia, El Salvador, Pakistan, Tunisia, and Libya), and contracts worth over $64 million. *See* Eisenberg Decl., Ex. D ¶ 12. Post March 2025, USIP now has:

- Three non-DOGE employees working in its headquarters: two information services staff, one finance office staff member, and one human resources officer;

- Cancellation notices for all staff contracts in the field offices;

- Termination notices of all office leases; and

- No new job postings.

Eisenberg Decl., Ex. E ¶¶ 10-12. And since DOGE took over in mid-March 2025, USIP has not conducted any activities to "satisfy Congress's mandate." Specifically, USIP no longer:

- "advanc[es] the history, science, art, and practice of international peace and the resolution of conflicts among nations without the use of violence";

- operates the "Jennings Randolph Program" (for study and development of policy recommendations);

- maintains "formal and informal relationships with other institutions";

- "develop[s] programs to make international peace and conflict resolution research, education, and training more available and useful";

- "provide[s], promote[s], and support[s] peace education and research programs";

- "conduct[s] training, symposia, and continuing education programs";

- "develop[s], for publication or other public communication, and disseminate[s], the carefully selected products of the Institute";

- "disseminate[s], the carefully selected products of the Institute"; or

- operates "the Spark M. Matsunaga Scholars Program" (peace and conflict management scholarship).

*Id.* ¶¶ 13-15.

In sum, because of Defendants, USIP has no staff and no office; it does not advance peacebuilding; and it has no plans to change that.

### C.    The DOGE Agenda at USIP and Elsewhere

Over the last two months, Defendants Cavanaugh, Jackson, the U.S. DOGE Service, the U.S. DOGE Service Temporary Organization, and GSA have driven the dismantling of numerous entities that receive federal funds in an approach that mirrored what happened at USIP, albeit with less urgency and force.  For example:

- In March 2025, following the resignation of the Chair of the **National Endowment for the Humanities**, Nate Cavanaugh contacted the leadership of the National Endowment for the Humanities, and later, facilitated the appointment of a DOGE agenda-affiliated acting director who promptly cancelled hundreds of millions in grants, and terminated roughly 75% of its workforce.[5]

- In March or April 2025, Kenneth Jackson was installed as the new executive director of the **United States Interagency Council on Homelessness** ("USICH"), and then delegated all responsibilities to Nate Cavanaugh, who represented himself to USICH employees as "the boss."  After a brief meeting with staff, Nate Cavanaugh decided that the agency would be reduced to a workforce of one employee—a payroll administrator—and subsequently GSA terminated the agency's office lease.[6]

- On April 11, 2025, Nate Cavanaugh emailed the President of the **Vera Institute** ("Vera"), a non-governmental criminal justice non-profit, stating that he was "a member of the DOGE team working at the General Services Administration" and seeking to "get[] a DOGE team assigned to [Vera]."  In a subsequent meeting with Vera, Nate Cavanaugh informed Vera that "[t]here are other independent non-profits like USIP where we have a DOGE team assigned."  When Nate Cavanaugh learned that Vera's federal grants had already been rescinded, he ended the

---

[5] Compl. ¶¶ 5-7, *American Council of Learned Societies v. McDonald*, No. 1:25-CV-03657 (S.D.N.Y May 1, 2025); Ben Johansen, Sophia Cai & Irie Sentner. *DOGE Comes for the Little Guy*, Politico (Apr. 16, 2025, 4:54 PM), https://www.politico.com/newsletters/west-wing-playbook-remaking-government/2025/04/16/doge-comes-for-the-little-guy-00294469.

[6] Richard Fowler. *DOGE Days: Inside The Dismantling Of The Federal Homelessness Agency*, Forbes (Apr. 30, 2025, 4:05 PM), https://www.forbes.com/sites/richardfowler/2025/04/30/doge-days-inside-the-dismantling-of-the-federal-homelessness-agency/.

meeting.[7]

- On April 21, 2025, Nate Cavanaugh became a member of the **National Labor Relations Board**, where those acting to further the DOGE agenda have terminated leases for its offices and reduced its staff.[8]

- On April 23, 2025, the CEO of the **Millennium Challenge Corporation** ("MCC"), a bipartisan agency, announced to employees: "'We understand from the DOGE team there will soon be significant reduction in the number of MCC's programs and relatedly the agency's staff.'" This announcement was made shortly after a series of meetings with Nate Cavanaugh—a representative of the DOGE agenda assigned to MCC.[9]

- On April 28, 2025, Nate Cavanaugh, as representative of the DOGE agenda, arrived at the headquarters of the **U.S. International Development Finance Corporation** to evaluate its "efficiency."[10]

- On May 1, 2025, as part of the dismantling of the **Minority Business Development Agency** ("MBDA"), grantees received funding termination notices signed by Nate Cavanaugh and "Under the Authority of Keith Sonderling, Acting Undersecretary of MBDA."[11]

- Since the U.S. DOGE Service and U.S. DOGE Service Temporary Organization were created, Kenneth Jackson has served in at least the following roles, in addition to his affiliation with the DOGE agenda: senior advisor to the **Department of State**, Deputy Administrator for Management and Resources as well as the Chief Financial Officer at the **U.S. Agency for International Development**, President of USIP, President of the **Inter-American Foundation**, and Executive Director of

---

[7] Eisenberg Decl., Ex. B. *See also Trump Administration Ramps Up On Attacks On Civil Society, Empowers DOGE To Investigate Independent Nonprofits*, Vera (Apr. 15, 2025), https://www.vera.org/newsroom/trump-administration-ramps-up-on-attacks-on-civil-society-empowers-doge-to-investigate-independent-nonprofits.

[8] Robert Iafolla. *Labor Board's DOGE Detailees Connected To Agency Take Downs*, Bloomberg Law (Apr. 21, 2025, 6:17 PM), https://news.bloomberglaw.com/us-law-week/labor-boards-doge-detailees-connected-to-agency-take-downs; Michael Sainato. *Democrats In Congress Wan Cuts At Top US Labor Watchdog Will Be 'Catastrophic'*, The Guardian (Apr. 28, 2025, 1:12 PM), https://www.theguardian.com/business/2025/apr/28/doge-nlrb-cuts-democrats.

[9] Ben Johansen. *DOGE Is Shutting Down Foreign Ad Agency Millennium Challenge Corporation*, Politico (Apr. 23, 2025, 3:00 PM). https://www.politico.com/news/2025/04/23/doge-millennium-challenge-foreign-aid-00306333.

[10] Robbie Gramer & Sophia Cai. *DOGE Targets US Foreign Aid Agency Created Under First Trump Administration*, Politico (Apr. 28, 2025, 7:49 PM), https://www.politico.com/news/2025/04/28/doge-us-foreign-aid-agency-first-trump-administration-00314510.

[11] Press Release, Martin Heinrich, Senator of New Mexico, Heinrich, Lujan, Colleagues Demand To Know Who Killed Minority Business Development Agency, Why & Where's The Money Going? (May 1, 2025), https://www.heinrich.senate.gov/newsroom/press-releases/heinrich-lujan-colleagues-demand-to-know-who-killed-minority-business-development-agency-why-and-wheres-the-money-going.

USICH.[12]

DOGE agenda affiliates have also made repeated public comments about their exploits at USIP.  For example, on March 31, 2025, after taking over USIP, the official DOGE X account posted the following message:

> Each year, the United States Institute of Peace (USIP) receives $55M in congressional (taxpayer) funds. - Prior management would sweep excess funds into its private Endowment (zero congressional oversight). -In the past 10 years, USIP has transferred ~$13M to its private Endowment, mainly used for private events and travel.[13]

In that message, the account also posted a list of four USIP contracts that had purportedly been cancelled, including one that identified a former member of the Taliban who was working to advance USIP's peacebuilding efforts in Afghanistan.  *Id*.  Public disclosure of this information has exposed this contractor to the world as working for USIP and led to death threats against his family in Afghanistan.  *See* Am. Compl. ¶ 111.

On April 1, 2025, the official DOGE X account posted: "Update: the $13M in taxpayer dollars (referenced [in the March 31, 2025 USIP X message]) has been returned to the Treasury."[14] Of course, USIP is authorized to move Congressionally-appropriated funds to the Endowment at the end of every fiscal year pursuant to 22 U.S.C. § 4609(b).

On May 1, 2025, Elon Musk, and approximately one dozen people purportedly working for him and the DOGE agenda, participated in a broadcasted roundtable with Fox News host Jesse Waters to discuss "where's our money going?"  After identifying purported "fraud" that the DOGE

---

[12] Richard Fowler. *DOGE Days: Inside The Dismantling Of The Federal Homelessness Agency*, Forbes (Apr. 30, 2025, 4:05 PM), https://www.forbes.com/sites/richardfowler/2025/04/30/doge-days-inside-the-dismantling-of-the-federal-homelessness-agency/.

[13] Department of Government Efficiency (@DOGE), X (Mar. 31, 2025, 7:22 PM) https://x.com/DOGE/status/1906848257705443758.

[14] Department of Government Efficiency (@DOGE), X (Apr. 1, 2025, 8:30 PM) https://x.com/DOGE/status/1907229152073199840.

agenda has uncovered at myriad entities, Nate Cavanaugh discussed what he and the DOGE agenda had done at USIP, explaining:

> Jesse, there's a small institute called the United States Institute of Peace, it's definitely the agency we had the most fight at, we actually went into the agency and found that they had loaded guns inside of their headquarters . . . So, it was by far the least peaceful agency we've worked with ironically. . . . additionally, we found they were spending money on private jets, and they even had a $130,000 contract with a former member of the Taliban.[15]

## ARGUMENT

Plaintiffs propose to take limited depositions to elicit facts that will help the Court decide threshold issues for Plaintiffs' *ultra vires* and APA claims. Meaningful judicial review of *ultra vires* agency action requires a record that shows "the extent of the agency's delegated authority" and "whether the agency has acted within that authority," *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022), or alternatively, whether the agency acted without any authority whatsoever. For APA claims, a court must first determine whether an entity constitutes an "agency" for purposes of judicial review under the statute, 5 U.S.C. § 551(1), which requires inquiry into the scope and nature of an entity's wielding of executive authority, and secondarily, whether the agency has taken a "final agency action" marking the culmination of a decision making process, *Bennett v. Spear*, 520 U.S. 154, 178 (1997). For both sets of claims, an administrative record detailing the decision to shutter USIP—if one even exists—will be inadequate.

## I. THE DISCOVERY THAT PLAINTIFFS SEEK—TWO FACT DEPOSITIONS AND THREE, NARROW RULE 30(B)(6) DEPOSITIONS—IS CRITICAL TO PLAINTIFFS' CLAIMS.

Plaintiffs seek leave to take two fact depositions of Defendants Kenneth Jackson and Nate

---

[15] Fox News. 'FRAUD AT SCALE': Elon Musk Exposes Shocking Waste That Makes People 'Numb', YouTube (May 2, 2025) https://www.youtube.com/watch?v=8uhiwIFUoKQ.

Cavanaugh, given their centrality to the *ultra vires* conduct that Plaintiffs allege and the material facts underlying Plaintiffs' claims. Plaintiffs also seek narrow depositions of Defendants the U.S. DOGE Service, the U.S. DOGE Service Temporary Organization, and the GSA pursuant to Federal Rule of Civil Procedure 30(b)(6) on the following topics, which are copied here from Plaintiffs' proposed order:

> A. Mission, responsibilities, leadership structure, and decision-making structure between February 18, 2025 and the date of the deposition.
>
> B. Supervision, direction, or involvement with the U.S. Institute of Peace between February 18, 2025 and the date of the deposition.
>
> C. Scope and authority with respect to supervising, directing, or becoming involved with the U.S. Institute of Peace.
>
> D. Determining the U.S. Institute of Peace's statutory minimum, including any analysis of what the statutory minimum is.
>
> E. Analysis of whether the U.S. Institute of Peace is a non-profit corporation and/or part of the Executive Branch.
>
> F. The role, titles, and responsibilities of any employee or agent involved with any of the prior topics.

The discovery Plaintiffs seek here is precisely the kind of extra-record evidence that courts routinely permit parties to probe in APA and APA-adjacent claims. For Plaintiffs' *ultra vires* claims, Plaintiffs will need to understand the bounds of Defendants Jackson's and Cavanaugh's lawful authority, such as who they work for, the source—if any—of the directive to take over and shutter USIP, and the authority for all subsequent decisions. For Defendant Cavanaugh in particular, he claims to be simultaneously a member of the DOGE team working at the GSA, the leader of a DOGE team at USIP, and the president of USIP.[16] When he fired all of USIP's staff,

---

[16] Eisenberg Decl., Ex. B. *See also Trump Administration Ramps Up On Attacks On Civil Society, Empowers DOGE To Investigate Independent Nonprofits*, Vera (Apr. 15, 2025), https://www.vera.org/newsroom/trump-administration-ramps-up-on-attacks-on-civil-society-empowers-doge-to-investigate-independent-nonprofits.

cancelled all of its contracts, and transferred its $500 million headquarters to GSA for free, was he exercising authority conferred by USIP, DOGE, GSA, or somewhere else?  Additionally, for their APA claims, Plaintiffs will need to identify the part of the federal government that led the takeover of USIP, and if that answer is the U.S. DOGE Service and/or the U.S. DOGE Service Temporary Organization, establish that they are "agencies" within the meaning of the APA whose actions are subject to judicial review.  The Government contends that "[the U.S. DOGE Service] itself is not an 'agency' within the meaning of the APA's definition, 5 U.S.C. §§ 551(1), 701(b)(1), because it does not 'exercise substantial independent authority[.]'"  Defs.' Opp. at 22, ECF No. 18 (citation omitted).  But there is a cache of public reporting suggesting otherwise.  Only through targeted deposition discovery can Plaintiffs and the Court adequately probe this issue.

Self-serving affidavits in lieu of depositions, which cannot be tested by Plaintiffs or the Court, will be insufficient to allow meaningful judicial review.  Similarly, it is unlikely that there is a complete set of documents containing the information that this Court requires; to the extent there somehow is, it would be more expedient for the parties and the Court to obtain this information via one round of depositions, instead of serial document requests likely to be followed by requests for depositions.

## II.    THE DISCOVERY THAT PLAINTIFFS SEEK IS EXACTLY THE SORT OF TARGETED DISCOVERY THAT COURTS HAVE PERMITTED IN OTHER CASES.

With respect to Plaintiffs' *ultra vires* claims, although courts tend to restrict review of non-APA claims to the administrative record when they are brought in parallel to APA claims, *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 43 (D.D.C. 2018), courts in this District have recognized that *ultra vires* claims are differently situated.  *See Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, No. 1:19-CV-2236, 2023 WL 5221367, at **4, 7 (D.D.C. Aug. 15, 2023) (permitting discovery beyond the administrative record for claim that Postal Service acted *ultra*

*vires* by failing to maintain an adequate supervisory differential); *see also id.* at *7 ("allowing discovery will ultimately aid the Court in exercising its limited role of determining the extent of the agency's delegated authority and whether the agency acted within that authority") (cleaned up).[17]

Because "the purpose of admitting extra-record evidence is to secure effective judicial review," the question is whether, on a case-by-case basis, discovery will permit effective adjudication of the claim. *Id.* at *4-6; *see also Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, No. 22-CV-0035, 2024 WL 2110141, at *6 (D.D.C. May 10, 2024). Whether extra-record evidence is necessary depends on the contours of the specific statutory mandate of which the plaintiff alleges the defendant has run afoul. *See Nat'l Ass'n. of Postal Supervisors*, 2023 WL 5221367, at *4-6.

For Plaintiffs' APA claims, the factual basis for judicial review of agency action is generally limited to the administrative record, 5 U.S.C. § 706, consisting of "'all documents and materials that the agency directly or indirectly considered' in making its decision." *Oceana, Inc. v. Ross*, 454 F. Supp. 3d 62, 68 (D.D.C. 2020) (quoting *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006)); *see also* Fed. R. App. P. 16(a) (defining the administrative record as "the order involved, any findings or reports on which that order is based, and the pleadings, evidence, and other parts of the proceedings before the agency") (cleaned up).

---

[17] District courts retain "broad discretion over the structure, timing, and scope of discovery." *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1208 (D.C. Cir. 2020). Discovery generally must be "proportional to the needs of the case" and account for "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

But courts routinely exercise their discretion to permit discovery on threshold issues that would fall outside of any administrative record. For example, courts have considered limited discovery in APA cases beyond any administrative record for various purposes, including:

- "[T]o ascertain the contours of the precise policy at issue." *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 409 F.3d 359, 367 (D.C. Cir. 2005);

- When "parties' litigation positions have obscured the issues in [the] case, so it is impossible to discern whether the alleged disclosure policy in fact exists" and when an agency "appeared to take a different position" on the policy than the position advanced by agency's counsel. *Id.* at 360;

- To assist the court in assessing plaintiffs' claims because the administrative record was "entirely bare" as to one claim and was impossible to review "by way of the administrative record alone," *Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. 2d 150, 158 (D.D.C. 2012); *see also Am. First Legal Found. v. Cardona*, 630 F. Supp. 3d 170, 185-88 (D.D.C. 2022);

- When an agency's procedural defaults—failure to conduct required hearings, lack of written record of decision-making—made it impossible for the district court to determine whether the adjudicative officials considered all relevant factors in reaching determinations, *see Esch v. Yeutter*, 876 F.2d 976, 993 (D.C. Cir. 1989);

- To help the court "decide additional factual questions necessary to resolving [] critical legal issues," *Am. Fed'n of Lab. & Congress of Industrial Orgs. v. Dep't of Labor*, No. 25-0339, 2025 WL 556325, at *1 (D.D.C. Feb. 19, 2025) ("AFL-CIO");

- When "Plaintiffs don't contend that the decisions or policies they challenge were made through a formal process or otherwise produced a record like the Court may see in a typical APA case. Indeed, one of the core questions here is whether the defendants even took the actions (or established the policies) that plaintiffs challenge. There's no way for the Court to decide that question—or the follow-up question of whether those policies were in accordance with law—without some evidence of defendants' decisionmaking process[,]" *id.*;

- "To evaluate the reasonableness and lawfulness of Defendants' decision to take those actions, this Court requires an adequate record of exactly what actions Defendants took . . . . And in this case—unlike the typical APA case, which involves the enactment of a rule or other agency action taken in public view—only the Defendants know the 'contours' of those actions," Mem. Order & Op. at 6, *All. for Retired Americans v. Bessent*, No. 1:25-CV-00313 (D.D.C. Mar. 20, 2025) (ECF No. 52).

13

Courts have permitted similar discovery where the threshold issue that must be resolved is whether an agency is exercising "substantial independent authority" such that it is subject to the Freedom of Information Act or the Economy Act of 1933. *See, e.g.*, Op. and Order at 3, *Citizens for Resp. & Ethics in Washington v. U.S. DOGE Service*, No. 1:25-CV-00511 (D.D.C. Apr. 15, 2025) (ECF No. 38) ("CREW") (granting leave to depose 30(b)(6) witness and rejecting various objections to interrogatories that are relevant to "authority USDS exercises over federal agencies[,]" and collecting cases); *see also* Order at 8, 14, *AFL-CIO*, No. 25-CV-339 (D.D.C. Feb. 27, 2025) (ECF No. 48) (finding that structure of USDS and its scope of authority were unclear from the record yet critical to deciding whether USDS is an agency within the meaning of the Economy Act of 1933 and permitting four depositions, capped at eight hours in the aggregate and limited to three narrow topics). And, of course, limited discovery is appropriate when the agency's purported administrative record contradicts public reporting of the exercise and scope of an agency's authority. *See, e.g.*, Op. and Order at 6, *CREW*, No. 1:25-CV-0051 (D.D.C. Apr. 15, 2025) (ECF No. 38).

In sum, courts tend to permit discovery when (1) a traditional administrative record is unavailable to facilitate the Court's judicial review; (2) the record is so bare as to preclude review; or (3) there is a substantial showing of bad faith or improper behavior underlying the agency's decisions. *See Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001). All of these rationales are present here.

A.    **The Facts Underlying Plaintiffs' *Ultra Vires* Claim Will Be Absent from Any Administrative Record.**

The crux of Plaintiffs' *ultra vires* claims against Defendants Jackson and Cavanaugh is that they exceeded their lawful authority in deciding or implementing the decision to seize and shutter USIP. Yet aside from scattershot news reports, it is not known who these Defendants work for,

what their roles are, what they believe their lawful authority to be, and the rationale underlying their efforts at USIP.[18]  Judicial review of *ultra vires* claims "rests on the longstanding principle that if an agency action is 'unauthorized by the statute under which [the agency] assumes to act,' the agency has 'violate[d] the law' and 'the courts generally have jurisdiction to grant relief.'" *Nat'l Ass'n of Postal Supervisors,* 26 F.4th at 970 (quoting *McAnnulty v. McFarland*, 187 U.S. 108 (1902)).  Here, we need discovery to ascertain where Defendants believe their lawful authority derives.

For example, in addition to their roles at USIP, Defendants Jackson and Cavanaugh have or continue to serve in leadership positions at the National Endowment for the Humanities, the United States Interagency Council on Homelessness, GSA, Millennium Challenge Corporation, the U.S. International Development Finance Corporation, Minority Business Development Agency, "DOGE," the Department of State, the U.S. Agency for International Development, and the Inter-American Foundation.  *See* pages 6-8, *supra*.  In each position, these Defendants have sought to truncate and wind down their employers despite their own Congressional mandates and appropriation.  The same is true here.  Plaintiffs have alleged that Defendants' actions are "beyond mere legal or factual error and amount to a clear departure by the agency from its statutory mandate" and in the alternative, are "blatantly lawless." *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022).  So much is unknown about the basis for two individuals to wield such significant executive power.  The derivation of Defendants' authority to act—whether statutory or constitutional—must be determined for the Court to meaningfully

---

[18] Defendants assert no meaningful challenge to Plaintiffs' ultra vires claims, other than to say that there is "no ultra vires claim that is distinct from their APA claims[.]"  Defs' Opp. at 28, ECF No. 18.  Yet the purpose of *ultra vires* review includes judicial review of agency action when the agency is exempt from review under the APA, *New York v. Biden*, 636 F. Supp. 3d 1 (D.D.C. 2022), opinion clarified, No. 20-CV-2340 (EGS), 2023 WL 3311788, at *12 (D.D.C. Mar. 6, 2023).

review Defendants' decision to dismantle USIP, and this information cannot be gleaned from an administrative record.

### B.    Whether the U.S. DOGE Service, the U.S. DOGE Service Temporary Organization is an APA "Agency" Will Be Absent from Any Administrative Record.

The APA provides that an "agency" is "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 551(1). This language requires courts to "examine the structure, function, and mandate" of an entity. *McKinney v. Caldera*, 141 F. Supp. 2d 25, 33 (D.D.C. 2001) (citation omitted). Defendants argue that the U.S. DOGE Service is not an "agency" subject to the APA because it "does not 'exercise substantial independent authority[.]'" Defs.' Opp. at 22, ECF No. 18 (quoting *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C. Cir. 1997)). Defendants rely on the text of President Trump's Executive Order 14158 establishing the U.S. DOGE Service and U.S. DOGE Service Temporary Organization as an entity with a "limited set of advisory responsibilities[.]" *Id.*

But these anodyne descriptions of DOGE do not reconcile with what happened at USIP or widespread public reporting. It does not even reconcile with how some of the Defendants have characterized the U.S. DOGE Service in other litigation. *See, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-CV-0946, 2025 WL 1187730, at *44 n.54 (D.D.C. Apr. 24, 2025) (discussing whether U.S. DOGE Service is an agency of the Executive Branch and noting that "Defendants appear to concede that the U.S. DOGE Service is an agency").

To prove any APA claim against the two DOGE entities, Plaintiffs will need to understand the extent to which they are serving as an "authority" of the federal government and driving events on the ground. And if it were GSA at the helm, as Defendant Cavanaugh has suggested, the Court should have the opportunity to know that too.

### C.    Defendants Dispute that There Has Been Final Agency Action, Which Suggests There Is No Administrative Record at All, or that It Is Paltry.

Limited, expedited discovery will also allow Plaintiffs to probe Defendants' contention that there has been no "final agency action" necessary for an APA violation. *See* Defs' Opp. at 27, ECF No. 18.  Without the kind of robust administrative record that normally accompanies APA cases, *see Am. Bioscience, Inc.*, 243 F.3d at 582, efficient resolution of Plaintiffs' claims requires discovery into this threshold factual inquiry.

A final agency action within the meaning of the APA is "the consummation of the agency's decisionmaking process . . . by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).  Action derived from "top agency officials" typifies final agency action.  *See Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 702 (D.C. Cir. 1971) (holding agency head approval of an agency action as a "signpost[] of authoritative determination, finality[,] and ripeness").  Such action also need not be expressly memorialized in writing, *see Brotherhood of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020), or formally acknowledged by the agency as a "final order," *Friedman v. Fed. Aviation Admin.*, 841 F.3d 537, 541-42 (D.C. Cir. 2016), so long as the action has the same legal effects and implications, *see Aracely, R v. Nielsen*, 319 F. Supp. 3d 110, 139 (D.D.C. 2018) (finding final agency action where the defendant agency "took specific, discrete steps" pursuant to an unwritten policy and those steps harmed plaintiffs).

As a result, the factual context surrounding the decision-making process for an unwritten policy or practice becomes paramount in determining the decision's impact, and therefore its status as final agency action.  *See Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 930-31 (D.C. Cir. 2008) (reviewing as final agency action under the APA an unwritten policy that, "[o]n

this record[,] it is clear the Commission" adopted). Moreover, because "[t]he manner in which an agency's governing statutes and regulations structure its decisionmaking processes is a touchstone of the finality analysis," *Soundboard Assoc. v. Fed. Trade Comm'n*, 888 F.3d 1261, 1269 (D.C. Cir. 2018), where a purported agency lacks governing documents and deliberately obscures its bureaucratic hierarchy, additional factual inquiry is necessary to ensure meaningful judicial review.

Regardless of whether Defendants have reduced USIP to its statutory minimum or have effectively dissolved USIP, final agency action has occurred or is imminent. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990) (agency action is reviewable if it "has an actual or immediately threatened effect"). The opaque and rapidly shifting narratives advanced by Defendants in this case have made it impossible for the Court to determine who authorized these decisions, or under what authority, and the impact of Defendants "specific, discrete steps" on legal rights and obligations. *Aracely, R*, 319 F. Supp. 3d at 139. Defendants cannot have it both ways: they cannot seek to dismiss a claim for lack of alleged final agency action while obfuscating information critical to identifying APA-reviewable action.

Similarly, limited extra-record discovery is appropriate when an agency's record is likely to be "entirely bare," *Nat'l Mining Ass'n*, 865 F. Supp. at 158, "contain[s] no information whatsoever" about critical factual elements necessary to adjudicate an APA claim, *Am. First Legal Found.*, 630 F. Supp 3d. at 185-88, or when there is no written record of any decision-making. Here, no formal adjudication has occurred; no notice-and-comment rulemaking has been initiated; and no policy guidance has been issued. Rather, federal officials—principally personnel affiliated with the DOGE entities or GSA—have undertaken a swift, chaotic, and unprecedented campaign to frustrate Congress's mandate for an independent non-profit corporation. This is a case for

18

discovery.

**D.    There Are Substantial Indicia of Bad Faith Underlying Defendants'
Decisions and Exercise of Authority.**

Limited discovery is also warranted because there is a substantial likelihood that
Defendants are seeking to obfuscate the record and avoid judicial review of their conduct.  A party
may obtain limited discovery in an APA context if there is "a showing of bad faith or improper
behavior." *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019); *see also Air Transp. Ass'n
of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487–88 (D.C. Cir. 2011);*Neighborhood
Assistance Corp. of Am. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 11-CV-1312, 2011 WL 3611461,
at *1 (D.D.C. Aug. 17, 2011) (discovery may be warranted where there is a strong showing of bad
faith or improper behavior on the part of the agency, such that "without discovery[,] the
administrative record cannot be trusted") (cleaned up).  For example, in *Neighborhood Assistance
Corporation of America*, the court found that plaintiff had made "a strong preliminary showing
that the agency acted improperly or in bad faith toward [plaintiff] leading up to and possibly in
connection with the adoption" of a regulation specifically targeting plaintiff following its public
criticism of the Obama administration.  2011 WL 3611461 at 2.

Defendants have proffered shifting explanations for the drastic, overt actions to dismantle
USIP by arriving at headquarters with law enforcement officers, summarily terminating hundreds
of employees with special expertise who have dedicated their lives to peace building, giving away
the building, and cutting off any access to funding.  For example, in response to Plaintiffs' petition
for a temporary restraining order, Defendants insisted that USIP "while reduced, continues to
perform functions required by statute," when on the ground, Defendants had all-but dismantled
USIP.  *Compare* Eisenberg Decl., Exs. B-E *with* Defs' Opp. at 31, ECF No. 18 *and* Eisenberg
Decl., Ex. A.  At oral argument, Defendants represented to the Court that "there is no indication .

. . that the institute does not have the staff necessary to carry out its minimum statutory functions," *see* Eisenberg Decl., Ex. F (Oral Arg. Tr. at 74:18-20), and that Defendant Cavanaugh's letter to the GSA "is what the agency is doing," *id.* at 75: 9-11.  Not so.  *See* Eisenberg Decl., Ex. E ¶¶ 10-12.

There are now more than 60 lawsuits challenging DOGE's sweeping exercise of executive authority.[19]  As other federal courts have found, individuals affiliated with DOGE, hired into the federal government on a temporary basis, have embedded themselves within federal agencies in decision-making positions, not to further the missions of those agencies, but rather to further the DOGE agenda.  *See, e.g.*, *Does v. Musk*, No. 25-0462, 2025 WL 840574, at \*\*1–4 (D. Md. Mar. 18, 2025); *New York v. Trump*, No. 25-CV-01144, 2025 WL 573771, at \*\*3–7 (S.D.N.Y. Feb. 21, 2025); *Am. Fed'n of Lab. & Congress of Industrial Orgs. v. Dep't of Lab.*, No. 25-339, 2025 WL 1129227, at \*\*1–4 (D.D.C. Apr. 16, 2025).  Under the guise of cost cutting and efficiency, entire agencies have been eviscerated when Congressional mandates conflict with the DOGE agenda.

But Defendants still maintain that "it's been the United States Institute of Peace that has been performing all of the actions; it's not actually DOGE," Eisenberg Decl., Ex. F at 83:16-18, that a DOGE team lead installed in an agency "is herself an agency employee, who reports to the agency's head or an agency head's designee—not to [the U.S. DOGE Service]," and that "the agency head may overrule the assessment of the DOGE Team Lead," Resp. at 25, ECF No. 18.  Narrowly tailored discovery—including testimony from agency officials—will create a more reliable factual record for the Court.  *See Tummino v. Von Eschenbach*, 427 F. Supp. 2d 212, 230 (E.D.N.Y. 2006) ("[W]here a strong preliminary showing of bad faith or improper behavior is made, agency officials can be required to give testimony to explain the reasons for their actions.")

---

[19] *Litigation Tracker: Legal Challenges to Trump Administration Actions*, Just Security (May 8, 2025), https://www.justsecurity.org/107087/tracker-litigation-legal-challenges-trump-administration/.

(cleaned up).

### E.    Depositions Would Impose Minimal Burden on Defendants.

Plaintiffs seek narrowly tailored depositions of key personnel in an attempt to surface the threshold issues efficiently.  To the extent Defendants object to depositions of Kenneth Jackson and Nate Cavanaugh under the "apex doctrine," this argument can be easily set aside.  Although depositions of "high-ranking government official[s]" are generally disfavored, *United States v. Newman*, 531 F. Supp. 3d 181, 188 (D.D.C. 2021) (cleaned up), that is not the case when the witnesses have "some personal knowledge about the matter and the party seeking the deposition makes a showing that the information cannot be obtained elsewhere," *see Alexander v. F.B.I*, 186 F.R.D. 1, 4 (D.D.C. 1998).

That is precisely the situation here: Defendants Jackson and Cavanaugh were not only personally involved with—and leading—the material events in this case, but they are likely the only sources of the information that Plaintiffs seek.  For example, there are only three non-DOGE employees left at USIP—one human resources officer, one finance officer, and one information services officer.  Eisenberg Decl., Ex. E ¶¶ 10-12.  Defendant Cavanaugh is the only person with decision-making authority who remains.  *See Zimmerman v. Al Jazeera Am., LLC*, 329 F.R.D. 1, 7 (D.D.C. 2018) (holding that apex doctrine did not foreclose deposition because the witness had "unique knowledge of facts highly relevant to [the] case"); *Am. Broad. Cos. v. U.S. Info. Agency*, 599 F. Supp. 765, 769 (D.D.C. 1984) (apex doctrine does not preclude a deposition where the official is personally involved to the extent that he "possesses particular information necessary to the development . . . of the [plaintiffs'] case.") (cleaned up).

## III.    EXPEDITED DISCOVERY IS WARRANTED.

Plaintiffs also respectfully submit that discovery should proceed on an expedited schedule. To determine whether expedited discovery is appropriate, the Court considers the "reasonableness

of the request in light of all of the surrounding circumstances." *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 98 (D.D.C. 2014) (cleaned up). These include: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Id.*

These factors favor expedited discovery here. First, although a preliminary injunction is not pending, *see, e.g.*, Order at 8, 14, *AFL-CIO*, No. 25-CV-339 (D.D.C. Feb. 27, 2025) (ECF No. 48), Plaintiffs face further irreparable harm the longer that USIP is unable to function. They have been left without salaries, benefits, and other institutional supports, and the harms caused by Defendants are ongoing. Second, these limited depositions are narrowly tailored to shed light on threshold legal issues that are critical to the resolution of Plaintiffs' claims and for which a traditional, administrative agency record will not aid.

Third, expedited discovery is eminently reasonable "in light of all of the surrounding circumstances" in which Defendants' substantial authority has come before the Court, *see Guttenberg*, 26 F. Supp. 3d at 97–98, and is in the interest of judicial economy. Without further factual development and testimony from Defendants, briefing on forthcoming dispositive motions will likely be insufficient for meaningful judicial review. Fourth, the burden on Defendants is minimal. Plaintiffs' requests are narrowly tailored to the scope of the threshold issues before the Court. *Cf. Landwehr v. Fed. Deposit. Insurance. Corp.*, 282 F.R.D. 1, 4 (D.D.C. 2010) (finding expedited discovery requests to be overly burdensome when requests were not "narrowly tailored," or when the allegations at issue were "extraordinar[ily] vague[]"); *see also Attkisson v. Holder*, 113 F. Supp. 3d 156, 165 (D.D.C. 2015) (finding discovery burdensome where the requests were "overly broad and would require significant time and resources to address.").

Fifth, Plaintiffs' application closely follows the Court's denial of their petition for a temporary restraining order, and would allow for dispositive motion practice, per the Court's instruction, to begin as soon as these depositions can be completed. Without this discovery into the contours of Defendants' decisions, the Court will be unable to sufficiently "test the agency action against the administrative record." *See* LCvR (7)(h) cmt.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for expedited discovery and allow fact depositions of Kenneth Jackson and Nate Cavanaugh, and narrow Rule 30(b)(6) depositions of the two DOGE entities and the GSA in advance of any dispositive motion practice.

Dated: May 9, 2025

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

  /s/ Daniel M. Eisenberg
Andrew G. Celli, Jr.*
Daniel M. Eisenberg (Bar No. 90017823)
Margaret Turner**
Rachael Wyant*
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
acelli@ecbawm.com
deisenberg@ecbawm.com
mturner@ecbawm.com
rwyant@ecbawm.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice

** Application for admission pro hac vice
pending

ALI & LOCKWOOD LLP

  /s/ Kathryn Ali
Kathryn Ali (Bar No. 994633)
Elizabeth Lockwood (Bar No. 1029746)
Meghan Palmer (Bar No. 1736144)
501 H Street NE, Suite 200
Washington, D.C. 20002
(202) 651-2475
katie.ali@alilockwood.com
liz.lockwood@alilockwood.com
meghan.palmer@alilockwood.com

*Attorneys for Plaintiffs*