# Exhibit F

```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
SASHA PIPPENGER, et al.           )  Civil Action
              Plaintiffs,         )  No. 25-1090
vs.                               )
                                  )
U.S. DOGE Service, et al.,        )  April 16, 2025
              Defendants.         )  11:09 a.m.
                                  )  Washington, D.C.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

<u>**APPEARANCES**</u>:

FOR PLAINTIFFS:
        DANIEL M. EISENBERG
        RACHAEL WYANT
        Emery Celli Brinkerhoff Abady Ward & Maazel
        One Rockefeller Plaza, 8th Floor
        New York, New York
        (212) 763-5000
        deisenberg@ecbawm.com


FOR DEFENDANTS:
        JOHNNY H. WALKER, III
        SAM ESCHER
        Assistant United States Attorneys
        U.S. Department of Justice
        Civil Division
        601 D Street, NW
        Washington, D.C.  20001
        (202) 252-2511
        johnny.walker@usdoj.gov
        sam.escher@usdoj.gov


Court Reporter: Elizabeth Davila, RPR, FCRR
             Official Court Reporter


         Proceedings reported by machine shorthand.
     Transcript produced by computer-aided transcription.

1                          **P R O C E E D I N G S**

2                  THE COURTROOM DEPUTY:  Your Honor, this is Civil

3       Action 25-1090; Sasha Pippenger, et al. versus U.S. DOGE

4       Service, et al.

5                  Would the parties please come forward to the

6       lectern and identify yourselves for the record this morning.

7       We'll start with plaintiffs' counsel first.

8                  MR. EISENBERG:  Good morning, Your Honor.

9       Dan Eisenberg from Emery, Celli, Brinckerhoff, Abady, Ward &

10      Maazel for the plaintiffs.  I am here at counsel table with

11      my colleague, Rachael Wyant.

12                 THE COURT:  Good morning.

13                 MR. ESCHER:  Good morning, Your Honor.

14      Sam Escher on behalf of defendants, along with my co-counsel

15      Johnny Walker.

16                 THE COURT:  Okay.  Well, that's a memorable name,

17      Mr. Walker.  You must thank your parents for that.

18                 MR. WALKER:  Johnny Walker, Jr.

19                 THE COURT:  All right.  Well, good morning.

20                 This is the third time the Court has been called

21      on an emergency basis for a temporary restraining order to

22      address the Trump administration's actions towards the

23      U.S. Institute For Peace.  Today, a new set of plaintiffs,

24      in a new case, seek TRO relief.

25                 In this case, the terminated institute's

1    employees' program partners and an institute donor are

2    bringing claims against DOGE -- several DOGE officials;

3    President Trump; the existing ex officio members of the

4    institute board; the Office of Personnel Management; Trent

5    Morse, who sent termination emails, on behalf of the White

6    House, to the terminated employees; and the institute itself

7    is being sued, as well as the institute endowment.

8         In the other case, the *Institute v. Jackson* at

9    25-CV-804, the plaintiffs were the terminated board

10   members -- or some of them -- suing on behalf of the

11   institute, to challenge their abrupt removal without

12   compliance with statutory requirements.  And in an amended

13   complaint, the former president, terminated president

14   Ambassador Moose, was added.

15        So although these are two separate cases, this

16   case was filed as a related one to the first one because

17   they derived from the identical set of facts, DOGE

18   officials', or others', takeover of the institute, including

19   its property and its leadership.

20        They are sufficiently related, as a factual

21   matter, for the case to be related to the first case and to

22   be properly assigned to me directly as a related case,

23   instead of getting randomly assigned to another judge on

24   this court.

25        The temporary emergency relief the plaintiffs here

1    are seeking also overlaps, somewhat, with the relief

2    previously sought on a temporary emergency basis and the

3    *Institute v. Jackson*, 25-CV-804 case.

4            This case, like the first one, premises relief on

5    the unlawful termination of the institute's board members in

6    violation of the statutory for-cause protections.  But this

7    case further seeks relief under the Administrative Procedure

8    Act for arbitrary and capricious and allegedly unlawful

9    actions taken by the defendants to seize institute property

10   and sell the assets, to seize the institute's activities and

11   effectively shut it down.  Plaintiffs also claim that

12   dissolving the institute violates the organic statute

13   creating the institute and other statutory mandates, as well

14   as the separation of powers.

15           I want to start by -- because I am going to be

16   talking about this in some detail during the course of this

17   hearing, starting with the plaintiffs.

18           The relief that the plaintiffs are requesting here

19   asked for the removed board members to be declared the

20   lawful ones, though stops short of asking for the

21   reinstatement; it seeks an injunction, halting any

22   transferring of assets out of the institute; prohibiting any

23   further terminations of personnel within the institute;

24   restoring the employees' status for purpose of receiving

25   benefits; and prohibiting the disclosure or publication of

```
 1    any information about the current or former employees of the

 2    institute, the institute's grantees, partners, or

 3    contractors.

 4          Let me just start by saying I am familiar --

 5    because of the Institute v. Jackson case, the first one

 6    filed -- that the Court is familiar with the institute

 7    generally as an entity.  I am also familiar with the

 8    background facts of what has occurred, the legal and factual

 9    context around the removal of the institute's board members

10    and the institute's president, given the two prior hearings

11    I have had, and the expedited summary judgment briefing that

12    is still underway from the plaintiffs and the defendants in

13    the first filed case.

14          I am going to start with the plaintiffs, it's

15    plaintiffs' motion.  I want to start by learning more about

16    the current facts on the ground, so to speak, and about the

17    plaintiffs' situations, and then talk about some of the

18    legal issues underlying the plaintiffs' claims.

19          So who is arguing for the plaintiff?

20          Mr. Eisenberg.

21          MR. EISENBERG:  Good morning, Your Honor.

22    Third time is the charm.

23          Your Honor, one small amendment to the Court's

24    recitation of the facts --

25          THE COURT:  Okay.  That's why I was doing that.
```

1    MR. EISENBERG:  Sure.  Mr. Abuznad, who is one of

2    the plaintiffs in our case, is currently still a PSC who is

3    still in Libya.

4        The Court is well familiar --

5        THE COURT:  You are using that acronym, and I keep

6    having to refer back to figure it out.  What does that stand

7    for again?

8        MR. EISENBERG:  I'm sorry.  Personal services

9    contractor.

10       THE COURT:  Personal services contractor.  You are

11   calling it a PSK?

12       MR. EISENBERG:  PSC.

13       THE COURT:  PSC.

14       MR. EISENBERG:  The U.S. Institute of Peace

15   employs U.S. citizens and noncitizens, and so it has a

16   number of personal services contractors who work for the

17   institute who, effectively, are employees, but they just

18   have a different status by virtue of their nationality.

19       THE COURT:  Okay.  Thank you.

20       MR. EISENBERG:  Your Honor, the Court is familiar

21   with the events at the U.S. -- the shocking and jarring

22   events at the U.S. Institute of Peace.  But if the Court

23   will indulge us, we just wanted to take a minute or so to

24   talk about some of the facts that are now before the Court

25   that may not have been there in the prior hearings.

1          This case rises and falls on its facts.  What are

2     the facts of this case?  And what is the U.S. Institute of

3     Peace?

4          As the Court now has before it, affidavits from a

5     number of the plaintiffs and others, and also --

6          THE COURT:  You call that rising and falling on

7     the facts?

8          I mean, I think it's -- one of the questions I am

9     going to ask you is whether it rises and falls on what the

10    nature of the institute is, and that is a fairly novel legal

11    issue based on the statutory underpinnings of this creation

12    by Congress.

13         MR. EISENBERG:  Yes, Your Honor.

14         And the way that the Court -- the analysis should

15    be guided, in our view, based on what the facts of what the

16    U.S. Institute of Peace is.

17         So here, the Court has before it affidavits from a

18    number of the plaintiffs.  I am just going to call out some

19    of the -- well, actually, I will do that as I get to it in

20    real time.

21         But the Court now has affidavits from some of the

22    plaintiffs, and others.  It also has summary judgment

23    briefing in the *Jackson* case.  And it also has two very

24    powerful amicus briefs that were submitted in the *Jackson*

25    case that we ask the Court take judicial notice of here in

1          this matter.

2                     What is the U.S. Institute of Peace?

3                     When someone starts as a new employee of USIP,

4          they do not swear an oath of allegiance to the Constitution

5          of the United States, they do not answer to the President,

6          they do not answer to the Secretary of State.  They are

7          completely outside of that chain of command.

8                     They work for the U.S. Institute of Peace, which

9          is an independent entity, as defined in statute, that is

10         designed to research peace building and train people in

11         peace building, and help resolve conflicts.

12                    The U.S. Institute of Peace is an entity that is

13         part of the fabric of our civil society.  Congress

14         identified as a whole --

15                    THE COURT:  And when it goes out to help mediate

16         conflict situations, it does so in consultation with the

17         Department of Defense and the Secretary of State?

18                    MR. EISENBERG:  No, Your Honor.  It does it on its

19         own accord.  Under the USIP Act, the U.S. Institute of Peace

20         is allowed to respond equally toward directives from the

21         government, but it is not mandated to do so.  And so there

22         are, certainly, opportunities for civil society, in all

23         manner, to work with the government to achieve mutually

24         beneficial or shared goals.  The U.S. Institute of Peace

25         certainly does that from time to time.

1          It certainly can facilitate peace building with

2     the U.S. government, but it's not obligated to do so because

3     it answers to its own board, its independent board of

4     directors, who have a fiduciary duty to the nonprofit

5     corporation organized under the laws of the District of

6     Columbia.

7          So, again, when someone works for the U.S.

8     Institute of Peace, they believe that they are serving an

9     independent mission that Congress has identified as:  We

10    need to have a living repository of peace-building research

11    and the avant-garde techniques.  And we think that that is

12    an important aspect of --

13         THE COURT:  Doesn't the organic statute require

14    the Institute of Peace to consult with the DoD and the

15    Department of State in undertaking some of its activities

16    abroad?

17         MR. EISENBERG:  No, Your Honor.  We don't believe

18    so.  In fact, when you see how it works in practice, it's

19    certainly not the case.

20         Because when employees of the U.S. Institute of

21    Peace travel to Afghanistan, travel to Libya, or work in

22    Libya or these other places, they are not on a diplomatic

23    passport; they do not have the security of the United States

24    government.  They are not limited, in terms of who they can

25    speak with or what they do.

1    They are operating under their independent mission

2    independently.  Just as if representatives from the Council

3    on Foreign Relations or the Brookings Institution or the

4    American Enterprise Institute, if they went abroad, they

5    would have their own prerogative, independent prerogative,

6    independent security apparatus to do the work they need to

7    do.

8    In the field of international relations -- you

9    don't have to take it from me, and you don't have to take it

10   from counsel -- the experts have told us that there is a

11   value in having a robust civil society that exists

12   independent and unattached from any federal government

13   apparatus.

14   It's not only limited to the foreign affairs

15   field.  We've seen it in the health field.  The Red Cross is

16   an important entity in the fabric of our civil society that

17   attends to health issues and medical issues.  It's not a

18   subsidiary of the Department of Health and Human Services,

19   even though it is a federally chartered institution.  It's

20   an independent entity that exists, and it happens to be

21   chartered under the U.S. Code.

22   So that's how we view the U.S. --

23   THE COURT:  But "chartered" is different in nature

24   from being a congressionally created government corporation,

25   funded by the government.  And so --

```
1             MR. EISENBERG:  Agreed.
2             THE COURT:  -- I will tell you right at the
3    outset, I am not deciding the issue that is pending summary
4    judgment briefing in front of me here today.
5             MR. EISENBERG:  I understand, Your Honor.
6             THE COURT:  This is a repeat of some of the
7    discussions that were done on a fire-drill basis, less than
8    24-hour notice.  As I have said, this is a novel issue with
9    both sides having the arguments it's presenting on why the
10   institute is -- despite being congressionally established
11   government -- not just chartered, but created by statute --
12   government owned, et cetera, is otherwise independent.
13            Let me turn to facts that I think are more
14   pertinent to the relief requested here.
15            What is plaintiffs' understanding of the number of
16   staff -- other than the 28-year-old tech guy, Cavanaugh --
17   working at the institute now?
18            MR. EISENBERG:  We don't have facts in the record
19   about this in our affidavits.  But our understanding is that
20   approximately 300 of the U.S. Institute of Peace's employees
21   of a total of approximately 400 have been fired.  In fact,
22   they were fired on March 28th, starting in alphabetical
23   order; and they ran down the list until around midnight.
24            THE COURT:  That's one form of nonarbitrary
25   reasoned decision-making, the alphabet.
```

1    MR. EISENBERG:  That's right, the alphabet.  We

2  can all agree, it was sequential.  It was sequential, so

3  that's true.  That was certainly not -- that aspect of it

4  was not arbitrary.

5    Also, Your Honor, the U.S. Institute of Peace is

6  not government owned, I just wanted to clarify that for the

7  record.  It receives private donations in addition to --

8  it's predominantly funded by Congress, but I just wanted to

9  clarify that.

10    But returning to Your Honor's question, you know,

11  it is operating at a skeleton staff; and we believe that the

12  balance of USIP's contractors and personnel will be

13  terminated at some point in May.  They have received no --

14  we understand that there have been notices that have gone

15  out to them.  And so after that is done, I don't -- I mean,

16  we're talking about a single-digit entity, so --

17    THE COURT:  When you say a "single-digit entity,"

18  you think the only person left standing at the institute

19  will be the president, Defendant Cavanaugh?

20    MR. EISENBERG:  Yeah.  Or the ex officio board

21  members that remain by statute.  You know, maybe

22  Mr. Cavanaugh and an HR officer -- you know, something like

23  that.  But it's certainly not a staff that has any sort of

24  capacity to do peace building, to do research, to do

25  training, to, you know, stand up for Gandhi-King Academy and

1    to do in-person trainings.  I mean, it is not a

2    functional -- it is not a functioning entity; it has no

3    headquarters; it may not have any offices.  So it's,

4    essentially, defunct.

5                And so, you know --

6                THE COURT:  So let me go back to touch on this.

7                As I understand plaintiffs' position, that if the

8    Court ultimately finds that removal of the board members was

9    unlawful, that all of the subsequent conduct or actions

10   taken by any remaining personnel at the institute was

11   similarly unlawful and, therefore, plaintiffs would succeed,

12   basically, across the board, across all of their claims?

13               MR. EISENBERG:  Yes, Your Honor.  That's one of

14   the multiple routes that this Court has to find for the

15   plaintiffs.

16               THE COURT:  Okay.  Since, as I have said, I am not

17   going to rule on the removal issue in the posture of this

18   case, since it's already being briefed in the other case;

19   and given that the terminated board members are actually

20   plaintiffs with standing in the other case, and they're not

21   even here in this case, that other case is the proper forum

22   for resolving that issue.

23               So if I assume for purposes of this hearing --

24               MR. EISENBERG:  Your Honor, apologies for

25   interrupting.  I have a counterpoint for that, if the Court

1    will hear it.

2             THE COURT:  Yes.

3             MR. EISENBERG:  In the *Collins* case, that's the

4    case involving federal fair housing authority, the Court

5    found that the shareholders of that entity had standing to

6    challenge the unlawful removal of the director; and so we

7    believe we are similarly situated.

8             All we need to show is that the harm -- that the

9    unlawful conduct had harm that flowed down to our clients

10   and to the plaintiffs.

11            And so we are not asking the Court --

12            THE COURT:  None of the plaintiffs in this case

13   are shareholders.

14            MR. EISENBERG:  They are not, Your Honor, but we

15   would acknowledge that they are comparable to shareholders.

16            THE COURT:  Why is that, because they're

17   employees --

18            MR. EISENBERG:  Yes, Your Honor.

19            THE COURT:  -- and have a donor?

20            MR. EISENBERG:  Yes, Your Honor.

21            THE COURT:  Whose only connection with the

22   institute, currently, is because the donor contributed funds

23   for a conference room?

24            MR. EISENBERG:  Yes, Your Honor.  And the reason

25   for that --

1          THE COURT:  And that gives you as much standing as

2     a shareholder?

3          MR. EISENBERG:  Your Honor, we believe that it

4     does, and that also goes back to what the U.S. Institute of

5     Peace is; because there is no regulated entity.

6          Or it -- U.S. Institute of Peace does not regulate

7     anyone; it does not enforce any sort of executive power or

8     executive action.  The only people here that have been

9     harmed are its employees and the people who are the

10    beneficiaries of its peace-building efforts.

11         So to the extent that, you know, the board does

12    not have standing or -- as the Court has -- at least was one

13    of the issues --

14         THE COURT:  No, I appreciate the plaintiffs'

15    position; it's the same one in the other case, because the

16    institute's a totally independent body.

17         Despite all of the factors that the government has

18    pointed out, this should be a simple issue.  It's totally

19    independent, it's not part of the federal government.  It's

20    not part of -- if it's part of the federal government and a

21    federal entity, since it was created and established by

22    Congress and under definitions of what an "agency" is and a

23    federal entity is -- it seems to look, smell, and talk like

24    a duck; and so then I shouldn't -- it means that I shouldn't

25    call it a duck.

1          But putting all of that aside, even if it is a

2     federal entity, it's not within the executive branch -- is

3     that part of your position?

4          MR. EISENBERG:  Well, let me --

5          THE COURT:  And even if it isn't part of the

6     executive branch, it falls within the exception of

7     *Humphrey's Executor*, and so the case law jurisprudence that

8     has been embraced so fully by the Supreme Court under *Myers*

9     that:  If the President has appointment power, he has got

10    removal power, absolute; no matter what congressional

11    safeguards have been put up to protect the independence of a

12    particular entity.

13         You are going to say Positions A and B fall; final

14    position, *Humphrey's Executor* protects it.

15         Do I have that right?

16         MR. EISENBERG:  Yes, Your Honor.

17         You can find the likelihood of success -- assuming

18    we have standing to raise this issue, you can find a

19    likelihood of success on the merits if either the U.S.

20    Institute of Peace is completely independent and detached or

21    if it approaches on the continuum something that looks

22    closer to an executive agency because the *Myers* case is not

23    appropriate here; it's the *Humphrey's Executor*, *FTC, NLRB*,

24    those are -- that's the jurisprudence, because the Supreme

25    Court has not yet found that a multimember partisan-balanced

1    board where the President can exercise some --

2              (Court reporter interruption.)

3              MR. EISENBERG:  -- multimember bipartisan board

4    where the President can exercise some degree of control.

5              I am from New York.  I apologize.

6              (Court reporter reads back the record.)

7              MR. EISENBERG:  Please.  If I get ahead of myself,

8    slow me down.

9              THE COURT:  She will.  She protects my record very

10   well.

11             MR. EISENBERG:  -- bipartisan board where the

12   President has removal authority, in fact, greater removal

13   authority than was the case in *Humphrey's Executor* because

14   there are many ways for the President to discharge one of

15   the board members.

16             So under either scenario, we believe that we can

17   show a likelihood of success on the merits.  We do not ask

18   this Court to reach the ultimate question at this

19   preliminary phase.

20             THE COURT:  And I am not.

21             MR. EISENBERG:  Understood.

22             THE COURT:  So, on that, we are agreed.

23             You mentioned standing.  I will be honest, I am

24   concerned about the disconnect between what is being sought

25   in this case and the harms suffered by these particular

1    plaintiffs and the claims brought.  I mean, I think that's

2    sort of standard standing law; you know, that you have to

3    satisfy these three familiar parts:  Injury and fact,

4    causation, and redressability.

5         Let me just say, I have reviewed the plaintiffs'

6    declarations.  I appreciate how upset they all are about

7    their own summary terminations, in alphabetical order, and

8    what they see as the destruction of this institute, which

9    they believe is very valuable, and where they worked; but

10   upset and even concrete injury by a plaintiff is not enough

11   for standing, as you know.

12        Plaintiffs have to also establish redressability

13   and traceability; in other words, that the relief requested

14   would actually redress their harms.

15        As the D.C. Circuit has said:  Redressability

16   examines whether the relief sought, assuming the court

17   chooses to grant it, will likely -- with an emphasis on

18   "likely" -- alleviate the particularized injury alleged by

19   the plaintiff.

20        I have some concerns about this, and so I want to

21   start with the proposed order docketed at ECF 11-18, and

22   just go through this in terms of redressability.

23        The first thing that the plaintiffs want is to:

24   Restore all institute employees and personal services

25   contractors terminated since March 14, 2025, to their prior

1  roles in a paid leave status so that they can obtain the

2  health insurance, immigration, and other collateral benefits

3  of employment while this litigation unfolds.

4       Plaintiffs are not trying to get back to work,

5  wherever they might go for that since the building has been

6  transferred to GSA.  So they're not going to get back to

7  work, they're just going to be put on paid leave status.

8       How would that help the institute continue to

9  function and carry out its statutory mission, which is the

10  purpose of the claims?

11       MR. EISENBERG:  Your Honor, the institute cannot

12  fulfill its statutory mission until this Court discharges

13  the current purported president of the U.S. Institute of

14  Peace.

15       We're here at a preliminary phase -- at the

16  temporary restraining order phase and maybe even preliminary

17  injunction -- because the standard, as the Court knows, is

18  the same.  What we're trying to do is stem the harm that has

19  befallen the plaintiffs.

20       The harm is not necessarily limited to the lost

21  income from their jobs; it's the subsidiary harms that have

22  flowed from the U.S. Institute of Peace's -- frankly, their

23  violation of the policies they had in place and the

24  reasonable expectations that these employees had about what

25  it would mean to work for the U.S. Institute of Peace.

```
 1              We had, I think, in great detail, descriptions

 2      from Elizabeth Quinlan, from Sasha Pippenger, from

 3      Mr. Abuznad, and others about how these destructive acts --

 4      not only flowing from the termination of the board, also

 5      associated with defendant's takeover of the institute and

 6      systematic dismantling of its security apparatus, of its

 7      flouting privacy norms by exposing an Afghanistan contractor

 8      who worked with the U.S. Institute of Peace that has caused

 9      threats to his family; and, surely, Mr. Abuznad is in an

10      ineducable, if not even more, vulnerable position to that

11      effect.

12              So the disruption to their lives is not limited to

13      their lost income; it's their health insurance, it's when

14      you have an incurable terminal -- "terminal" is not the

15      right word -- but you have an incurable illness that

16      requires a very sophisticated, detailed treatment plan; and

17      when your health insurance is getting jerked around, back

18      and forth, because we don't know if we are going to have

19      COBRA or not.  And it's just not both --

20              THE COURT:  I thought the government's brief in

21      the opposition, basically, said they all have COBRA

22      available?

23              MR. EISENBERG:  They may have COBRA.  First of

24      all, we haven't seen a declaration or an affidavit to that

25      effect.
```

 1              But second of all, even if they do have COBRA

 2     available yesterday, weeks after the time that they were

 3     supposed to get COBRA, will it be there tomorrow?

 4              Because as -- the government's plans are to

 5     shutter the U.S. Institute of Peace, to reduce the number of

 6     personnel that work there to some minimum --

 7              THE COURT:  I actually -- I mean, I am not all

 8     that familiar, but I don't think that's how COBRA works.

 9              MR. EISENBERG:  Our understanding is that if an

10     entity shrinks below a certain minimum number of people, it

11     is not eligible or obligated to offer COBRA benefits.

12              And so if that is the government's position, then

13     we would like to see some evidence of it so we can make an

14     analysis for our clients, about whether that is an

15     appropriate mitigation of how the --

16              THE COURT:  So your understanding of COBRA is that

17     it's only available if the former employer is of a certain

18     size?

19              MR. EISENBERG:  Yes, Your Honor.  And that's one

20     of the many considerations, because another --

21              THE COURT:  And if so, if the Trump Administration

22     is saying to all of the 300-some-odd terminated employees:

23     Go get COBRA, you will be good but, at the same time, is

24     shrinking the institute to below whatever the COBRA

25     requirements are, COBRA will not available to them?

1          MR. EISENBERG:  That's our understanding.  And

2     also, if the U.S. Institute of Peace doesn't exist anymore,

3     then COBRA may not be available either.  I mean, it's not a

4     far cry for the government to make that argument in two

5     months from now, given what we have seen so far, that the

6     U.S. Institute of Peace has been closed.  But that's

7     another -- the mere availability of --

8          THE COURT:  So back to this, though, the request

9     to restore all institute employees and all personal service

10    contractors terminated since March 14, 2025, how -- I mean,

11    these plaintiffs are not here representing a class.  How are

12    these seven plaintiffs -- a donor, a couple of PSCs -- how

13    are they asking for relief for hundreds of other former

14    terminated employees?

15         MR. EISENBERG:  Your Honor, when courts have

16    delved into this issue --

17         THE COURT:  I had this situation in the first case

18    also, where I had five terminated board members asking for

19    all of the terminated board members to be put back on the

20    board when they weren't in front of me and might not want

21    that job back, let alone -- you know, because I was not in

22    the position of putting people into the position of forced

23    labor to comply with my court order on a temporary

24    injunction basis.

25         So how are you asking for that relief, or are you

1      going to edit it as we speak?

2              MR. EISENBERG:  No, Your Honor.

3              We are asking the Court to enter it as iterated.

4      I will point the Court to a case out of the District of

5      Maryland, which addresses the very same issue, it's *Does 1*

6      *through 26 v. Musk*, 25-cv-0462, 2025, WL 840574.

7              The court in that case dealt with a similar issue.

8              THE COURT:  When was this?

9              MR. EISENBERG:  I'm sorry.  From 2025.  March 18,

10     2025.

11             In that case, the court wrote:  Although

12     defendants assert that the preliminary injunction should

13     apply only to plaintiffs where the parties have been unable

14     to identify means by which individualized relief could be

15     provided without jeopardizing plaintiffs' anonymity -- which

16     is certainly not an issue here -- and the record already

17     contains multiple examples of USAID personnel who are placed

18     on administrative leave or otherwise sanctioned for

19     objecting to defendants' actions, the court finds that

20     applying these requirements to all current USAID employees

21     and PSCs, including those on administrative leave, is

22     necessary to provide full relief to plaintiffs.

23             And there are some other cases that hold to a

24     similar effect.

25             Here, we just don't believe --

1        THE COURT:  In that case the court found that

2    there was too much of a significant risk of retaliation or

3    something, and that was the basis for saying that all of the

4    plaintiffs involved in that case didn't have to actually

5    appear and sign their name on the dotted line?

6        Because I know you did make an effort, at least

7    initially, for pseudonymity filing in this case.

8        So that was the basis for it?

9        MR. EISENBERG:  Yes, Your Honor.  The issues were

10   different in that case.  I have two others that are

11   comparable, including one from the District of Columbia.

12       But the point there is that it was difficult or

13   impossible for the court to craft a remedy that was limited

14   to one plaintiff.  So the Court could say:  Only Sasha

15   Pippenger gets health insurance.  And that doesn't reconcile

16   with how entity-provided health insurance works.

17       So here, because there are so many people who are

18   similarly situated who will be impacted by whatever the

19   Court decides, it's not a class action.  But at least, at

20   this TRO phase, we would submit that the relief should be --

21   should apply -- should be in the form of rules that have the

22   ancillary effect of impacting other people.

23       And I can put those other two cases into the

24   record, Your Honor, or not, as the Court wishes.

25       THE COURT:  Yes.  Go ahead, because they weren't

1    in your briefing.

2          MR. EISENBERG:  That's right, Your Honor.

3          So the second case is *PFLAG, Inc. v. Trump*,

4    25-cv-337, 2025, WL 685124, District of Maryland, March 4,

5    2025; and the other case is *D.C. v. U.S. Department of*

6    *Agriculture*, 444 F. Supp. 3d 1, from the District of

7    Columbia, 2020.

8          Those all sort of address similar issues at the

9    injunctive phase -- preliminary injunctive phase or TRO

10   phase where the relief afforded to plaintiffs can extend to

11   other people who are similarly situated, even though it's

12   not a class.

13         THE COURT:  Okay.  The next thing that you are

14   requesting to be ordered is that the institute and endowment

15   of the institute -- the institutes's board and officers are

16   enjoined from transferring any assets outside of the

17   institute or the endowment for the institute.

18         This seems like fairly broad language to me since

19   "assets," I would think, would include monetary payments.

20         So taken literally, would this language in the TRO

21   prohibit the payment of contractors who are currently owed

22   money?

23         Because I saw in some of the declarations that

24   there are some contractors who are owed money and want to be

25   paid and are trying to figure out how to reach Defendant

1    Cavanaugh to get paid, without success, because there is no

2    response to that email address.

3            So isn't that a little broad?

4            MR. EISENBERG:  It is, Your Honor.  And that is

5    certainly an oversight on the part of plaintiffs.  We

6    certainly contemplate payments of the current obligations --

7    any financial obligations that the institute has as part of

8    the TRO.  We are certainly not seeking to deprive lawful

9    contractors of money that is owed.

10           We would seek to amend that order.  We can either

11   put it on the docket later today or just do it in real time.

12           THE COURT:  All right.  And then the other thing

13   about this, about transferring any assets and barring

14   anybody still working at the institute from transferring

15   assets is that some of the plaintiff contractors talked

16   about how some of their equipment -- privately owned

17   equipment was still at the building and they haven't been

18   able to get it back.

19           This seems like this would undercut their ability

20   to collect their own physical property from whoever is left

21   at the institute.

22           MR. EISENBERG:  Yes, Your Honor.  We would amend

23   the order to the same effect.

24           THE COURT:  All right.  So then the next thing

25   that is requested is that the institute -- the board and

1    officers are enjoined from any new termination of institute

2    employees, personal service contractors, or contracts.

3          And that seems like a bit of micromanaging by the

4    Court, to tell an agency -- even if you have a good reason:

5    You found fraud, you found some other malfeasance -- no, you

6    cannot terminate anybody.  That is not something that most

7    federal judges are particularly comfortable getting involved

8    in.

9          Is that what you are asking here?

10          MR. EISENBERG:  Your Honor, we're asking for a

11    14-day period for defendants to stop Tweeting about the

12    contractors working in war zones abroad; that's essentially

13    what we're asking for.  Because there are people at the U.S.

14    Institute of Peace who do important things and are in a

15    vulnerable position and are now without the protection of

16    the security apparatus that previously existed.  So that is

17    the relief.

18          We are not seeking to infringe upon the

19    government's ability to say the things that they wish to

20    say.  And we apologize to the extent that the Court

21    construes it as an ask, as intruding upon the executive

22    branch's privacy, and those things.  That's certainly not

23    our intention --

24          THE COURT:  I am not construing, I am just reading

25    the literal language.

```
 1                 MR. EISENBERG:  Yes, your Honor.

 2                 That's certainly not our intention.  We are not

 3       seeking relief that is so broad.

 4                 Again, we can certainly amend our proposed order

 5       to that effect.  This is really intending to protect the

 6       privacy -- the people who have a serious privacy and

 7       security interest in the work that they are doing or have

 8       done.

 9                 THE COURT:  Then the harm experienced by these

10       particular plaintiffs in front of me, is it only the Libyan

11       PSC who is still employed who would benefit from that

12       particular portion of barring any further termination of

13       PSCs?

14                 MR. EISENBERG:  No, Your Honor.

15                 The other plaintiff that would benefit from that

16       is Brave Generation.  It's not an employee of the U.S.

17       Institute of Peace; but what that organization does is, it

18       builds confidence and trust of people in the Ukraine and

19       Russia to try to facilitate peaceful building there.  That

20       confidence and trust is predicated on the assumption that

21       the information provided to it and, then, ultimately to the

22       U.S. Institute of Peace is going to remain confidential.

23       And so their work would be disrupted as well.

24                 I will point the Court's attention to the --

25                 THE COURT:  I am still on the point -- the order
```

```
1      in -- that the institute and its officers and board are

2      enjoined from any new termination of institute employees,

3      personal service contractors, or support contracts.

4                MR. EISENBERG:  Apologies, Your Honor.  I was

5      responding to a different portion of the --

6                THE COURT:  I haven't gotten there yet.  I am

7      still on this one.

8                MR. EISENBERG:  Okay.  Sure.

9                THE COURT:  And so that Ukrainian group --

10                MR. EISENBERG:  Is different.

11                THE COURT:  -- is different?

12                MR. EISENBERG:  Yes, Your Honor.

13                THE COURT:  So I am right.  So it's only the

14      Libyan PSC --

15                MR. EISENBERG:  Yes, Your Honor.

16                THE COURT:  -- that would benefit from that

17      particular provision because that PSC still has an ongoing

18      contract that has not yet been terminated?

19                MR. EISENBERG:  Correct.

20                THE COURT:  And barring any further termination

21      would help that person keep the contract?

22                MR. EISENBERG:  Correct.

23                THE COURT:  Okay.  So the Supreme Court, in sort

24      of a surprise decision, *Department of Education v.*

25      *California* -- decided just last week, it seems like time is
```

1    extended -- at 145 S Court 966, on a TRO, enjoined -- no,

2    stayed an injunction issued by a district court, on a

3    temporary basis, from having the Department of Education

4    terminate at the behest of -- well, terminate contracts for

5    teacher training.

6         A bunch of states filed suit.  They got the TRO

7    from the district court saying:  Pause this termination of

8    all of these contracts.

9         The First Circuit agreed with the district court

10   on the TRO basis.  The majority on the Supreme Court stayed

11   it, leaving the question open for courts all around the

12   country, given the majority's per curiam decision in that

13   case over stinging dissents, mostly by Ketanji Brown

14   Jackson, whether injunctions of -- to stop the termination

15   of contracts by federal agencies is still something that

16   district courts can do.

17        So that's what you are asking for here.  You don't

18   mention or talk about *Department of Education v. California*

19   with respect to this, and I am bound by the Supreme Court.

20        MR. EISENBERG:  You are, Your Honor.

21        We can submit a letter today to address that

22   specific case in the context of what we're asking for here.

23        But to the extent that the Court sought to

24   construe the order or modify the order that we proposed here

25   to be limited to folks who are similarly situated to the

1    PSCs, who are functionally employees in this case, we

2    believe, certainly, is a more reasonable middle ground, a

3    more cautious middle ground.  We can --

4            THE COURT:  I am not sure I can even do that

5    under the Supreme Court's per curiam decision.  So --

6            MR. EISENBERG:  Perhaps we can address that in a

7    letter to the Court today, and how that case may impact the

8    Court's ability to issue a TRO here.

9            THE COURT:  So you want me to hold off ruling on

10   the TRO until you get your proposed remedies more limited

11   and you address what is binding Supreme Court precedent,

12   which really just came out recently and we're all trying to

13   figure out what it means?

14           MR. EISENBERG:  Yes, Your Honor.  We can do it

15   today, we're very quick.  Everybody has had to be very

16   quick, including the Court.  We'll do that.  We'll send a

17   letter today addressing that specific case and also with an

18   amended proposed order.

19           THE COURT:  Okay.  Well, I am not finished with

20   the order yet.

21           MR. EISENBERG:  Yes, Your Honor.

22           THE COURT:  Let's go on to the next thing.

23           Plaintiffs are asking that defendants, all of

24   them, be enjoined from publishing and/or disclosing any

25   information pertaining to the identity of current and former

1    employees, grantees, program partners, contractors, or PSCs.

2        And I guess contractors and PSCs -- there is a

3    difference between them?

4        MR. EISENBERG:  I suppose.  They're both working

5    pursuant to contract; but in a way, we're all members

6    working pursuant to contract.

7        "PSCs" refers to people, individuals who are

8    employed to do a specific function, as opposed to -- a

9    contractor is usually, in this context, with an entity, as

10   opposed to a person.  That's how I understand it.  But, I

11   suppose, they're all contractual to some extent.

12       THE COURT:  Okay.  This also is very broad

13   language.  I just was curious how -- if I issued this order,

14   because it would go out over my signature -- not the

15   plaintiffs' -- how it would work in practice?

16       I have got 300-some-odd terminated employees who

17   are unemployed looking for jobs, might want a reference

18   check, if they get somebody -- if they get a new job and

19   there are employment checks to be done.  Because they say:

20   I was a former institute employee and they called the

21   institute -- if the phone is answered, if there is anybody

22   there to answer the phone, other than Defendant Cavanaugh --

23   are they, pursuant to my order, enjoined from disclosing any

24   information pertaining to the identity of the former

25   employee?

```
1              MR. EISENBERG:  Your Honor --
2              THE COURT:  That's how it reads.
3              MR. EISENBERG:  We'll include an amendment to this
4    proposed order in our letter to the Court today.  But the
5    intention here is to prohibit what we have already seen,
6    which is the defendants posting information exposing the
7    identity of somebody who is working in Afghanistan -- and
8    not only his identity but, also, imputing some sort of
9    fraudulent or illegal conduct, and how that poses a threat
10   to people who are working in volatile places, such as
11   Mr. Abuznad.  So that's really the intention here.
12              But we will certainly limit the scope --
13              THE COURT:  I mean, since this is the second or
14   third time you have brought it up -- I was going to address
15   this a little bit later.  But why don't you explain
16   specifically that situation.
17              Because the government's response to that
18   complaint, which I found -- I found the incident that
19   plaintiffs referred to of a person who is working for the
20   institute's identity as working for the institute being
21   disclosed in Afghanistan; that person then coming under the
22   scrutiny and, perhaps, threat by the Taliban, to be
23   eyebrow-raising, perhaps attributable to the fact that the
24   20-year-old tech guy, who is now the president of the
25   institute, maybe didn't understand what he was doing.  But I
```

1    found that to be a very disturbing and troubling

2    circumstance.

3            So could you explain what's happened since -- how

4    the disclosure happened and what's happened to that

5    individual working in good faith for the institute since the

6    disclosure?

7            MR. EISENBERG:  Your Honor, the U.S. Institute of

8    Peace Act requires that the board members for that entity

9    have experience in the field of peace building.  And that's

10   because the U.S. Institute of Peace does sensitive,

11   sometimes confidential work in other countries towards its

12   effort of peace building.

13           So what happened in that case is that Defendant

14   DOGE identified a contract that it perceived to be

15   problematic or it perceived to be fraudulent or inconsistent

16   with its view about how Congress should spend its money or

17   how the U.S. Institute of Peace should spend its money.  And

18   so what they decided to do was tweet about it or X-post

19   about it, I should say.

20           THE COURT:  Who was it who posted about it on X?

21           MR. EISENBERG:  It was the DOGE Service, from the

22   official U.S. DOGE Service account.  We have included a

23   screenshot of that post in our complaint and a transcript of

24   the post in our brief.

25           You know, it's problematic for all of the reasons

1    that the Court has identified because, in our understanding,

2    this person who is working in Afghanistan has now

3    subsequently experienced threats to his personal safety,

4    personal safety of his family.  There is certainly no USIP

5    security apparatus to bail him out or to guide him or to

6    direct him to a safe area.  And, you know, these facts -- we

7    don't have this in an affidavit.  This is our understanding

8    based on what is happening on the ground.

9         But it's very similar to our plaintiff,

10   Mr. Abuznad.  Because here -- you know, he is a little

11   different because his identity is not a secret.  He is known

12   to relevant actors in Libya as someone who is associated

13   with and employed by the U.S. Institute of Peace.  But for

14   him, the considerations that he has laid out in his

15   affidavit, at paragraphs 5, 6, 7, 8, and 9 -- he is talking

16   about how the perception that he has lost the support of the

17   U.S. Institute of Peace can cause grave consequences for his

18   and his family's personal safety, that he has lost the

19   institutional support of the U.S. Institute of Peace.

20        He says:  I wish to emphasize that the danger I

21   face -- at paragraph 7 -- is not solely the result of losing

22   a job; individuals connected to both government and their

23   affiliated militia groups would target me for USIP's sudden

24   and unexplained withdrawal.  The perception that I may be

25   abandoned by the organization I represented has already made

1    me more a vulnerable target increasing the likelihood of

2    being interrogated, harassed, or accused of bad faith.  The

3    lack of any official communication or support from USIP

4    following and its abrupt shutdown will compound the

5    suspicion I face and leave me with no protection.

6            So in the case of Mr. Abuznad, these -- the

7    Court's -- the record that is in front of the Court about

8    what is going on in Libya comes from his declaration.  It is

9    not disputed by the government.  The government has not put

10   in a declaration from some official at the Department of

11   State staying:  Libya is perfectly safe, Mr. Abuznad has no

12   credible concerns.

13           These are the facts in front of the Court, and

14   this is someone who has been working on-site for years who

15   has an intimate understanding of what his vulnerability and

16   exposure is.  It is an intimate understanding that is shared

17   by the experts at the U.S. Institute of Peace, including the

18   plaintiffs who have spent their careers working in these

19   extremely dangerous places.

20           So the risk that we would -- especially if the

21   Court may at some point find that defendants have violated

22   the law in removing the board members, in shutting down the

23   U.S. Institute of Peace -- the harm that they could inflict

24   upon Mr. Abuznad can continue, even if the Court ultimately

25   reaches a disposition that is favorable to him.  And so

1    that's the purpose for our request.

2         THE COURT:  Okay.  So let's go back to the person

3    in Afghanistan because the government's opposition basically

4    says -- to be honest, it struck me as somewhat flippant --

5    there was no indication that this information was protected

6    by the Privacy Act; and it's not protected by the Privacy

7    Act, so we should be able to disseminate it, and there is no

8    problem with DOGE publicly revealing the name of an

9    institute employee in Afghanistan.

10        What's your reaction to that?

11        MR. EISENBERG:  The reason why the government's

12   actions are causing or at risk of causing irreparable harm

13   to Mr. Abuznad is not because they're violating the Privacy

14   Act, it's because they are exposing him in a way that will

15   be harmful to his personal physical safety.

16        So the claim that he has is not predicated on a

17   Privacy Act violation.  We're not accusing the government of

18   violating the law by exposing this person in Afghanistan,

19   even though it may violate the law, we don't know.  We

20   haven't looked into those -- we don't have those facts; and

21   maybe we will in discovery, if we get there.  But that's not

22   the basis for the harm that Mr. Abuznad is experiencing and

23   the basis for the relief that we're seeking in the order.

24        THE COURT:  But you keep flipping back to

25   Mr. Abuznad rather than the Afghanistan person, but I will

 1    stick with Mr. Abuznad.

 2          Does he have a permanent entitlement to work with

 3    the institute because otherwise he will lose the protection

 4    of the institute?  Is that what you are arguing to me?

 5    Because that is not a persuasive argument.

 6          MR. EISENBERG:  Certainly not, Your Honor.

 7          He has the same entitlement that any other person

 8    has to work in a place of their choosing.  It's not -- he is

 9    not entitled to work at the U.S. Institute of Peace, and no

10    one is entitled to work at the U.S. Institute of Peace.

11          The U.S. Institute of Peace decides on its own who

12    it wishes to hire, and it also promulgates policies as to

13    what happens when the institute lets people go, fires them;

14    it promulgates policies about the conditions of their

15    workplace.

16          So here Mr. Abuznad is harmed because, A, of the

17    series of events that started with the unlawful termination

18    of the board members; and then B, the other of our claims,

19    which concern violations of the APA and *ultra vires* activity

20    and violations of separation of powers, as this Court

21    outlined at the beginning of this hearing.

22          So those are the harms -- that's the liability;

23    and the harms that he's experiencing are as a result of

24    those actions.

25          THE COURT:  Before I move on.

1          As to this provision seeking an injunction from

2     publishing, enjoining, or disclosing any information

3     pertaining to the identity of current and former employees,

4     grantees, program partners, contractors or PSCs, the main

5     plaintiff for whom this injunctive relief request would

6     benefit and match with his harm is the PSC in Libya?

7          MR. EISENBERG:  Yes, Your Honor.  And also, there

8     is also Brave Generation, which is what we started to talk

9     about a minute ago.  And if I may, I can talk about some of

10    the facts.

11         THE COURT:  All right.

12         MR. EISENBERG:  Your Honor, one of the plaintiffs

13    is Brave Generation, which is a nonprofit organization that

14    works in the Ukraine and in Russia, with youth, to try to

15    facilitate dialogue and peace building.

16         And that work is done -- and specifically at

17    paragraphs 8 and 9 of the Brave declaration -- Brave

18    Generation declaration, which is Exhibit M -- you know, and

19    that work that Brave Generation does is premised on

20    knowing -- on everyone knowing that the information that

21    they obtain about the identities of the people that are

22    involved in their programs will remain confidential.

23         So if we had a situation where the DOGE Service

24    started tweeting about, posting about the people who were

25    working with Brave Generation in Ukraine, that will cause

```
1    Brave Generation --
2             THE COURT:  The particular youth --
3             MR. EISENBERG:  The youth or -- and potentially
4    also -- depending on how it's construed, Brave Generation.
5             If we had people who are experienced in the field
6    of foreign relations who are responsible actors at the helm
7    of the U.S. Institute of Peace, this would certainly not be
8    as acute of a concern as it is here where, clearly, the
9    leadership -- the current leadership of that entity does not
10   have that such discretion.
11            THE COURT:  So this particular provision would be
12   limited to enjoining, publishing, or disclosing information
13   pertaining to the identity of any person working for the
14   institute overseas -- in a conflict area overseas?  Or what
15   precisely would target the specific harm to tie that harm --
16            MR. EISENBERG:  Sure.
17            THE COURT:  -- to the relief you are seeking --
18            MR. EISENBERG:  Understood.
19            THE COURT:  -- to the specific harm you have a
20   declaration supporting?
21            MR. EISENBERG:  Understood, Your Honor.
22            THE COURT:  It's that disconnect all through the
23   requested relief that has given me significant pause.
24            MR. EISENBERG:  Understood, Your Honor.
25            We will submit a much more narrowly crafted
```

1    request from the Court that will limit it to something that

2    is not susceptible to multiple interpretations, and it will

3    certainly be narrower than the proposal that we have.  We

4    will do that today.

5          THE COURT:  All right.  Well, don't be so quick.

6    I am not done with the order.

7          MR. EISENBERG:  Yes, Your Honor.

8          THE COURT:  Okay.  The next paragraph asks that

9    defendants, including the General Services Administration,

10   shall transfer ownership of the institute headquarters

11   building on Constitution Avenue back to the institute and

12   its endowment.

13         That's a big ask, even though -- and that was

14   asked in the *Institute v. Jackson* case, the first one filed,

15   when GSA was not a defendant in front of me, over whom I

16   haven't any control whatsoever.

17         GSA is a defendant in this case.  And yet, asking

18   GSA to transfer -- or directing, which is what I typically

19   do to defendants -- directing GSA to transfer the building

20   back to Mr. Cavanaugh, may last about three seconds.  They

21   can transfer it back, and then it took only a couple days

22   for a $5 million transfer of real estate to go to GSA

23   because they have got all of the documents down; they can do

24   that in about 20 minutes.  So that might not last very long,

25   number one.

1          Number two, even if the building got transferred

2     back, how would that help the plaintiffs?  They would have a

3     place to go back to work, presumably.  But they're not

4     asking to go back to work; they're asking to be put on paid

5     leave.  So another disconnect between the request you are

6     making -- which is a big ask, for me to get involved in this

7     interagency real estate transaction -- and I am not seeing

8     how that will remedy any of the harm detailed by the

9     plaintiffs.

10         Do you want to explain that?

11         MR. EISENBERG:  Yes, Your Honor.

12         This remedy only makes sense if the Court were

13    prepared to find that the board was unlawfully discharged

14    and reinstate the board.

15         So to the extent the Court is not inclined to go

16    there, and I'd admit, obviously, there are good reasons for

17    the Court to reserve that for some other time, as the Court

18    has signaled, we would certainly withdraw this request for

19    relief now.  We will do so in our amended proposed order.

20         THE COURT:  Then we get to the next thing, you

21    want a declaration that the institute's board and officers

22    as of March 14, 2025, are the lawful board members and

23    officers of the institute.

24         So that declaration doesn't actually put them

25    back -- reinstate them, it's a declaration of my view of the

1    law.  And that's something that -- in your temporary relief

2    is something that I am going to be deciding in the expedited

3    summary judgment briefing that is underway in the other

4    case.

5              So you want me to jump the gun and do that here?

6              MR. EISENBERG:  No longer, Your Honor.

7              We'll put that in the same bucket as the building,

8    and so we would certainly take that out of our amended

9    proposed order.

10             THE COURT:  Okay.  Then, next, you want declared

11   that all action taken by defendants following the removal of

12   the institute board members violated the Administrative

13   Procedure Act was *ultra vires* and violated the separation of

14   powers.  That's another declaration that you want.

15             Can I, again, make such a broad declaration

16   without either ruling on the board members' removal issue,

17   which I do not plan to do today, or without examining each

18   individual action?

19             Because there may be some things that the current

20   president of the institute has done that may be appropriate;

21   I don't know all of the actions he has done.  This is a

22   pretty broad statement.

23             MR. EISENBERG:  Sure.  Yes, Your Honor.  This --

24             THE COURT:  If, for example, Mr. Cavanaugh, in

25   order to effectuate at a minimal level -- which is, I think,

1    the term the administration used -- minimal level, the

2    statutory tasks required for the institute to function; has

3    hired, perhaps, other contractors to help do that, including

4    mandated tasks that the institute is required to do under

5    congressional direction, would this actually declare all of

6    that null and void, too, when -- I mean, that would leave

7    other contractors, who you may not even know about, high and

8    dry.

9             So what am I supposed to do with that?

10            MR. EISENBERG:  Yes, Your Honor.

11            We would also amend the order to narrow the scope

12   of this request.  But this request really goes to the

13   violations of the Administrative Procedures Act that we

14   haven't had a chance to discuss yet.  Nonetheless --

15            THE COURT:  We're getting there.

16            MR. EISENBERG:  Okay.  Great.  We're here.  We're

17   happy to be here.

18            But nonetheless, we'll certainly amend the scope

19   of this order.

20            THE COURT:  Okay.  I think that does it for your

21   initial request.

22            MR. EISENBERG:  Okay.

23            THE COURT:  So I did want to just go back to

24   plaintiffs' vivid description of what happened factually

25   here, which I am familiar with.

1    I think that the plaintiffs describe the takeover

2    of the physical property as a bizarre series of events that

3    one might expect in a war-torn, unstable country abroad and

4    which are plainly anathema to how the United States

5    government relates to American civil society.

6            That caught my attention.

7            It certainly caught my attention, at least when

8    this case first landed on my docket, that three different

9    law enforcement agencies were brought by DOGE officials and

10   the Trump Administration to take over the building.

11           But what would have been an alternative or a civil

12   society method of defendants effectuating their goals for

13   the institute?

14           MR. EISENBERG:  One idea that comes to mind is

15   seeking a declaration from the Court about where USIP

16   exists.  And we don't understand why, if there was a

17   dispute, that the government would -- or frankly, the U.S.

18   Institute of Peace, didn't do that.  You know --

19           THE COURT:  Meaning, the prior board members and

20   prior management of the institute when they were having

21   discussions with the administration --

22           MR. EISENBERG:  Yeah.

23           THE COURT:  -- and explaining that they had a

24   difference of opinion about the administration's control

25   over the institute.  And neither side -- neither the Trump

1    Administration then or the institute management or board

2    then -- tried to get a declaratory judgment from the Court

3    to resolve it before we landed in this situation.

4              Is that what you are saying?

5              MR. EISENBERG:  It's what I am saying.

6              But I'd walk back one part of it because I don't

7    mean to cast any aspersions on the then-existing U.S.

8    Institute of Peace or its counsel because the events, again,

9    are unprecedented, I'd submit, in the course of American

10   history.  And so how would they know that the FBI was going

11   to show up at their building using their old security

12   contractor's skeleton key to break into the building?

13             I mean, that is -- you know, I have to -- I would

14   ask the Court actually to digress for one second.

15             There was an article in *The Washington Post* last

16   night that --

17             THE COURT:  I was busy reading your papers in

18   opposition, so I'm sorry, I haven't read any news.

19             MR. EISENBERG:  Understood.  Every day is a Monday

20   these days.  I understand, Your Honor.

21             THE COURT:  I know that feeling.

22             MR. EISENBERG:  But we printed out a copy of this

23   article, and I have shared a copy with co-counsel.  If I

24   could, if I could hand it up to the Court just so it could

25   take judicial notice of this article in *The Washington Post*.

1          THE COURT:  What is it about?

2          MR. EISENBERG:  It's about -- the title of the

3    article is "DOGE Sought to Assign a Team to an Independent

4    Nonprofit Group."  And that was talking about the Vera

5    Institute, which is an entity that has no government

6    affiliation whatsoever.  It wasn't created by the

7    government.  It wasn't founded by the government.  It

8    received some government grants from Congress.

9          The defendant in this case, Mr. Cavanaugh, had a

10   call with the leadership of the -- as reported in *The*

11   *Washington Post* -- with the leadership of the Vera Institute

12   seeking to inquire about how it is using government funds.

13         And what is eerie about these events -- and I can

14   pass up a copy up to -- no?  So I'll just read the --

15         THE COURT:  If it doesn't have the institute at

16   issue --

17         MR. EISENBERG:  Sure.

18         THE COURT:  -- it really is not something that I

19   think I need to see.

20         MR. EISENBERG:  Understood.

21         Well, it was published at 7:13 p.m. last night,

22   and the title is "DOGE Sought to Assign a Team to an

23   Independent Nonprofit Group."

24         So it has the Defendant Nate Cavanaugh in -- whom

25   you have mentioned --

```
1              THE COURT:  He is a very busy guy.

2              MR. EISENBERG:  He is.

3              You know, it just goes to show that we are not in

4     a world where we can expect the government to be acting in a

5     way that is consistent with historical norms about how it

6     engages with entities that even -- giving them the most

7     benefit of the doubt, there is a dispute.

8              THE COURT:  Okay.  Let's come back to the institute.

9              MR. EISENBERG:  Yes, Your Honor.

10             THE COURT:  I don't care -- I mean, I want to

11    focus on this case.

12             MR. EISENBERG:  Of course.

13             THE COURT:  Not any other things that

14    Mr. Cavanaugh may be up to or DOGE may be up to.

15             So for plaintiffs' APA claim, plaintiffs do focus

16    on DOGE as the entity that is responsible for things

17    happening at the institute, and argue that it is an agency

18    under the APA.

19             The defendants here have argued that DOGE is not

20    an agency under the APA.  And in any event, disputed that

21    DOGE is responsible for anything happening at the institute,

22    but, in fact, the ex officio board members and the current

23    president, Defendant Cavanaugh, is responsible for what is

24    happening at the institute now.

25             I have got this dispute as a factual matter as
```

1    to -- under the APA, I am supposed to be evaluating final

2    agency action; and I have a dispute between the parties as

3    to which agency is even involved, okay?

4            That's a little bit of a messy situation from

5    where I sit.  I wonder ultimately whether it makes any

6    difference.

7            So do you want to address that?

8            MR. EISENBERG:  Sure.  And it is --

9            THE COURT:  Does it make a difference?

10           MR. EISENBERG:  Make a difference to the outcome,

11   Your Honor?

12           THE COURT:  Perhaps.

13           I mean, does it make a difference whether it was

14   DOGE; whether it was Cavanaugh working for GSA, because I

15   understand at some point he was a GSA employee; whether he

16   is now the president of the institute, you have named the

17   institute as a defendant here?

18           So why -- does it make a difference who the agency

19   is here?  Because it is a little bit slippery.

20           MR. EISENBERG:  It is, Your Honor.

21           So the way that we have approached these claims --

22   because it is messy and it is not really clear, to be

23   honest, what DOGE is.  I mean, if DOGE is a tech

24   consultancy, as defendants submit, and it goes to help

25   agencies evaluate their computer systems, then we have no

1    claim under the APA and we have no *ultra vires* claim; if

2    that's what happened here.

3            If DOGE was coming in to help federal agencies

4    evaluate their technological means to help streamline their

5    operations, then we have no claim.  But that's not --

6            THE COURT:  Is that right?

7            MR. EISENBERG:  Yes, Your Honor.  And --

8            THE COURT:  You wouldn't -- you have named the

9    institute as a defendant here.  You have named the president

10   of the institute as a defendant here.  So I thought that

11   strategically you were naming them as defendants because:

12   No matter who Cavanaugh works for, he has now got a position

13   as president of the institute, hoists the government on its

14   own petard, so to speak.  They say:  The institute is an

15   agency.  Okay.  It's an agency.

16           Under the APA, therefore, Cavanaugh and the

17   institute are responsible for executing all actions

18   vis-à-vis its contractors and its employees reasonably and

19   not arbitrarily --

20           MR. EISENBERG:  Yes.

21           THE COURT:  -- and not capriciously, and in

22   accordance with the law.

23           So you are challenging, under the APA, Cavanaugh's

24   actions at the institute for being arbitrary and capricious

25   and contrary to law?

```
 1            MR. EISENBERG:  That's exactly right.

 2            THE COURT:  So am I misunderstanding something?

 3            MR. EISENBERG:  No.  You have it --

 4            THE COURT:  You wouldn't lose your APA claims, you

 5    would say:  Okay.  We have got a slippery agency here,

 6    perhaps by design; we have got it all covered in our list of

 7    defendants.

 8            MR. EISENBERG:  Yes, Your Honor.  It's more

 9    about --

10            THE COURT:  They didn't give you too much

11    strategic credit.

12            MR. EISENBERG:  Probably.  Probably.

13            It's not so much -- the first -- where I would

14    like to focus the Court is more on the conduct.  And the

15    question is -- we can sort out, as sort of a second matter,

16    who did the conduct.  So was it DOGE the entity itself?

17    Because we have an APA claim for that.

18            Was it the individuals acting to the extent that

19    DOGE is not an agency under the APA?  Well, we have an *ultra

20    vires* claim for that.

21            And I think that's the labyrinth of causes of

22    action that we have, regrettably, had to plead here because

23    we know that there is misconduct that has happened that is

24    irrational action.  It is either the case that the U.S.

25    Institute of Peace is nongovernmental or it's governmental.
```

1          And so there is almost no way -- to the extent

2     that the Court finds that there was some action that was

3     *ultra vires* in excess of statutory relief, or that there was

4     some arbitrary -- there are enumerated basis in the APA to

5     find separation of powers issue, arbitrary and capricious,

6     et cetera.

7          So there is basically -- to the extent that the

8     Court finds there has been misconduct, there is sort of no

9     way, in our view, to escape liability on some claim.  And

10    that is -- we have had to do this in an inelegant way by

11    naming numerous defendants in a two-page-long caption;

12    certainly not our preference.  And it's certainly not our

13    preference to hoist this issue on the Court or on

14    Article III courts, but that is the posture that we are in

15    because of the factual lack of clarity that we have on the

16    grounds.

17          THE COURT:  So let me just ask you -- I mean, the

18    government strongly says that DOGE is not an agency.

19          Are you aware of any cases around the country

20    where any court has adopted that position, that DOGE is not

21    an agency subject to the APA?

22          MR. EISENBERG:  No, Your Honor.

23          There have been cases where courts have found that

24    DOGE is an agency for the purpose of other statutes, and

25    which I am sure the Court is aware -- for FOIA, the Federal

1    Records Act, and I think there may be another one or two.

2    We don't believe that a district court has reached

3    the decision about whether, you know, DOGE is an agency

4    under the APA; but we also don't think that there has been

5    another case with facts such as these.  Because if there

6    were any case that existed where DOGE was -- could be

7    assigned responsibility for the actions here, this is

8    certainly a compelling example of it.

9    THE COURT:  Okay.  One of the things that the

10   defendants argue is that the wholesale, broad-based,

11   broad-brush attack on the conduct of the institute since --

12   first Jackson, and now Cavanaugh have taken it over, are

13   really challenges that amount to programmatic challenges

14   that are not as to such specific agency actions that it is

15   amenable to -- or justiciable for review under the APA,

16   which does require a final agency action, sort of like a

17   concrete step that has been taken for courts not to become

18   micromanagers in running agencies; that is so not our job.

19   We don't have the expertise for that, with all humility.

20   That's why courts refuse to review when challenges

21   are programmatic; that is the case law term for this

22   nonjudiciable challenges to agency action.

23   The government has cited a whole bunch of cases,

24   both in this Circuit and outside of this Circuit, where

25   courts have found -- this is sort of too broad brush for us

1    courts to get involved; things like challenges to the

2    commitments made by an agency in carrying out a specific

3    agency project because they want the court to monitor

4    implementation of a project.  And the court said:  Those are

5    commitments, not really a final -- a precise enough final

6    agency action for us to get involved.

7          Or agency's budget requests, where people wanted

8    the courts to get involved in budget requests; and courts --

9    the D.C. Circuit, in that case, *Fund For Animals*, said:

10   Those are programmatic statements; they're not agency

11   actions subject or amenable to judicial review.

12         There are other examples.

13         So what is the plaintiffs' response to that since

14   the challenges about how the institute is prioritizing what

15   it is or is not doing, and how it's doing it and how much

16   staff it needs to do it, and so on -- assuming, for purposes

17   of this debate, that an issue I haven't resolved yet, as I

18   keep saying -- that the removal was not -- without deciding

19   on the legality of removal of the board and what flows from

20   that; what's your response to the programmatic challenges?

21         That also caught my attention because the breadth

22   of the relief requested in your proposed order was also so

23   broad.

24         MR. EISENBERG:  Your Honor, this case is not about

25   ending the Jennings Randolph Program.  I am just reading

1    from Defendant Nate Cavanaugh's letter to GSA and the -- and

2    I am not quoting.  I am just identifying the things that

3    Mr. Cavanaugh has identified.

4            It's not about the Jennings Randolph Program, it's

5    not about conducting training or symposia; because the USIP

6    Act deliberately gives broad discretion to the board to

7    decide how they're supposed to work.  They may do this, they

8    may do that, they may do the other things.  Because the

9    point of it is that you have an independent board of

10   directors that is making its independent judgments about

11   what is necessary to advance the field of peace building.

12           So we are not challenging any purported decision

13   to cancel a particular program or lay off any individual

14   staff member.

15           THE COURT:  But how does not fall right into what

16   the government argument or critique is, is that you are just

17   criticizing sort of a much broader-brush programmatic set of

18   decisions by the new leadership of the institute that is

19   really not justiciable?

20           MR. EISENBERG:  Your Honor, the issue that we have

21   here is a binary one -- or more like a binary one.  It's

22   like an on-and-off switch.

23           Because what has happened here is the current

24   leadership of the U.S. Institute of Peace, or DOGE -- or

25   whoever is running the entity -- has fired, essentially, the

1    entirety of its staff and -- by the end of May will have

2    fired the entirety of the staff.

3          There is no programmatic partnering.  There is no

4    ability to comply with the Gandhi-King Act.  Because all 34

5    members of the U.S. Institute of Peace who did that do not

6    work there anymore; they cannot advance peace if they have

7    no staff and they have no budget and they have no building.

8    And so that's really what the issue is here.

9          THE COURT:  But they have a 28-year-old tech guy.

10         MR. EISENBERG:  Maybe he can do it.  Maybe he can

11   do it.

12         But it's not -- I think the problem is, the U.S.

13   Institute of Peace -- the USIP Act specifically says that

14   the board and the entity does not have the ability to

15   dissolve itself.  And so we don't need --

16         THE COURT:  And according to the letter that

17   Cavanaugh wrote to GSA, he is not dissolving it.

18         MR. EISENBERG:  He is not dissolving it.

19         THE COURT:  He is not dissolving it.  He says he

20   is up to the task.  He is carrying out the tasks of the

21   institute, and he is preserving -- this phrase the

22   administration has used:  The statutory minima of the

23   organization.

24         I mean, we'll find out from the government what

25   that means -- and certainly, at summary judgment, I am going

1     to expect a full and complete set of declarations from all

2     of the people who are still working at the institute as to

3     what that means and how they're doing it, and whether

4     Mr. Cavanaugh is sitting at home because he has no building

5     to go to and no office to go to and carrying out all of

6     these tasks.

7              I mean, we are not at summary judgment yet, so I

8     am not sure, with the relief being requested, what I am

9     supposed to do with that claim.

10             MR. EISENBERG:  Your Honor, the facts of this case

11    that are before the Court are that the defendants have fired

12    almost 300 people, in alphabetical order, on a single day.

13    And so you don't need to reach the request question of

14    whether the USIP Act has been violated, and you don't need

15    to reach the question about whether the Gandhi-King Act has

16    been violated because, admittedly, those are laws that give

17    conferred discretion to the board.

18             We think that we have statutory violation claims,

19    we have *ultra vires* claims based on that; but you don't need

20    to go there because what has happened here is clearly

21    arbitrary and capricious and the disruption of the reliance

22    interest, and implicates other provisions of the APA.  So we

23    can have relief --

24             THE COURT:  But why is it so obvious to me that

25    it's arbitrary and capricious when the institute still has

1    Cavanaugh and about a hundred other employees and the

2    ability to hire other contractors -- why should I just

3    assume, like you are, that he is not carrying out the tasks

4    required to be carried out by Congress in the institute's

5    organic statute?

6                MR. EISENBERG:  Your Honor, that's -- we can look

7    to defendants' own words here.

8                Here, in this same letter, Mr. Cavanaugh wrote

9    that:  The U.S. Institute of Peace duplicates the efforts of

10    federal agencies, including the State Department.

11                And that is -- first of all, plainly not true.

12    Even if the Court were to conclude that the USIP is a

13    government agency, it is certainly not --

14                THE COURT:  Well, he basically concedes that

15    that's not true because later in the letter he says:  We're

16    also doing unique statutorily required tasks --

17                MR. EISENBERG:  And they're not doing them.

18                THE COURT:  -- that Congress has set out.

19                And you are saying:  But he's not doing that.

20                You have nobody who works there anymore to tell

21    you that; that's a summary judgment issue.  Are they or

22    aren't they?

23                That's why I would expect tons of declarations

24    explaining that by the government, of how they are -- and

25    the President is still performing his conscientious duty

1    under the Constitution to take care that a congressional

2    statute is implemented to the best of its ability.  But

3    we're not at that point yet.

4              MR. EISENBERG:  You're right.  And we don't need

5    to get to that.  We don't need to get all the way there

6    because we just need to show a substantial likelihood of

7    success on the merits.

8              Here, based on the public statements from

9    defendants, based on their internally inconsistent

10    rhetoric about -- their internally inconsistent statements

11    about what they have done to the U.S. Institute of Peace and

12    what it will do and what it has done, their confusion of its

13    mandate; and they're doing everything that you would expect

14    them to do to shut it down in its entirety, fire --

15              THE COURT:  You think the record is sufficient for

16    you to show a likelihood of success on that?

17              MR. EISENBERG:  Yes, Your Honor.

18              THE COURT:  When the institute still has a

19    president, still has about 100 employees, still has the

20    ability to contract out the duties?

21              I think that's a factual matter.  I just don't

22    know, as a legal matter, that the likelihood of success is

23    demonstrated on the record before the Court now.

24              What am I missing?

25              MR. EISENBERG:  Well, a few things, Your Honor.

1    First, the U.S. Institute of Peace website has been shut

2    down.  Obviously, the website for an institution that exists

3    to do research and promote -- and training, and serve as a

4    repository of information is critical to the mission of the

5    U.S. Institute of Peace; so that's one thing.

6            And second of all, there is precedent that I can

7    cite for you in a moment -- not at my fingerprints -- that a

8    defendant's ability to subsequently remediate a violation of

9    the APA does not necessarily vitiate liability under the

10   APA.  And so the mere fact that they can turn the website

11   back on does not preclude the Court from finding that they

12   acted arbitrarily and capriciously in turning it off in the

13   first place.

14           THE COURT:  What does operating a website, as a

15   legal matter, mean to me in terms of complying with the

16   congressionally delineated task for the institute?

17           I know you mentioned that, is it disturbing that

18   the website has gone dark?  Does that indicate that they're

19   shutting it down?

20           That's a perfectly commonsensical inference.  But

21   as a legal matter, and likelihood of success --

22           MR. EISENBERG:  Sure.

23           THE COURT:  -- of them not operating the institute

24   and acting in an *ultra vires* way -- is shutting down the

25   website enough?

 1                    MR. EISENBERG:  Your Honor, these are the facts --

 2                    THE COURT:  I find that a little bit of a weak

 3       thread.

 4                    MR. EISENBERG:  These are the facts that we

 5       have -- and I will tell you what they are.  Okay?

 6                    So we have public statements from defendants or

 7       their representatives talking about how they view the U.S.

 8       Institute of Peace as a set of unaccountable bureaucrats,

 9       which they're not because they're employed by the private

10       entity, the U.S. Institute of Peace.

11                    THE COURT:  Is that in the Cavanaugh-GSA letter?

12                    MR. EISENBERG:  No.  That's in statements made by

13       the press secretary for the President of the United States.

14                    And so we have those statements.  We have tweets

15       or posts from DOGE talking about how they have swept money

16       from the endowment of the U.S. Institute of Peace back into

17       the federal treasury.  We have a situation where, in a

18       single day, the leadership -- the defendants have fired

19       almost 300 members of a 400-member team, with announcements

20       that they will be firing the balance at the end of May.

21       They have ended almost every contract or most contracts.

22                    And so there is nothing that defendants could do,

23       in my view, that would lead to a shutdown of the agency in

24       an alphabetical manner better than what they're doing now.

25                    So I understand we haven't taken depositions, and

1    we haven't -- we will.  We're looking forward to

2    understanding more about the facts of this case so that we

3    can make a more fulsome presentation to the Court.  But

4    here, we submit that we have enough to secure --

5              THE COURT:  It's very rare to have depositions in

6    an APA case, isn't it?  Is that what you are seeking?  Are

7    you presenting another novel issue to me?

8              MR. EISENBERG:  Not today.  Not today.  We'll

9    address that, if that is okay, at some other time; but we

10   think that we have enough for temporary relief here.

11             THE COURT:  All right.

12             Oh, let me just add, there was a twist in the

13   government's briefing, I guess, implementing a fairly recent

14   White House instruction to be demanding security under

15   Federal Rule of Civil Procedure 65(c), if injunctive relief

16   is granted.  And so the defendants have asked that if

17   injunctive relief is granted that the plaintiffs post

18   security.

19             Do you want an opportunity to respond to that?

20             MR. EISENBERG:  Yes, please, Your Honor.

21             So first, defendants have a burden to show what

22   the security is for.  We would like to know, what are the

23   losses --

24             THE COURT:  Me too.

25             MR. EISENBERG:  What are the losses that they

1    claim that would be precluded by temporary relief?  And this

2    is an issue that came up in the *Voice of America* case in

3    SDNY -- that has now been transferred to the district court.

4    The government there asked for something like $23 million in

5    security for a TRO, which corresponded to the salaries of

6    the people that they intended to lay off.  Different case

7    for a number of reasons, but it's just -- we have some

8    familiarity with that situation.

9            THE COURT:  So this is not the first case that the

10   government has started making this demand?

11           MR. EISENBERG:  No, Your Honor.

12           Here, there had been numerous court decisions

13   finding that -- affirming the D.C. Circuit and others saying

14   that the Court has full discretion to decide whether a bond

15   is appropriate and the Court should evaluate the harm to the

16   government.  And we don't believe that there is any harm to

17   the government.

18           Additionally -- and so I can cite a few decisions

19   to that effect, if that would be --

20           THE COURT:  That's all right.  I am familiar.

21           MR. EISENBERG:  Okay.  So we would just ask the

22   Court that no bond be imposed --

23           THE COURT:  And what do you think the purpose -- I

24   am giving you the opportunity to explain what the purpose of

25   this new requirement is for security under Federal Rule of

1    Civil Procedure 65(c).

2              I will ask the government.  But from the

3    plaintiffs' perspective from whom a demand for security is

4    being made by the government, what do you think the purpose

5    of that is?

6              MR. EISENBERG:  Your Honor, I am a civil rights

7    lawyer, and so I represent people in prison; I represent

8    people who have been harmed via discrimination; I represent

9    employees who work for international peace organizations.

10   And it is an incredible act of bravery and courage to seek

11   to vindicate your rights in a court of law.  And they do

12   that at great risk to themselves, at reputational risk.  And

13   to stand up here against the awesome power of the United

14   States government is something that is hard to do.  In fact,

15   we had an issue in this very case because one of our

16   purported plaintiffs -- I mean, the docket, I think, is --

17   reveals that there was an immigration issue.  And we have

18   seen recently that the government has taken the position

19   that people who are not citizens of this country can be

20   deported for their views about -- for their views.  It is

21   not a far -- we didn't pursue that route in this court, but

22   it is certainly not -- we don't have to go too far to

23   imagine that the government might say:  You are adverse to

24   the government, you have sued the government, and your time

25   in the United States is over.

1      The bond here --

2      THE COURT:  And just for clarity of the record,

3  all motions for pseudonymous filing is handled by the chief

4  judge of the court, not by the judge to whom the case is

5  ultimately assigned.

6      I had that privilege when I was a chief judge --

7  no longer.  Hurray.  So the decision on pseudonymity here

8  was not mine; it was the chief judge of the court.

9      MR. EISENBERG:  And we have also obviated the

10  issue because one of our two pseudonymous plaintiffs have

11  now disclosed themselves, Mr. Abuznad; and the other has

12  withdrawn from the case.

13      We view the bond requirement, especially when you

14  are seeking, in the other case, $23 million from journalists

15  to be able to seek emergency relief from the court as sort

16  of a plain attempt to intimidate and to prevent folks from

17  seeking redress of their rights in a court of law at a time

18  where that activity, in our view -- in my view, is something

19  that is important.

20      So for those and the reasons that have been stated

21  in the other cases that have heard this issue, we would

22  submit them all as appropriate here.

23      THE COURT:  Thank you.

24      I am going to turn to the government now.

25      MR. ESCHER:  Good afternoon, Your Honor.

```
 1              If I may, if there are any questions about harm,

 2     my colleague, Johnny Walker, can handle any questions of

 3     that.  I am happy to answer any questions on the merits, the

 4     likelihood of success on the merits.

 5              THE COURT:  Do you have anything to respond to

 6     from what was discussed already in the case?

 7              MR. ESCHER:  I -- I do.  The thing is --

 8              THE COURT:  You are short on time?

 9              MR. ESCHER:  Sorry?

10              THE COURT:  You are short on time?

11              MR. ESCHER:  Oh, no.  Not necessarily.  I do, but

12     it would be things that relate to the merits in the other

13     case, and the Court has already --

14              THE COURT:  Why don't we start with what

15     Mr. Eisenberg just left off talking about in terms of the

16     defendant's request that this Court require plaintiffs to

17     post security before any temporary injunctive relief be

18     granted, and that that security be pursuant to Federal Rule

19     of Civil Procedure 65(c).

20              Is this request made in this brief in accordance

21     with the direction from the White House that 65(c) be

22     invoked in all such cases involving preliminary relief

23     against -- seeking preliminary relief or injunctive relief

24     against the government?

25              MR. ESCHER:  I --
```

1      THE COURT:  Because it's not something I have

2  typically seen in government responses challenging agency

3  action in the whole time I have been on the bench.  So is

4  this a new thing because of White House direction?

5      MR. ESCHER:  We have done it, so I can represent

6  that.  I believe the White House has instructed us -- I

7  wouldn't say "the White House."  I can't say specifically

8  who --

9      THE COURT:  I am looking at a White House fact

10  sheet from March 6, 2025, saying:  Today President Donald J.

11  Trump signed a memorandum directing federal agencies to

12  enforce a rule mandating financial guarantees for parties

13  requesting injunctions.  The memorandum instructs agency

14  heads in consultation with the Attorney General to request

15  under Federal Rule of Civil Procedure 65(c) that federal

16  courts require plaintiffs post security equal to the federal

17  government's potential costs and damages from a wrongly

18  issued preliminary injunction or temporary restraining

19  order.

20      That was dated on the White House fact sheet

21  March 6, 2025.

22      The actual memorandum, which the fact sheet says

23  was issued that day, actually was dated March 11, 2025.  So

24  I don't know -- maybe somebody got messed up with their

25  dates at the White House, I don't know.

1          But then there is the memorandum saying:  Ensuring

2     the enforcement of Federal Rule of Civil Procedure 65(c).

3          I am just asking:  Is this portion of the

4     defendant's response to this TRO asking for a security to be

5     posted by the plaintiffs under Federal Rule of Civil

6     Procedure 65(c) pursuant to the White House's order?

7          MR. WALKER:  Your Honor, I am sorry.

8          THE COURT:  Yes, Mr. Walker.

9          MR. WALKER:  If I may.

10         THE COURT:  Man of memorable names.  Yes.

11         MR. WALKER:  We have sort of divided up the

12    topics, this is sort of in my area.

13         I can acknowledge the fact sheet that Your Honor

14    read.  That is a fact sheet.  We don't dispute what it says,

15    we don't dispute that it was published.

16         We cannot get into privileged communications and

17    what went into the drafting of this brief and how this brief

18    came together.  But certainly, Your Honor has that fact

19    sheet.  That is a fact sheet that was published; we

20    acknowledge that.

21         THE COURT:  And the memo.

22         MR. WALKER:  And the memo.

23         THE COURT:  Okay.  So are --

24         MR. WALKER:  My area of expertise, Your Honor, is

25    the irreparable harm issues in the case.  My friend and

1    colleague, Sam Escher, is here to address the merits.  So

2    depending on where you would like to go next.

3         THE COURT:  Well, I just need -- maybe the both of

4    you can stand up there to answer my questions about the

5    bond --

6         MR. WALKER:  Happy to do that.

7         THE COURT:  -- because I don't know how you have

8    divided up your work, and I don't care.  I just want

9    answers.  Okay?

10        So now, security under Federal Rule of Civil

11   Procedure 65(c) is only required where the costs and damages

12   will be sustained by any party found to be wrongfully

13   enjoined or restrained.

14        What harm will any particular defendant face if

15   efforts to dismantle the institute are delayed by a couple

16   of weeks?

17        MR. WALKER:  It depends largely on the nature of

18   relief, Your Honor.  The relief that is requested here is

19   expansive, sort of shifted here in court today.  So we are

20   not able, in the very limited amount of time that we have,

21   to put a specific number on that.  Certainly --

22        THE COURT:  You would have to see the final TRO

23   first?

24        MR. WALKER:  Exactly.  We would have to know what

25   the relief is.  It takes time, calculation, deliberations,

1    consideration, gathering of information to put a number on

2    that.  We do not have the time to do that in the limited

3    time available to us.

4            We understand that this is an area that affords

5    the Court great discretion to award a bond in this context.

6    We have asked the Court to exercise that discretion here,

7    but we do not have a specific number to add --

8            THE COURT:  Well, I just wanted to make sure that

9    you understood that the law in this Circuit -- at least in

10   this Circuit, as it stands now -- is that the courts have

11   complete discretion to determine whether or not any security

12   is required.  And that broad discretion includes the

13   discretion to find that no bond is required at all.

14           But I want the government's position on the

15   following:  In determining whether a bond is required,

16   should the Court consider the public service rendered by

17   plaintiffs in bringing lawsuits to clarify the legal basis

18   for a challenged and controversial government action whether

19   the plaintiffs win or lose?

20           MR. WALKER:  That's not something we would put

21   forward for the Court to consider, Your Honor.

22           I think that what Federal Rule of Civil Procedure

23   65(c) contemplates is the harm that defendants are going to

24   be out.  We don't think it affects the motivation of the

25   plaintiffs in bringing the lawsuit.  It's a proper

1    consideration.  Obviously, Your Honor has the discretion to

2    consider what Your Honor likes.  But that is certainly not a

3    factor that we have put forward.

4         The factors that we have put forward are the fact

5    that a temporary restraining order or preliminary injunction

6    would be, in our view, a serious impingement on the

7    President's exercise of executive powers, and a

8    serious disruption of --

9         THE COURT:  Well, do you think -- to go back to

10    Rule 65(c) before we get into, yet again, the unitarian

11    presidency theory that has been embraced by the majority on

12    the Supreme Court and has been fully exercised by the

13    current President, what is the government's position going

14    to be in how it is going to propose calculating the bonds?

15         Plaintiffs' counsel said in the *Voice of America*

16    case they basically looked at all of the salaries that would

17    have to be paid by the government to *Voice of America*

18    employees were they not terminated and if their termination

19    was enjoined.

20         So here, if part of the relief is putting all of

21    the terminated employees of the institute back on paid

22    administrative leave so they could take a more measured

23    approach to finding how they're going to lead their lives

24    and get health insurance, and so on -- rather than being

25    abruptly terminated on one day in alphabetical order --

1    would that be the approach the government would take here,

2    which is:  Look at how much it would cost for the 300

3    terminated employees to be put back on administrative leave;

4    and just multiply that, and come up with a number so it

5    would be in the millions?

6            MR. WALKER:  I can certainly -- where you have a

7    case where there is direct economic costs to the agency

8    connected with the preliminary relief, those are great

9    candidates showing that bond calculation.

10           Putting aside, obviously, we're in a world where

11   we're not talking about that they think such relief would be

12   inappropriate because it's not warranted on the merits nor

13   to alleviate irreparable harm.  Just assuming all of that

14   looking and looking at the bond, costs to the agency for

15   having to reemploy and pay employees would be a candidate;

16   costs to the agency for having to reengage the contractors

17   and pay contracts would be a good candidate.  So the short

18   answer to Your Honor's question is yes.

19           THE COURT:  I mean, you represent the institute

20   now, you know how many people precisely were terminated, you

21   know how much each of those individuals directly cost, so

22   what would be the bond --

23           MR. WALKER:  I don't have all those --

24           THE COURT:  -- that you would be asking for?

25           MR. WALKER:  I don't have all of those numbers

1    prepared to provide for you today.

2            I think the plaintiffs' declaration indicates that

3    they believe they understand 265 people have been terminated

4    on March 28th.  But to have salaries connected with all of

5    that, I do not have that for you today, Your Honor.

6            THE COURT:  But that would be an appropriate

7    starting point in the government's view?

8            MR. WALKER:  Yes, Your Honor.

9            THE COURT:  And what about what Mr. Eisenberg said

10   about this new tactic of demanding, asking for a 65(c) bond

11   where any plaintiff seeks injunctive relief in challenging

12   agency action?  And what he says about it:  Chilling

13   people's ability to bring such actions.

14           Is that one of the purposes of this new policy?

15           MR. WALKER:  Your Honor, our inclusion of that,

16   the request for bond, comes from Federal Rule of Civil

17   Procedure 65, permits us, as a defendant, facing

18   extraordinary relief of a TRO, and preliminary injunction

19   permits us to do so.  Our motivation is what we are invited

20   to do by the Federal Rules of Civil Procedure.

21           THE COURT:  I don't know of any APA case I have

22   had where this request has been made by the government in my

23   over a decade of service on the court; do you?

24           MR. WALKER:  I am coming up on a decade, like Your

25   Honor.  I do not get that many APA cases, but I am

1    unaware --

2              THE COURT:  Oh, I get a lot.

3              MR. WALKER:  I understand.

4              I am unaware of any case that I have handled where

5    the bond has been included.  Certainly, I have seen it

6    included in several other cases that I am aware of, but

7    not firsthand.

8              THE COURT:  Recently?

9              MR. WALKER:  More recently, yes.

10             THE COURT:  Okay.  So let me go back to the first

11   question I asked the plaintiffs, which -- so I can get some

12   up-to-date information about the institute's status right

13   now.

14             So how many people, other than Defendant

15   Cavanaugh, are still working at the institute?

16             MR. WALKER:  I don't have a precise number of

17   individuals working at the institute.

18             What I can say is that there is no indication, I

19   think, that the institute does not have the staff necessary

20   to carry on its minimum statutory functions.  We have not

21   seen the plaintiff point to any specific statutory functions

22   as mandated by statute --

23             THE COURT:  Could you just pull the microphone

24   closer?

25             MR. WALKER:  Oh, yes.  I'm sorry.  I don't have

1    the height of my colleague.

2          We have -- the plaintiffs have not been able to

3    point to any specific statutory function that the agency

4    does not have the staff or resources necessary to carry out.

5    All we have is what the agency has -- or what the executive

6    order says on paper and what the agency says it is doing.

7          What the executive order has said is that the

8    agency will carry out the statutory minimum functions.  The

9    letter from Mr. Cavanaugh said that that is what the agency

10   is doing.  We have seen no factual, record-based indication

11   that that is not occurring.

12          THE COURT:  And what would be those indications?

13          MR. WALKER:  It would be -- what the plaintiffs, I

14   think, would need to do is point out a specific statutory

15   requirement that Congress --

16          THE COURT:  Why would the plaintiffs have to do

17   that, as opposed to you on summary judgment having to give

18   me very, very fulsome declarations about exactly how many

19   people work there; what they're doing; what their tasking

20   was before Mr. Cavanaugh came on board and after

21   Mr. Cavanaugh on board; how they're implementing each of the

22   specific mandated and discretionary tasks set out in the

23   institute's organic statutes?  Are those all things you are

24   working on getting together?

25          MR. WALKER:  Summary judgment is one thing, Your

1    Honor.  I have been at the table writing furiously about the

2    things that you just said the government will need to show

3    on summary judgment.

4            THE COURT:  And that's just off the top of my

5    head.

6            MR. WALKER:  But here we are at a TRO stage.  And

7    at the TRO stage, burden is on the plaintiffs; and it's a

8    big burden.

9            So they would need to show not only that there's a

10   specific statutory function that the government is not

11   fulfilling but that it is irreparably harming one of these

12   plaintiffs in some way; and there is nothing like that on

13   this record.

14           THE COURT:  So why aren't the plaintiffs right

15   that certain inferences can be taken from the fact that the

16   website has gone dark, all the staff from the -- I'm not

17   going to get the name right -- I think it's called the

18   Gandhi Academy; is that right?  Gandhi Academy -- have been

19   gone, so how can that be functioning?

20           How can they be performing that specific statutory

21   task -- signed off on by President Trump, no less, in his

22   first term?  Why can't I draw that inference here?

23           MR. WALKER:  Well, I think the website -- I will

24   take both of those things.  Your Honor mentioned the website

25   and the academy.

1    The website is not tied to any statutory

2    requirement whatsoever; and I think that that's a

3    non sequitur, to say that the website is not operating and,

4    therefore, we're failing to perform some statutory function,

5    particularly some unidentified statutory function.

6    With respect to the Gandhi-King Peace Academy, I

7    believe is what it's called, the provision -- the statutory

8    requirement that I see there is sort of a limited time

9    authorization appropriation to the Institute of Peace to

10    provide for this academy.

11    I believe what I recall the statute saying is it

12    was a one-time appropriation in 2020 that could be renewed

13    for additional years.  I don't know that it was renewed.

14    There is no indication that it was.

15    But more importantly, there's that -- the prong

16    with that required the institute to develop a training

17    program and put it out there for the public to access.  And

18    even though these 30 individuals have been terminated, there

19    is no indication that the training materials are not out

20    there for public access.

21    THE COURT:  Well, if the website has been shut

22    down, how would they be available for access?

23    MR. WALKER:  I believe there is a separate app

24    that's operated by the Institute For Justice --

25    THE COURT:  And how to you access that app?

1          MR. WALKER:  And there's no -- I don't know that

2    there is a requirement that there be an operating website

3    with these materials available.

4          But more importantly, there's no -- the fact that

5    the 30 individuals who were previously --

6          THE COURT:  Well, you'll have to clarify that, how

7    they're fulfilling it in a conscientious, energetic way --

8    about how to implement that.

9          MR. WALKER:  I don't think it's the government's

10   burden on a TRO, Your Honor, to demonstrate that we're

11   fulfilling the Peace Academy provision in a conscientious,

12   vigorous way.  I think it's the plaintiffs' burden to

13   establish that there is a statutory failure; and they

14   haven't done that.

15         Not only that, they must establish there is a

16   statutory failure that is irreparably harming one of these

17   individual plaintiffs in a specific way.  And there is no

18   indication that any of these plaintiffs are suffering

19   irreparable harm from some nonoperation of the Peace

20   Academy.

21         THE COURT:  So back to some of the things that

22   came up in my interchange with Mr. Eisenberg.  I mean, I

23   have to be honest with you, I was very disturbed by the

24   fairly flippant response in the government's brief about a

25   person in Afghanistan who worked for the government whose

 1    name was disclosed in an X/tweet -- do you still call them

 2    "tweets"? -- by DOGE, putting that person at risk.

 3            Is your only answer that it didn't look to be

 4    Privacy Act protected?

 5            MR. WALKER:  No, Your Honor.  I am happy to have

 6    the opportunity --

 7            THE COURT:  Putting aside the flippancy of that

 8    response, what is the current institute staff and president

 9    doing to get up to speed, if there is a lack of expertise

10    there, to understand that -- what information should be kept

11    more confidential, particularly for people working overseas

12    for the institute?

13            MR. WALKER:  If I may, I would like to take the

14    opportunity to address the flippancy and then --

15            THE COURT:  Yes.  If you would.  I will give you

16    that opportunity because it's disturbing.

17            MR. WALKER:  And I am happy to have the

18    opportunity to address that.

19            It's certainly not my intent.  That was my part of

20    the brief.  It's certainly not my intent to be flippant

21    about an individual's personal security.

22            But I do want to be exacting with the degree of

23    proof and what plaintiffs have to show at the TRO stage.

24    And I think what we had here was a single tweet that

25    identified an individual.  And from that tweet identifying

1    an individual, the plaintiffs drew the conclusion, which was

2    not supported by anything in the record, that both -- that

3    that information was confidential and that it led to some

4    sort of death threats or harm or threats to that

5    individual's personal safety.

6         And if that occurred, that's a serious situation.

7    I don't mean to be flippant and say that it's not a serious

8    situation that someone is facing threats to their personal

9    safety.  But to make that kind of charge in a TRO context,

10   the plaintiff needs to show it.  And what I think they have

11   just indicated here is that they have no record evidence to

12   indicate that this individual's identity was confidential;

13   they have no record or declaration indicating this

14   individual has faced any kind of threats; it was just our,

15   quote, understanding of the situation.  There is no basis

16   for that understanding.

17        And that is what I intended to convey in the

18   brief, is there is simply no record and no proof of this

19   sort of harm.

20        This is sort of disconnected from some of the

21   legal concerns with that, too, Your Honor.  There is no sort

22   of legal claim that any of these plaintiffs have connected

23   to a tweet by a member of DOGE.  But the sort of -- what I

24   was trying to raise in the brief was not flippancy about an

25   individual's personal safety, but the failure to demonstrate

1    that that personal safety was actually threatened.

2          THE COURT:  All right.  Well, I appreciate that.

3    But are you consulting with your client agency here about

4    the need for carefulness and cautiousness in talking about

5    people working overseas?  Are you doing that?

6          MR. WALKER:  I have not personally done that, Your

7    Honor.  I am happy to take any message that Your Honor has

8    back to the agency.

9          THE COURT:  Oh, you can take that back.

10         MR. WALKER:  But I think what you have here --

11   like I say, I don't know that there is a strong evidentiary

12   showing of uncarefulness.  I would say that there is a

13   single tweet that we have here; there is no demonstration

14   that the information in the tweet was confidential; that --

15   it was certainly not Privacy Act protected, as you see in

16   some of the other cases where there are injunctions

17   prohibiting the disclosure of information.

18         The only sort of record evidence that we have here

19   about concerns about disclosure of secret information is we

20   have a declaration from a former employee named Lowenger

21   that just says that the agency has a lot of sensitive

22   information that would be bad if it was released; but no

23   indication that it will be used; no indication that

24   sensitive information will be released.

25         And then we have the declaration from the founder

1    of the Brave Generation organization who essentially just

2    says that her organization partnered on a five-month project

3    with the Institute of Peace a year ago last year; and she's

4    concerned that some personal information the agency may have

5    will be released, she doesn't trust the current agency.

6         All we have is that bare mistrust from that

7    founder and this other individual's representations that the

8    agency has some access to sensitive information.  There has

9    been no showing that there is an actual certain, great,

10   imminent threat that that information will be disclosed,

11   which is what's necessary for a TRO.

12        THE COURT:  So I know that the defendants take the

13   position that DOGE is not subject to the APA because it's

14   not an agency; it's purely consultative, advisory, and so

15   on.

16        Has any court adopted the government's position

17   about DOGE?

18        MR. WALKER:  I will pass the hot potato to my

19   colleague, Sam Escher.

20        THE COURT:  Sure.  Mr. Escher.

21        MR. ESCHER:  Not that I am aware of, Your Honor.

22        THE COURT:  Me neither.  Okay.  But you are going

23   to keep trying?

24        MR. ESCHER:  We will, Your Honor.

25        THE COURT:  Okay.  Does it make a difference here,

1    whether DOGE is an agency or not?

2                MR. ESCHER:  Well, I am going to answer that

3    question by answering a different question.  And --

4                THE COURT:  I will see if that is satisfactory.

5                MR. ESCHER:  Okay.  One of the things that was

6    discussed during the discussions with the plaintiff was who

7    has been acting during all of these events.  And so the

8    government's position has been that, from all of the

9    evidence that we have provided, actually, the Institute of

10   Peace --

11               THE COURT:  Could you speak up?

12               MR. ESCHER:  I get that a lot.

13               THE COURT:  You are getting quieter and quieter.

14   Move the microphone over to you.

15               MR. ESCHER:  I get that a lot.

16               So our position has been that it's been the United

17   States Institute of Peace that has been performing all of

18   the actions; it's not actually DOGE.  Sort of the underlying

19   premise there is that it's the Institute of Peace that has

20   been performing these actions.

21               THE COURT:  And so thankfully, rather than being

22   the plaintiff in the lawsuit, like in the *Jackson* lawsuit,

23   the first lawsuit, the institute is actually a defendant

24   here.

25               MR. ESCHER:  Yes.  We are a defendant here.  And

1    so you have seen the exhibits showing that the -- pointing

2    to *Jackson*.  It doesn't say "DOGE" anywhere in the exhibits.

3    You have seen the other exhibits about transferring the

4    property, that's not coming from DOGE, that's coming from

5    the Institute of Peace.  Every exhibit -- every piece of

6    evidence in this case has shown that it's coming from the

7    Institute of Peace and so, therefore, the underlying premise

8    that this is all coming from DOGE for this case is -- we

9    disagree with that underlying premise.

10          THE COURT:  Right.  But from where I sit, would

11    you agree that I don't have to get into the issue that some

12    of my colleagues have written -- I think very persuasive

13    opinions on -- that DOGE is an agency?  You know, when it

14    walks like a duck, quacks like a duck, swims like a duck,

15    it's a duck.  And I think that they said it does all of

16    those things as an agency.

17          But I don't have to get into that because I

18    have -- if the government is right -- an agency here headed

19    by Defendant Cavanaugh whose actions here -- and before

20    Cavanaugh, Jackson -- are being challenged.  So it doesn't

21    matter whether DOGE is or isn't an agency for purposes of

22    the APA claims here.

23          MR. ESCHER:  So I would say whether -- you know,

24    for there to be a claim under the APA, you know, one of the

25    things, it has to be an agency action.  And so, therefore,

1    whether -- it has to be an agency action.

2              Whether --

3              THE COURT:  I know.  So we have got this

4    situation, the plaintiffs are bringing an APA action.

5              MR. ESCHER:  Right.

6              THE COURT:  They have to be challenging an action

7    by the agency; but at the same time, they want to preserve

8    their argument that the institute is not an agency --

9              MR. ESCHER:  Right.

10             THE COURT:  -- it's an independent organization.

11   So things done within the institute by the new leadership of

12   the institute don't qualify even as an agency action because

13   the institute is simply not an active -- so they're sort of

14   between a rock and a hard place on that.

15             MR. ESCHER:  I see what you are saying.

16             THE COURT:  But I think one way to get around this

17   is plaintiffs have targeted DOGE.  DOGE is the actual

18   agency; DOGE took over the institute, and all of the bad

19   things that have been happening at the institute are done by

20   an agency in the form of DOGE taking over the institute.

21   Or, if Cavanaugh isn't a DOGE person -- although he

22   certainly has got connections with DOGE somehow, I don't

23   know, you will explain it in summary judgment -- because I

24   want to understand who this guy is and what his connection

25   is to DOGE, who is paying his salary -- or if he is an

1    employee of GSA, which I have also been told, he sort of

2    gets around, then GSA is an agency; right?  GSA took over

3    the institute, so I'd still have an agency.

4            But as I said, this is a fairly slippery item.

5    But you are not challenging the ability to -- for the

6    plaintiffs to bring an APA claim because, in your view, it's

7    an agency?

8            MR. ESCHER:  So we aren't challenging the ability

9    for the plaintiffs to have an APA claim, but those are for

10    other reasons.  So --

11            THE COURT:  Okay.  But not that one.  Okay.

12            Before -- I know I am not deciding that here, but

13    I was just curious about one line in your brief --

14            MR. ESCHER:  Okay.

15            THE COURT:  -- on the issue of whether the

16    institute is an executive branch agency; and if it's not an

17    agency as we normally think of it, is it an establishment,

18    government-controlled, government corporation?

19            The statement in your brief was that the

20    institute -- whatever kind of federal entity it is, it falls

21    within the executive branch because it doesn't fall within

22    the other two branches.  And that -- am I understanding

23    correctly that you think all federal entities -- whether you

24    call them an agency, an establishment, a corporation,

25    commission, a board -- all federal entities must fall within

1    one of the three branches of government?

2         MR. ESCHER:  Yes.  There are only three branches

3    of government, so they must.

4         THE COURT:  So what struck me about that is we

5    have -- we have other entities that are -- according to the

6    Supreme Court, not falling within any of the three branches

7    of government.  So I think your assumption may be off.

8         I mean, if you look at federal grand juries, for

9    example, they are associated with the judicial branch; but

10    the Supreme Court has made it clear that, as a textual

11    matter under the Constitution, grand juries belong to no

12    branch of the government, although they are certainly

13    federal entities.

14         So have you thought about that?  And how does

15    that -- how does that affect your analysis of whether a

16    federal entity must fall within one of the three branches of

17    government?  That's clearly not correct.  That's not a

18    correct assumption.

19         MR. ESCHER:  In this case, given the

20    characteristics and the purpose of the institute, it

21    would -- even if there is some overlap with other branches

22    of the government, different branches of the government --

23    in this case, given all of the characteristics and the

24    purpose of the institute, it most squarely, if there is --

25    if any of them, falls within the executive branch.  And

1    that's --

2             THE COURT:  And why is that?

3             MR. ESCHER:  Because of the purpose of the

4    institute.  It is a -- there's been a lot of references to

5    it being an independent establishment.  We respectively

6    disagree with that characterization.

7             There is a Supreme Court -- the *Collins* case did a

8    good job going into discussing the status of independence

9    and education and how much effect that has, issues like

10   removal power.

11            But ultimately, the institute is an establishment

12   that deals with foreign affairs.  It was created to be a

13   soft power when the statute was created.  And foreign

14   affairs and things of that nature are squarely functions

15   that fall into the executive branch.  So it -- at its core,

16   it's an executive branch agency with executive functions.

17            THE COURT:  All right.  So would the government

18   agree -- the defendants here -- do the defendants agree that

19   the executive branch has no power to dissolve or shut down

20   the institute without congressional approval?

21            MR. ESCHER:  That's not a legal issue I have

22   thought about.  I think I am only limited to speak on the

23   removal power.  You know, that's getting into, I believe,

24   necessary and proper clause issues.  I have not thought

25   about that issue, Your Honor.

1          THE COURT:  But I think that's one of the claims

2     the plaintiffs have brought.  They're claiming that -- their

3     *ultra vires* claim is that you are shutting down the

4     institute when you don't have the authority to do that, and

5     it's in violation of the organic statute of the institute.

6     So I think you better think about that.

7          MR. ESCHER:  So I think where we disagree with

8     that is that the allegations that the institute is, in fact,

9     being shut down.

10          THE COURT:  Oh, so you think that we haven't

11     gotten to that point yet?

12          MR. ESCHER:  No.  The institute has not been shut

13     down.  They are following the --

14          THE COURT:  And you are not prepared to answer

15     that:  If the institute does get to the point of being shut

16     down, you are not prepared to answer whether or not that

17     would clearly be an *ultra vires* act because it would be done

18     without congressional approval, at least at this juncture?

19          MR. ESCHER:  I think it's legal arguments for

20     another day.

21          THE COURT:  Well, are you prepared to answer the

22     question of whether the defendants would agree that any

23     actions taken to reduce the institute's activities must be

24     consistent with the institute's organic statute and the

25     mandates that Congress has tasked the institute with

1    performing?

2            MR. ESCHER:  I believe that the institute has to

3    comply with the statute, so that's what they're doing, at

4    least their minimum functions of the statute.

5            THE COURT:  And what do the defendants consider to

6    be the institute's statutory minima which it's trying to

7    reach in the name of efficiency, in reducing the employee

8    roles, transferring the building and assets of the

9    institute?

10           MR. ESCHER:  So those are answers that I don't

11   have for you today for purposes of this TRO hearing.  Those

12   are not answers I have for you today but, certainly, they

13   will be more fleshed out on summary judgment.

14           THE COURT:  Mr. Walker, do you have any answers to

15   that?

16           MR. WALKER:  I think the only thing I can point

17   you to, Your Honor, is that I believe that Mr. Cavanaugh, in

18   the letter, laid out a number of statutory functions that

19   the agency was performing.

20           But I do think, as my colleague, Mr. Escher,

21   says -- I do think that as my colleague, Mr. Escher, says

22   that:  At the TRO stage, it's the plaintiffs' burden to come

23   forward, and we answer the charges that they have made and

24   the evidence that they have put forward very, very quickly,

25   and on a highly expedited basis, which is what we've done.

1          I don't think we've seen anything from them that

2    there is any specific statutory obligation that the agency

3    is not performing.

4          So I understand, if we were moving for summary

5    judgment and we were trying to get the Court to say, as a

6    matter of law, that the agency is performing all of its

7    statutory functions, we would have to show you what those

8    functions were; but we are responding on a highly expedited

9    basis to a TRO hearing today.  And there's been no supported

10   demonstration that the agency is not fulfilling its

11   statutory obligation.

12        THE COURT:  Well, you say that.  But the

13   plaintiffs have said that for the Gandhi-King program, all

14   of the staff that worked on that -- which is mandated,

15   that's not a discretionary -- that's a mandated program --

16   all of the staff has been fired; there is no building for

17   them to perform that training program.  So why isn't that

18   pretty darn strong evidence that that statutorily mandated

19   task is not happening?

20        MR. WALKER:  A couple of things.  You don't need a

21   specific building to operate that academy.  You don't need a

22   specific 30 individuals to operate that academy.  Duties to

23   operate that academy can be transferred to other people.

24   There's been no demonstration that the actual functions of

25   the academy, to the extent that they are required, are not

1    being carried out.

2              And much more saliently, I think, on a TRO,

3    absolutely no demonstration that any failure to operate that

4    academy is leading to irreparable, imminent harm for any of

5    these plaintiffs.

6              THE COURT:  And is that because none of these

7    plaintiffs in front of me were actually part of the group

8    responsible for the Gandhi-King program?

9              MR. WALKER:  I think Plaintiff Pippenger said she

10   had some responsibility for it, but that does not lead to

11   irreparable harm for her, certainly.  And she doesn't claim

12   that as irreparable harm.

13             THE COURT:  Is there anything else you want to add

14   to your papers?

15             And if plaintiffs are submitting additional legal

16   analysis today, do you want an opportunity to respond?

17             MR. WALKER:  Yes.  I mean, we think we're here on

18   a TRO.  The plaintiffs were able to craft their proposed

19   order for relief previously.  I think that it's a steep ask

20   for them to come in here and ask the Court to, essentially,

21   re-file the TRO with a new proposed order.

22             We don't see that there is anything in the record

23   currently, the declarations that Your Honor has, that

24   supports irreparable harm --

25             THE COURT:  Do you want a response -- an

1    opportunity to respond or not, Mr. Walker?

2              That was a simple yes or no.

3              MR. WALKER:  Yes.

4              Note my objection to the entire opportunity to

5    re-file the TRO if they are permitted to re-file the TRO;

6    but we would absolutely like an opportunity to respond.

7              THE COURT:  Okay.  Did you want to respond,

8    Mr. Eisenberg?

9              MR. EISENBERG:  Just very briefly, Your Honor.

10             Just a few responses to some of the discrete

11   points that were raised.

12             First, as the Court is aware, the USIP Act

13   prohibits USIP from dissolving itself; and so we have

14   attached the relevant statute.  So I just wanted that to be

15   clear.

16             Second, the mere fact --

17             THE COURT:  But the defendants say that they're

18   not dissolving it yet.  They're not even prepared to think

19   through that, as though to say whether or not the President

20   has the authority -- even under a unitary President theory

21   on removal power has the power to dissolve an organization

22   that has been statutorily created by Congress.  So they

23   haven't even thought about that.

24             MR. EISENBERG:  Yes.  That's true.

25             A few other discrete points.

1          There are -- as the Court has suggested, there are

2     various other ways in which civil society engages with the

3     federal government that does not make a civil society part

4     of the federal government.  So, for example, the inaugural

5     poet that the President appoints for inauguration is not a

6     creature of the executive branch; the Girl Scouts, probably

7     not a creature of the executive branch.

8          THE COURT:  Aren't they chartered by the

9     electoral --

10         MR. EISENBERG:  They are.  And so we exist on a

11     continuum.

12         We have entities like the Vera Institute, which

13     are wholly independent entities that happen to receive some

14     appropriation from Congress or some grant funding from

15     Congress.  And then you have a -- you move a little bit

16     over, you have maybe something like the Red Cross or Girl

17     Scouts; and the USIP is somewhere in that spot; and you go

18     all the way over to the Department of State.

19         I think the fundamental question for the Court is:

20     Are we more like the Department of State or are we more like

21     an independent think tank --

22         THE COURT:  You haven't argued this at all in your

23     papers, and -- in terms of this continuum or what the

24     difference is between the Red Cross and the Girl Scouts and

25     what a charter versus an establishment of an entity is.

1          Now, there is the government, by the way; so

2     they're just pretty firm that this is a federal entity in

3     the executive branch, and they're just sticking to that.

4          Do you want an opportunity to talk about that?

5          MR. EISENBERG:  You will have that from us, Your

6     Honor, at summary judgment or at the next phase.  But the

7     reason for --

8          THE COURT:  So I just have to wait for it.  Just

9     like I waited -- this is serious.

10         MR. EISENBERG:  Yes.

11         THE COURT:  Just like I waited in the other case

12    and denied the TRO twice, on a novel issue, with

13    repercussions -- not just for the institute but for a number

14    of other organizations and entities with varying

15    relationships with the U.S. government; this is no trivial

16    issue.

17         MR. EISENBERG:  Your Honor, in our papers we have

18    made several arguments that advocate for viewing the U.S.

19    Institute of Peace as an independent entity, and we haven't

20    cited specifically the example of the Red Cross or the Girl

21    Scouts.  And if we need to brief that more fully at some

22    point in the future, we will; but we have already provided

23    the Court with a basis to decide that the Institute of Peace

24    is, in fact, truly independent.

25         Also, to the extent that the Court finds it is

1    slightly less independent, the Court has a basis for that,

2    too.

3           So I guess in closing -- you know, I will just say

4    this:  The facts in this case are troubling, and we have not

5    seen them in many instances before, if ever.  And so what we

6    have tried to do in our application is offer the Court

7    several ways to map the claims for relief that we have onto

8    these facts.

9           Unfortunately, it is not a simple case of battery;

10   it is not a case, you know, that fits squarely within any

11   existing doctrine.  But there is no way for defendants to

12   excuse this conduct across all of the different claims that

13   we have.  It is either an independent entity and the

14   government has no business seizing it or it is either an

15   agency, in which case it is bound to follow the APA, and --

16   or it's *ultra vires* action by agency officials; because the

17   conduct here is really what we're focusing on, which is:

18   Members of the federal government have taken over an entity

19   with, at best, dubious legal authority to do so and has

20   caused significant damage to the functioning of that

21   congressionally chartered entity and its purpose under the

22   law.

23          So we thank the Court for its consideration, and

24   we will submit the materials to the effect that we had

25   discussed.

1          THE COURT:  All right.  So if plaintiff submits

2    materials today -- I won't put a time limit on it because I

3    want the best work product that I can get today.

4          I will give the government until two o'clock

5    tomorrow to submit any response.  And then I will reserve

6    ruling until I see all of the supplemental material.

7          You are all excused.

8          (Whereupon, the proceeding concludes, 1:24 p.m.)

9                        **CERTIFICATE**

10

11          I, ELIZABETH DAVILA, RPR, FCRR, do hereby certify

12   that the foregoing constitutes a true and accurate

13   transcript of my stenographic notes, and is a full, true,

14   and complete transcript of the proceedings to the best of my

15   ability.

16          This certificate shall be considered null and void

17   if the transcript is disassembled and/or photocopied in any

18   manner by any party without authorization of the signatory

19   below.

20

21          Dated this 24th day of April, 2025.

22          /s/ Elizabeth Davila, RPR, FCRR
            Official Court Reporter
23

24

25

**$**

**$23** [2] - 63:4, 65:14

**/**

**/s** [1] - 97:22

**1**

**1** [2] - 23:5, 25:6
**100** [1] - 59:19
**11** [1] - 67:23
**11-18** [1] - 18:21
**11:09** [1] - 1:5
**14** [3] - 18:25, 22:10, 42:22
**14-day** [1] - 27:11
**145** [1] - 30:1
**16** [1] - 1:5
**18** [1] - 23:9
**1:24** [1] - 97:8

**2**

**20** [1] - 41:24
**20-year-old** [1] - 33:24
**20001** [1] - 1:19
**202** [1] - 1:19
**2020** [2] - 25:7, 77:12
**2025** [13] - 1:5, 18:25, 22:10, 23:6, 23:9, 23:10, 25:4, 25:5, 42:22, 67:10, 67:21, 67:23, 97:21
**212** [1] - 1:13
**24-hour** [1] - 11:8
**24th** [1] - 97:21
**25-1090** [2] - 1:3, 2:3
**25-cv-0462** [1] - 23:6
**25-cv-337** [1] - 25:4
**25-CV-804** [2] - 3:9, 4:3
**252-2511** [1] - 1:19
**26** [1] - 23:6
**265** [1] - 73:3
**28-year-old** [2] - 11:16, 56:9
**28th** [2] - 11:22, 73:4

**3**

**30** [3] - 77:18, 78:5, 91:22
**300** [4] - 11:20, 57:12, 61:19, 72:2
**300-some-odd** [2] - 21:22, 32:16
**34** [1] - 56:4
**3d** [1] - 25:6

**4**

**4** [1] - 25:4
**400** [1] - 11:21
**400-member** [1] - 61:19
**444** [1] - 25:6

**5**

**5** [2] - 35:15, 41:22

**6**

**6** [3] - 35:15, 67:10, 67:21
**601** [1] - 1:18
**65** [1] - 73:17
**65(c** [8] - 62:15, 66:21, 67:15, 68:6, 69:11, 70:23, 71:10, 73:10
**65(c)** [3] - 64:1, 66:19, 68:2
**685124** [1] - 25:4

**7**

**7** [2] - 35:15, 35:21
**763-5000** [1] - 1:13
**7:13** [1] - 47:21

**8**

**8** [2] - 35:15, 39:17
**840574** [1] - 23:6
**8th** [1] - 1:12

**9**

**9** [2] - 35:15, 39:17
**966** [1] - 30:1

**A**

**a.m** [1] - 1:5
**Abady** [2] - 1:12, 2:9
**abandoned** [1] - 35:25
**ability** [13] - 26:19, 27:19, 31:8, 56:4, 56:14, 58:2, 59:2, 59:20, 60:8, 73:13, 86:5, 86:8, 97:15
**able** [6] - 26:18, 37:7, 65:15, 69:20, 75:2, 92:18
**abroad** [4] - 9:16, 10:4, 27:12, 45:3
**abrupt** [2] - 3:11, 36:4
**abruptly** [1] - 71:25
**absolute** [1] - 16:10
**absolutely** [2] - 92:3, 93:6
**Abuznad** [14] - 6:1, 20:3, 20:9, 33:11, 35:10, 36:6, 36:11, 36:24, 37:13, 37:22, 37:25, 38:1, 38:16, 65:11
**Academy** [6] - 12:25, 76:18, 77:6, 78:11, 78:20
**academy** [7] - 76:25, 77:10, 91:21, 91:22, 91:23, 91:25, 92:4
**access** [5] - 77:17, 77:20, 77:22, 77:25, 82:8
**accord** [1] - 8:19
**accordance** [2] - 50:22, 66:20
**according** [2] - 56:16, 87:5
**account** [1] - 34:22
**accurate** [1] - 97:12
**accused** [1] - 36:2
**accusing** [1] - 37:17
**achieve** [1] - 8:23
**acknowledge** [3] - 14:15, 68:13, 68:20
**acronym** [1] - 6:5
**Act** [18] - 4:8, 8:19, 34:8, 37:6, 37:7, 37:14, 37:17, 43:13, 44:13, 53:1, 55:6, 56:4, 56:13, 57:14, 57:15, 79:4, 81:15, 93:12
**act** [2] - 64:10, 89:17
**acted** [1] - 60:12
**acting** [4] - 48:4, 51:18, 60:24, 83:7
**action** [20] - 15:8, 24:19, 43:11, 43:18, 49:2, 51:22, 51:24, 52:2, 53:16, 53:22, 54:6, 67:3, 70:18, 73:12, 84:25, 85:1, 85:4, 85:6, 85:12, 96:16
**Action** [2] - 1:3, 2:3
**actions** [17] - 2:22, 4:9, 13:9, 23:19, 37:12, 38:24, 43:21, 50:17, 50:24, 53:7, 53:14, 54:11, 73:13, 83:18, 83:20, 84:19, 89:23
**active** [1] - 85:13
**activities** [3] - 4:10, 9:15, 89:23
**activity** [2] - 38:19, 65:18
**actors** [2] - 35:12, 40:6
**acts** [1] - 20:3
**actual** [4] - 67:22, 82:9, 85:17, 91:24
**acute** [1] - 40:8
**add** [3] - 62:12, 70:7, 92:13
**added** [1] - 3:14
**addition** [1] - 12:7
**additional** [2] - 77:13, 92:15
**additionally** [1] - 63:18
**address** [12] - 2:22, 25:8, 26:2, 30:21, 31:6, 31:11, 33:14, 49:7, 62:9, 69:1, 79:14, 79:18
**addresses** [1] - 23:5
**addressing** [1] - 31:17
**administration** [3] - 44:1, 45:21, 56:22
**Administration** [4] - 21:21, 41:9, 45:10, 46:1
**administration's** [2] - 2:22, 45:24
**administrative** [4] - 23:18, 23:21, 71:22, 72:3
**Administrative** [3] - 4:7, 43:12, 44:13
**admit** [1] - 42:16
**admittedly** [1] - 57:16
**adopted** [2] - 52:20, 82:16
**advance** [2] - 55:11, 56:6
**adverse** [1] - 64:23
**advisory** [1] - 82:14
**advocate** [1] - 95:18
**affairs** [3] - 10:14, 88:12, 88:14
**affect** [1] - 87:15
**affects** [1] - 70:24
**affidavit** [2] - 20:24, 35:7, 35:15
**affidavits** [4] - 7:4, 7:17, 7:21, 11:19
**affiliated** [1] - 35:23
**affiliation** [1] - 47:6
**affirming** [1] - 63:13
**afforded** [1] - 25:10
**affords** [1] - 70:4
**Afghanistan** [10] - 9:21, 20:7, 33:7, 33:21, 35:2, 37:3,
37:9, 37:18, 37:25, 78:25
**afternoon** [1] - 65:25
**agencies** [7] - 30:15, 45:9, 49:25, 50:3, 53:18, 58:10, 67:11
**agency** [68] - 15:22, 16:22, 27:4, 48:17, 48:20, 49:2, 49:3, 49:18, 50:15, 51:5, 51:19, 52:18, 52:21, 52:24, 53:3, 53:14, 53:16, 53:22, 54:2, 54:3, 54:6, 54:10, 58:13, 61:23, 67:2, 67:13, 72:7, 72:14, 72:16, 73:12, 75:3, 75:5, 75:6, 75:8, 75:9, 81:3, 81:8, 81:21, 82:4, 82:5, 82:8, 82:14, 83:1, 84:13, 84:16, 84:18, 84:21, 84:25, 85:1, 85:7, 85:8, 85:12, 85:18, 85:20, 86:2, 86:3, 86:7, 86:16, 90:19, 91:2, 91:6, 91:10, 96:15, 96:16
**agency's** [1] - 54:7
**ago** [2] - 39:9, 82:3
**agree** [5] - 12:2, 84:11, 88:18, 89:22
**agreed** [3] - 11:1, 17:22, 30:9
**Agriculture** [1] - 25:6
**ahead** [2] - 17:7, 24:25
**aided** [1] - 1:24
**al** [4] - 1:3, 1:5, 2:3, 2:4
**allegations** [1] - 89:8
**alleged** [1] - 18:18
**allegedly** [1] - 4:8
**allegiance** [1] - 8:4
**alleviate** [2] - 18:18, 72:13
**allowed** [1] - 8:20
**almost** [4] - 52:1, 57:12, 61:19, 61:21
**alone** [1] - 22:21
**alphabet** [2] - 11:25, 12:1
**alphabetical** [5] - 11:22, 18:7, 57:12, 61:24, 71:25
**alternative** [1] - 45:11
**Ambassador** [1] - 3:14
**amenable** [2] - 53:15, 54:11

2

**amend** [5] - 26:10, 26:22, 28:4, 44:11, 44:18
**amended** [4] - 3:12, 31:18, 42:19, 43:8
**amendment** [2] - 5:23, 33:3
**America** [3] - 63:2, 71:15, 71:17
**American** [3] - 10:4, 45:5, 46:9
**amicus** [1] - 7:24
**amount** [2] - 53:13, 69:20
**analysis** [4] - 7:14, 21:14, 87:15, 92:16
**anathema** [1] - 45:4
**ancillary** [1] - 24:22
**Animals** [1] - 54:9
**announcements** [1] - 61:19
**anonymity** [1] - 23:15
**answer** [12] - 8:5, 8:6, 32:22, 66:3, 69:4, 72:18, 79:3, 83:2, 89:14, 89:16, 89:21, 90:23
**answered** [1] - 32:21
**answering** [1] - 83:3
**answers** [5] - 9:3, 69:9, 90:10, 90:12, 90:14
**APA** [28] - 38:19, 48:15, 48:18, 48:20, 49:1, 50:1, 50:16, 50:23, 51:4, 51:17, 51:19, 52:4, 52:21, 53:4, 53:15, 57:22, 60:9, 60:10, 62:6, 73:21, 73:25, 82:13, 84:22, 84:24, 85:4, 86:6, 86:9, 96:15
**apologies** [2] - 13:24, 29:4
**apologize** [2] - 17:5, 27:20
**app** [2] - 77:23, 77:25
**apparatus** [5] - 10:6, 10:13, 20:6, 27:16, 35:5
**appear** [1] - 24:5
**APPEARANCES** [1] - 1:9
**application** [1] - 96:6
**apply** [2] - 23:13, 24:21
**applying** [1] - 23:20
**appointment** [1] - 16:9
**appoints** [1] - 94:5

**appreciate** [3] - 15:14, 18:6, 81:2
**approach** [2] - 71:23, 72:1
**approached** [1] - 49:21
**approaches** [1] - 16:21
**appropriate** [6] - 16:23, 21:15, 43:20, 63:15, 65:22, 73:6
**appropriation** [3] - 77:9, 77:12, 94:14
**approval** [2] - 88:20, 89:18
**April** [2] - 1:5, 97:21
**arbitrarily** [2] - 50:19, 60:12
**arbitrary** [7] - 4:8, 12:4, 50:24, 52:4, 52:5, 57:21, 57:25
**area** [5] - 35:6, 40:14, 68:12, 68:24, 70:4
**argue** [2] - 48:17, 53:10
**argued** [2] - 48:19, 94:22
**arguing** [2] - 5:19, 38:4
**argument** [4] - 22:4, 38:5, 55:16, 85:8
**arguments** [3] - 11:9, 89:19, 95:18
**Article** [1] - 52:14
**article** [4] - 46:15, 46:23, 46:25, 47:3
**aside** [3] - 16:1, 72:10, 79:7
**aspect** [2] - 9:12, 12:3
**aspersions** [1] - 46:7
**assert** [1] - 23:12
**assets** [7] - 4:10, 4:22, 25:16, 25:19, 26:13, 26:15, 90:8
**Assign** [2] - 47:3, 47:22
**assigned** [4] - 3:22, 3:23, 53:7, 65:5
**Assistant** [1] - 1:17
**associated** [3] - 20:5, 35:12, 87:9
**assume** [2] - 13:23, 58:3
**assuming** [4] - 16:17, 18:16, 54:16, 72:13
**assumption** [3] - 28:20, 87:7, 87:18
**attached** [1] - 93:14
**attack** [1] - 53:11
**attempt** [1] - 65:16

**attends** [1] - 10:17
**attention** [4] - 28:24, 45:6, 45:7, 54:21
**Attorney** [1] - 67:14
**Attorneys** [1] - 1:17
**attributable** [1] - 33:23
**authority** [6] - 14:4, 17:12, 17:13, 89:4, 93:20, 96:19
**authorization** [2] - 77:9, 97:18
**availability** [1] - 22:7
**available** [8] - 20:22, 21:2, 21:17, 21:25, 22:3, 70:3, 77:22, 78:3
**avant** [1] - 9:11
**avant-garde** [1] - 9:11
**Avenue** [1] - 41:11
**award** [1] - 70:5
**aware** [5] - 52:19, 52:25, 74:6, 82:21, 93:12
**awesome** [1] - 64:13

## B

**background** [1] - 5:8
**bad** [3] - 36:2, 81:22, 85:18
**bail** [1] - 35:5
**balance** [2] - 12:12, 61:20
**balanced** [1] - 16:25
**bare** [1] - 82:6
**barring** [3] - 26:13, 28:12, 29:20
**based** [8] - 7:11, 7:15, 35:8, 53:10, 57:19, 59:8, 59:9, 75:10
**basis** [17] - 2:21, 4:2, 11:7, 22:24, 24:3, 24:8, 30:3, 30:10, 37:22, 37:23, 52:4, 70:17, 80:15, 90:25, 91:9, 95:23, 96:1
**battery** [1] - 96:9
**become** [1] - 53:17
**befallen** [1] - 19:19
**BEFORE** [1] - 1:8
**beginning** [1] - 38:21
**behalf** [3] - 2:14, 3:5, 3:10
**behest** [1] - 30:4
**belong** [1] - 87:11
**below** [3] - 21:10, 21:24, 97:19
**bench** [1] - 67:3
**beneficial** [1] - 8:24

**beneficiaries** [1] - 15:10
**benefit** [5] - 28:11, 28:15, 29:16, 39:6, 48:7
**benefits** [3] - 4:25, 19:2, 21:11
**BERYL** [1] - 1:8
**best** [4] - 59:2, 96:19, 97:3, 97:14
**better** [2] - 61:24, 89:6
**between** [6] - 17:24, 32:3, 42:5, 49:2, 85:14, 94:24
**big** [3] - 41:13, 42:6, 76:8
**binary** [2] - 55:21
**binding** [1] - 31:11
**bipartisan** [2] - 17:3, 17:11
**bit** [6] - 27:3, 33:15, 49:4, 49:19, 61:2, 94:15
**bizarre** [1] - 45:2
**board** [43] - 3:4, 3:9, 4:5, 4:19, 5:9, 9:3, 12:20, 13:8, 13:12, 13:19, 15:11, 17:1, 17:3, 17:11, 17:15, 20:4, 22:18, 22:19, 22:20, 25:15, 26:25, 29:1, 34:8, 36:22, 38:18, 42:13, 42:14, 42:21, 42:22, 43:12, 43:16, 45:19, 46:1, 48:22, 54:19, 55:6, 55:9, 56:14, 57:17, 75:20, 75:21, 86:25
**body** [1] - 15:16
**bond** [14] - 63:14, 63:22, 65:1, 65:13, 69:5, 70:5, 70:13, 70:15, 72:9, 72:14, 72:22, 73:10, 73:16, 74:5
**bonds** [1] - 71:14
**bound** [2] - 30:19, 96:15
**branch** [13] - 16:2, 16:6, 86:16, 86:21, 87:9, 87:12, 87:25, 88:15, 88:16, 88:19, 94:6, 94:7, 95:3
**branch's** [1] - 27:22
**branches** [7] - 86:22, 87:1, 87:2, 87:6, 87:16, 87:21, 87:22
**Brave** [10] - 28:16, 39:8, 39:13, 39:17, 39:19, 39:25, 40:1,

40:4, 82:1
**bravery** [1] - 64:10
**breadth** [1] - 54:21
**break** [1] - 46:12
**brief** [12] - 20:20, 34:24, 66:20, 68:17, 78:24, 79:20, 80:18, 80:24, 86:13, 86:19, 95:21
**briefed** [1] - 13:18
**briefing** [6] - 5:11, 7:23, 11:4, 25:1, 43:3, 62:13
**briefly** [1] - 93:9
**briefs** [1] - 7:24
**Brinckerhoff** [1] - 2:9
**bring** [2] - 73:13, 86:6
**bringing** [4] - 3:2, 70:17, 70:25, 85:4
**Brinkerhoff** [1] - 1:12
**broad** [12] - 25:18, 26:3, 28:3, 32:12, 43:15, 43:22, 53:10, 53:11, 53:25, 54:23, 55:6, 70:12
**broad-based** [1] - 53:10
**broad-brush** [1] - 53:11
**broader** [1] - 55:17
**broader-brush** [1] - 55:17
**Brookings** [1] - 10:3
**brought** [4] - 18:1, 33:14, 45:9, 89:2
**Brown** [1] - 30:13
**brush** [3] - 53:11, 53:25, 55:17
**bucket** [1] - 43:7
**budget** [3] - 54:7, 54:8, 56:7
**building** [25] - 8:10, 8:11, 9:1, 9:10, 12:24, 15:10, 19:5, 26:17, 28:19, 34:9, 34:12, 39:15, 41:11, 41:19, 42:1, 43:7, 45:10, 46:11, 46:12, 55:11, 56:7, 57:4, 90:8, 91:16, 91:21
**builds** [1] - 28:18
**bunch** [2] - 30:6, 53:23
**burden** [6] - 62:21, 76:7, 76:8, 78:10, 78:12, 90:22
**bureaucrats** [1] - 61:8
**business** [1] - 96:14
**busy** [2] - 46:17, 48:1

3

## C

**calculating** [1] - 71:14
**calculation** [2] - 69:25, 72:9
**California** [2] - 29:25, 30:18
**cancel** [1] - 55:13
**candidate** [2] - 72:15, 72:17
**candidates** [1] - 72:9
**cannot** [4] - 19:11, 27:6, 56:6, 68:16
**capacity** [1] - 12:24
**capricious** [5] - 4:8, 50:24, 52:5, 57:21, 57:25
**capriciously** [2] - 50:21, 60:12
**caption** [1] - 52:11
**care** [3] - 48:10, 59:1, 69:8
**careers** [1] - 36:18
**carefulness** [1] - 81:4
**carried** [2] - 58:4, 92:1
**carry** [4] - 19:9, 74:20, 75:4, 75:8
**carrying** [4] - 54:2, 56:20, 57:5, 58:3
**case** [87] - 2:24, 2:25, 3:8, 3:16, 3:21, 3:22, 4:3, 4:4, 4:7, 5:5, 5:13, 6:2, 7:1, 7:2, 7:23, 7:25, 9:19, 13:18, 13:20, 13:21, 14:3, 14:4, 14:12, 15:15, 16:7, 16:22, 17:13, 17:25, 22:17, 23:4, 23:7, 23:11, 24:1, 24:4, 24:7, 24:10, 25:3, 25:5, 30:13, 30:22, 31:1, 31:7, 31:17, 34:13, 36:6, 41:14, 41:17, 43:4, 45:8, 47:9, 48:11, 51:24, 53:5, 53:6, 53:21, 54:9, 54:24, 57:10, 62:2, 62:6, 63:2, 63:6, 63:9, 64:15, 65:4, 65:12, 65:14, 66:6, 66:13, 68:25, 71:16, 72:7, 73:21, 74:4, 84:6, 84:8, 87:19, 87:23, 88:7, 95:11, 96:4, 96:9, 96:10, 96:15
**cases** [11] - 3:15, 23:23, 24:23, 52:19, 52:23, 53:23, 65:21,
66:22, 73:25, 74:6, 81:16
**cast** [1] - 46:7
**caught** [3] - 45:6, 45:7, 54:21
**causation** [1] - 18:4
**caused** [2] - 20:8, 96:20
**causes** [1] - 51:21
**causing** [2] - 37:12
**cautious** [1] - 31:3
**cautiousness** [1] - 81:4
**Cavanaugh** [29] - 11:16, 12:19, 12:22, 26:1, 32:22, 41:20, 43:24, 47:9, 47:24, 48:14, 48:23, 49:14, 50:12, 50:16, 53:12, 55:3, 56:17, 57:4, 58:1, 58:8, 61:11, 74:15, 75:9, 75:20, 75:21, 84:19, 84:20, 85:21, 90:17
**Cavanaugh's** [2] - 50:23, 55:1
**Cavanaugh-GSA** [1] - 61:11
**Celli** [2] - 1:12, 2:9
**certain** [4] - 21:10, 21:17, 76:15, 82:9
**certainly** [41] - 8:22, 8:25, 9:1, 9:19, 12:3, 12:23, 23:16, 26:5, 26:6, 26:8, 27:22, 28:2, 28:4, 31:2, 33:12, 35:4, 38:6, 40:7, 41:3, 42:18, 43:8, 44:18, 45:7, 52:12, 53:8, 56:25, 58:13, 64:22, 68:18, 69:21, 71:2, 72:6, 74:5, 79:19, 79:20, 81:15, 85:22, 87:12, 90:12, 92:11
**CERTIFICATE** [1] - 97:9
**certificate** [1] - 97:16
**certify** [1] - 97:11
**cetera** [2] - 11:12, 52:6
**chain** [1] - 8:7
**challenge** [2] - 3:11, 14:6
**challenged** [2] - 70:18, 84:20
**challenges** [7] - 53:13, 53:20, 53:22, 54:1, 54:14, 54:20
**challenging** [7] - 50:23, 55:12, 67:2,
73:11, 85:6, 86:5, 86:8
**chance** [1] - 44:14
**characteristics** [2] - 87:20, 87:23
**characterization** [1] - 88:6
**charge** [1] - 80:9
**charges** [1] - 90:23
**charm** [1] - 5:22
**charter** [1] - 94:25
**chartered** [6] - 10:19, 10:21, 10:23, 11:11, 94:8, 96:21
**check** [1] - 32:18
**checks** [1] - 32:19
**chief** [3] - 65:3, 65:6, 65:8
**chilling** [1] - 73:12
**chooses** [1] - 18:17
**choosing** [1] - 38:8
**Circuit** [8] - 18:15, 30:9, 53:24, 54:9, 63:13, 70:9, 70:10
**circumstance** [1] - 34:2
**cite** [2] - 60:7, 63:18
**cited** [2] - 53:23, 95:20
**citizens** [2] - 6:15, 64:19
**civil** [9] - 8:13, 8:22, 10:11, 10:16, 45:5, 45:11, 64:6, 94:2, 94:3
**Civil** [13] - 1:3, 1:18, 2:2, 62:15, 64:1, 66:19, 67:15, 68:2, 68:5, 69:10, 70:22, 73:16, 73:20
**claim** [17] - 4:11, 37:16, 48:15, 50:1, 50:5, 51:17, 51:20, 52:9, 57:9, 63:1, 80:22, 84:24, 86:6, 86:9, 89:3, 92:11
**claiming** [1] - 89:2
**claims** [14] - 3:2, 5:18, 13:12, 18:1, 19:10, 38:18, 49:21, 51:4, 57:18, 57:19, 84:22, 89:1, 96:7, 96:12
**clarify** [4] - 12:6, 12:9, 70:17, 78:6
**clarity** [2] - 52:15, 65:2
**class** [3] - 22:11, 24:19, 25:12
**clause** [1] - 88:24
**clear** [3] - 49:22, 87:10, 93:15
**clearly** [4] - 40:8,
57:20, 87:17, 89:17
**client** [1] - 81:3
**clients** [2] - 14:9, 21:14
**closed** [1] - 22:6
**closer** [2] - 16:22, 74:24
**closing** [1] - 96:3
**co** [2] - 2:14, 46:23
**co-counsel** [2] - 2:14, 46:23
**COBRA** [12] - 20:19, 20:21, 20:23, 21:1, 21:3, 21:8, 21:11, 21:16, 21:23, 21:24, 21:25, 22:3
**Code** [1] - 10:21
**collateral** [1] - 19:2
**colleague** [7] - 2:11, 66:2, 69:1, 75:1, 82:19, 90:20, 90:21
**colleagues** [1] - 84:12
**collect** [1] - 26:20
**Collins** [2] - 14:3, 88:7
**COLUMBIA** [1] - 1:1
**Columbia** [3] - 9:6, 24:11, 25:7
**comfortable** [1] - 27:7
**coming** [4] - 33:21, 50:3, 73:24, 84:4, 84:6, 84:8
**command** [1] - 8:7
**commission** [1] - 86:25
**commitments** [2] - 54:2, 54:5
**commonsensical** [1] - 60:20
**communication** [1] - 36:3
**communications** [1] - 68:16
**comparable** [2] - 14:15, 24:11
**compelling** [1] - 53:8
**complaint** [3] - 3:13, 33:18, 34:23
**complete** [3] - 57:1, 70:11, 97:14
**completely** [2] - 8:7, 16:20
**compliance** [1] - 3:12
**comply** [3] - 22:23, 56:4, 90:3
**complying** [1] - 60:15
**compound** [1] - 36:4
**computer** [2] - 1:24, 49:25
**computer-aided** [1] - 1:24
**concedes** [1] - 58:14
**concern** [2] - 38:19, 40:8
**concerned** [2] - 17:24, 82:4
**concerns** [4] - 18:20, 36:12, 80:21, 81:19
**conclude** [1] - 58:12
**concludes** [1] - 97:8
**conclusion** [1] - 80:1
**concrete** [2] - 18:10, 53:17
**conditions** [1] - 38:14
**conduct** [8] - 13:9, 14:9, 33:9, 51:14, 51:16, 53:11, 96:12, 96:17
**conducting** [1] - 55:5
**conference** [1] - 14:23
**conferred** [1] - 57:17
**confidence** [2] - 28:18, 28:20
**confidential** [7] - 28:22, 34:11, 39:22, 79:11, 80:3, 80:12, 81:14
**conflict** [2] - 8:16, 60:14
**conflicts** [1] - 8:11
**confusion** [1] - 59:12
**Congress** [14] - 7:12, 8:13, 9:9, 12:8, 15:22, 34:16, 47:8, 58:4, 58:18, 75:15, 89:25, 93:22, 94:14, 94:15
**congressional** [5] - 16:10, 44:5, 59:1, 88:20, 89:18
**congressionally** [4] - 10:24, 11:10, 60:16, 96:21
**connected** [4] - 35:22, 72:8, 73:4, 80:22
**connection** [2] - 14:21, 85:24
**connections** [1] - 85:22
**conscientious** [3] - 58:25, 78:7, 78:11
**consequences** [1] - 35:17
**consider** [4] - 70:16, 70:21, 71:2, 90:5
**consideration** [3] - 70:1, 71:1, 96:23
**considerations** [2] - 21:20, 35:14
**considered** [1] - 97:16
**consistent** [2] - 48:5,

4

89:24

**constitutes** [1] - 97:12
**Constitution** [4] - 8:4, 41:11, 59:1, 87:11
**construe** [1] - 30:24
**construed** [1] - 40:4
**construes** [1] - 27:21
**construing** [1] - 27:24
**consult** [1] - 9:14
**consultancy** [1] - 49:24
**consultation** [2] - 8:16, 67:14
**consultative** [1] - 82:14
**consulting** [1] - 81:3
**contains** [1] - 23:17
**contemplate** [1] - 26:6
**contemplates** [1] - 70:23
**context** [5] - 5:9, 30:22, 32:9, 70:5, 80:9
**continue** [2] - 19:8, 36:24
**continuum** [3] - 16:21, 94:11, 94:23
**contract** [7] - 29:18, 29:21, 32:5, 32:6, 34:14, 59:20, 61:21
**contractor** [4] - 6:9, 6:10, 20:7, 32:9
**contractor's** [1] - 46:12
**contractors** [20] - 5:3, 6:16, 12:12, 18:25, 22:10, 25:21, 25:24, 26:9, 26:15, 27:2, 27:12, 29:3, 32:1, 32:2, 39:4, 44:3, 44:7, 50:18, 58:2, 72:16
**contracts** [7] - 27:2, 29:3, 30:4, 30:8, 30:15, 61:21, 72:17
**contractual** [1] - 32:11
**contrary** [1] - 50:25
**contributed** [1] - 14:22
**control** [3] - 17:4, 41:16, 45:24
**controlled** [1] - 86:18
**controversial** [1] - 70:18
**convey** [1] - 80:17
**copy** [3] - 46:22, 46:23, 47:14
**core** [1] - 88:15
**corporation** [4] - 9:5, 10:24, 86:18, 86:24

**correct** [4] - 29:19, 29:22, 87:17, 87:18
**correctly** [1] - 86:23
**corresponded** [1] - 63:5
**cost** [2] - 72:2, 72:21
**costs** [5] - 67:17, 69:11, 72:7, 72:14, 72:16
**Council** [1] - 10:2
**counsel** [2] - 2:7, 2:10, 2:14, 10:10, 46:8, 46:23, 71:15
**counterpoint** [1] - 13:25
**countries** [1] - 34:11
**country** [4] - 30:12, 45:3, 52:19, 64:19
**couple** [4] - 22:12, 41:21, 69:15, 91:20
**courage** [1] - 64:10
**course** [3] - 4:16, 46:9, 48:12
**court** [28] - 3:24, 17:2, 17:6, 18:16, 22:23, 23:7, 23:11, 23:19, 24:1, 24:13, 30:2, 30:7, 30:9, 52:20, 53:2, 54:3, 54:4, 63:3, 63:12, 64:11, 64:21, 65:4, 65:8, 65:15, 65:17, 69:19, 73:23, 82:16
**COURT** [191] - 1:1, 1:8, 2:12, 2:16, 2:19, 5:25, 6:5, 6:10, 6:13, 6:19, 7:6, 8:15, 9:13, 10:23, 11:2, 11:6, 11:24, 12:17, 13:6, 13:16, 14:2, 14:12, 14:16, 14:19, 14:21, 15:1, 15:14, 16:5, 17:9, 17:20, 17:22, 20:20, 21:7, 21:16, 21:21, 22:8, 22:17, 23:8, 24:1, 24:25, 25:13, 26:12, 26:24, 27:24, 28:9, 28:25, 29:6, 29:9, 29:11, 29:13, 29:16, 29:20, 29:23, 31:4, 31:9, 31:19, 31:22, 32:12, 33:2, 33:13, 34:20, 37:2, 37:24, 38:25, 39:11, 40:2, 40:11, 40:17, 40:19, 40:22, 41:5, 41:8, 42:20, 43:10, 43:24, 44:15, 44:20, 44:23, 45:19, 45:23, 46:17, 46:21,

47:1, 47:15, 47:18, 48:1, 48:8, 48:10, 48:13, 49:9, 49:12, 50:6, 50:8, 50:21, 51:2, 51:4, 51:10, 52:17, 53:9, 55:15, 56:9, 56:16, 56:19, 57:24, 58:14, 58:18, 59:15, 59:18, 60:14, 60:23, 61:2, 61:11, 62:5, 62:11, 62:24, 63:9, 63:20, 63:23, 65:2, 65:23, 66:5, 66:8, 66:10, 66:14, 67:1, 67:9, 68:8, 68:10, 68:21, 68:23, 69:3, 69:7, 69:22, 70:8, 71:9, 72:19, 72:24, 73:6, 73:9, 73:21, 74:2, 74:8, 74:10, 74:23, 75:12, 75:16, 76:4, 76:14, 77:21, 77:25, 78:6, 78:21, 79:7, 79:15, 81:2, 81:9, 82:12, 82:20, 82:22, 82:25, 83:4, 83:11, 83:13, 83:21, 84:10, 85:3, 85:6, 85:10, 85:16, 86:11, 86:15, 87:4, 88:2, 88:17, 89:1, 89:10, 89:14, 89:21, 90:5, 90:14, 91:12, 92:6, 92:13, 92:25, 93:7, 93:17, 94:8, 94:22, 95:8, 95:11, 97:1
**Court** [89] - 1:22, 1:22, 2:20, 5:6, 6:4, 6:20, 6:22, 6:24, 7:4, 7:14, 7:17, 7:21, 7:25, 13:8, 13:14, 13:25, 14:4, 14:11, 15:12, 16:8, 16:25, 17:18, 19:12, 19:17, 23:3, 23:4, 24:14, 24:19, 24:24, 27:4, 27:20, 29:23, 30:1, 30:10, 30:19, 30:23, 31:7, 31:11, 31:16, 33:4, 35:1, 36:7, 36:13, 36:21, 36:24, 38:20, 41:1, 42:12, 42:15, 42:17, 45:15, 46:2, 46:14, 46:24, 51:14, 52:2, 52:8, 52:13, 52:25, 57:11, 58:12, 59:23, 60:11, 62:3, 63:14, 63:15, 63:22, 66:13, 66:16, 70:5, 70:6, 70:16, 70:21,

71:12, 87:6, 87:10, 88:7, 91:5, 92:20, 93:12, 94:1, 94:19, 95:23, 95:25, 96:1, 96:6, 96:23, 97:22
**Court's** [5] - 5:23, 28:24, 31:5, 31:8, 36:7
**COURTROOM** [1] - 2:2
**courts** [13] - 22:15, 30:11, 30:16, 52:14, 52:23, 53:17, 53:20, 53:25, 54:1, 54:8, 67:16, 70:10
**covered** [1] - 51:6
**craft** [2] - 24:13, 92:18
**crafted** [1] - 40:25
**created** [7] - 10:24, 11:11, 15:21, 47:6, 88:12, 88:13, 93:22
**creating** [1] - 4:13
**creation** [1] - 7:11
**creature** [2] - 94:6, 94:7
**credible** [1] - 36:12
**credit** [1] - 51:11
**critical** [1] - 60:4
**criticizing** [1] - 55:17
**critique** [1] - 55:16
**Cross** [4] - 10:15, 94:16, 94:24, 95:20
**cry** [1] - 22:4
**curiam** [2] - 30:12, 31:5
**curious** [2] - 32:13, 86:13
**current** [14] - 5:1, 5:16, 19:13, 23:20, 26:6, 31:25, 39:3, 40:9, 43:19, 48:22, 55:23, 71:13, 79:8, 82:5

**D**

**D.C** [6] - 1:6, 1:19, 18:15, 25:5, 54:9, 63:13
**damage** [1] - 96:20
**damages** [2] - 67:17, 69:11
**dan** [1] - 2:9
**danger** [1] - 35:20
**dangerous** [1] - 36:19
**DANIEL** [1] - 1:11
**dark** [2] - 60:18, 76:16
**darn** [1] - 91:18
**date** [1] - 74:12
**Dated** [1] - 97:21

**dated** [2] - 67:20, 67:23
**dates** [1] - 67:25
**DAVILA** [1] - 97:11
**Davila** [2] - 1:22, 97:22
**days** [2] - 41:21, 46:20
**deals** [1] - 88:12
**dealt** [1] - 23:7
**death** [1] - 80:4
**debate** [1] - 54:17
**decade** [2] - 73:23, 73:24
**decide** [3] - 55:7, 63:14, 95:23
**decided** [2] - 29:25, 34:18
**decides** [2] - 24:19, 38:11
**deciding** [4] - 11:3, 43:2, 54:18, 86:12
**decision** [7] - 11:25, 29:24, 30:12, 31:5, 53:3, 55:12, 65:7
**decision-making** [1] - 11:25
**decisions** [3] - 55:18, 63:12, 63:18
**declaration** [16] - 20:24, 36:8, 36:10, 39:17, 39:18, 40:20, 42:21, 42:24, 42:25, 43:14, 43:15, 45:15, 73:2, 80:13, 81:20, 81:25
**declarations** [6] - 18:6, 25:23, 57:1, 58:23, 75:18, 92:23
**declaratory** [1] - 46:2
**declare** [1] - 44:5
**declared** [2] - 4:19, 43:10
**defendant** [10] - 41:15, 41:17, 47:9, 49:17, 50:9, 50:10, 69:14, 73:17, 83:23, 83:25
**Defendant** [9] - 12:19, 25:25, 32:22, 34:13, 47:24, 48:23, 55:1, 74:14, 84:19
**defendant's** [4] - 20:5, 60:8, 66:16, 68:4
**defendants** [33] - 2:14, 4:9, 5:12, 23:12, 27:11, 31:23, 33:6, 36:21, 41:9, 41:19, 43:11, 45:12, 48:19, 49:24, 50:11, 51:7, 52:11, 53:10, 57:11, 59:9, 61:6,

5

61:18, 61:22, 62:16, 62:21, 70:23, 82:12, 88:18, 89:22, 90:5, 93:17, 96:11

**Defendants** [1] - 1:5

**DEFENDANTS** [1] - 1:15

**defendants'** [2] - 23:19, 58:7

**Defense** [1] - 8:17

**defined** [1] - 8:9

**definitions** [1] - 15:22

**defunct** [1] - 13:4

**degree** [2] - 17:4, 79:22

**deisenberg@ ecbawm.com** [1] - 1:14

**delayed** [1] - 69:15

**deliberately** [1] - 55:6

**deliberations** [1] - 69:25

**delineated** [1] - 60:16

**delved** [1] - 22:16

**demand** [2] - 63:10, 64:3

**demanding** [2] - 62:14, 73:10

**demonstrate** [2] - 78:10, 80:25

**demonstrated** [1] - 59:23

**demonstration** [4] - 81:13, 91:10, 91:24, 92:3

**denied** [1] - 95:12

**Department** [12] - 1:17, 8:17, 9:15, 10:18, 25:5, 29:24, 30:3, 30:18, 36:10, 58:10, 94:18, 94:20

**deported** [1] - 64:20

**depositions** [2] - 61:25, 62:5

**deprive** [1] - 26:8

**DEPUTY** [1] - 2:2

**derived** [1] - 3:17

**describe** [1] - 45:1

**description** [1] - 44:24

**descriptions** [1] - 20:1

**design** [1] - 51:6

**designed** [1] - 8:10

**despite** [2] - 11:10, 15:17

**destruction** [1] - 18:8

**destructive** [1] - 20:3

**detached** [1] - 16:20

**detail** [2] - 4:16, 20:1

**detailed** [2] - 20:16, 42:8

**determine** [1] - 70:11

**determining** [1] - 70:15

**develop** [1] - 77:16

**dialogue** [1] - 39:15

**difference** [9] - 32:3, 45:24, 49:6, 49:9, 49:10, 49:13, 49:18, 82:25, 94:24

**different** [12] - 6:18, 10:23, 24:10, 29:5, 29:10, 29:11, 35:11, 45:8, 63:6, 83:3, 87:22, 96:12

**difficult** [1] - 24:12

**digit** [2] - 12:16, 12:17

**digress** [1] - 46:14

**diplomatic** [1] - 9:22

**direct** [2] - 35:6, 72:7

**directing** [3] - 41:18, 41:19, 67:11

**direction** [3] - 44:5, 66:21, 67:4

**directives** [1] - 8:20

**directly** [2] - 3:22, 72:21

**director** [1] - 14:6

**directors** [2] - 9:4, 55:10

**disagree** [3] - 84:9, 88:6, 89:7

**disassembled** [1] - 97:17

**discharge** [1] - 17:14

**discharged** [1] - 42:13

**discharges** [1] - 19:12

**disclosed** [4] - 33:21, 65:11, 79:1, 82:10

**disclosing** [4] - 31:24, 32:23, 39:2, 40:12

**disclosure** [5] - 4:25, 34:4, 34:6, 81:17, 81:19

**disconnect** [3] - 17:24, 40:22, 42:5

**disconnected** [1] - 80:20

**discovery** [1] - 37:21

**discrete** [2] - 93:10, 93:25

**discretion** [10] - 40:10, 55:6, 57:17, 63:14, 70:5, 70:6, 70:11, 70:12, 70:13, 71:1

**discretionary** [2] - 75:22, 91:15

**discrimination** [1] - 64:8

**discuss** [1] - 44:14

**discussed** [3] - 66:6, 83:6, 96:25

**discussing** [1] - 88:8

**discussions** [2] - 11:7, 45:21, 83:6

**dismantle** [1] - 69:15

**dismantling** [1] - 20:6

**disposition** [1] - 36:25

**dispute** [6] - 45:17, 48:7, 48:25, 49:2, 68:14, 68:15

**disputed** [2] - 36:9, 48:20

**disrupted** [1] - 28:23

**disruption** [3] - 20:12, 57:21, 71:8

**disseminate** [1] - 37:7

**dissents** [1] - 30:13

**dissolve** [3] - 56:15, 88:19, 93:21

**dissolving** [4] - 4:12, 56:17, 56:18, 56:19, 93:13, 93:18

**district** [6] - 30:2, 30:7, 30:9, 30:16, 53:2, 63:3

**District** [9] - 9:5, 23:4, 24:11, 25:4, 25:6

**DISTRICT** [3] - 1:1, 1:1, 1:8

**disturbed** [1] - 78:23

**disturbing** [3] - 34:1, 60:17, 79:16

**divided** [2] - 68:11, 69:8

**Division** [1] - 1:18

**docket** [3] - 26:11, 45:8, 64:16

**docketed** [1] - 18:21

**doctrine** [1] - 96:11

**documents** [1] - 41:23

**DoD** [1] - 9:14

**DOGE** [48] - 1:5, 2:3, 3:2, 3:17, 34:14, 34:21, 34:22, 37:8, 39:23, 45:9, 47:3, 47:22, 48:14, 48:16, 48:19, 48:21, 49:14, 49:23, 50:3, 51:16, 51:19, 52:18, 52:20, 52:24, 53:3, 53:6, 55:24, 61:15, 79:2, 80:23, 82:13, 82:17, 83:1, 83:18, 84:2, 84:4, 84:8, 84:13, 84:21, 85:17, 85:18, 85:20, 85:21, 85:22, 85:25

**Donald** [1] - 67:10

**donations** [1] - 12:7

**done** [17] - 11:7, 12:15, 28:8, 32:19, 39:16, 41:6, 43:20, 43:21, 59:11, 59:12, 67:5, 78:14, 81:6, 85:11, 85:19, 89:17, 90:25

**donor** [4] - 3:1, 14:19, 14:22, 22:12

**dotted** [1] - 24:5

**doubt** [1] - 48:7

**down** [16] - 4:11, 11:23, 14:9, 17:8, 36:22, 41:23, 59:14, 60:2, 60:19, 60:24, 77:22, 88:19, 89:3, 89:9, 89:13, 89:16

**drafting** [1] - 68:17

**draw** [1] - 76:22

**drew** [1] - 80:1

**drill** [1] - 11:7

**dry** [1] - 44:8

**dubious** [1] - 96:19

**duck** [6] - 15:24, 15:25, 84:14, 84:15

**duplicates** [1] - 58:9

**during** [4] - 4:16, 83:6, 83:7

**duties** [2] - 59:20, 91:22

**duty** [2] - 9:4, 58:25

**E**

**ECF** [1] - 18:21

**economic** [1] - 72:7

**edit** [1] - 23:1

**education** [1] - 88:9

**Education** [3] - 29:24, 30:3, 30:18

**eerie** [1] - 47:13

**effect** [9] - 20:11, 20:25, 23:24, 24:22, 26:23, 28:5, 63:19, 88:9, 96:24

**effectively** [2] - 4:11, 6:17

**effectuate** [1] - 43:25

**effectuating** [1] - 45:12

**efficiency** [1] - 90:7

**effort** [2] - 24:6, 34:12

**efforts** [3] - 15:10, 58:9, 69:15

**Eisenberg** [6] - 2:9, 5:20, 66:15, 73:9, 78:22, 93:8

**EISENBERG** [125] - 1:11, 2:8, 5:21, 6:1, 6:8, 6:12, 6:14, 6:20,

7:13, 8:18, 9:17, 11:1, 11:5, 11:18, 12:1, 12:20, 13:13, 13:24, 14:3, 14:14, 14:18, 14:20, 14:24, 15:3, 16:4, 16:16, 17:3, 17:7, 17:11, 17:21, 19:11, 20:23, 21:9, 21:19, 22:1, 22:15, 23:2, 23:9, 24:9, 25:2, 26:4, 26:22, 27:10, 28:1, 28:14, 29:4, 29:8, 29:10, 29:12, 29:15, 29:19, 29:22, 30:20, 31:6, 31:14, 31:21, 32:4, 33:1, 33:3, 34:7, 34:21, 37:11, 38:6, 39:7, 39:12, 40:3, 40:16, 40:18, 40:21, 40:24, 41:7, 42:11, 43:6, 43:23, 44:10, 44:16, 44:22, 45:14, 45:22, 46:5, 46:19, 46:22, 47:2, 47:17, 47:20, 48:2, 48:9, 48:12, 49:8, 49:10, 49:20, 50:7, 50:20, 51:1, 51:3, 51:8, 51:12, 52:22, 54:24, 55:20, 56:10, 56:18, 57:10, 58:6, 58:17, 59:4, 59:17, 59:25, 60:22, 61:1, 61:4, 61:12, 62:8, 62:20, 62:25, 63:11, 63:21, 64:6, 65:9, 93:9, 93:24, 94:10, 95:5, 95:10, 95:17

**either** [8] - 16:19, 17:16, 22:3, 26:10, 43:16, 51:24, 96:13, 96:14

**electoral** [1] - 94:9

**eligible** [1] - 21:11

**ELIZABETH** [1] - 97:11

**Elizabeth** [3] - 1:22, 20:2, 97:22

**email** [1] - 26:2

**emails** [1] - 3:5

**embraced** [2] - 16:8, 71:11

**emergency** [4] - 2:21, 3:25, 4:2, 65:15

**Emery** [2] - 1:12, 2:9

**emphasis** [1] - 18:17

**emphasize** [1] - 35:20

**employed** [4] - 28:11, 32:8, 35:13, 61:9

6

**employee** [9] - 8:3, 28:16, 32:20, 32:25, 37:9, 49:15, 81:20, 86:1, 90:7
**employees** [27] - 3:6, 5:1, 6:17, 9:20, 11:20, 14:17, 15:9, 18:24, 19:24, 21:22, 22:9, 22:14, 23:20, 27:2, 29:2, 31:1, 32:1, 32:16, 39:3, 50:18, 58:1, 59:19, 64:9, 71:18, 71:21, 72:3, 72:15
**employees'** [2] - 3:1, 4:24
**employer** [1] - 21:17
**employment** [2] - 19:3, 32:19
**employs** [1] - 6:15
**end** [2] - 56:1, 61:20
**ended** [1] - 61:21
**ending** [1] - 54:25
**endowment** [5] - 3:7, 25:14, 25:17, 41:12, 61:16
**energetic** [1] - 78:7
**enforce** [2] - 15:7, 67:12
**enforcement** [2] - 45:9, 68:2
**engages** [2] - 48:6, 94:2
**enjoined** [8] - 25:16, 27:1, 29:2, 30:1, 31:24, 32:23, 69:13, 71:19
**enjoining** [2] - 39:2, 40:12
**ensuring** [1] - 68:1
**enter** [1] - 23:3
**Enterprise** [1] - 10:4
**entire** [1] - 93:4
**entirety** [3] - 56:1, 56:2, 59:14
**entities** [8] - 48:6, 86:23, 86:25, 87:5, 87:13, 94:12, 94:13, 95:14
**entitled** [2] - 38:9, 38:10
**entitlement** [2] - 38:2, 38:7
**entity** [33] - 5:7, 8:9, 8:12, 10:16, 10:20, 12:16, 12:17, 13:2, 14:5, 15:5, 15:21, 15:23, 16:2, 16:12, 21:10, 24:16, 32:9, 34:8, 40:9, 47:5,

48:16, 51:16, 55:25, 56:14, 61:10, 86:20, 87:16, 94:25, 95:2, 95:19, 96:13, 96:18, 96:21
**entity-provided** [1] - 24:16
**enumerated** [1] - 52:4
**equal** [1] - 67:16
**equally** [1] - 8:20
**equipment** [2] - 26:16, 26:17
**escape** [1] - 52:9
**ESCHER** [30] - 1:16, 2:13, 65:25, 66:7, 66:9, 66:11, 66:25, 67:5, 82:21, 82:24, 83:2, 83:5, 83:12, 83:15, 83:25, 84:23, 85:5, 85:9, 85:15, 86:8, 86:14, 87:2, 87:19, 88:3, 88:21, 89:7, 89:12, 89:19, 90:2, 90:10
**Escher** [6] - 2:14, 69:1, 82:19, 82:20, 90:20, 90:21
**especially** [2] - 36:20, 65:13
**essentially** [5] - 13:4, 27:12, 55:25, 82:1, 92:20
**establish** [3] - 18:12, 78:13, 78:15
**established** [2] - 11:10, 15:21
**establishment** [5] - 86:17, 86:24, 88:5, 88:11, 94:25
**estate** [2] - 41:22, 42:7
**et** [6] - 1:3, 1:5, 2:3, 2:4, 11:12, 52:6
**evaluate** [3] - 49:25, 50:4, 63:15
**evaluating** [1] - 49:1
**event** [1] - 48:20
**events** [7] - 6:21, 6:22, 38:17, 45:2, 46:8, 47:13, 83:7
**evidence** [7] - 21:13, 80:11, 81:18, 83:9, 84:6, 90:24, 91:18
**evidentiary** [1] - 81:11
**ex** [3] - 3:3, 12:20, 48:22
**exacting** [1] - 79:22
**exactly** [3] - 51:1, 69:24, 75:18
**examines** [1] - 18:16
**examining** [1] - 43:17

**example** [5] - 43:24, 53:8, 87:9, 94:4, 95:20
**examples** [2] - 23:17, 54:12
**exception** [1] - 16:6
**excess** [1] - 52:3
**excuse** [1] - 96:12
**excused** [1] - 97:7
**executing** [1] - 50:17
**executive** [15] - 15:7, 15:8, 16:2, 16:6, 16:22, 27:21, 71:7, 75:5, 75:7, 86:16, 86:21, 87:25, 88:15, 88:16, 88:19, 94:6, 94:7, 95:3
**Executor** [4] - 16:7, 16:14, 16:23, 17:13
**exercise** [4] - 17:1, 17:4, 70:6, 71:7
**exercised** [1] - 71:12
**Exhibit** [1] - 39:18
**exhibit** [1] - 84:5
**exhibits** [3] - 84:1, 84:2, 84:3
**exist** [2] - 22:2, 94:10
**existed** [2] - 27:16, 53:6
**existing** [3] - 3:3, 46:7, 96:11
**exists** [4] - 10:11, 10:20, 45:16, 60:2
**expansive** [1] - 69:19
**expect** [5] - 45:3, 48:4, 57:1, 58:23, 59:13
**expectations** [1] - 19:24
**expedited** [4] - 5:11, 43:2, 90:25, 91:8
**experience** [1] - 34:9
**experienced** [3] - 28:9, 35:3, 40:5
**experiencing** [2] - 37:22, 38:23
**expertise** [3] - 53:19, 68:24, 79:9
**experts** [2] - 10:10, 36:17
**explain** [5] - 33:15, 34:3, 42:10, 63:24, 85:23
**explaining** [2] - 45:23, 58:24
**exposing** [4] - 20:7, 33:6, 37:14, 37:18
**exposure** [1] - 36:16
**extend** [1] - 25:10
**extended** [1] - 30:1
**extent** [10] - 15:11,

27:20, 30:23, 32:11, 42:15, 51:18, 52:1, 52:7, 91:25, 95:25
**extraordinary** [1] - 73:18
**extremely** [1] - 36:19
**eyebrow** [1] - 33:23
**eyebrow-raising** [1] - 33:23

## F

**fabric** [2] - 8:13, 10:16
**face** [3] - 35:21, 36:5, 69:14
**faced** [1] - 80:14
**facilitate** [3] - 9:1, 28:19, 39:15
**facing** [2] - 73:17, 80:8
**fact** [21] - 9:18, 11:21, 17:12, 18:3, 33:23, 48:22, 60:10, 64:14, 67:9, 67:20, 67:22, 68:13, 68:14, 68:18, 68:19, 71:4, 76:15, 78:4, 89:8, 93:16, 95:24
**factor** [1] - 71:3
**factors** [2] - 15:17, 71:4
**facts** [22] - 3:17, 5:8, 5:16, 5:24, 6:24, 7:1, 7:2, 7:7, 7:15, 11:13, 11:18, 35:6, 36:13, 37:20, 39:10, 53:5, 57:10, 61:1, 61:4, 62:2, 96:4, 96:8
**factual** [6] - 3:20, 5:8, 48:25, 52:15, 59:21, 75:10
**factually** [1] - 44:24
**failing** [1] - 77:4
**failure** [4] - 78:13, 78:16, 80:25, 92:3
**fair** [1] - 14:4
**fairly** [5] - 7:10, 25:18, 62:13, 78:24, 86:4
**faith** [2] - 34:5, 36:2
**fall** [6] - 16:13, 55:15, 86:21, 86:25, 87:16, 88:15
**falling** [2] - 7:6, 87:6
**falls** [5] - 7:1, 7:9, 16:6, 86:20, 87:25
**familiar** [9] - 5:4, 5:6, 5:7, 6:4, 6:20, 18:3, 21:8, 44:25, 63:20
**familiarity** [1] - 63:8
**family** [2] - 20:9, 35:4

**family's** [1] - 35:18
**far** [4] - 22:4, 22:5, 64:21, 64:22
**favorable** [1] - 36:25
**FBI** [1] - 46:10
**FCRR** [3] - 1:22, 97:11, 97:22
**federal** [25] - 10:12, 14:4, 15:19, 15:20, 15:21, 15:23, 16:2, 27:7, 30:15, 50:3, 58:10, 61:17, 67:11, 67:15, 67:16, 86:20, 86:23, 86:25, 87:8, 87:13, 87:16, 94:3, 94:4, 95:2, 96:18
**Federal** [11] - 52:25, 62:15, 63:25, 66:18, 67:15, 68:2, 68:5, 69:10, 70:22, 73:16, 73:20
**federally** [1] - 10:19
**few** [4] - 59:25, 63:18, 93:10, 93:25
**fiduciary** [1] - 9:4
**field** [6] - 10:8, 10:15, 34:9, 40:5, 55:11
**figure** [3] - 6:6, 25:25, 31:13
**file** [3] - 92:21, 93:5
**filed** [5] - 3:16, 5:6, 5:13, 30:6, 41:14
**filing** [2] - 24:7, 65:3
**final** [6] - 16:13, 49:1, 53:16, 54:5, 69:22
**financial** [2] - 26:7, 67:12
**fingerprints** [1] - 60:7
**finished** [1] - 31:19
**fire** [2] - 11:7, 59:14
**fire-drill** [1] - 11:7
**fired** [7] - 11:21, 11:22, 55:25, 56:2, 57:11, 61:18, 91:16
**fires** [1] - 38:13
**firing** [1] - 61:20
**firm** [1] - 95:2
**First** [1] - 30:9
**first** [23] - 2:7, 3:16, 3:21, 4:4, 5:5, 5:13, 18:23, 20:23, 22:17, 41:14, 45:8, 51:13, 53:12, 58:11, 60:1, 60:13, 62:21, 63:9, 69:23, 74:10, 76:22, 83:23, 93:12
**firsthand** [1] - 74:7
**fits** [1] - 96:10
**five** [2] - 22:18, 82:2
**five-month** [1] - 82:2

7

**fleshed** [1] - 90:13
**flippancy** [3] - 79:7, 79:14, 80:24
**flippant** [4] - 37:4, 78:24, 79:20, 80:7
**flipping** [1] - 37:24
**Floor** [1] - 1:12
**flouting** [1] - 20:7
**flowed** [2] - 14:9, 19:22
**flowing** [1] - 20:4
**flows** [1] - 54:19
**focus** [3] - 48:11, 48:15, 51:14
**focusing** [1] - 96:17
**FOIA** [1] - 52:25
**folks** [2] - 30:25, 65:16
**follow** [1] - 96:15
**following** [4] - 36:4, 43:11, 70:15, 89:13
**FOR** [3] - 1:1, 1:10, 1:15
**for-cause** [1] - 4:6
**forced** [1] - 22:22
**foregoing** [1] - 97:12
**Foreign** [1] - 10:3
**foreign** [4] - 10:14, 40:6, 88:12, 88:13
**form** [3] - 11:24, 24:21, 85:20
**former** [9] - 3:13, 5:1, 21:17, 22:13, 31:25, 32:20, 32:24, 39:3, 81:20
**forth** [1] - 20:18
**forum** [1] - 13:21
**forward** [7] - 2:5, 62:1, 70:21, 71:3, 71:4, 90:23, 90:24
**founded** [1] - 47:7
**founder** [2] - 81:25, 82:7
**frankly** [2] - 19:22, 45:17
**fraud** [1] - 27:5
**fraudulent** [2] - 33:9, 34:15
**friend** [1] - 68:25
**front** [7] - 11:4, 22:20, 28:10, 36:7, 36:13, 41:15, 92:7
**FTC** [1] - 16:23
**fulfill** [1] - 19:12
**fulfilling** [4] - 76:11, 78:7, 78:11, 91:10
**full** [4] - 23:22, 57:1, 63:14, 97:13
**fully** [3] - 16:8, 71:12, 95:21
**fulsome** [2] - 62:3,

75:18
**function** [7] - 19:9, 32:8, 44:2, 75:3, 76:10, 77:4, 77:5
**functional** [1] - 13:2
**functionally** [1] - 31:1
**functioning** [3] - 13:2, 76:19, 96:20
**functions** [10] - 74:20, 74:21, 75:8, 88:14, 88:16, 90:4, 90:18, 91:7, 91:8, 91:24
**Fund** [1] - 54:9
**fundamental** [1] - 94:19
**funded** [2] - 10:25, 12:8
**funding** [1] - 94:14
**funds** [2] - 14:22, 47:12
**furiously** [1] - 76:1
**future** [1] - 95:22

## G

**Gandhi** [8] - 12:25, 56:4, 57:15, 76:18, 77:6, 91:13, 92:8
**Gandhi-King** [6] - 12:25, 56:4, 57:15, 77:6, 91:13, 92:8
**garde** [1] - 9:11
**gathering** [1] - 70:1
**General** [2] - 41:9, 67:14
**generally** [1] - 5:7
**Generation** [9] - 28:16, 39:8, 39:13, 39:18, 39:19, 39:25, 40:1, 40:4, 82:1
**Girl** [4] - 94:6, 94:16, 94:24, 95:20
**given** [5] - 5:10, 13:19, 22:5, 30:12, 40:23, 87:19, 87:23
**goals** [2] - 8:24, 45:12
**government** [72] - 8:21, 8:23, 9:2, 9:24, 10:12, 10:24, 10:25, 11:11, 11:12, 12:6, 15:17, 15:19, 15:20, 22:4, 35:22, 36:9, 37:17, 45:5, 45:17, 47:5, 47:7, 47:8, 47:12, 48:4, 50:13, 52:18, 53:23, 55:16, 56:24, 58:13, 58:24, 63:4, 63:10, 63:16, 63:17, 64:2, 64:4, 64:14, 64:18, 64:23,

64:24, 65:24, 66:24, 67:2, 70:18, 71:17, 72:1, 73:22, 76:2, 76:10, 78:25, 84:18, 86:18, 87:1, 87:3, 87:7, 87:12, 87:17, 87:22, 88:17, 94:3, 94:4, 95:1, 95:15, 96:14, 96:18, 97:4
**government's** [16] - 20:20, 21:4, 21:12, 27:19, 33:17, 37:3, 37:11, 62:13, 67:17, 70:14, 71:13, 73:7, 78:9, 78:24, 82:16, 83:8
**government-controlled** [1] - 86:18
**governmental** [1] - 51:25
**grand** [2] - 87:8, 87:11
**grant** [2] - 18:17, 94:14
**granted** [3] - 62:16, 62:17, 66:18
**grantees** [3] - 5:2, 32:1, 39:4
**grants** [1] - 47:8
**grave** [1] - 35:17
**great** [6] - 20:1, 44:16, 64:12, 70:5, 72:8, 82:9
**greater** [1] - 17:12
**ground** [4] - 5:16, 31:2, 31:3, 35:8
**grounds** [1] - 52:16
**Group** [2] - 47:4, 47:23
**group** [2] - 29:9, 92:7
**groups** [1] - 35:23
**GSA** [14] - 19:6, 41:15, 41:17, 41:18, 41:19, 41:22, 49:14, 49:15, 55:1, 56:17, 61:11, 86:1, 86:2
**guarantees** [1] - 67:12
**guess** [3] - 32:2, 62:13, 96:3
**guide** [1] - 35:5
**guided** [1] - 7:15
**gun** [1] - 43:5
**guy** [5] - 11:16, 33:24, 48:1, 56:9, 85:24

## H

**halting** [1] - 4:21
**hand** [1] - 46:24
**handle** [1] - 66:2

**handled** [2] - 65:3, 74:4
**happy** [4] - 44:17, 66:3, 69:6, 79:5, 79:17, 81:7
**harassed** [1] - 36:2
**hard** [2] - 64:14, 85:14
**harm** [27] - 14:8, 14:9, 19:18, 19:20, 28:9, 36:23, 37:12, 37:22, 39:6, 40:15, 40:19, 42:8, 63:15, 63:16, 66:1, 68:25, 69:14, 70:23, 72:13, 78:19, 80:4, 80:19, 92:4, 92:11, 92:12, 92:24
**harmed** [3] - 15:9, 38:16, 64:8
**harmful** [1] - 37:15
**harming** [2] - 76:11, 78:16
**harms** [5] - 17:25, 18:14, 19:21, 38:22, 38:23
**head** [1] - 76:5
**headed** [1] - 84:18
**headquarters** [2] - 13:3, 41:10
**heads** [1] - 67:14
**health** [8] - 10:15, 10:17, 19:2, 20:13, 20:17, 24:15, 24:16, 71:24
**Health** [1] - 10:18
**hear** [1] - 14:1
**heard** [1] - 65:21
**HEARING** [1] - 1:7
**hearing** [5] - 4:17, 13:23, 38:21, 90:11, 91:9
**hearings** [2] - 5:10, 6:25
**height** [1] - 75:1
**helm** [1] - 40:6
**help** [9] - 8:11, 8:15, 19:8, 29:21, 42:2, 44:3, 49:24, 50:3, 50:4
**hereby** [1] - 97:11
**high** [1] - 44:7
**highly** [2] - 90:25, 91:8
**hire** [2] - 38:12, 58:2
**hired** [1] - 44:3
**historical** [1] - 48:5
**history** [1] - 46:10
**hoist** [1] - 52:13
**hoists** [1] - 50:13
**hold** [2] - 23:23, 31:9
**home** [1] - 57:4

**honest** [4] - 17:23, 37:4, 49:23, 78:23
**Honor** [94] - 2:2, 2:8, 2:13, 5:21, 5:23, 6:20, 7:13, 8:18, 9:17, 11:5, 12:5, 13:13, 13:24, 14:14, 14:18, 14:20, 14:24, 15:3, 16:16, 19:11, 21:19, 22:15, 23:2, 24:9, 24:24, 25:2, 26:4, 26:22, 27:10, 28:1, 28:14, 29:4, 29:12, 29:15, 30:20, 31:14, 31:21, 33:1, 34:7, 38:6, 39:7, 39:12, 40:21, 40:24, 41:7, 42:11, 43:6, 43:23, 44:10, 46:20, 48:9, 49:11, 49:20, 50:7, 51:8, 52:22, 54:24, 55:20, 57:10, 58:6, 59:17, 59:25, 61:1, 62:20, 63:11, 64:6, 65:25, 68:7, 68:13, 68:18, 68:24, 69:18, 70:21, 71:1, 71:2, 73:5, 73:8, 73:15, 73:25, 76:1, 76:24, 78:10, 79:5, 80:21, 81:7, 82:21, 82:24, 88:25, 90:17, 92:23, 93:9, 95:6, 95:17
**Honor's** [2] - 12:10, 72:18
**HONORABLE** [1] - 1:8
**hot** [1] - 82:18
**House** [9] - 3:6, 62:14, 66:21, 67:4, 67:6, 67:7, 67:9, 67:20, 67:25
**House's** [1] - 68:6
**housing** [1] - 14:4
**HOWELL** [1] - 1:8
**HR** [1] - 12:22
**Human** [1] - 10:18
**humility** [1] - 53:19
**Humphrey's** [4] - 16:7, 16:14, 16:23, 17:13
**hundred** [1] - 58:1
**hundreds** [1] - 22:13
**hurray** [1] - 65:7

## I

**idea** [1] - 45:14
**identical** [1] - 3:17
**identified** [6] - 8:14,

8

9:9, 34:14, 35:1, 55:3, 79:25
**identify** [2] - 2:6, 23:14
**identifying** [2] - 55:2, 79:25
**identities** [1] - 39:21
**identity** [9] - 31:25, 32:24, 33:7, 33:8, 33:20, 35:11, 39:3, 40:13, 80:12
**III** [2] - 1:16, 52:14
**illegal** [1] - 33:9
**illness** [1] - 20:15
**imagine** [1] - 64:23
**immigration** [2] - 19:2, 64:17
**imminent** [2] - 82:10, 92:4
**impact** [1] - 31:7
**impacted** [1] - 24:18
**impacting** [1] - 24:22
**impingement** [1] - 71:6
**implement** [1] - 78:8
**implementation** [1] - 54:4
**implemented** [1] - 59:2
**implementing** [2] - 62:13, 75:21
**implicates** [1] - 57:22
**important** [4] - 9:12, 10:16, 27:14, 65:19
**importantly** [2] - 77:15, 78:4
**imposed** [1] - 63:22
**impossible** [1] - 24:13
**imputing** [1] - 33:8
**in-person** [1] - 13:1
**inappropriate** [1] - 72:12
**inaugural** [1] - 94:4
**inauguration** [1] - 94:5
**Inc** [1] - 25:3
**incident** [1] - 33:18
**inclined** [1] - 42:15
**include** [2] - 25:19, 33:3
**included** [3] - 34:22, 74:5, 74:6
**includes** [1] - 70:12
**including** [8] - 3:18, 23:21, 24:11, 31:16, 36:17, 41:9, 44:3, 58:10
**inclusion** [1] - 73:15
**income** [2] - 19:21, 20:13

**inconsistent** [3] - 34:15, 59:9, 59:10
**increasing** [1] - 36:1
**incredible** [1] - 64:10
**incurable** [2] - 20:14, 20:15
**independence** [2] - 16:11, 88:8
**Independent** [2] - 47:3, 47:23
**independent** [22] - 8:9, 9:3, 9:9, 10:1, 10:5, 10:6, 10:12, 10:20, 11:12, 15:16, 15:19, 16:20, 55:9, 55:10, 85:10, 88:5, 94:13, 94:21, 95:19, 95:24, 96:1, 96:13
**independently** [1] - 10:2
**indicate** [2] - 60:18, 80:12
**indicated** [1] - 80:11
**indicates** [1] - 73:2
**indicating** [1] - 80:13
**indication** [8] - 37:5, 74:18, 75:10, 77:14, 77:19, 78:18, 81:23
**indications** [1] - 75:12
**individual** [7] - 34:5, 43:18, 55:13, 78:17, 79:25, 80:1, 80:14
**individual's** [5] - 79:21, 80:5, 80:12, 80:25, 82:7
**individualized** [1] - 23:14
**individuals** [8] - 32:7, 35:22, 51:18, 72:21, 74:17, 77:18, 78:5, 91:22
**indulge** [1] - 6:23
**ineducable** [1] - 20:10
**inelegant** [1] - 52:10
**inference** [2] - 60:20, 76:22
**inferences** [1] - 76:15
**inflict** [1] - 36:23
**information** [22] - 5:1, 28:21, 31:25, 32:24, 33:6, 37:5, 39:2, 39:20, 40:12, 60:4, 70:1, 74:12, 79:10, 80:3, 81:14, 81:17, 81:19, 81:22, 81:24, 82:4, 82:8, 82:10
**infringe** [1] - 27:18
**initial** [1] - 44:21
**injunction** [9] - 4:21, 19:17, 22:24, 23:12,

30:2, 39:1, 67:18, 71:5, 73:18
**injunctions** [3] - 30:14, 67:13, 81:16
**injunctive** [8] - 25:9, 39:5, 62:15, 62:17, 66:17, 66:23, 73:11
**injury** [3] - 18:3, 18:10, 18:18
**inquire** [1] - 47:12
**instances** [1] - 96:5
**instead** [1] - 3:23
**Institute** [71] - 2:23, 3:8, 4:3, 5:5, 6:14, 6:22, 7:2, 7:16, 8:2, 8:8, 8:12, 8:19, 8:24, 9:8, 9:14, 9:20, 10:4, 11:20, 12:5, 15:4, 15:6, 16:20, 19:13, 19:22, 19:25, 20:8, 21:5, 22:2, 22:6, 27:14, 28:17, 28:22, 34:7, 34:10, 34:17, 35:13, 35:17, 35:19, 36:17, 36:23, 38:9, 38:10, 38:11, 40:7, 41:14, 45:18, 46:8, 47:5, 47:11, 51:25, 55:24, 56:5, 56:13, 58:9, 59:11, 60:1, 60:5, 61:8, 61:10, 61:16, 77:9, 77:24, 82:3, 83:9, 83:17, 83:19, 84:5, 84:7, 94:12, 95:19, 95:23
**institute** [115] - 3:1, 3:4, 3:6, 3:7, 3:11, 3:18, 4:9, 4:12, 4:13, 4:22, 4:23, 5:2, 5:6, 6:17, 7:10, 11:10, 11:17, 12:18, 13:10, 14:22, 18:8, 18:24, 19:8, 19:11, 20:5, 21:24, 22:9, 25:14, 25:15, 25:17, 26:7, 26:14, 26:21, 26:25, 27:1, 29:1, 29:2, 32:20, 32:21, 33:20, 33:25, 34:5, 37:9, 38:3, 38:4, 38:13, 40:14, 41:10, 41:11, 42:23, 43:12, 43:20, 44:2, 44:4, 45:13, 45:20, 45:25, 46:1, 47:15, 48:8, 48:17, 48:21, 48:24, 49:16, 49:17, 50:9, 50:10, 50:13, 50:14, 50:17, 50:24, 53:11, 54:14, 55:18, 56:21, 57:2,

57:25, 59:18, 60:16, 60:23, 69:15, 71:21, 72:19, 74:15, 74:17, 74:19, 77:16, 79:8, 79:12, 83:23, 85:8, 85:11, 85:12, 85:13, 85:18, 85:19, 85:20, 86:3, 86:16, 86:20, 87:20, 87:24, 88:4, 88:11, 88:20, 89:4, 89:5, 89:8, 89:12, 89:15, 89:25, 90:2, 90:9, 95:13
**institute's** [15] - 2:25, 4:5, 4:10, 5:2, 5:9, 5:10, 15:16, 33:20, 42:21, 58:4, 74:12, 75:23, 89:23, 89:24, 90:6
**institutes's** [1] - 25:15
**Institution** [1] - 10:3
**institution** [2] - 10:19, 60:2
**institutional** [1] - 35:19
**instructed** [1] - 67:6
**instruction** [1] - 62:14
**instructs** [1] - 67:13
**insurance** [6] - 19:2, 20:13, 20:17, 24:15, 24:16, 71:24
**intended** [2] - 63:6, 80:17
**intending** [1] - 28:5
**intent** [2] - 79:19, 79:20
**intention** [4] - 27:23, 28:2, 33:5, 33:11
**interagency** [1] - 42:7
**interchange** [1] - 78:22
**interest** [2] - 28:7, 57:22
**internally** [2] - 59:9, 59:10
**international** [2] - 10:8, 64:9
**interpretations** [1] - 41:2
**interrogated** [1] - 36:2
**interrupting** [1] - 13:25
**interruption** [1] - 17:2
**intimate** [2] - 36:15, 36:16
**intimidate** [1] - 65:16
**intruding** [1] - 27:21
**invited** [1] - 73:19
**invoked** [1] - 66:22
**involved** [8] - 24:4,

27:7, 39:22, 42:6, 49:3, 54:1, 54:6, 54:8
**involving** [2] - 14:4, 66:22
**irrational** [1] - 51:24
**irreparable** [8] - 37:12, 68:25, 72:13, 78:19, 92:4, 92:11, 92:12, 92:24
**irreparably** [2] - 76:11, 78:16
**issue** [32] - 7:11, 11:3, 11:8, 13:17, 13:22, 15:18, 16:18, 22:16, 23:5, 23:7, 23:16, 31:8, 43:16, 47:16, 52:5, 52:13, 54:17, 55:20, 56:8, 58:21, 62:7, 63:2, 64:15, 64:17, 65:10, 65:21, 84:11, 86:15, 88:21, 88:25, 95:12, 95:16
**issued** [4] - 30:2, 32:13, 67:18, 67:23
**issues** [9] - 5:18, 10:17, 15:13, 24:9, 25:8, 68:25, 88:9, 88:24
**item** [1] - 86:4
**iterated** [1] - 23:3
**itself** [4] - 3:6, 51:16, 56:15, 93:13

## J

**Jackson** [11] - 3:8, 4:3, 5:5, 7:23, 7:24, 30:14, 41:14, 53:12, 83:22, 84:2, 84:20
**jarring** [1] - 6:21
**Jennings** [2] - 54:25, 55:4
**jeopardizing** [1] - 23:15
**jerked** [1] - 20:17
**job** [5] - 22:21, 32:18, 35:22, 53:18, 88:8
**jobs** [2] - 19:21, 32:17
**JOHNNY** [1] - 1:16
**Johnny** [3] - 2:15, 2:18, 66:2
**johnny.walker@ usdoj.gov** [1] - 1:20
**journalists** [1] - 65:14
**Jr** [1] - 2:18
**judge** [5] - 3:23, 65:4, 65:6, 65:8
**JUDGE** [1] - 1:8
**judges** [1] - 27:7

9

**judgment** [15] - 5:11, 7:22, 11:4, 43:3, 46:2, 56:25, 57:7, 58:21, 75:17, 75:25, 76:3, 85:23, 90:13, 91:5, 95:6
**judgments** [1] - 55:10
**judicial** [4] - 7:25, 46:25, 54:11, 87:9
**jump** [1] - 43:5
**juncture** [1] - 89:18
**juries** [2] - 87:8, 87:11
**jurisprudence** [2] - 16:7, 16:24
**Justice** [2] - 1:17, 77:24
**justiciable** [2] - 53:15, 55:19

## K

**keep** [5] - 6:5, 29:21, 37:24, 54:18, 82:23
**kept** [1] - 79:10
**Ketanji** [1] - 30:13
**key** [1] - 46:12
**kind** [3] - 80:9, 80:14, 86:20
**King** [6] - 12:25, 56:4, 57:15, 77:6, 91:13, 92:8
**knowing** [2] - 39:20
**known** [1] - 35:11
**knows** [1] - 19:17

## L

**labor** [1] - 22:23
**labyrinth** [1] - 51:21
**lack** [3] - 36:3, 52:15, 79:9
**laid** [2] - 35:14, 90:18
**landed** [2] - 45:8, 46:3
**language** [4] - 25:18, 25:20, 27:25, 32:13
**largely** [1] - 69:17
**last** [6] - 29:25, 41:20, 41:24, 46:15, 47:21, 82:3
**law** [15] - 16:7, 18:2, 36:22, 37:18, 37:19, 43:1, 45:9, 50:22, 50:25, 53:21, 64:11, 65:17, 70:9, 91:6, 96:22
**lawful** [3] - 4:20, 26:8, 42:22
**laws** [2] - 9:5, 57:16
**lawsuit** [4] - 70:25, 83:22, 83:23

**lawsuits** [1] - 70:17
**lawyer** [1] - 64:7
**lay** [2] - 55:13, 63:6
**lead** [3] - 61:23, 71:23, 92:10
**leadership** [9] - 3:19, 40:9, 47:10, 47:11, 55:18, 55:24, 61:18, 85:11
**leading** [1] - 92:4
**learning** [1] - 5:15
**least** [7] - 15:12, 24:6, 24:19, 45:7, 70:9, 89:18, 90:4
**leave** [9] - 19:1, 19:7, 23:18, 23:21, 36:5, 42:5, 44:6, 71:22, 72:3
**leaving** [1] - 30:11
**lectern** [1] - 2:6
**led** [1] - 80:3
**left** [3] - 12:18, 26:20, 66:15
**legal** [13] - 5:8, 5:18, 7:10, 59:22, 60:15, 60:21, 70:17, 80:21, 80:22, 88:21, 89:19, 92:15, 96:19
**legality** [1] - 54:19
**less** [3] - 11:7, 76:21, 96:1
**letter** [11] - 30:21, 31:7, 31:17, 33:4, 55:1, 56:16, 58:8, 58:15, 61:11, 75:9, 90:18
**level** [2] - 43:25, 44:1
**liability** [3] - 38:22, 52:9, 60:9
**Libya** [7] - 6:3, 9:21, 9:22, 35:12, 36:8, 36:11, 39:6
**Libyan** [2] - 28:10, 29:14
**likelihood** [9] - 16:17, 16:19, 17:17, 36:1, 59:6, 59:16, 59:22, 60:21, 66:4
**likely** [2] - 18:17, 18:18
**limit** [3] - 33:12, 41:1, 97:2
**limited** [12] - 9:24, 10:14, 19:20, 20:12, 24:13, 30:25, 31:10, 40:12, 69:20, 70:2, 77:8, 88:22
**line** [2] - 24:5, 86:13
**list** [2] - 11:23, 51:6
**literal** [1] - 27:25

**literally** [1] - 25:20
**litigation** [1] - 19:3
**lives** [2] - 20:12, 71:23
**living** [1] - 9:10
**look** [5] - 15:23, 58:6, 72:2, 79:3, 87:8
**looked** [2] - 37:20, 71:16
**looking** [5] - 32:17, 62:1, 67:9, 72:14
**looks** [1] - 16:21
**lose** [3] - 38:3, 51:4, 70:19
**losing** [1] - 35:21
**losses** [2] - 62:23, 62:25
**lost** [4] - 19:20, 20:13, 35:16, 35:18
**Lowenger** [1] - 81:20

## M

**Maazel** [2] - 1:12, 2:10
**machine** [1] - 1:24
**main** [1] - 39:4
**majority** [2] - 30:10, 71:11
**majority's** [1] - 30:12
**malfeasance** [1] - 27:5
**man** [1] - 68:10
**management** [2] - 45:20, 46:1
**Management** [1] - 3:4
**mandate** [1] - 59:13
**mandated** [7] - 8:21, 44:4, 74:22, 75:22, 91:14, 91:15, 91:18
**mandates** [2] - 4:13, 89:25
**mandating** [1] - 67:12
**manner** [3] - 8:23, 61:24, 97:18
**map** [1] - 96:7
**March** [10] - 11:22, 18:25, 22:10, 23:9, 25:4, 42:22, 67:10, 67:21, 67:23, 73:4
**Maryland** [2] - 23:5, 25:4
**match** [1] - 39:6
**material** [1] - 97:6
**materials** [4] - 77:19, 78:3, 96:24, 97:2
**matter** [13] - 3:21, 8:1, 16:10, 48:25, 50:12, 51:15, 59:21, 59:22, 60:15, 60:21, 84:21, 87:11, 91:6
**mean** [25] - 7:8, 12:15, 13:1, 18:1, 19:25,

21:7, 22:3, 22:10, 33:13, 44:6, 46:7, 46:13, 48:10, 49:13, 49:23, 52:17, 56:24, 57:7, 60:15, 64:16, 72:19, 78:22, 80:7, 87:8, 92:17
**meaning** [1] - 45:19
**means** [6] - 15:24, 23:14, 31:13, 50:4, 56:25, 57:3
**measured** [1] - 71:22
**mediate** [1] - 8:15
**medical** [1] - 10:17
**member** [2] - 55:14, 80:23
**members** [22] - 3:3, 3:10, 4:5, 4:19, 5:9, 12:21, 13:8, 13:19, 17:15, 22:18, 22:19, 32:5, 34:8, 36:22, 38:18, 42:22, 43:12, 45:19, 48:22, 56:5, 61:19, 96:18
**members'** [1] - 43:16
**memo** [2] - 68:21, 68:22
**memorable** [2] - 2:16, 68:10
**memorandum** [4] - 67:11, 67:13, 67:22, 68:1
**mention** [1] - 30:18
**mentioned** [4] - 17:23, 47:25, 60:17, 76:24
**mere** [3] - 22:7, 60:10, 93:16
**merits** [8] - 16:19, 17:17, 59:7, 66:3, 66:4, 66:12, 69:1, 72:12
**message** [1] - 81:7
**messed** [1] - 67:24
**messy** [2] - 49:4, 49:22
**method** [1] - 45:12
**micromanagers** [1] - 53:18
**micromanaging** [1] - 27:3
**microphone** [2] - 74:23, 83:14
**middle** [2] - 31:2, 31:3
**midnight** [1] - 11:23
**might** [6] - 19:5, 22:20, 32:17, 41:24, 45:3, 64:23
**militia** [1] - 35:23
**million** [3] - 41:22, 63:4, 65:14

**millions** [1] - 72:5
**mind** [1] - 45:14
**mine** [1] - 65:8
**minima** [2] - 56:22, 90:6
**minimal** [2] - 43:25, 44:1
**minimum** [5] - 21:6, 21:10, 74:20, 75:8, 90:4
**minute** [2] - 6:23, 39:9
**minutes** [1] - 41:24
**misconduct** [2] - 51:23, 52:8
**missing** [1] - 59:24
**mission** [5] - 9:9, 10:1, 19:9, 19:12, 60:4
**mistrust** [1] - 82:6
**misunderstanding** [1] - 51:2
**mitigation** [1] - 21:15
**modify** [1] - 30:24
**moment** [1] - 60:7
**Monday** [1] - 46:19
**monetary** [1] - 25:19
**money** [6] - 25:22, 25:24, 26:9, 34:16, 34:17, 61:15
**monitor** [1] - 54:3
**month** [1] - 82:2
**months** [1] - 22:5
**Moose** [1] - 3:14
**morning** [6] - 2:6, 2:8, 2:12, 2:13, 2:19, 5:21
**Morse** [1] - 3:5
**most** [4] - 27:6, 48:6, 61:21, 87:24
**mostly** [1] - 30:13
**motion** [1] - 5:15
**MOTION** [1] - 1:7
**motions** [1] - 65:3
**motivation** [2] - 70:24, 73:19
**move** [3] - 38:25, 83:14, 94:15
**moving** [1] - 91:4
**MR** [191] - 2:8, 2:13, 2:18, 5:21, 6:1, 6:8, 6:12, 6:14, 6:20, 7:13, 8:18, 9:17, 11:1, 11:5, 11:18, 12:1, 12:20, 13:13, 13:24, 14:3, 14:14, 14:18, 14:20, 14:24, 15:3, 16:4, 16:16, 17:3, 17:7, 17:11, 17:21, 19:11, 20:23, 21:9, 21:19, 22:1,

10

22:15, 23:2, 23:9,
24:9, 25:2, 26:4,
26:22, 27:10, 28:1,
28:14, 29:4, 29:8,
29:10, 29:12, 29:15,
29:19, 29:22, 30:20,
31:6, 31:14, 31:21,
32:4, 33:1, 33:3,
34:7, 34:21, 37:11,
38:6, 39:7, 39:12,
40:3, 40:16, 40:18,
40:21, 40:24, 41:7,
42:11, 43:6, 43:23,
44:10, 44:16, 44:22,
45:14, 45:22, 46:5,
46:19, 46:22, 47:2,
47:17, 47:20, 48:2,
48:9, 48:12, 49:8,
49:10, 49:20, 50:7,
50:20, 51:1, 51:3,
51:8, 51:12, 52:22,
54:24, 55:20, 56:10,
56:18, 57:10, 58:6,
58:17, 59:4, 59:17,
59:25, 60:22, 61:1,
61:4, 61:12, 62:8,
62:20, 62:25, 63:11,
63:21, 64:6, 65:9,
65:25, 66:7, 66:9,
66:11, 66:25, 67:5,
68:7, 68:9, 68:11,
68:22, 68:24, 69:6,
69:17, 69:24, 70:20,
72:6, 72:23, 72:25,
73:8, 73:15, 73:24,
74:3, 74:9, 74:16,
74:25, 75:13, 75:25,
76:6, 76:23, 77:23,
78:1, 78:9, 79:5,
79:13, 79:17, 81:6,
81:10, 82:18, 82:21,
82:24, 83:2, 83:5,
83:12, 83:15, 83:25,
84:23, 85:5, 85:9,
85:15, 86:8, 86:14,
87:2, 87:19, 88:3,
88:21, 89:7, 89:12,
89:19, 90:2, 90:10,
90:16, 91:20, 92:9,
92:17, 93:3, 93:9,
93:24, 94:10, 95:5,
95:10, 95:17
**multimember** [2] -
  16:25, 17:3
**multiple** [3] - 13:14,
  23:17, 41:2
**multiply** [1] - 72:4
**Musk** [1] - 23:6
**must** [6] - 2:17, 78:15,
  86:25, 87:3, 87:16,

89:23
**mutually** [1] - 8:23
**Myers** [2] - 16:8, 16:22

## N

**name** [6] - 2:16, 24:5,
  37:8, 76:17, 79:1,
  90:7
**named** [4] - 49:16,
  50:8, 50:9, 81:20
**names** [1] - 68:10
**naming** [2] - 50:11,
  52:11
**narrow** [1] - 44:11
**narrower** [1] - 41:3
**narrowly** [1] - 40:25
**Nate** [2] - 47:24, 55:1
**nationality** [1] - 6:18
**nature** [4] - 7:10,
  10:23, 69:17, 88:14
**necessarily** [3] -
  19:20, 60:9, 66:11
**necessary** [6] - 23:22,
  55:11, 74:19, 75:4,
  82:11, 88:24
**need** [19] - 9:10, 10:6,
  14:8, 47:19, 56:15,
  57:13, 57:14, 57:19,
  59:4, 59:5, 59:6,
  69:3, 75:14, 76:2,
  76:9, 81:4, 91:20,
  91:21, 95:21
**needs** [2] - 54:16,
  80:10
**new** [13] - 2:23, 2:24,
  8:3, 27:1, 29:2,
  32:18, 55:18, 63:25,
  67:4, 73:10, 73:14,
  85:11, 92:21
**New** [3] - 1:13, 17:5
**news** [1] - 46:18
**next** [8] - 25:13, 26:24,
  31:22, 41:8, 42:20,
  43:10, 69:2, 95:6
**night** [2] - 46:16,
  47:21
**NLRB** [1] - 16:23
**nobody** [1] - 58:20
**non** [1] - 77:3
**nonarbitrary** [1] -
  11:24
**noncitizens** [1] - 6:15
**none** [2] - 14:12, 92:6
**nonetheless** [2] -
  44:14, 44:18
**nongovernmental** [1]
  - 51:25
**nonjudiciable** [1] -
  53:22

**nonoperation** [1] -
  78:19
**Nonprofit** [2] - 47:4,
  47:23
**nonprofit** [1] - 9:4,
  39:13
**normally** [1] - 86:17
**norms** [2] - 20:7, 48:5
**note** [1] - 93:4
**notes** [1] - 97:13
**nothing** [2] - 61:22,
  76:12
**notice** [3] - 7:25, 11:8,
  46:25
**notices** [1] - 12:14
**novel** [4] - 7:10, 11:8,
  62:7, 95:12
**null** [2] - 44:6, 97:16
**number** [16] - 6:16,
  7:5, 7:18, 11:15,
  21:5, 21:10, 41:25,
  42:1, 63:7, 69:21,
  70:1, 70:7, 72:4,
  74:16, 90:18, 95:13
**numbers** [1] - 72:25
**numerous** [2] - 52:11,
  63:12
**NW** [1] - 1:18

## O

**o'clock** [1] - 97:4
**oath** [1] - 8:4
**objecting** [1] - 23:19
**objection** [1] - 93:4
**obligated** [2] - 9:2,
  21:11
**obligation** [2] - 91:2,
  91:11
**obligations** [2] - 26:6,
  26:7
**obtain** [2] - 19:1,
  39:21
**obviated** [1] - 65:9
**obvious** [1] - 57:24
**obviously** [4] - 42:16,
  60:2, 71:1, 72:10
**occurred** [2] - 5:8,
  80:6
**occurring** [1] - 75:11
**OF** [2] - 1:1, 1:7
**offer** [2] - 21:11, 96:6
**office** [1] - 57:5
**Office** [1] - 3:4
**officer** [1] - 12:22
**officers** [5] - 25:15,
  27:1, 29:1, 42:21,
  42:23
**offices** [1] - 13:3
**official** [4] - 34:22,

36:3, 36:10, 97:22
**Official** [1] - 1:22
**officials** [3] - 3:2,
  45:9, 96:16
**officials'** [1] - 3:18
**officio** [3] - 3:3, 12:20,
  48:22
**old** [1] - 46:11
**on-and-off** [1] - 55:22
**on-site** [1] - 36:14
**One** [1] - 1:12
**one** [45] - 3:16, 4:4,
  5:5, 5:23, 6:1, 7:8,
  11:24, 13:13, 15:12,
  15:15, 17:14, 21:19,
  24:11, 24:14, 29:7,
  38:10, 39:12, 41:14,
  41:25, 45:3, 45:14,
  46:6, 46:14, 53:1,
  53:9, 55:21, 60:5,
  64:15, 65:10, 71:25,
  73:14, 75:25, 76:11,
  77:12, 78:16, 83:5,
  84:24, 85:16, 86:11,
  86:13, 87:1, 87:16,
  89:1
**one-time** [1] - 77:12
**ones** [1] - 4:20
**ongoing** [1] - 29:17
**open** [1] - 30:11
**operate** [4] - 91:21,
  91:22, 91:23, 92:3
**operated** [1] - 77:24
**operating** [6] - 10:1,
  12:11, 60:14, 60:23,
  77:3, 78:2
**operations** [1] - 50:5
**opinion** [1] - 45:24
**opinions** [1] - 84:13
**opportunities** [1] -
  8:22
**opportunity** [11] -
  62:19, 63:24, 79:6,
  79:14, 79:16, 79:18,
  92:16, 93:1, 93:4,
  93:6, 95:4
**opposed** [3] - 32:8,
  32:10, 75:17
**opposition** [3] - 20:21,
  37:3, 46:18
**order** [34] - 2:21,
  11:23, 18:7, 18:21,
  19:16, 22:23, 26:10,
  26:23, 28:4, 28:25,
  30:24, 31:18, 31:20,
  32:13, 32:23, 33:4,
  37:23, 41:6, 42:19,
  43:9, 43:25, 44:11,
  44:19, 54:22, 57:12,
  67:19, 68:6, 71:5,

71:25, 75:6, 75:7,
  92:19, 92:21
**ordered** [1] - 25:14
**organic** [6] - 4:12,
  9:13, 58:5, 75:23,
  89:5, 89:24
**organization** [8] -
  28:17, 35:25, 39:13,
  56:23, 82:1, 82:2,
  85:10, 93:21
**organizations** [2] -
  64:9, 95:14
**organized** [1] - 9:5
**others'** [1] - 3:18
**otherwise** [3] - 11:12,
  23:18, 38:3
**outcome** [1] - 49:10
**outlined** [1] - 38:21
**outset** [1] - 11:3
**outside** [3] - 8:7,
  25:16, 53:24
**overlap** [1] - 87:21
**overlaps** [1] - 4:1
**overseas** [4] - 40:14,
  79:11, 81:5
**oversight** [1] - 26:5
**owed** [3] - 25:21,
  25:24, 26:9
**own** [8] - 8:19, 9:3,
  10:5, 18:7, 26:20,
  38:11, 50:14, 58:7
**owned** [3] - 11:12,
  12:6, 26:16
**ownership** [1] - 41:10

## P

**p.m** [2] - 47:21, 97:8
**page** [1] - 52:11
**paid** [7] - 19:1, 19:7,
  25:25, 26:1, 42:4,
  71:17, 71:21
**paper** [1] - 75:6
**papers** [4] - 46:17,
  92:14, 94:23, 95:17
**paragraph** [2] - 35:21,
  41:8
**paragraphs** [2] -
  35:15, 39:17
**parents** [1] - 2:17
**part** [13] - 8:13, 15:19,
  15:20, 16:3, 16:5,
  26:5, 26:7, 46:6,
  71:20, 79:19, 92:7,
  94:3
**particular** [9] - 16:12,
  17:25, 28:10, 28:12,
  29:17, 40:2, 40:11,
  55:13, 69:14
**particularized** [1] -

18:18
**particularly** [3] - 27:7, 77:5, 79:11
**parties** [4] - 2:5, 23:13, 49:2, 67:12
**partisan** [1] - 16:25
**partisan-balanced** [1] - 16:25
**partnered** [1] - 82:2
**partnering** [1] - 56:3
**partners** [4] - 3:1, 5:2, 32:1, 39:4
**parts** [1] - 18:3
**party** [2] - 69:12, 97:18
**pass** [2] - 47:14, 82:18
**passport** [1] - 9:23
**pause** [2] - 30:7, 40:23
**pay** [2] - 72:15, 72:17
**paying** [1] - 85:25
**payment** [1] - 25:21
**payments** [2] - 25:19, 26:6
**Peace** [63] - 2:23, 6:14, 6:22, 7:3, 7:16, 8:2, 8:8, 8:12, 8:19, 8:24, 9:8, 9:14, 9:21, 12:5, 15:5, 15:6, 16:20, 19:14, 19:25, 20:8, 21:5, 22:2, 22:6, 27:14, 28:17, 28:22, 34:8, 34:10, 34:17, 35:13, 35:17, 35:19, 36:17, 36:23, 38:9, 38:10, 38:11, 40:7, 45:18, 46:8, 51:25, 55:24, 56:5, 56:13, 58:9, 59:11, 60:1, 60:5, 61:8, 61:10, 61:16, 77:6, 77:9, 78:11, 78:19, 82:3, 83:10, 83:17, 83:19, 84:5, 84:7, 95:19, 95:23
**peace** [12] - 8:10, 8:11, 9:1, 9:10, 12:24, 15:10, 34:9, 34:12, 39:15, 55:11, 56:6, 64:9
**Peace's** [2] - 11:20, 19:22
**peace-building** [2] - 9:10, 15:10
**peaceful** [1] - 28:19
**pending** [1] - 11:3
**people** [31] - 8:10, 15:8, 15:9, 21:10, 22:22, 24:17, 24:22, 25:11, 27:13, 28:6, 28:18, 32:7, 33:10,

38:13, 39:21, 39:24, 40:5, 54:7, 57:2, 57:12, 63:6, 64:7, 64:8, 64:19, 72:20, 73:3, 74:14, 75:19, 79:11, 81:5, 91:23
**people's** [1] - 73:13
**per** [2] - 30:12, 31:5
**perceived** [2] - 34:14, 34:15
**perception** [2] - 35:16, 35:24
**perfectly** [2] - 36:11, 60:20
**perform** [2] - 77:4, 91:17
**performing** [8] - 58:25, 76:20, 83:17, 83:20, 90:1, 90:19, 91:3, 91:6
**perhaps** [6] - 31:6, 33:22, 33:23, 44:3, 49:12, 51:6
**period** [1] - 27:11
**permanent** [1] - 38:2
**permits** [2] - 73:17, 73:19
**permitted** [1] - 93:5
**person** [15] - 12:18, 13:1, 29:21, 32:10, 33:19, 33:21, 35:2, 37:2, 37:18, 37:25, 38:7, 40:13, 78:25, 79:2, 85:21
**personal** [17] - 6:8, 6:10, 6:16, 18:24, 22:9, 27:2, 29:3, 35:3, 35:4, 35:18, 37:15, 79:21, 80:5, 80:8, 80:25, 81:1, 82:4
**personally** [1] - 81:6
**Personnel** [1] - 3:4
**personnel** [5] - 4:23, 12:12, 13:10, 21:6, 23:17
**perspective** [1] - 64:3
**persuasive** [2] - 38:5, 84:12
**pertaining** [4] - 31:25, 32:24, 39:3, 40:13
**pertinent** [1] - 11:14
**petard** [1] - 50:14
**PFLAG** [1] - 25:3
**phase** [8] - 17:19, 19:15, 19:16, 24:20, 25:9, 25:10, 95:6
**phone** [2] - 32:21, 32:22
**photocopied** [1] -

97:17
**phrase** [1] - 56:21
**physical** [3] - 26:20, 37:15, 45:2
**piece** [1] - 84:5
**Pippenger** [4] - 2:3, 20:2, 24:15, 92:9
**PIPPENGER** [1] - 1:3
**place** [5] - 19:23, 38:8, 42:3, 60:13, 85:14
**placed** [1] - 23:17
**places** [3] - 9:22, 33:10, 36:19
**plain** [1] - 65:16
**plainly** [2] - 45:4, 58:11
**plaintiff** [14] - 5:19, 18:10, 18:19, 24:14, 26:15, 28:15, 35:9, 39:5, 73:11, 74:21, 80:10, 83:6, 83:22, 97:1
**Plaintiff** [1] - 92:9
**plaintiffs** [70] - 2:10, 2:23, 3:9, 3:25, 4:11, 4:17, 4:18, 5:12, 5:14, 6:2, 7:5, 7:18, 7:22, 13:11, 13:15, 13:20, 14:10, 14:12, 18:1, 18:12, 18:23, 19:4, 19:19, 22:11, 22:12, 23:13, 23:22, 24:4, 25:10, 26:5, 28:10, 31:23, 33:19, 36:18, 39:12, 42:2, 42:9, 45:1, 48:15, 62:17, 64:16, 65:10, 66:16, 67:16, 68:5, 70:17, 70:19, 70:25, 74:11, 75:2, 75:13, 75:16, 76:7, 76:12, 76:14, 78:17, 78:18, 79:23, 80:1, 80:22, 85:4, 85:17, 86:6, 86:9, 89:2, 91:13, 92:5, 92:7, 92:15, 92:18
**Plaintiffs** [1] - 1:3
**PLAINTIFFS** [1] - 1:10
**plaintiffs'** [18] - 2:7, 5:15, 5:17, 5:18, 11:15, 13:7, 15:14, 18:5, 23:15, 32:15, 44:24, 48:15, 54:13, 64:3, 71:15, 73:2, 78:12, 90:22
**plan** [2] - 20:16, 43:17
**plans** [1] - 21:4
**Plaza** [1] - 1:12
**plead** [1] - 51:22

**poet** [1] - 94:5
**point** [17] - 12:13, 23:4, 24:12, 28:24, 28:25, 36:21, 49:15, 55:9, 59:3, 73:7, 74:21, 75:3, 75:14, 89:11, 89:15, 90:16, 95:22
**pointed** [1] - 15:18
**pointing** [1] - 84:1
**points** [2] - 93:11, 93:25
**policies** [3] - 19:23, 38:12, 38:14
**policy** [1] - 73:14
**portion** [3] - 28:12, 29:5, 68:3
**poses** [1] - 33:9
**position** [18] - 13:7, 15:15, 16:3, 16:14, 20:10, 21:12, 22:22, 27:15, 50:12, 52:20, 64:18, 70:14, 71:13, 82:13, 82:16, 83:8, 83:16
**Positions** [1] - 16:13
**post** [6] - 34:18, 34:23, 34:24, 62:17, 66:17, 67:16
**Post** [3] - 46:15, 46:25, 47:11
**posted** [2] - 34:20, 68:5
**posting** [2] - 33:6, 39:24
**posts** [1] - 61:15
**posture** [2] - 13:17, 52:14
**potato** [1] - 82:18
**potential** [1] - 67:17
**potentially** [1] - 40:3
**power** [10] - 15:7, 16:9, 16:10, 64:13, 88:10, 88:13, 88:19, 88:23, 93:21
**powerful** [1] - 7:24
**powers** [5] - 4:14, 38:20, 43:14, 52:5, 71:7
**practice** [2] - 9:18, 32:15
**precedent** [2] - 31:11, 60:6
**precise** [2] - 54:5, 74:16
**precisely** [2] - 40:15, 72:20
**preclude** [1] - 60:11
**precluded** [1] - 63:1
**predicated** [2] - 28:20,

37:16
**predominantly** [1] - 12:8
**preference** [2] - 52:12, 52:13
**preliminary** [11] - 17:19, 19:15, 19:16, 23:12, 25:9, 66:22, 66:23, 67:18, 71:5, 72:8, 73:18
**premise** [2] - 83:19, 84:7, 84:9
**premised** [1] - 39:19
**premises** [1] - 4:4
**prepared** [6] - 42:13, 73:1, 89:14, 89:16, 89:21, 93:18
**prerogative** [2] - 10:5
**presentation** [1] - 62:3
**presenting** [2] - 11:9, 62:7
**preserve** [1] - 85:7
**preserving** [1] - 56:21
**presidency** [1] - 71:11
**president** [13] - 3:13, 5:10, 12:19, 19:13, 33:24, 43:20, 48:23, 49:16, 50:9, 50:13, 59:19, 79:8
**President** [15] - 3:3, 8:5, 16:9, 17:1, 17:4, 17:12, 17:14, 58:25, 61:13, 67:10, 71:13, 76:21, 93:19, 93:20, 94:5
**President's** [1] - 71:7
**press** [1] - 61:13
**presumably** [1] - 42:3
**pretty** [3] - 43:22, 91:18, 95:2
**prevent** [1] - 65:16
**previously** [4] - 4:2, 27:16, 78:5, 92:19
**printed** [1] - 46:22
**prioritizing** [1] - 54:14
**prison** [1] - 64:7
**privacy** [4] - 20:7, 27:22, 28:6
**Privacy** [6] - 37:6, 37:13, 37:17, 79:4, 81:15
**private** [2] - 12:7, 61:9
**privately** [1] - 26:16
**privilege** [1] - 65:6
**privileged** [1] - 68:16
**problem** [2] - 37:8, 56:12
**problematic** [2] - 34:15, 34:25

12

**Procedure** [12] - 4:7, 43:13, 62:15, 64:1, 66:19, 67:15, 68:2, 68:6, 69:11, 70:22, 73:17, 73:20
**Procedures** [1] - 44:13
**proceeding** [1] - 97:8
**Proceedings** [1] - 1:24
**proceedings** [1] - 97:14
**produced** [1] - 1:24
**product** [1] - 97:3
**program** [9] - 3:1, 32:1, 39:4, 55:13, 77:17, 91:13, 91:15, 91:17, 92:8
**Program** [2] - 54:25, 55:4
**programmatic** [6] - 53:13, 53:21, 54:10, 54:20, 55:17, 56:3
**programs** [1] - 39:22
**prohibit** [2] - 25:21, 33:5
**prohibiting** [3] - 4:22, 4:25, 81:17
**prohibits** [1] - 93:13
**project** [3] - 54:3, 54:4, 82:2
**promote** [1] - 60:3
**promulgates** [2] - 38:12, 38:14
**prong** [1] - 77:15
**proof** [2] - 79:23, 80:18
**proper** [3] - 12:21, 70:25, 88:24
**properly** [1] - 3:22
**property** [5] - 3:19, 4:9, 26:20, 45:2, 84:4
**proposal** [1] - 41:3
**propose** [1] - 71:14
**proposed** [11] - 18:21, 28:4, 30:24, 31:10, 31:18, 33:4, 42:19, 43:9, 54:22, 92:18, 92:21
**protect** [2] - 16:11, 28:5
**protected** [4] - 37:5, 37:6, 79:4, 81:15
**protection** [3] - 27:15, 36:5, 38:3
**protections** [1] - 4:6
**protects** [2] - 16:14, 17:9
**provide** [3] - 23:22,

73:1, 77:10
**provided** [5] - 23:15, 24:16, 28:21, 83:9, 95:22
**provision** [5] - 29:17, 39:1, 40:11, 77:7, 78:11
**provisions** [1] - 57:22
**PSC** [7] - 6:2, 6:12, 6:13, 28:11, 29:14, 29:17, 39:6
**PSCs** [8] - 22:12, 23:21, 28:13, 31:1, 32:1, 32:2, 32:7, 39:4
**pseudonymity** [2] - 24:7, 65:7
**pseudonymous** [2] - 65:3, 65:10
**PSK** [1] - 6:11
**public** [5] - 59:8, 61:6, 70:16, 77:17, 77:20
**publication** [1] - 4:25
**publicly** [1] - 37:8
**published** [3] - 47:21, 68:15, 68:19
**publishing** [3] - 31:24, 39:2, 40:12
**pull** [1] - 74:23
**purely** [1] - 82:14
**purported** [3] - 19:13, 55:12, 64:16
**purpose** [11] - 4:24, 19:10, 37:1, 52:24, 63:23, 63:24, 64:4, 87:20, 87:24, 88:3, 96:21
**purposes** [5] - 13:23, 54:16, 73:14, 84:21, 90:11
**pursuant** [5] - 32:5, 32:6, 32:23, 66:18, 68:6
**pursue** [1] - 64:21
**put** [18] - 16:11, 19:7, 22:19, 24:23, 26:11, 36:9, 42:4, 42:24, 43:7, 69:21, 70:1, 70:20, 71:3, 71:4, 72:3, 77:17, 90:24, 97:2
**putting** [6] - 16:1, 22:22, 71:20, 72:10, 79:2, 79:7

**Q**

**quacks** [1] - 84:14
**qualify** [1] - 85:12
**questions** [5] - 7:8,

66:1, 66:2, 66:3, 69:4
**quick** [3] - 31:15, 31:16, 41:5
**quieter** [1] - 83:13
**Quinlan** [1] - 20:2
**quote** [1] - 80:15
**quoting** [1] - 55:2

**R**

**Rachael** [1] - 2:11
**RACHAEL** [1] - 1:11
**raise** [2] - 16:18, 80:24
**raised** [1] - 93:11
**raising** [1] - 33:23
**ran** [1] - 11:23
**Randolph** [2] - 54:25, 55:4
**randomly** [1] - 3:23
**rare** [1] - 62:5
**rather** [3] - 37:25, 71:24, 83:21
**re** [3] - 92:21, 93:5
**re-file** [3] - 92:21, 93:5
**reach** [5] - 17:18, 25:25, 57:13, 57:15, 90:7
**reached** [1] - 53:2
**reaches** [1] - 36:25
**reaction** [1] - 37:10
**read** [3] - 46:18, 47:14, 68:14
**reading** [3] - 27:24, 46:17, 54:25
**reads** [2] - 17:6, 33:2
**real** [4] - 7:20, 26:11, 41:22, 42:7
**really** [11] - 28:5, 31:12, 33:11, 44:12, 47:18, 49:22, 53:13, 54:5, 55:19, 56:8, 96:17
**reason** [4] - 14:24, 27:4, 37:11, 95:7
**reasonable** [2] - 19:24, 31:2
**reasonably** [1] - 50:18
**reasoned** [1] - 11:25
**reasons** [5] - 34:25, 42:16, 63:7, 65:20, 86:10
**receive** [1] - 94:13
**received** [2] - 12:13, 47:8
**receives** [1] - 12:7
**receiving** [1] - 4:24
**recent** [1] - 62:13
**recently** [4] - 31:12,

64:18, 74:8, 74:9
**recitation** [1] - 5:24
**reconcile** [1] - 24:15
**record** [19] - 2:6, 11:18, 12:7, 17:6, 17:9, 23:16, 24:24, 36:7, 59:15, 59:23, 65:2, 75:10, 76:13, 80:2, 80:11, 80:13, 80:18, 81:18, 92:22
**record-based** [1] - 75:10
**Records** [1] - 53:1
**Red** [4] - 10:15, 94:16, 94:24, 95:20
**redress** [2] - 18:14, 65:17
**redressability** [4] - 18:4, 18:12, 18:15, 18:22
**reduce** [2] - 21:5, 89:23
**reducing** [1] - 90:7
**reemploy** [1] - 72:15
**reengage** [1] - 72:16
**refer** [1] - 6:6
**reference** [1] - 32:17
**references** [1] - 88:4
**referred** [1] - 33:19
**refers** [1] - 32:7
**refuse** [1] - 53:20
**regrettably** [1] - 51:22
**regulate** [1] - 15:6
**regulated** [1] - 15:5
**reinstate** [2] - 42:14, 42:25
**reinstatement** [1] - 4:21
**relate** [1] - 66:12
**related** [4] - 3:16, 3:20, 3:21, 3:22
**relates** [1] - 45:5
**Relations** [1] - 10:3
**relations** [2] - 10:8, 40:6
**relationships** [1] - 95:15
**released** [3] - 81:22, 81:24, 82:5
**relevant** [2] - 35:12, 93:14
**reliance** [1] - 57:21
**relief** [46] - 2:24, 3:25, 4:1, 4:4, 4:7, 4:18, 11:14, 18:13, 18:16, 22:13, 22:25, 23:14, 23:22, 24:20, 25:10, 27:17, 28:3, 37:23, 39:5, 40:17, 40:23, 42:19, 43:1, 52:3,

54:22, 57:8, 57:23, 62:10, 62:15, 62:17, 63:1, 65:15, 66:17, 66:22, 66:23, 69:18, 69:25, 71:20, 72:8, 72:11, 73:11, 73:18, 92:19, 96:7
**remain** [3] - 12:21, 28:22, 39:22
**remaining** [1] - 13:10
**remediate** [1] - 60:8
**remedies** [1] - 31:10
**remedy** [2] - 24:13, 42:8, 42:12
**removal** [15] - 3:11, 5:9, 13:8, 13:17, 14:6, 16:10, 17:12, 43:11, 43:16, 54:18, 54:19, 88:10, 88:23, 93:21
**removed** [1] - 4:19
**removing** [1] - 36:22
**rendered** [1] - 70:16
**renewed** [2] - 77:12, 77:13
**repeat** [1] - 11:6
**repercussions** [1] - 95:13
**reported** [2] - 1:24, 47:10
**reporter** [2] - 17:2, 17:6
**Reporter** [3] - 1:22, 1:22, 97:22
**repository** [2] - 9:10, 60:4
**represent** [5] - 64:7, 64:8, 67:5, 72:19
**representations** [1] - 82:7
**representatives** [2] - 10:2, 61:7
**represented** [1] - 35:25
**representing** [1] - 22:11
**reputational** [1] - 64:12
**request** [15] - 22:8, 37:1, 39:5, 41:1, 42:5, 42:18, 44:12, 44:21, 57:13, 66:16, 66:20, 67:14, 73:16, 73:22
**requested** [7] - 11:14, 18:13, 26:25, 40:23, 54:22, 57:8, 69:18
**requesting** [3] - 4:18, 25:14, 67:13
**requests** [2] - 54:7,

54:8
**require** [4] - 9:13, 53:16, 66:16, 67:16
**required** [10] - 44:2, 44:4, 58:4, 58:16, 69:11, 70:12, 70:13, 70:15, 77:16, 91:25
**requirement** [6] - 63:25, 65:13, 75:15, 77:2, 77:8, 78:2
**requirements** [3] - 3:12, 21:25, 23:20
**requires** [2] - 20:16, 34:8
**research** [4] - 8:10, 9:10, 12:24, 60:3
**reserve** [2] - 42:17, 97:5
**resolve** [2] - 8:11, 46:3
**resolved** [1] - 54:17
**resolving** [1] - 13:22
**resources** [1] - 75:4
**respect** [2] - 30:19, 77:6
**respectively** [1] - 88:5
**respond** [7] - 8:20, 62:19, 66:5, 92:16, 93:1, 93:6, 93:7
**responding** [2] - 29:5, 91:8
**response** [9] - 26:2, 33:17, 54:13, 54:20, 68:4, 78:24, 79:8, 92:25, 97:5
**responses** [2] - 67:2, 93:10
**responsibility** [2] - 53:7, 92:10
**responsible** [6] - 40:6, 48:16, 48:21, 48:23, 50:17, 92:8
**restore** [2] - 18:24, 22:9
**restoring** [1] - 4:24
**restrained** [1] - 69:13
**restraining** [4] - 2:21, 19:16, 67:18, 71:5
**result** [2] - 35:21, 38:23
**retaliation** [1] - 24:2
**returning** [1] - 12:10
**revealing** [1] - 37:8
**reveals** [1] - 64:17
**review** [3] - 53:15, 53:20, 54:11
**reviewed** [1] - 18:5
**rhetoric** [1] - 59:10
**rights** [3] - 64:6, 64:11, 65:17
**rises** [2] - 7:1, 7:9

**rising** [1] - 7:6
**risk** [6] - 24:2, 36:20, 37:12, 64:12, 79:2
**robust** [1] - 10:11
**rock** [1] - 85:14
**Rockefeller** [1] - 1:12
**roles** [2] - 19:1, 90:8
**room** [1] - 14:23
**route** [1] - 64:21
**routes** [1] - 13:14
**RPR** [3] - 1:22, 97:11, 97:22
**Rule** [10] - 62:15, 63:25, 66:18, 67:15, 68:2, 68:5, 69:10, 70:22, 71:10, 73:16
**rule** [2] - 13:17, 67:12
**Rules** [1] - 73:20
**rules** [1] - 24:21
**ruling** [3] - 31:9, 43:16, 97:6
**running** [2] - 53:18, 55:25
**Russia** [2] - 28:19, 39:14

## S

**safe** [2] - 35:6, 36:11
**safeguards** [1] - 16:11
**safety** [8] - 35:3, 35:4, 35:18, 37:15, 80:5, 80:9, 80:25, 81:1
**salaries** [2] - 63:5, 71:16, 73:4
**salary** [1] - 85:25
**saliently** [1] - 92:2
**Sam** [3] - 2:14, 69:1, 82:19
**SAM** [1] - 1:16
**sam.escher@usdoj.gov** [1] - 1:20
**sanctioned** [1] - 23:18
**Sasha** [3] - 2:3, 20:2, 24:14
**SASHA** [1] - 1:3
**satisfactory** [1] - 83:4
**satisfy** [1] - 18:3
**saw** [1] - 25:23
**scenario** [1] - 17:16
**scope** [3] - 33:12, 44:11, 44:18
**Scouts** [4] - 94:6, 94:17, 94:24, 95:21
**screenshot** [1] - 34:23
**scrutiny** [1] - 33:22
**SDNY** [1] - 63:3
**second** [7] - 21:1, 25:3, 33:13, 46:14, 51:15, 60:6, 93:16

**seconds** [1] - 41:20
**secret** [2] - 35:11, 81:19
**Secretary** [2] - 8:6, 8:17
**secretary** [1] - 61:13
**secure** [1] - 62:4
**security** [20] - 9:23, 10:6, 20:6, 27:16, 28:7, 35:5, 46:11, 62:14, 62:18, 62:22, 63:5, 63:25, 64:3, 66:17, 66:18, 67:16, 68:4, 69:10, 70:11, 79:21
**see** [11] - 9:18, 18:8, 21:13, 47:19, 69:22, 77:8, 81:15, 83:4, 85:15, 92:22, 97:6
**seeing** [1] - 42:7
**seek** [4] - 2:24, 26:10, 64:10, 65:15
**seeking** [13] - 4:1, 26:8, 27:18, 28:3, 37:23, 39:1, 40:17, 45:15, 47:12, 62:6, 65:14, 65:17, 66:23
**seeks** [3] - 4:7, 4:21, 73:11
**seize** [2] - 4:9, 4:10
**seizing** [1] - 96:14
**sell** [1] - 4:10
**send** [1] - 31:16
**SENIOR** [1] - 1:8
**sense** [1] - 42:12
**sensitive** [4] - 34:10, 81:21, 81:24, 82:8
**sent** [1] - 3:5
**separate** [2] - 3:15, 77:23
**separation** [4] - 4:14, 38:20, 43:13, 52:5
**sequential** [2] - 12:2
**sequitur** [1] - 77:3
**series** [2] - 38:17, 45:2
**serious** [6] - 28:6, 71:6, 71:8, 80:6, 80:7, 95:9
**serve** [1] - 60:3
**service** [5] - 22:9, 27:2, 29:3, 70:16, 73:23
**Service** [5] - 1:5, 2:4, 34:21, 34:22, 39:23
**Services** [2] - 10:18, 41:9
**services** [4] - 6:8, 6:10, 6:16, 18:24
**serving** [1] - 9:8
**set** [7] - 2:23, 3:17,

55:17, 57:1, 58:18, 61:8, 75:22
**seven** [1] - 22:12
**several** [4] - 3:2, 74:6, 95:18, 96:7
**shall** [2] - 41:10, 97:16
**shared** [3] - 8:24, 36:16, 46:23
**shareholder** [1] - 15:2
**shareholders** [3] - 14:5, 14:13, 14:15
**sheet** [7] - 67:10, 67:20, 67:22, 68:13, 68:14, 68:19
**shifted** [1] - 69:19
**shocking** [1] - 6:21
**short** [4] - 4:20, 66:8, 66:10, 72:17
**shorthand** [1] - 1:24
**show** [12] - 14:8, 17:17, 46:11, 48:3, 59:6, 59:16, 62:21, 76:2, 76:9, 79:23, 80:10, 91:7
**showing** [4] - 72:9, 81:12, 82:9, 84:1
**shown** [1] - 84:6
**shrinking** [1] - 21:24
**shrinks** [1] - 21:10
**shut** [8] - 4:11, 59:14, 60:1, 77:21, 88:19, 89:9, 89:12, 89:15
**shutdown** [2] - 36:4, 61:23
**shutter** [1] - 21:5
**shutting** [4] - 36:22, 60:19, 60:24, 89:3
**side** [1] - 45:25
**sides** [1] - 11:9
**sign** [1] - 24:5
**signaled** [1] - 42:18
**signatory** [1] - 97:18
**signature** [1] - 32:14
**signed** [2] - 67:11, 76:21
**significant** [3] - 24:2, 40:23, 96:20
**similar** [4] - 23:7, 23:24, 25:8, 35:9
**similarly** [5] - 13:11, 14:7, 24:18, 25:11, 30:25
**simple** [3] - 15:18, 93:2, 96:9
**simply** [2] - 80:18, 85:13
**single** [6] - 12:16, 12:17, 57:12, 61:18, 79:24, 81:13
**single-digit** [2] -

12:16, 12:17
**sit** [2] - 49:5, 84:10
**site** [1] - 36:14
**sitting** [1] - 57:4
**situated** [4] - 14:7, 24:18, 25:11, 30:25
**situation** [11] - 22:17, 33:16, 39:23, 46:3, 49:4, 61:17, 63:8, 80:6, 80:8, 80:15, 85:4
**situations** [2] - 5:17, 8:16
**size** [1] - 21:18
**skeleton** [2] - 12:11, 46:12
**slightly** [1] - 96:1
**slippery** [3] - 49:19, 51:5, 86:4
**slow** [1] - 17:8
**small** [1] - 5:23
**smell** [1] - 15:23
**society** [8] - 8:13, 8:22, 10:11, 10:16, 45:5, 45:12, 94:2, 94:3
**soft** [1] - 88:13
**solely** [1] - 35:21
**someone** [5] - 8:3, 9:7, 35:12, 36:14, 80:8
**sometimes** [1] - 34:11
**somewhat** [2] - 4:1, 37:4
**somewhere** [1] - 94:17
**sophisticated** [1] - 20:16
**sorry** [6] - 6:8, 23:9, 46:18, 66:9, 68:7, 74:25
**sort** [26] - 12:23, 15:7, 18:2, 25:8, 29:23, 33:8, 51:15, 52:8, 53:16, 53:25, 55:17, 65:15, 68:11, 68:12, 69:19, 77:8, 80:4, 80:19, 80:20, 80:21, 80:23, 81:18, 83:18, 85:13, 86:1
**Sought** [2] - 47:3, 47:22
**sought** [4] - 4:2, 17:24, 18:16, 30:23
**specific** [19] - 30:22, 31:17, 32:8, 40:15, 40:19, 53:14, 54:2, 69:21, 70:7, 74:21, 75:3, 75:14, 75:22, 76:10, 76:20, 78:17,

14

91:2, 91:21, 91:22

**specifically** [5] -
33:16, 39:16, 56:13,
67:7, 95:20

**speed** [1] - 79:9

**spend** [2] - 34:16,
34:17

**spent** [1] - 36:18

**spot** [1] - 94:17

**squarely** [3] - 87:24,
88:14, 96:10

**staff** [14] - 11:16,
12:11, 12:23, 54:16,
55:14, 56:1, 56:2,
56:7, 74:19, 75:4,
76:16, 79:8, 91:14,
91:16

**stage** [4] - 76:6, 76:7,
79:23, 90:22

**stand** [4] - 6:6, 12:25,
64:13, 69:4

**standard** [2] - 18:2,
19:17

**standing** [9] - 12:18,
13:20, 14:5, 15:1,
15:12, 16:18, 17:23,
18:2, 18:11

**stands** [1] - 70:10

**start** [7] - 2:7, 4:15,
5:4, 5:14, 5:15,
18:21, 66:14

**started** [4] - 38:17,
39:8, 39:24, 63:10

**starting** [3] - 4:17,
11:22, 73:7

**starts** [1] - 8:3

**State** [7] - 8:6, 8:17,
9:15, 36:11, 58:10,
94:18, 94:20

**statement** [2] - 43:22,
86:19

**statements** [6] -
54:10, 59:8, 59:10,
61:6, 61:12, 61:14

**states** [1] - 30:6

**STATES** [2] - 1:1, 1:8

**States** [8] - 1:17, 8:5,
9:23, 45:4, 61:13,
64:14, 64:25, 83:17

**status** [6] - 4:24, 6:18,
19:1, 19:7, 74:12,
88:8

**statute** [15] - 4:12, 8:9,
9:13, 11:11, 12:21,
58:5, 59:2, 74:22,
77:11, 88:13, 89:5,
89:24, 90:3, 90:4,
93:14

**statutes** [2] - 52:24,
75:23

**statutorily** [3] - 58:16,
91:18, 93:22

**statutory** [28] - 3:12,
4:6, 4:13, 7:11, 19:9,
19:12, 44:2, 52:3,
56:22, 57:18, 74:20,
74:21, 75:3, 75:8,
75:14, 76:10, 76:20,
77:1, 77:4, 77:5,
77:7, 78:13, 78:16,
90:6, 90:18, 91:2,
91:7, 91:11

**stayed** [2] - 30:2,
30:10

**staying** [1] - 36:11

**steep** [1] - 92:19

**stem** [1] - 19:18

**stenographic** [1] -
97:13

**step** [1] - 53:17

**stick** [1] - 38:1

**sticking** [1] - 95:3

**still** [19] - 5:12, 6:2,
6:3, 26:14, 26:17,
28:11, 28:25, 29:7,
29:17, 30:15, 57:2,
57:25, 58:25, 59:18,
59:19, 74:15, 79:1,
86:3

**stinging** [1] - 30:13

**stop** [2] - 27:11, 30:14

**stops** [1] - 4:20

**strategic** [1] - 51:11

**strategically** [1] -
50:11

**streamline** [1] - 50:4

**Street** [1] - 1:18

**strong** [2] - 81:11,
91:18

**strongly** [1] - 52:18

**struck** [2] - 37:4, 87:4

**subject** [3] - 52:21,
54:11, 82:13

**submit** [9] - 24:20,
30:21, 40:25, 46:9,
49:24, 62:4, 65:22,
96:24, 97:5

**submits** [1] - 97:1

**submitted** [1] - 7:24

**submitting** [1] - 92:15

**subsequent** [1] - 13:9

**subsequently** [2] -
35:3, 60:8

**subsidiary** [2] - 10:18,
19:21

**substantial** [1] - 59:6

**succeed** [1] - 13:11

**success** [9] - 16:17,
16:19, 17:17, 26:1,
59:7, 59:16, 59:22,

60:21, 66:4

**sudden** [1] - 35:23

**sued** [2] - 3:7, 64:24

**suffered** [1] - 17:25

**suffering** [1] - 78:18

**sufficient** [1] - 59:15

**sufficiently** [1] - 3:20

**suggested** [1] - 94:1

**suing** [1] - 3:10

**suit** [1] - 30:6

**summary** [15] - 5:11,
7:22, 11:3, 18:7,
43:3, 56:25, 57:7,
58:21, 75:17, 75:25,
76:3, 85:23, 90:13,
91:4, 95:6

**Supp** [1] - 25:6

**supplemental** [1] -
97:6

**support** [4] - 29:3,
35:16, 35:19, 36:3

**supported** [2] - 80:2,
91:9

**supporting** [1] - 40:20

**supports** [1] - 92:24

**suppose** [2] - 32:4,
32:11

**supposed** [5] - 21:3,
44:9, 49:1, 55:7,
57:9

**Supreme** [11] - 16:8,
16:24, 29:23, 30:10,
30:19, 31:5, 31:11,
71:12, 87:6, 87:10,
88:7

**surely** [1] - 20:9

**surprise** [1] - 29:24

**susceptible** [1] - 41:2

**suspicion** [1] - 36:5

**sustained** [1] - 69:12

**swear** [1] - 8:4

**swept** [1] - 61:15

**swims** [1] - 84:14

**switch** [1] - 55:22

**symposia** [1] - 55:5

**systematic** [1] - 20:6

**systems** [1] - 49:25

**T**

**table** [2] - 2:10, 76:1

**tactic** [1] - 73:10

**takeover** [3] - 3:18,
20:5, 45:1

**Taliban** [1] - 33:22

**tank** [1] - 94:21

**target** [3] - 35:23,
36:1, 40:15

**targeted** [1] - 85:17

**task** [4] - 56:20, 60:16,

76:21, 91:19

**tasked** [1] - 89:25

**tasking** [1] - 75:19

**tasks** [7] - 44:2, 44:4,
56:20, 57:6, 58:3,
58:16, 75:22

**teacher** [1] - 30:5

**Team** [2] - 47:3, 47:22

**team** [1] - 61:19

**tech** [4] - 11:16, 33:24,
49:23, 56:9

**techniques** [1] - 9:11

**technological** [1] -
50:4

**temporary** [12] - 2:21,
3:25, 4:2, 19:16,
22:23, 30:3, 43:1,
62:10, 63:1, 66:17,
67:18, 71:5

**term** [3] - 44:1, 53:21,
76:22

**terminal** [1] - 20:14

**terminate** [3] - 27:6,
30:4

**terminated** [21] - 2:25,
3:6, 3:9, 3:13, 12:13,
13:19, 18:25, 21:22,
22:10, 22:14, 22:18,
22:19, 29:18, 32:16,
71:18, 71:21, 71:25,
72:3, 72:20, 73:3,
77:18

**termination** [11] - 3:5,
4:5, 20:4, 27:1,
28:12, 29:2, 29:20,
30:7, 30:14, 38:17,
71:18

**terminations** [2] -
4:23, 18:7

**terms** [5] - 9:24,
18:22, 60:15, 66:15,
94:23

**textual** [1] - 87:10

**thankfully** [1] - 83:21

**THE** [192] - 1:1, 1:8,
2:2, 2:12, 2:16, 2:19,
5:25, 6:5, 6:10, 6:13,
6:19, 7:6, 8:15, 9:13,
10:23, 11:2, 11:6,
11:24, 12:17, 13:6,
13:16, 14:2, 14:12,
14:16, 14:19, 14:21,
15:1, 15:14, 16:5,
17:9, 17:20, 17:22,
20:20, 21:7, 21:16,
21:21, 22:8, 22:17,
23:8, 24:1, 24:25,
25:13, 26:12, 26:24,
27:24, 28:9, 28:25,
29:6, 29:9, 29:11,

29:13, 29:16, 29:20,
29:23, 31:4, 31:9,
31:19, 31:22, 32:12,
33:2, 33:13, 34:20,
37:2, 37:24, 38:25,
39:11, 40:2, 40:11,
40:17, 40:19, 40:22,
41:5, 41:8, 42:20,
43:10, 43:24, 44:15,
44:20, 44:23, 45:19,
45:23, 46:17, 46:21,
47:1, 47:15, 47:18,
48:1, 48:8, 48:10,
48:13, 49:9, 49:12,
50:6, 50:8, 50:21,
51:2, 51:4, 51:10,
52:17, 53:9, 55:15,
56:9, 56:16, 56:19,
57:24, 58:14, 58:18,
59:15, 59:18, 60:14,
60:23, 61:2, 61:11,
62:5, 62:11, 62:24,
63:9, 63:20, 63:23,
65:2, 65:23, 66:5,
66:8, 66:10, 66:14,
67:1, 67:9, 68:8,
68:10, 68:21, 68:23,
69:3, 69:7, 69:22,
70:8, 71:9, 72:19,
72:24, 73:6, 73:9,
73:21, 74:2, 74:8,
74:10, 74:23, 75:12,
75:16, 76:4, 76:14,
77:21, 77:25, 78:6,
78:21, 79:7, 79:15,
81:2, 81:9, 82:12,
82:20, 82:22, 82:25,
83:4, 83:11, 83:13,
83:21, 84:10, 85:3,
85:6, 85:10, 85:16,
86:11, 86:15, 87:4,
88:2, 88:17, 89:1,
89:10, 89:14, 89:21,
90:5, 90:14, 91:12,
92:6, 92:13, 92:25,
93:7, 93:17, 94:8,
94:22, 95:8, 95:11,
97:1

**themselves** [2] -
64:12, 65:11

**then-existing** [1] -
46:7

**theory** [2] - 71:11,
93:20

**therefore** [5] - 13:11,
50:16, 77:4, 84:7,
84:25

**third** [3] - 2:20, 5:22,
33:14

**thread** [1] - 61:3

15

**threat** [3] - 33:9, 33:22, 82:10
**threatened** [1] - 81:1
**threats** [6] - 20:9, 35:3, 80:4, 80:8, 80:14
**three** [7] - 18:3, 41:20, 45:8, 87:1, 87:2, 87:6, 87:16
**tie** [1] - 40:15
**tied** [1] - 77:1
**title** [2] - 47:2, 47:22
**today** [22] - 2:23, 11:4, 26:11, 30:21, 31:7, 31:15, 31:17, 33:4, 41:4, 43:17, 62:8, 67:10, 69:19, 73:1, 73:5, 90:11, 90:12, 91:9, 92:16, 97:2, 97:3
**together** [2] - 68:18, 75:24
**tomorrow** [2] - 21:3, 97:5
**tons** [1] - 58:23
**took** [3] - 41:21, 85:18, 86:2
**top** [1] - 76:4
**topics** [1] - 68:12
**torn** [1] - 45:3
**total** [1] - 11:21
**totally** [2] - 15:16, 15:18
**touch** [1] - 13:6
**toward** [1] - 8:20
**towards** [2] - 2:22, 34:11
**traceability** [1] - 18:13
**train** [1] - 8:10
**training** [7] - 12:25, 30:5, 55:5, 60:3, 77:16, 77:19, 91:17
**trainings** [1] - 13:11
**transaction** [1] - 42:7
**transcript** [4] - 34:23, 97:13, 97:14, 97:17
**TRANSCRIPT** [1] - 1:7
**Transcript** [1] - 1:24
**transcription** [1] - 1:24
**transfer** [5] - 41:10, 41:18, 41:19, 41:21, 41:22
**transferred** [4] - 19:6, 42:1, 63:3, 91:23
**transferring** [6] - 4:22, 25:16, 26:13, 26:14, 84:3, 90:8
**travel** [2] - 9:21
**treasury** [1] - 61:17

**treatment** [1] - 20:16
**Trent** [1] - 3:4
**tried** [2] - 46:2, 96:6
**trivial** [1] - 95:15
**TRO** [29] - 2:24, 24:20, 25:9, 25:20, 26:8, 30:1, 30:6, 30:10, 31:8, 31:10, 63:5, 68:4, 69:22, 73:18, 76:6, 76:7, 78:10, 79:23, 80:9, 82:11, 90:11, 90:22, 91:9, 92:2, 92:18, 92:21, 93:5, 95:12
**troubling** [2] - 34:1, 96:4
**true** [6] - 12:3, 58:11, 58:15, 93:24, 97:12, 97:13
**truly** [1] - 95:24
**Trump** [8] - 2:22, 3:3, 21:21, 25:3, 45:10, 45:25, 67:11, 76:21
**trust** [3] - 28:18, 28:20, 82:5
**try** [2] - 28:19, 39:14
**trying** [8] - 19:4, 19:18, 25:25, 31:12, 80:24, 82:23, 90:6, 91:5
**turn** [3] - 11:13, 60:10, 65:24
**turning** [1] - 60:12
**tweet** [6] - 34:18, 79:24, 79:25, 80:23, 81:13, 81:14
**tweeting** [1] - 39:24
**Tweeting** [1] - 27:11
**tweets** [2] - 61:14, 79:2
**twice** [1] - 95:12
**twist** [1] - 62:12
**two** [12] - 3:15, 5:10, 7:23, 22:4, 24:10, 24:23, 42:1, 52:11, 53:1, 65:10, 86:22, 97:4
**two-page-long** [1] - 52:11
**typically** [2] - 41:18, 67:2

## U

**U.S** [64] - 1:5, 1:17, 2:3, 2:23, 6:14, 6:15, 6:21, 6:22, 7:2, 7:16, 8:2, 8:8, 8:12, 8:19, 8:24, 9:2, 9:7, 9:20, 10:21, 10:22, 11:20,

12:5, 15:4, 15:6, 16:19, 19:13, 19:22, 19:25, 20:8, 21:5, 22:2, 22:6, 25:5, 27:13, 28:16, 28:22, 34:7, 34:10, 34:17, 34:22, 35:13, 35:17, 35:19, 36:17, 36:23, 38:9, 38:10, 38:11, 40:7, 45:17, 46:7, 51:24, 55:24, 56:5, 56:12, 58:9, 59:11, 60:1, 60:5, 61:7, 61:10, 61:16, 95:15, 95:18
**Ukraine** [3] - 28:18, 39:14, 39:25
**Ukrainian** [1] - 29:9
**ultimate** [1] - 17:18
**ultimately** [6] - 13:8, 28:21, 36:24, 49:5, 65:5, 88:11
**ultra** [10] - 38:19, 43:13, 50:1, 51:19, 52:3, 57:19, 60:24, 89:3, 89:17, 96:16
**unable** [1] - 23:13
**unaccountable** [1] - 61:8
**unattached** [1] - 10:12
**unaware** [2] - 74:1, 74:4
**uncarefulness** [1] - 81:12
**under** [31] - 4:7, 8:19, 9:5, 10:1, 10:21, 15:22, 16:8, 17:16, 31:5, 33:21, 44:4, 48:18, 48:20, 49:1, 50:1, 50:16, 50:23, 51:19, 53:4, 53:15, 59:1, 60:9, 62:14, 63:25, 67:15, 68:5, 69:10, 84:24, 87:11, 93:20, 96:21
**undercut** [1] - 26:19
**underlying** [4] - 5:18, 83:18, 84:7, 84:9
**underpinnings** [1] - 7:11
**understood** [7] - 17:21, 40:18, 40:21, 40:24, 46:19, 47:20, 70:9
**undertaking** [1] - 9:15
**underway** [2] - 5:12, 43:3
**unemployed** [1] - 32:17
**unexplained** [1] -

35:24
**unfolds** [1] - 19:3
**unfortunately** [1] - 96:9
**unidentified** [1] - 77:5
**unique** [1] - 58:16
**unitarian** [1] - 71:10
**unitary** [1] - 93:20
**United** [8] - 1:17, 8:5, 9:23, 45:4, 61:13, 64:13, 64:25, 83:16
**UNITED** [2] - 1:1, 1:8
**unlawful** [7] - 4:5, 4:8, 13:9, 13:11, 14:6, 14:9, 38:17
**unlawfully** [1] - 42:13
**unprecedented** [1] - 46:9
**unstable** [1] - 45:3
**up** [22] - 12:25, 16:11, 33:14, 46:11, 46:24, 47:14, 48:14, 56:20, 63:2, 64:13, 67:24, 68:11, 69:4, 69:8, 72:4, 73:24, 74:12, 76:22, 79:9, 83:11
**up-to-date** [1] - 74:12
**upset** [2] - 18:6, 18:10
**USAID** [2] - 23:17, 23:20
**USIP** [12] - 8:3, 8:19, 35:4, 36:3, 45:15, 55:5, 56:13, 57:14, 58:12, 93:12, 93:13, 94:17
**USIP's** [2] - 12:12, 35:23

## V

**valuable** [1] - 18:9
**value** [1] - 10:11
**various** [1] - 94:2
**varying** [1] - 95:14
**Vera** [3] - 47:4, 47:11, 94:12
**versus** [2] - 2:3, 94:25
**via** [1] - 64:8
**view** [7] - 7:15, 10:22, 34:16, 42:25, 52:9, 61:7, 61:23, 65:13, 65:18, 71:6, 73:7, 86:6
**viewing** [1] - 95:18
**views** [2] - 64:20
**vigorous** [1] - 78:12
**vindicate** [1] - 64:11
**violate** [1] - 37:19
**violated** [5] - 36:21, 43:12, 43:13, 57:14,

57:16
**violates** [1] - 4:12
**violating** [2] - 37:13, 37:18
**violation** [6] - 4:6, 19:23, 37:17, 57:18, 60:8, 89:5
**violations** [3] - 38:19, 38:20, 44:13
**vires** [10] - 38:19, 43:13, 50:1, 51:20, 52:3, 57:19, 60:24, 89:3, 89:17, 96:16
**virtue** [1] - 6:18
**vis-à-vis** [1] - 50:18
**vitiate** [1] - 60:9
**vivid** [1] - 44:24
**Voice** [3] - 63:2, 71:15, 71:17
**void** [2] - 44:6, 97:16
**volatile** [1] - 33:10
**vs** [1] - 1:4
**vulnerability** [1] - 36:15
**vulnerable** [3] - 20:10, 27:15, 36:1

## W

**wait** [1] - 95:8
**waited** [2] - 95:9, 95:11
**walk** [1] - 46:6
**Walker** [4] - 2:15, 2:17, 2:18, 66:2
**walker** [3] - 68:8, 90:14, 93:1
**WALKER** [39] - 1:16, 2:18, 68:7, 68:9, 68:11, 68:22, 68:24, 69:6, 69:17, 69:24, 70:20, 72:6, 72:23, 72:25, 73:8, 73:15, 73:24, 74:3, 74:9, 74:16, 74:25, 75:13, 75:25, 76:6, 76:23, 77:23, 78:1, 78:9, 79:5, 79:13, 79:17, 81:6, 81:10, 82:18, 90:16, 91:20, 92:9, 92:17, 93:3
**walks** [1] - 84:14
**war** [2] - 27:12, 45:3
**war-torn** [1] - 45:3
**Ward** [2] - 1:12, 2:9
**warranted** [1] - 72:12
**Washington** [4] - 1:6, 46:15, 46:25, 47:11
**washington** [1] - 1:19
**ways** [3] - 17:14, 94:2,

96:7

**weak** [1] - 61:2
**website** [13] - 60:1, 60:2, 60:10, 60:14, 60:18, 60:25, 76:16, 76:23, 76:24, 77:1, 77:3, 77:21, 78:2
**week** [1] - 29:25
**weeks** [2] - 21:2, 69:16
**whatsoever** [3] - 41:16, 47:6, 77:2
**White** [10] - 3:5, 62:14, 66:21, 67:4, 67:6, 67:7, 67:9, 67:20, 67:25, 68:6
**whole** [3] - 8:14, 53:23, 67:3
**wholesale** [1] - 53:10
**wholly** [1] - 94:13
**win** [1] - 70:19
**wish** [2] - 27:19, 35:20
**wishes** [2] - 24:24, 38:12
**withdraw** [1] - 42:18
**withdrawal** [1] - 35:24
**withdrawn** [1] - 65:12
**WL** [2] - 23:6, 25:4
**wonder** [1] - 49:5
**word** [1] - 20:15
**words** [2] - 18:13, 58:7
**workplace** [1] - 38:15
**works** [7] - 9:7, 9:18, 21:8, 24:16, 39:14, 50:12, 58:20
**world** [2] - 48:4, 72:10
**writing** [1] - 76:1
**written** [1] - 84:12
**wrongfully** [1] - 69:12
**wrongly** [1] - 67:17
**wrote** [3] - 23:11, 56:17, 58:8
**Wyant** [1] - 2:11
**WYANT** [1] - 1:11

## X

**X-post** [1] - 34:18
**X/tweet** [1] - 79:1

## Y

**year** [2] - 82:3
**years** [2] - 36:14, 77:13
**yesterday** [1] - 21:2
**York** [3] - 1:13, 17:5
**yourselves** [1] - 2:6
**youth** [3] - 39:14,

40:2, 40:3

## Z

**zones** [1] - 27:12